**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DC DC

LAWRENCE MAYNARD )
#307469   DC JAIL )
1901 D STREET SE. )
WASHINGTON DC. 20003 )

(Enter your full name, prison number
and address)

v.

Case: 1:07-cv-01192
Assigned To : Robertson, James
Assign. Date : 6/29/2007
Description: Pro Se Gen. Civil

District Court)

KATERINA GELKAS SPECIAL AGENT AND UNKNOWN AGENTS )
U.S. IMMIGRATION AND )
CUSTOMS ENFORCEMENT )
~~ASDFGHJ ~~ ) WASH DC

(Enter the full name and address(es),
if known, of defendant(s) in this
action)

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### Instructions for filing a Complaint by a Prisoner
### Under the Civil Rights Act 42 U.S.C. §1983

This packet contains one copy of a complaint form and one copy of an application to proceed *in forma pauperis.* To start an action, you must file an original and one copy of this complaint form.

Your complaint must be clearly handwritten or typewritten and you must sign and declare under penalty of perjury that the facts are correct. If you need additional space to answer a question, you may use another blank page.

Your complaint can be brought in this Court only if one or more of the named defendants is located within the District of Columbia. Further, you must file a separate complaint for each claim that you have unless they are related to the same incident or problem. The law requires that you state only facts in your complaint.

You must supply a certified copy of your prison trust account, pursuant to the provisions of 28 U.S.C. §1915, effective April 26, 1996. The filing fee is $150.00.. If insufficient funds exist in your prison account at the time of filing your complaint, the court **must** assess, and when funds exist, collect an initial filing fee equal to 20 percent of the greater of:

**RECEIVED**

MAY 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(1)   the average monthly deposits to your prison account, or
(2)   the average monthly balance of your prison account for the prior six-month period.

1

Thereafter, you are required to make monthly payments of 20% of the preceding month's income. The agency having custody over you must forward payments from your account to the clerk of the court each time the amount in the account exceeds $10.00 until the filing fees are paid.

Therefore, before an assessment can be made regarding your ability to pay, you must submit a certified copy of your prison account for the prior six-month period.

When this form is completed, mail it and the copies to the Clerk of United States District Court for the District of Columbia, 333 Constitution Ave., NW, Washington, D.C. 20001.

I.     SUCCESSIVE CLAIMS

Pursuant to the Prison Litigation Reform Act of 1995, unless a prisoner claims to be in "imminent danger of serious physical injury," he or she may not file a civil action or pursue a civil appeal *in forma pauperis* "if the prisoner has, on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or they failed to state a claim upon which relief could be granted."

II.     PREVIOUS LAWSUITS

A.     Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?     Yes ( )     No (X)

B.     Have you begun other lawsuits in state or federal court relating to your imprisonment? Yes ( )     No (X)

C.     If your answer to A or B is Yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.     Parties to this previous lawsuit.

Plaintiffs: _____ N/A _____

Defendants: _____

2.     Court (if federal court, name the district; if state court, name the county)
_____ N/A _____

3.     Docket number_____ N/A _____

4.     Name of judge to whom case was assigned: _____ N/A _____

5.   Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?)_____ *N/A* _____

6.   Approximate date of filing lawsuit:_____ *N/A* _____

7.   Approximate date of disposition:_____ *N/A* _____

## III.   PLACE OF CONFINEMENT

_____

A.   Is there a prisoner grievance procedure in this institution?     Yes ( )     No ( )  *N/A*
     If your answer is Yes, go to Question III B.  If your answer is No, skip Question III B,C
     and D and go to Question III E.

B.   Did you present the facts relating to your complaint in the prisoner grievance procedure?
          Yes ( )     No ( )     *N/A*

C.   If your answer is Yes to Question III B;

     1.   To whom and when did you complain?_____ *N/A* _____

     2.   Did you complain in writing?  (Furnish copy of the complaint you made, if you
          have one.)     Yes ( )     No ( )     *N/A*

     3.   What, if any, response did you receive?  (Furnish copy of response, if in
          writing.) _____ *N/A* _____

     4.   What happened as a result of your complaint?     *N/A*

D.   If your answer is No to Question III B, explain why not.     *N/A*

E.   If there is no prison grievance procedure in the institution, did you complain to prison
     authorities?     Yes ( )     No ( )     *N/A*

F.   If your answer is Yes to Question III E;

1.  To whom and when did you complain?  _N/A_

2.  Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)  _N/A_

3.  What, if any, response did you receive? (Furnish copy of response if in writing)  _N/A_

4.  What happened as a result of your complaint?  _N/A_

## IV.  PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A.  Name of Plaintiff: _LAWRENCE MAYNARD   DC DC #307469_
    Address: _1901 D STREET S.E. WASHINGTON, D.C. 30003_

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B.  Defendant: _KATERINA GEKAS & UNKNOWN AGENTS_ is employed as
    _SPECIAL AGENT_ at _U.S. IMMIGRATION & CUSTOMS_
    Address: _~~UNKNOWN~~, ~~UNKNOWN~~ WASH DC_

    Defendant: _____ is employed as
    _____at _____
    Address: _____

    Defendant: _____ is employed as
    _____at _____
    Address: _____

    Defendant: _____ is employed
    as _____at _____
    Address: _____

APRIL 29, 2007

KATERINA GIKAS AND UNKNOWN AGENTS OF UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENTS

① VIOLATED MY FOURTH AMENDMENT RIGHTS BY SEARCHING 8550 MYRTLE AVE HOME WITHOUT PROBABLE CAUSE ON 2/27/04

② VIOLATED MY FOURTH AMENDMENT RIGHTS BY NOT GIVING NOTICE OF SEARCH OF MYRTLE AVE HOME, AFTER 60 DAY DELAY NOTICE EXPIRED.

③ VIOLATED MY FOURTH AMENDMENT RIGHTS BY AGAIN SEARCHING 8550 MYRTLE AVE HOME WITHOUT A WARRANT ON 2/28/04 *

I AM SEEKING DAMAGES FROM DEFENDANTS K. GIKAS AND UNKNOWN AGENTS OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ON A CLAIM THAT THEY DEPRIVED ME OF LIBERTY WITHOUT DUE PROCESS OF LAW BY USING PERJURED TESTIMONY AGAINST ME, CONCEALING AND FABRICATING CRITICAL EVIDENCE, BY ARRESTING, IM-PRISONING AND PROSECUTING ME WITHOUT PROBABLE CAUSE.

* FOOT NOTE TRANSCRIPT OF TRIAL THURSDAY NOVEMBER 16, 2006 2:12pm KGIKAS TESTIMONY PAGE 23-31

## V.    STATEMENT OF CLAIM

State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include the names of other persons involved, dates and places. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra sheets if necessary.

*SEE ATTACHMENT*

## VI.    RELIEF

State briefly exactly what you want the Court to do for you.

*SEE ATTACHMENT*

Signed this ___24___ day of ___APRIL_____, ___2007___.

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

___4/24/07___
(Date)

_____
(Signature of Plaintiff)

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

F-
07-1192
JR

**I (a) PLAINTIFFS**

*LAWRENCE MAYNARD*

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  *11044*
(EXCEPT IN U.S. PLAINTIFF CASES)

*PRO SE PR*

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*# 307-469*

**DEFENDANTS**

*KATERINA GIKAS, ETAL*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Case: 1:07-cv-01192
Assigned To : Robertson, James
Assign. Date : 6/29/2007
Description: Pro Se Gen. Civil

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
   Plaintiff

☐ 3 Federal Question
   (U.S. Government Not a Party)

● 2 U.S. Government
   Defendant

☐ 4 Diversity
   (Indicate Citizenship of Parties
   in item III)

**III CITIZE.**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency
Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
    Administrative Agency is Involved)

**☐ D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
    defendant
☐ 871 IRS-Third Party 26
    USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
    Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
    Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
    Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
    Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
    Exchange
☐ 875 Customer Challenge 12 USC
    3410
☐ 900 Appeal of fee determination
    under equal access to Justice
☐ 950 Constitutionality of State
    Statutes
☐ 890 Other Statutory Actions (if not
    administrative agency review or
    Privacy Act

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 198

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23  **DEMAND $**  Check YES only if demanded in complaint  **JURY DEMAND:** ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES ☒ NO  If yes, please complete related case form.

DATE 6-28-07  SIGNATURE OF ATTORNEY OF RECORD  NCD

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd



**Page 1**

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

---------------------------x
THE UNITED STATES OF AMERICA  x        Docket No. CR-05386
                vs.           x
                              x        Washington, D.C.
ANTOINE JONES,                x        Wednesday, November 15, 2006
ADRIAN JACKSON,               x        1.42 p.m.
MICHAEL HUGGINS,              x
KEVIN HOLLAND,                x        (Day 12)
Defendants.                   x
                              x        (AFTERNOON SESSION)
---------------------------x


                    TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
            UNITED STATES DISTRICT JUDGE, AND A JURY


APPEARANCES:

For the Government:           JACK GEISE, ESQUIRE
                              RACHEL LIEBER, ESQUIRE
                              Office of the U.S. Attorney
                              555 Fourth Street, N.W.
                              Washington, D.C.  20560
                              (202) 616-9156

For the Defendant Jones:      EDUARDO BALAREZO, ESQUIRE
                              400 Fifth Street, N.W.
                              Suite 300
                              Washington, D.C.  20001
                              lawoffice@balarezo.net
```

**Page 2**

```
APPEARANCES:   (Con't.)

For Defendant Jackson:        JON NORRIS, ESQUIRE
                              641 Indiana Avenue, N.W.
                              2nd Floor
                              Washington, D.C.  20001
                              (202) 842-2695

For Defendant Jackson:        RUDOLPH ACREE, ESQUIRE
                              1211 Connecticut Avenue, N.W.
                              Suite 303
                              Washington, D.C.  20036
                              (202) 331-0739

For Defendant Holland:        BRIAN McDANIEL, ESQUIRE
                              1221 Connecticut Avenue, N.W.
                              Suite 506
                              Washington, D.C.  20036
                              (202) 331-0739

Court Reporter:               ANNIE R. SHAW, RPR
                              United States District Court
                              District of Columbia
                              333 Constitution Avenue, N.W.
                              Room 6830
                              Washington, D.C.  20001
                              (202) 354-3242


Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
```

**Page 3**

P-R-O-C-E-E-D-I-N-G-S

(Afternoon session 1:42 p.m.)

(Jury not present.)

THE COURT: Okay. Miss Griffith has retyped -- or listened to the transcript of the plea and has found that she has transcribed the figure incorrectly. So it would not have been a helpful -- I can't allow the cross-examination given what she has listened to. Anything else before she leaves for her lunch? No? All right. Thank you.

Mr. Acree, have you now completed your cross?

MR. ACREE: I just have a couple more questions, Your Honor.

THE COURT: I thought you had finished.

All right. Something?

MR. BALAREZO: One quick thing, Your Honor.

THE COURT: Yeah, sure.

MR. BALAREZO: Yesterday the government provided to us a set of documents related to the ICE investigation that Agent Gikas was testifying about.

THE COURT: Yes.

MR. BALAREZO: And going through it I noticed that there were four reports which were sequentially numbered one, two, three is not there, and then four and five. And I have asked the government to provide me a copy of number three, and I have been told that it has nothing to do with this matter.

**Page 4**

But I --

THE COURT: This is a report by Gikas?

MR. BALAREZO: By Gikas, right.

THE COURT: Gikas. Well, I -- if it doesn't have -- you mean it has nothing to do with her testimony so there's not Jencks for it, has nothing to do with this case?

MISS LEIBER: It has to do with the back end investigation, in other words, the Texas side of the investigation of this case. I have a copy of it and I'm happy to provide it to the Court.

THE COURT: Sure. We'll get it --

MR. BALAREZO: I will ask the Court to look at it.

THE COURT: Yeah. But I can't do anything with it until I hear what she testifies about. I barely can remember her testimony from before, I just remember the jurors thought she looked like a movie star. Anyway -- all right. Then we should bring in the -- what time did we tell the jury?

THE DEPUTY CLERK: You told them 1:45.

THE COURT: Just check on their numbers. Is that it?

MISS LEIBER: Yes.

THE COURT: All right. I am now being provided this report. But I guess I have -- this is a short two-page report.

MISS LEIBER: Your Honor, I can't imagine that we would get to cross of Special Agent Gikas or through it today, so I don't have a question, I just wanted to give a heads up.

FILED

07 1192  JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**5**

1  on --

2  THE COURT: Right. I won't -- I'm sorry, I won't be

3  able to rule on it anyway until I hear direct, the question of

4  what's relevant to her direct.

5  Is she the next witness?

6  MISS LEIBER: We have two very short witnesses before

7  her.

8  THE COURT: We couldn't work out any stipulation as to

9  the one?

10  MISS LEIBER: That we're actually going to move that

11  in terms of the search warrant of Mr. Adams' house, that's not

12  going to come until next week.

13  THE COURT: I guess I'm a little lost, who cares what

14  you got at his house?

15  MR. GEISE: Well, Your Honor, I think we've all talked

16  about it, and we think this could be one of the ones where the

17  stipulation would actually take longer than the witness,

18  because people just want to put things in context, where they

19  were physically located, and to stipulate to it probably --

20  THE COURT: I'm lost, though. I have to say I can't

21  understand why the government wants to put that in at all,

22  but --

23  MR. GEISE: Well, we don't, but they do, so we'll

24  accommodate everybody.

25  THE COURT: No, no. Why would you even be approaching

**6**

1  the subject? Why is it in your interest to put in what was

2  seized at his house?

3  MR. GEISE: That's a fair point, Your Honor. Let me

4  think about --

5  THE COURT: That's a question you are supposed to ask

6  yourselves.

7  MR. GEISE: Well, now I am. Now I am.

8  THE COURT: Well, okay. I asked him what purpose doe

9  it serve from the government's point of view.

10  MISS LEIBER: It corroborates the wire, Your Honor,

11  that's why. And he testified about it anyway, so --

12  THE COURT: Okay.

13  MISS LEIBER: -- we're not afraid of it.

14  THE COURT: No, but it's cumulative.

15  Okay. Then let's bring in the witness, please.

16  (Jury present 1:53 p.m.)

17  THE COURT: Everybody have a good lunch?

18  THE JURORS: Yes.

19  THE COURT: Then let's go. I hope you don't mind that

20  I got half a doughnut.

21  MR. ACREE: I'm sorry, I waited until the jury came

22  in, but there was one question I wanted to ask if I could ask

23  before --

24  THE COURT: Okay. Sorry, ladies and gentlemen.

25  MR. ACREE: Sorry about that.

**7**

1  (Bench conference.)

2  MR. ACREE: I'm sorry. Yes, Your Honor, I was going

3  to ask whether it's appropriate to ask, because I guess the

4  fact that Mr. Adams had a prior felony and he picked up a --

5  essentially these charges with the firearm, whether I would be

6  permitted to ask him is it fair to say that -- well, you know

7  you had a prior felony and you had a firearm, and is it fair to

8  say that you could have been charged as a felon in possession

9  of a firearm? You know what I mean or --

10  THE COURT: Yeah, I understand what you mean. He was

11  just charged in a one-count conspiracy initially because

12  everybody came in on --

13  MR. ACREE: Yes, that's right.

14  THE COURT: Well, is it old, is that why it hasn't

15  come out --

16  MR. GEISE: Yes.

17  THE COURT: -- about his prior record?

18  MR. ACREE: That's why none of it --

19  THE COURT: Is there any limit of a prior felony for

20  possession with a prior felon?

21  MR. GEISE: Well, for a felon in possession, no, Your

22  Honor.

23  THE COURT: Okay. He's right about it.

24  MR. GEISE: The openly point I would make is, of

25  course, he could not have been charged in this district with

**8**

1  it.

2  THE COURT: He couldn't have been charged in what

3  district with it?

4  MR. GEISE: Here, because it was in Maryland.

5  That's --

6  THE COURT: I don't think that's right. A prior

7  felony is a prior felony.

8  MR. GEISE: Yeah, but you can only charge him with a

9  felon in possession where he was the felon in possession when

10  the gun was found.

11  THE COURT: Oh, yes, but he could have been charged in

12  Maryland with that.

13  MR. GEISE: Yes.

14  THE COURT: I think it's fair to ask him, at least as

15  to the government, he fairly admits this is -- got messed up

16  with the --

17  MR. GEISE: Your Honor, I think if Mr. Acree would ask

18  if he had a prior conviction, the jury already knows he was in

19  jail and he had a prior conviction.

20  THE COURT: Well, he would say, you have a prior

21  felony.

22  MR. ACREE: Right.

23  THE COURT: And you are not going into what it was?

24  MR. ACREE: No, that's fine.

25  THE COURT: But obviously he could be charged with --

**9**

1    MR. ACREE:  Not at all.  Not at all.
2    MR. GEISE:  I don't have any problem with that.
3    THE COURT:  All right.
4    (open court.)
5    BY MR. ACREE:
6    Q.  Just a few more questions, Mr. Adams.  One thing I wanted
7    to ask you now, it's fair to say that at the time that you had
8    that firearm at your house that was recovered on October 24th
9    of 2005, you had been convicted previously of a felony; isn't
10   that right?
11   A.  Yes, sir.
12   Q.  So as a result, it's fair to say that by virtue of your
13   admission of being in possession of that firearm that was
14   recovered from your home on October 24th of 2005, you could
15   also have been charged with a person who had a felony that was
16   in possession of a firearm, could have been charged with that
17   as well; right?
18   A.  Yes, sir.
19   Q.  But you know that no one from -- from law enforcement has
20   charged you with that offense; isn't that right?
21   A.  That's correct, sir.
22   Q.  Now, just a couple of things I wanted to ask you about your
23   meetings where the government was present, either or both of
24   the prosecutors, and Agent Yanta and/or Agent Horne.  Isn't it
25   fair that you -- to say that you told them essentially that you

**10**

1    asked Mr. Jones what half a ticket was, and Jones basically
2    said that he didn't know what that meant, somebody messed up;
3    isn't that one of the things that you told the agents and the
4    prosecutors when you met with them in November of 2005?
5    A.  I could have, yes, sir.  I could have.
6    Q.  Say it again?
7    A.  I could have, yes, sir.
8    Q.  Okay.  Now, just to go back briefly to the photographs for
9    a moment, now, it's fair to say that you looked at a lot of
10   photographs; isn't that right?
11   A.  Yes, sir.
12   Q.  Fair to say like more than ten; isn't that fair to say?
13   A.  Yes, sir, it might be.
14   Q.  And you do recall seeing a photograph of Antoine Jones, as
15   you said; isn't that right?
16   A.  Yes, sir.
17   Q.  And, for example, you specifically said about that
18   photograph that that was an old photograph of Antoine.  That's
19   fair to say; right?
20   A.  Yes, sir.
21   Q.  Because that was something that stuck out to you, the fact
22   that it was an older picture of him; right?
23   A.  Yes, and the way he looked.
24   Q.  And it's also fair to say that there were times when --
25   well, let me ask you this:  One of the things that you claim is

**11**

1    that you went to Mr. Huggins' house; is that right?
2    A.  Yes, sir.
3    Q.  Did you ever have an occasion to see Mr. Huggins' wife or
4    what you believe may have been his wife when you went to his
5    home?
6    A.  No, sir.
7    Q.  Okay.  Now, and just to be clear with regards to the
8    photograph, the photographs themselves, it's fair to say that
9    you never said when looking at any of the photographs that "I'm
10   not sure" -- anything along the lines of "I'm not sure whether
11   I can identify that person or not because that photograph is
12   not clear enough"?  You never said anything like that or
13   anything similar to that back in November to one of these
14   individuals; isn't that fair to say, sir?
15   A.  I could have, I don't remember.
16   Q.  Okay.  In other words, you can't remember specifically
17   saying that, do you?
18   A.  No, sir.
19   MR. ACREE:  Okay.  I think that's all I have, Your
20   Honor.  Thank you.
21   MR. GEISE:  Your Honor, a few questions.
22   REDIRECT EXAMINATION
23   BY MR. GEISE:
24   Q.  Mr. Adams, first of all, good afternoon.
25   A.  Good afternoon, sir.

**12**

1    MR. GEISE:  Good afternoon.
2    THE JURORS:  Good afternoon.
3    BY MR. GEISE:
4    Q.  Now, the first question that the -- I'd like to talk to you
5    about some of the things that Mr. Acree went through with you
6    to begin with.  Just before the break Mr. Acree asked you
7    whether your wife trusted you.
8    A.  Yes, sir.
9    Q.  Do you know, do any of our wives trust us?
10   THE COURT:  How does he know about yours?
11   MR. GEISE:  I'll withdraw the question, Your Honor.
12   BY MR. GEISE:
13   Q.  Do you recall Mr. Acree asked you about whether the name --
14   Mr. Jones ever used the name "Mike" in any of the
15   conversations.  Do you recall that?
16   A.  Yes, sir.
17   MR. GEISE:  Ladies and gentlemen, I'm going to ask you
18   to look at call 4491.  It's at page 104 of the transcripts.
19   THE COURT:  Of Volume I?
20   MR. GEISE:  Of Volume I, yes, ma'am.  Page 104 of the
21   transcripts.  Page 104, Volume I of the transcripts, it's call
22   4491.  It's page 104 of the transcripts --
23   THE COURT:  Just wait for everybody.  It's on
24   October 11th, '05?
25   MR. GEISE:  Yes, ma'am.

13

1      THE COURT: One minute, please. Everybody find it?
2  Who found it first? Okay. Very good. Let's go, you ready,
3  104?
4      MR. GEISE: Yes, ma'am.
5      (CD is played.)
6  BY MR. GEISE:
7  Q.  Now, who is the "Mike" that Antoine Jones is referring to
8  in that conversation?
9  A.  Mr. Huggins.
10     MR. ACREE: Objection, Your Honor. I think he ought
11 to say who does he believe he was referring to.
12     THE COURT: That's true.
13 BY MR. GEISE:
14 Q.  Well, what did you do after the conversation?
15 A.  I went around Mike's house.
16 Q.  And whose house is Mike's house?
17 A.  The gentleman sitting right there.
18 Q.  What did you do when you went around his house?
19 A.  I'm not sure that day whether I gave him my -- gave him
20 drugs or received drugs back from him, I'm not really sure, but
21 it was a drug transaction that was made that day.
22 Q.  Mr. Acree asked you about a conversation you had with
23 Defendant Antoine Jones about half tickets and whatnot. Would
24 you tell the members of the jury when that conversation took
25 place and exactly what the discussion was?

14

1  A.  I can't really remember the conversation right offhand.
2  Q.  Do you remember when it took place?
3  A.  No.
4  Q.  You mentioned in talking with Mr. Acree about those photos
5  that you picked out certain people's photos?
6  A.  Yes, sir.
7  Q.  Prior to seeing those photos, how many times, best of your
8  knowledge, had you seen Antoine Jones face-to-face?
9  A.  Numerous of times.
10 Q.  How often when you were working at the club would you see
11 him?
12 A.  Every day that I was working. I seen him mostly every day.
13 Q.  And how about Lawrence Maynard, how many times had you see
14 him face-to-face before you looked at those photos?
15 A.  A lot.
16 Q.  And how often would you see him when you were at the club?
17 A.  Every day I was there.
18 Q.  And how about Derrick Gordon, how often would you see him?
19 A.  Every day that I was at the club almost.
20 Q.  Was he also employed at the club?
21 A.  Huh?
22 Q.  Was he also employed at the club?
23 A.  Yes, he was.
24 Q.  Now, prior to seeing the photo -- any photos of Michael
25 Huggins, how many times had you seen Mike Huggins face-to-face

15

1  prior to that?
2  A.  Two or three.
3  Q.  Now, Mr. Acree asked you about some of these words that
4  were used, tickets, VIP tickets, words like that.
5  A.  Yes, sir.
6  Q.  And you mentioned that -- you told him that the people who
7  were in the conversations were the ones who would understand
8  it?
9  A.  That's correct.
10     MR. GEISE: Let's look at call 4735, Your Honor. It's
11 in Volume I at page 0036. That's 4735, Volume I, 0036.
12     THE COURT: I'm sorry. Where would that be in this?
13     MR. GEISE: That would be in the first tab, Your
14 Honor, suppliers.
15     THE COURT: Oh, first tab. I'm sorry.
16     MR. GEISE: Yes.
17     THE COURT: Thirty-six. Are you under tab one in
18 Volume I?
19     MR. GEISE: Yes, ma'am.
20     THE COURT: Not you, I'm talking to the jury.
21     MR. GEISE: Oh, sorry.
22     THE COURT: Has everybody found it under the first
23 tab?
24     MR. GEISE: Page 36.
25     THE COURT: 0036, it's an October 13th, '05, call at

16

1  5:25. Find it?
2      MR. BALAREZO: Your Honor, can we approach?
3      THE COURT: Let's approach. Sorry.
4      (Bench conference.)
5      MR. ACREE: I'm just anticipating a little bit. I
6  don't know whether Mr. Geise is about to ask this witness what
7  the -- what were Mr. Jones and Mr. Bermea talking about --
8      THE COURT: No, he can't.
9      MR. ACREE: -- or what they meant.
10     MR. GEISE: Huh-uh.
11     MR. ACREE: Okay.
12     MR. GEISE: No, my question is actually going to be
13 after we play it who are the parties to the call and who would
14 have the best idea what it meant.
15     THE COURT: He can't tell who the parties of the call
16 are.
17     MR. GEISE: True enough.
18     THE COURT: Hasn't this been played before?
19     MR. GEISE: Once, Your Honor, yes.
20     THE COURT: And so what's your question? You can't --
21 you can only --
22     MR. GEISE: The question is the VIPs in the bottom.
23     MR. ACREE: Yeah, but he can't --
24     THE COURT: Well, what do you want to do?
25     MR. GEISE: I just want to reference to the use of the

**17**

1  VIP tickets, the very term that Mr. Acree was asking about.
2  　　　THE COURT:  Well, what are you asking, has Jones ever
3  used the term VIP tickets?
4  　　　MR. GEISE:  Has he ever used it in the context of
5  drugs.
6  　　　THE COURT:  You want him -- it's an odd way to do
7  this.  I mean, this is in evidence.  It's for you to argue it.
8  Why are you putting it in front of him?  He's just reading the
9  document?
10  　　　MR. GEISE:  Well, I just want to reference it at this
11  point in reference to the cross-examination.
12  　　　THE COURT:  But it's already in.
13  　　　MR. GEISE:  Sometimes even though it's already in,
14  Your Honor, you do want to use it again.
15  　　　THE COURT:  Yeah, but you are just doing it -- you're
16  just -- it hasn't --
17  　　　MR. GEISE:  To make a point.
18  　　　THE COURT:  Well, I know you are doing it to make a
19  point, but you are doing it with somebody who has no firsthand
20  knowledge of this particular conversation, so I have to sustain
21  that.
22  　　　All right.  Thank you.
23  　　　(Open court.)
24  　　　THE COURT:  All right.  You can take the stand again.
25  BY MR. GEISE:

**18**

1  Q.  Mr. Adams, I'm going to ask you a couple of questions about
2  some of the things you discussed with Mr. McDaniel late
3  yesterday and earlier today.  Remember which one Mr. McDaniel
4  is, the gentleman here?
5  A.  Okay.  Yes, sir.
6  　　　THE COURT:  You mean the one with the nice suit?
7  　　　MR. GEISE:  Always with the nice suit, Your Honor.
8  BY MR. GEISE:
9  Q.  Do you remember your discussion with Mr. McDaniel about
10  that Million Man March?
11  A.  Yes.
12  Q.  That you talked to Mr. Jones about having Kevin, the
13  promoter's, involvement?
14  A.  Yes.
15  　　　MR. GEISE:  Your Honor, at this time I would like to
16  play call 5177, which is -- there is no transcript of it, Your
17  Honor, but I'm going to --
18  　　　THE COURT:  What's the date of it?
19  　　　MR. GEISE:  I believe it is October 16th, Your Honor.
20  　　　(CD is played.)
21  BY MR. GEISE:
22  Q.  Let's play a little bit more and see if you recognize the
23  voices, Mr. Adams.
24  　　　(CD is played.)
25  　　　THE COURT:  Wait.  Is that finished?

**19**

1  　　　MR. GEISE:  Yeah, that's it, Your Honor.
2  　　　THE COURT:  I mean, can he identify the caller and the
3  speaker?
4  　　　MR. GEISE:  Yes.
5  BY MR. GEISE:
6  Q.  Do you know who is speaking in that?
7  A.  Me and Mr. Jones.
8  Q.  And when Mr. Jones is talking to you about the Sunday paper
9  in the MCI building, what's he talking about?
10  A.  He is talking about the event, the Million Man Movement
11  event that was at the MCI Center.
12  Q.  And what happened about that event?
13  A.  It was a flop.
14  Q.  And who was the person who was running that event?  What
15  did Mr. Jones tell you about the person running the event?
16  A.  That Mr. Holland was one of the promoters, that's it.
17  Q.  Now, at the time, did you know the last name?
18  A.  No, sir.
19  Q.  And how did Mr. Jones reference him?
20  A.  Kevin from Lissen.
21  Q.  Mr. McDaniel asked you something about that proffer in
22  support of detection.  Remember that thick document that --
23  　　　THE COURT:  Do we have a Jones 25?  Okay.
24  　　　MR. GEISE:  Jones 25, a copy of it.
25  　　　THE COURT:  That has only been marked for ID.  Okay.

**20**

1  BY MR. GEISE:
2  Q.  I'll show you what's been marked Jones 25 for
3  identification.  Do you recognize that, sir?
4  A.  Yes, sir.
5  Q.  And you mentioned to Mr. McDaniel that you discussed that
6  with some of your codefendants at the jail?
7  A.  Yes, sir.
8  Q.  What was the discussion you had with them?
9  　　　MR. NORRIS:  Objection, Judge.  Can we approach?
10  　　　THE COURT:  No, it was opened up.  Overruled.
11  BY MR. GEISE:
12  Q.  What was the discussion you had with them at the jail?
13  A.  It was me, Mr. Jones, Mr. Jackson, we were discussing this,
14  saying that --
15  　　　MR. NORRIS:  Objection.  Can we approach, Your Honor
16  　　　THE COURT:  Yes, you can approach.  Can I see the
17  exhibit, please.
18  　　　(Bench conference.)
19  　　　THE COURT:  Everybody was trying to insinuate he
20  learned a whole lot of stuff from this.
21  　　　MR. NORRIS:  Judge, I can tell you I didn't open up
22  any discussions with my client.
23  　　　THE COURT:  It was done at least by two, if not three,
24  of you.  You can't pick and choose at this point in time,
25  that's the problem.  If the notion was left with the jury that

**21**

1  he learned a whole bunch of things that he couldn't have known
2  otherwise except for looking, what's he going to say? Let's
3  hear what he has to say.
4      MR. GEISE:  I believe what he's going to say is -- it
5  also goes to the "half ticket" discussion. I think what he is
6  going to say is he and Antoine Jones -- that he and Antoine
7  Jones were discussing it and he said, "Look" --
8      THE COURT:  Discussing what?
9      MR. GEISE:  The proffer and what was in it.
10     THE COURT:  That 25?
11     MR. GEISE:  The conversations that were in it, and he
12 said, you know, there is no way we can keep claiming
13 basically -- I'm probably putting it more elegantly, no way we
14 can keep claiming that it's just about legitimate stuff.
15 What's a "half ticket"?
16     THE COURT:  Who said this?
17     MR. GEISE:  Adams says this to Jones. And Jones says,
18 "Well, somebody made a mistake."
19     THE COURT:  Somebody made a mistake?
20     MR. GEISE:  In using the term "half ticket." So, I
21 mean, you know, they are all talking about this -- they can --
22 what this proffer means, whether they can get away with the
23 cover story that it's all --
24     THE COURT:  I think you have to be specific about who
25 says what to whom, and so far I got that.

**22**

1      MR. GEISE:  Well, I'll ask him --
2      THE COURT:  It's going to come in.
3      MR. NORRIS:  Well, none of that goes to what he
4  learned from the actual proffer, the discussions are beyond the
5  scope of the proffer.
6      MR. GEISE:  Well, Your Honor, there was also the
7  question about half tickets. Mr. Acree I think asked him about
8  half tickets and his discussion, he actually asked him about
9  the 302 and what he told the agents about half tickets, so that
10 it's not only that they brought a --
11     THE COURT:  What he is saying in the 302 about --
12     MR. GEISE:  Well, he told them about what happened in
13 the jail, that he said to Antoine Jones, "Well, you know, how
14 can" -- basically, what's our story from what a half ticket is.
15     THE COURT:  But what's in the 302?
16     MR. GEISE:  I think that's a --
17     THE COURT:  You said you think he brought up somethin
18 about a 302.
19     MR. GEISE:  There is a bit about it in one of the
20 302s, and I believe it was Mr. Acree who raised it, asked a
21 question about it in the context of the 302 and what did Jones
22 say about half tickets.
23     MR. NORRIS:  None of that, though, is relevant to what
24 was discussed at jail. Judge, it's completely different
25 circumstances.

**23**

1      MR. GEISE:  Well, he had the proffer at the jail, the
2  discussion was what use he made of the proffer, whether he
3  acquired information from the proffer. But the specific
4  reference to "half ticket" --
5      THE COURT:  I'm sorry. How are you going to go about
6  the information -- what's responsive to the issue of what he
7  learned from the proffer or what he didn't learn from the
8  proffer?
9      MR. GEISE:  Well, first of all, what use they made of
10 it as a group. And second, the half ticket specifically.
11     THE COURT:  What use did they make of it? I mean, I
12 don't understand.
13     MR. GEISE:  I mean, I think they discussed it, whether
14 they could get away with the cover story that this was all
15 about tickets, real tickets, legitimate tickets. And then
16 there was also the specific discussion about the half tickets
17 that Mr. Acree asked him about, I can check my notes, but I
18 think it was near the end this morning, and there was a
19 discussion about 302, what he told him about half tickets.
20     THE COURT:  Well, did you ask about half tickets?
21     MR. ACREE:  I think basically what it was, he said he
22 asked Jones what a half ticket was, and Jones said, "I don't
23 know, somebody messed up."
24     THE COURT:  Did you bring that up?
25     MR. ACREE:  Yes. In other words, I asked him is that

**24**

1  what -- did he tell that to the -- to the folks he met with in
2  November, the law enforcement folks he met with in November.
3      MR. NORRIS:  But again, that doesn't open up
4  discussion at the jail.
5      MR. GEISE:  Well, that's where the conversation about
6  the half ticket took place.
7      THE COURT:  Yeah. You can go into what Jones said
8  about the tickets. I don't see any problem with that. But are
9  you going to be -- can I see this for a minute?
10     MR. GEISE:  That's not the proffer, Judge, that's what
11 you just gave him. The proffer's in front of the witness, I
12 think.
13     THE COURT:  Everybody's trying to say that he
14 didn't --
15     MR. GEISE:  That is right.
16     THE COURT:  -- he couldn't know what he knew other
17 than by reading these silly documents, which I doubt very much.
18 I feel as though the whole thing has been opened up. But this
19 conversation may be relevant to a couple of other things.
20     MR. GEISE:  Well, that's right, Your Honor. I mean, I
21 could even go into that conversation without talking about the
22 proffer.
23     THE COURT:  I think so too.
24     MR. GEISE:  I could rephrase the question that way.
25     THE COURT:  But it may be that you are right about

**25**

1  your particular client and this proffer, but it's not going to
2  be true for everybody else.
3      MR. NORRIS:  Well, here's the --
4      THE COURT:  And you're going more into the proffer.
5      MR. GEISE:  I can just rephrase my question to what
6  they discussed, I suppose.
7      MR. BALAREZO:  But, Your Honor, again, with what
8  Mr. Norris said, I attempted to go there and -- but I decided
9  to stop once I was getting objections, I said it's not really
10 worth it. So I didn't open up anything for my client except
11 that --
12     THE COURT:  So I'm going to allow him to repeat what
13 Jones said to him about tickets in there, and then move on.
14     MR. NORRIS:  Judge, here is my problem before moving
15 on, is Mr. Geise -- you know, I should have objected, because I
16 didn't know where he was going on this. I did object when it
17 came to jailhouse discussions. And now it's in front of the
18 jury that this witness had jailhouse discussions with my
19 client. He mentioned three people by name, he clearly said
20 Jackson. That was after I objected, and we couldn't approach
21 the bench at this point, and now it's out there, and --
22     THE COURT:  He's not attributed anything to Jackson;
23 right?
24     MR. GEISE:  I did not go into it on my direct, Your
25 Honor, because it just seemed messier than useful, but now that

**26**

1  it's open -- so I don't --
2      MR. NORRIS:  But he opened it.
3      MR. GEISE:  No, they opened it when they asked him
4  about half tickets and what Jones had told him. So, you know,
5  my best recollection is that is mostly a conversation between
6  him and Antoine Jones, although Mr. Jackson may have chimed in,
7  they were all talking together about --
8      THE COURT:  Well, just ask him to tell us what Jones
9  said.
10     MR. NORRIS:  And then I would like an instruction from
11 the Court striking the part about a discussion with my client.
12     THE COURT:  No. He didn't say anything about your
13 client yet. We'll find out what the discussion is and we'll
14 limit it to Jones. I don't know how in the world you can avoid
15 some of this just because you didn't make inquiry, I mean
16 somebody else opens the door to all this stuff. Some things
17 come in. But we can work it out so that he limits it to,
18 "During this discussion what did Mr. Jones say about tickets?"
19 That's where we'll --
20     MR. NORRIS:  Well, Judge, I think one of the things
21 I'm going to need to do is object and ask to approach when
22 Mr. Geise starts opening these other areas for proffers. I
23 mean, I hate interrupting cross -- or redirect like that, but
24 it was done that way on our crosses and you can see the
25 problems that come out now.

**27**

1      THE COURT:  I don't know where he's going. He is not
2  touching the proffer anymore after this.
3      MR. NORRIS:  There's other areas, you know, so --
4      THE COURT:  You don't know what they are yet.
5      MR. NORRIS:  I'm just giving you a heads-up. If I
6  don't know what they are, I'm going to be up here.
7      THE COURT:  Fine.
8          (Open court.)
9  BY MR. GEISE:
10 Q.  And during this discussion what did Mr. Jones say to you?
11 What was your conversation with Antoine Jones?
12 A.  When we was in D.C. Jail?
13 Q.  Yes.
14 A.  Well, me and him and Mr. Jackson --
15     MR. NORRIS:  Objection, Your Honor.
16     THE COURT:  He just asked you about what did Jones
17 say.
18     THE WITNESS:  Oh, Mr. Jones? I'm sorry. He said --
19 we were discussing, and he said, "Man, they don't have nothing
20 on us. All they got is a bunch of like garble, they don't know
21 what we talking about."
22 BY MR. GEISE:
23 Q.  And then what did you say to him?
24 A.  I said, "Man, what you mean they don't know" -- "they don't
25 got nothing? We got people in here talking about half a

**28**

1  ticket, whole tickets, 26 in the hole." I mean, I asked him
2  "What's a half a ticket?" I even made a mistake one time and
3  said a whole ticket. A whole ticket to me is one kilo of
4  cocaine.
5  Q.  And what was defendant's response at that point?
6      THE COURT:  Jones?
7  BY MR. GEISE:
8  Q.  What was Defendant Jones' response at that time?
9  A.  He didn't say anything.
10     MR. BALAREZO:  Your Honor, I would move to strike th
11 series of questions.
12     THE COURT:  Overruled.
13 BY MR. GEISE:
14 Q.  Now, you mentioned in response to several of the counsels'
15 cross-examination that you met with the government several -- a
16 number of times.
17 A.  Yes.
18 Q.  Were you asked about everything you knew at the first
19 meeting?
20 A.  No, sir.
21 Q.  Did it -- were more and more questions asked as time went
22 on?
23 A.  Yes, sir.
24     THE COURT:  Was the first meeting November 1?
25     THE WITNESS:  It could have been, Your Honor. I don't

29

1  remember the exact date.
2  BY MR. GEISE:
3  Q.  Mr. Balarezo asked you some questions about -- about who
4  you identified to the government as customers.
5  A.  Can you repeat that, sir?
6  Q.  Mr. Balarezo asked you some questions about who you
7  identified to the government as customers.  Do you
8  remember that?
9  A.  Yes, sir.
10  Q.  Did you give full names of your cousins?
11  A.  Yes, sir.
12  Q.  And you identified other people to the best you could?
13  A.  Yes, sir.
14  Q.  Now, do you know what further investigation the government
15  is doing?
16  A.  No, sir.
17  Q.  At one point in talking to Mr. Balarezo, you mentioned
18  something about Carlos, who had owned the club before?
19  A.  Yes, sir.
20  Q.  Just explain what that was about.
21  A.  Well, when I came to Levels, it was -- Levels was one side.
22  It was one side was the Boom Boom Room and the other side was
23  Club Levels.  These clubs -- the only thing really divided
24  these clubs was some doors.  So they were having problems with
25  Carlos, so eventually they wanted to buy Carlos out, Mr. Jones

30

1  and Fats.  So --
2  MR. BALAREZO:  I object.  I think there's some hearsay
3  regarding the specific references.
4  THE COURT:  I'm not sure it's being offered for the
5  truth.
6  MR. GEISE:  It's just being offered to explain his
7  discussion of Carlos in cross-examination, Your Honor.
8  THE COURT:  Go ahead.  Overruled.
9  THE WITNESS:  So eventually they did convince Carlos
10  to sell them the other part, the other half, which was the Boom
11  Boom Room.
12  BY MR. GEISE:
13  Q.  In response I think to Mr. Balarezo's cross-examination,
14  you mentioned some things that Lawrence Maynard had told you
15  about some events in North Carolina.
16  A.  Yes, sir.
17  Q.  What did Mr. Maynard tell you about those events?
18  A.  Me and him was sitting in the little part that we call --
19  it's a little room upstairs, me and him got to talking.  So
20  he was telling me that him and Derrick was on the way to North
21  Carolina --
22  Q.  Now, which Derrick was that?
23  A.  This is Derrick Gordon, Antoine's nephew, Mr. Jones'
24  nephew.  That they had got stopped in North Carolina.  I said,
25  "What'd they stop you for?"  He said the police told him that

31

1  Derrick looked like he was a gang member.  So he said -- he
2  said -- as you know, they was questioning him and everything,
3  and the police brought a dog out on the scene.
4  MR. BALAREZO:  Objection, Your Honor.  Can we approach
5  on this part?
6  THE COURT:  Okay.
7  (Bench conference.)
8  MR. BALAREZO:  When the Officer Whitehead testified, I
9  objected to the part about the dog coming in and showing
10  positive for the drugs, because I don't think he was there, he
11  was told by somebody else.  I don't know if this is where he is
12  going with this.  I know it's Maynard supposed to be telling
13  him, but --
14  THE COURT:  What's it being offered for, period,
15  anyways?  Why are you offering this conversation?
16  MR. GEISE:  Well, it's coconspirators hearsay.  They
17  brought out his statements to the officers about Maynard and
18  the North Carolina stop.  I'm just having him tell us what he
19  learned about the North Carolina stop from Lawrence Maynard,
20  who I -- I think he's going to just describe what Maynard told
21  him, the dog alerted, they found the money, and told him that
22  they were heading south to buy some kilos.
23  MR. BALAREZO:  Well, Your Honor, all I asked was at
24  one time you said he heard it from Derrick, the other time you
25  said you heard it from Maynard.  I don't think the details --

32

1  for that very reason I don't think the details are necessary,
2  he can say Maynard told him at this time and he told me that
3  something happened and then --
4  THE COURT:  Yeah, but you made a point about he had it
5  flip-flopping around.  So he's --
6  MR. BALAREZO:  The only flip-flop was about who he
7  heard it from, not what he heard.  It's a big difference.  I
8  mean, it --
9  THE COURT:  Well, it may be, but overruled.
10  MR. BALAREZO:  So you're going to let in the dog and
11  all that?
12  THE COURT:  Yeah, because it shows that he remembers
13  what he learned from Maynard.  He wasn't so flip-floppy after
14  all.  If he can pinpoint what he learned from Maynard, then the
15  jury can be told about the dog.  This isn't whether or not the
16  dog alerted positive or not, that's not --
17  MR. BALAREZO:  Well, it is, Your Honor, because if
18  it's a drug case, all they found on that stop was money, and
19  now we're going to get some testimony about a dog alerting
20  positive for cocaine --
21  THE COURT:  But we'll tell them there was no cocaine;
22  right?  They didn't find any.
23  MR. GEISE:  The way they testified it was money.
24  THE COURT:  All right.  Overruled.
25  (Open court.)

33

BY MR. GEISE:

Q.  You were saying, sir, Mr. Maynard told you what?

A.  That they had brought a dog out, and they put the dog around the van, and the dog smelled something. Then they searched the van, and it was money in the van.

Q.  Did he tell you how much money?

A.  No, sir, I don't remember that, no.

Q.  Did he tell you what the money was for?

A.  Yes, sir.

Q.  And what did he tell you the money was for?

A.  Say they was going to Atlanta to pick up some ki's of cocaine.

Q.  Did he tell you what happened after the police found the money?

A.  Said they took the van and let them go.

Q.  Prior to when you were arrested on October 24th, when Antoine Jones would talk to you about Unk or reference Unk, what did Unk mean?

A.  That was our -- that was his cocaine supplier.

Q.  Mr. Balarezo asked you about I think what's already been entered as Jones Exhibit 24, which is a flyer for a birthday party.

A.  Yes, sir.

MR. GEISE:  Is it in evidence?

THE DEPUTY CLERK:  It's not in evidence.

34

THE COURT:  Do you want to put it into evidence?

MR. GEISE:  Actually I just wanted to show it to the witness.

MR. BALAREZO:  I have no objection.

THE COURT:  Put it in so everybody can see it. It's Jones what?

THE DEPUTY CLERK:  It's 24.

MR. GEISE:  It's Jones 24, Your Honor.

THE COURT:  All right. Well, it's admitted.

(Jones Exhibit Number 24 was received into evidence.)

BY MR. GEISE:

Q.  Let me just show you that, and you may remember independently or -- let's see. And what day was that party?

A.  Friday, July 16th.

Q.  And what day is your actual birthday, sir?

A.  July the 15th.

Q.  You mentioned when you were talking to Mr. Balarezo about the things that you had had in your closet, the money.

A.  Yes.

Q.  And you said it was more accessible where it was.

A.  Yes, sir.

Q.  Now, why was it more accessible in the stuff it was in?

A.  Because one of my closet doors is broke, so me and my wife had piled a lot of stuff up there so it wouldn't fall back and forth. So instead of me having to move everything and climb

35

all the way in the back, I just made it so I can just easy reach up and get my money when I needed it.

Q.  When you were talking again to Mr. McDaniel about Kevin Holland --

A.  Yes.

Q.  -- if you wanted to, could you have pointed to Kevin Holland and said you delivered drugs to him?

A.  No, sir.

Q.  Why not?

A.  Because I never delivered drugs to Mr. Holland.

Q.  Thank you.

MR. McDANIEL:  I don't know if I agree with that, Your Honor. I would object.

THE COURT:  Overruled. I think the jury understands. But it is like similar-type questions are possible, but he said he couldn't do it. That's not possible.

BY MR. GEISE:

Q.  I think Mr. Balarezo asked you about whether you could put dates on particular things.

A.  Yes, sir.

Q.  Let's look at page 78 of the transcripts, call 3119.

MR. GEISE:  That's in the first volume, Your Honor, page 78.

THE COURT:  First volume under tab two?

MR. GEISE:  Yes, ma'am, first volume under tab two.

36

THE COURT:  And the page number is?

MR. GEISE:  Page 78.

THE COURT:  I'm sorry.

BY MR. GEISE:

Q.  You will notice, sir, that's dated September 30th?

A.  Yes, sir.

MR. GEISE:  Let's play that call.

(CD is played.)

BY MR. GEISE:

Q.  Now, what did you do after this conversation, sir?

A.  I went to Mike's house.

Q.  And what did you do at Mike's house?

A.  Picked up a bag of money from him.

Q.  And that's the bag of money you described before?

A.  Yes, it is.

Q.  And based on the call, what date was that?

A.  September 30th, 2005.

Q.  Now let's look at call 3178, which is on page 81.

THE COURT:  3178.

BY MR. GEISE:

Q.  Call 3178 on page 81. And what day is that, sir?

A.  October 1st, 2005.

MR. GEISE:  And I'm going to play the first portion of it. Actually, Miss Lieber has set it up for me to play it.

(CD is played.)

37

1  BY MR. GEISE:
2  Q.  Sir, although you testified about that several days ago,
3  what's going on in that conversation?
4  A.  This is a conversation about one of my customers had bought
5  some bad drugs, so he brought it back.  So if I'm not mistaken,
6  it was an eighth, and I kept it.  And --
7  Q.  An eighth of what, by the way?
8  A.  Eighth of crack.  And we was talking about -- he told me a
9  number, and the only thing I can remember was 14, 14 is a half
10  ounce.  So that's when I said the large jersey I was talking
11  about the half ounces, and the extra large jerseys would have
12  been up to -- that amount was 62.
13  Q.  And what were you supposed to do with the crack that you
14  had gotten back from your customer?
15  A.  I was supposed to give the 62 to Derrick, the 14 to Ty, and
16  the 14 to Brian.
17  Q.  And let's look at the next conversation, 3237, which is at
18  page 90.
19       THE COURT:  I'm sorry.  Have we already heard these
20  before?
21       MR. GEISE:  Yes, Your Honor.  This is the only one I
22  plan to play a little bit of.  3237 at page 90.
23       THE COURT:  If it's in and he has interpreted it once,
24  isn't that what -- how can that be rebuttal again?
25       MR. GEISE:  Well, let me ask, then, a couple --

38

1       THE COURT:  Is there something that you haven't
2  covered with him before?
3       MR. GEISE:  The timing issue, Your Honor.  I'll wrap
4  it up with a couple of questions.
5  BY MR. GEISE:
6  Q.  This call also is on October 1st, sir; is that right?
7  A.  Yes.
8  Q.  Based on these calls, do you know what day you gave those
9  drugs to Brian and Ty and Derrick?
10  A.  I never gave Ty and Brian the drugs, I only gave Derrick
11  the drugs.
12  Q.  And what day did you give Derrick the drugs?
13  A.  I can't remember.
14  Q.  Was it the day of this conversation?
15  A.  It could have been.  I'm not for sure, it could have been.
16  Q.  Now, Mr. Balarezo and everyone else actually asked you a
17  lot of questions about the plea agreement, if you'll recall?
18  A.  Yes.
19       MR. GEISE:  Just pull that out for a minute.
20       THE COURT:  Before you do that I have a question for
21  the jurors.  I'm sorry.  I don't have a question.
22       Tomorrow we're going to start a half hour late, ladies
23  and gentlemen, so I was just inquiring about whether breakfast
24  has already been ordered.
25       And apparently it has; right?

39

1       THE DEPUTY CLERK:  Yes.
2       THE COURT:  So tomorrow we'll start court -- we have
3  to share a lawyer with another judge for about 20 minutes in
4  the morning, so we will start at 10:00.  But breakfast will be
5  here before then.
6       MR. GEISE:  Let me show the witness, it's paragraph 8
7  of the plea agreement, which is already in evidence.
8  BY MR. GEISE:
9  Q.  Let's look at paragraph 8.  It says, "Your client
10  understands that the sentence to be imposed upon him is
11  determined solely by the Court."
12       Who do you understand will ultimately sentence you?
13  A.  The Judge.
14  Q.  Based on several days in the courtroom, if the government
15  were to say to the Judge we believed that you've given
16  substantial corporation and the Judge thought you were lying,
17  what do you think she would do?
18       MR. ACREE:  Objection.
19       THE COURT:  Sustained.  Good heavens.
20  BY MR. GEISE:
21  Q.  Let me ask you another question.  Who do you understand
22  will ultimately determine whether you have given honest
23  testimony?
24  A.  The Judge.
25       MR. GEISE:  Court's indulgence for one moment.

40

1       THE COURT:  Again, it's going to be in the province of
2  the jury to decide whether or not for purposes of this trial.
3  He is just asking about sentencing.
4       MR. GEISE:  Yes, ma'am.
5       THE COURT:  I'm not usurping the jury's role for
6  purposes of the trial.  They are the fact-finder.  Okay.
7       MR. GEISE:  No further questions, Your Honor.
8       THE COURT:  Okay.  I think that concludes the witness.
9       MR. BALAREZO:  Your Honor?
10       THE COURT:  You have other questions?
11       MR. BALAREZO:  Yes, just --
12       THE COURT:  Go ahead quickly.
13       FURTHER CROSS-EXAMINATION
14  BY MR. BALAREZO:
15  Q.  Good afternoon, Mr. Adams.
16  A.  Good afternoon, sir.
17  Q.  I'll start with the last question from Mr. Geise about you
18  said the Judge will determine whether you're telling the truth;
19  right?
20  A.  Yes.
21  Q.  That's what you just said; correct?
22  A.  Yes, sir.
23  Q.  The Judge didn't make the plea agreement, did she?
24       THE COURT:  This is recross, sir.
25       MR. BALAREZO:  Your Honor, it's regarding the

41

1　government's questions on redirect.
2　　　　THE COURT:  We have gone over this ad nauseam. I have
3　no idea what you possibly would be asking that hasn't been
4　asked five times before.
5　　　　MR. BALAREZO:  Well, I haven't asked that one, Your
6　Honor.
7　BY MR. BALAREZO:
8　Q.  Mr. Adams, did the Judge sign the plea agreement for you?
9　A.  I signed it, and I think she did sign it.
10　Q.  Did she make you the plea offer?
11　A.  No, sir.
12　Q.  Is she going to file a motion with the committee at the
13　U.S. Attorney's Office?
14　A.  No, sir.
15　Q.  So your answer is not correct, because they determine
16　whether you tell the truth; right?
17　　　　MR. GEISE:  Objection.
18　　　　THE COURT:  Sustained.
19　BY MR. BALAREZO:
20　Q.  Now, Mr. Adams, the conversation that you claim to have had
21　with Mr. Jones at the jail, you don't remember when that was;
22　right?
23　A.  A couple of days after we were arrested. I don't remember
24　the exact day, no, sir.
25　Q.  You don't remember exactly where you were at the jail?

42

1　A.  We was in D.C. Jail, sir, at the top tier.
2　Q.  Top tier?
3　A.  Yes, sir.
4　Q.  And you were all just housed at the same place; right?
5　A.  Yes, sir.
6　Q.  All right. So the only thing the jury has to go by is your
7　word on what Mr. Jones said, then; correct?
8　A.  That is correct.
9　Q.  And regarding the North Carolina stop, you don't remember
10　when Lawrence Maynard told you about that; right?
11　A.  Not the exact day, no.
12　Q.  And you've heard a lot of questions about the proffer –
13　　　　THE COURT:  Twenty-five.
14　　　　MR. BALAREZO:  Twenty-five.
15　　　　THE COURT:  You have any exhibits –
16　　　　MR. BALAREZO:  You might have it, Your Honor, I'm
17　sorry.
18　　　　THE COURT:  It did come up here at one point.
19　BY MR. BALAREZO:
20　Q.  Well, you had a chance to read the proffer; correct?
21　　　　MR. GEISE:  Objection, Your Honor. I think it's
22　beyond the scope of redirect.
23　　　　THE COURT:  I don't know, it was here, but who has got
24　it now? Where is it?
25　　　　MR. BALAREZO:  I hope I don't have it.

43

1　　　　THE COURT:  I don't have it. But I tell you the – we
2　are going to open up more cans of worms here.
3　　　　MR. BALAREZO:  I think they're all out, Your Honor.
4　　　　THE COURT:  We are going to hear from Mr. Norris.
5　All right. Go ahead.
6　BY MR. BALAREZO:
7　Q.  Now, you said you had a chance to read the proffer;
8　correct?
9　　　　THE COURT:  When? Back then, when they were – huh?
10　Is that what you are asking him?
11　　　　MR. BALAREZO:  Your Honor, if I could just at least
12　get my question out. I'm sorry.
13　　　　THE COURT:  No. I want to know what we're talking
14　about so I can rule on the objection. You want to know whether
15　he read it back at the time of his arrest?
16　BY MR. BALAREZO:
17　Q.  Mr. Adams, you testified earlier on my cross-examination
18　that before you met with the government you had an opportunity
19　to read the proffer. That's correct; right?
20　A.  Yes, sir.
21　Q.  And the first time you met with the government was on
22　November the 1st of 2005?
23　　　　MR. GEISE:  Objection, I think it's beyond the scope
24　of redirect.
25　　　　THE COURT:  I'll hear the question, but I think it's

44

1　going to be a problem.
2　BY MR. BALAREZO:
3　Q.  Right?
4　A.  Repeat that, sir.
5　Q.  You read the proffer within a week after your arrest?
6　A.  Yes.
7　Q.  All right. And in the proffer there is a section called,
8　A, prior to the first interception, and it details the North
9　Carolina stop involving Lawrence Maynard; correct?
10　　　　THE COURT:  Okay. Let's approach. Let me see it.
11　　　　(Bench conference.)
12　　　　THE COURT:  What page are we on?
13　　　　MR. BALAREZO:  It's right at the beginning, Your
14　Honor.
15　　　　THE COURT:  Okay. If you do open up this proffer, you
16　can't pick and choose paragraphs and then insinuate that he
17　learned about something from the proffer if you don't want to
18　put the proffer into evidence. You can't do it.
19　　　　MR. BALAREZO:  Your Honor, we're put in a position
20　where we have this guy testifying to whatever he wants to
21　testify about, and we have nothing to go against him – can I
22　finish, Jack?
23　　　　MR. GEISE:  Yeah, I wasn't going to say anything.
24　　　　MR. BALAREZO:  We have nothing to go against him
25　because it's his word. And all we have is these other –

---

45

1    THE COURT:  Excuse me, that's just such a
2 misstatement.  We've got all these tapes, we've got all these
3 documents, we have these pictures.
4    MR. BALAREZO:  We don't have a tape of the jail
5 conversation, Your Honor.  We don't have a tape of the Maynard
6 conversation.
7    THE COURT:  So --
8    MR. BALAREZO:  All the information he just said is
9 right there.  That's all I'm trying to say.
10    THE COURT:  But it has to go into evidence.  That's
11 the problem with what you're trying to do.  You can't pick and
12 choose just so that what you say may be right.
13    MR. BALAREZO:  But, Your Honor --
14    THE COURT:  When you open doors, you open doors, you
15 don't just -- you're trying to insinuate that he learned about
16 it from this paragraph.
17    MR. BALAREZO:  Well, Your Honor, let me --
18    THE COURT:  You have no basis for doing that, frankly,
19 and if you are, you're going to have to put it into evidence.
20 And I'm not going to let you just put paragraph three into
21 evidence, Mr. Norris will go crazy.
22    MR. BALAREZO:  Your Honor, if I could just have -- all
23 I'm asking him, and all I asked him before was, he said he --
24 this is the only document that he claims to have read prior to
25 the meeting with the government.  He testified to that, and I

---

46

1 think he just acknowledged it.  He met with the government
2 within a week after the arrest.  He just testified that
3 Lawrence Maynard told him X, Y, and Z.  All I'm saying is there
4 is a paragraph in this document which explains X, Y, and Z.
5 And it's clear why I'm doing it.  I'm not asking about the
6 other 20 or 30 pages, I don't see why the whole document has to
7 be opened.  All I'm asking him a question about is this
8 particular paragraph.
9    THE COURT:  The paragraph of the --
10    MR. GEISE:  If I might try to -- there is also another
11 issue, which is I asked about in reference to the 302 and the
12 cross-examination about the 302.  In fact, when I tried to get
13 into the proffer at one point, this actual proffer, they all
14 said you can't get into the factual proffer, rephrase your
15 question, and I did.  That was the question concerning what he
16 had been told in the jail by Jones, so -- or I think.  But my
17 point is I was not allowed and I chose not to get into the
18 proffer on redirect as I recall, so I'm not sure how the
19 proffer is now opened on recross, frankly.  Not to mention, as
20 the Court pointed out, once you start putting in paragraph
21 after paragraph, it creates a huge mess, but I don't believe I
22 got into it on redirect.
23    MR. BALAREZO:  You put the proffer in front of him.
24    MR. GEISE:  That's when I --
25    THE COURT:  I know, but then it went away because

---

47

1 Mr. Norris started objecting.
2    MR. GEISE:  Objected, and so I wasn't allowed to get
3 into it.
4    THE COURT:  Yeah.  You know, I'm not actually sure
5 going line-by-line your inference is correct.  He said more
6 about -- he said facts that aren't part of this.  When he
7 talked about what Maynard told him, what did he -- oh, he said
8 he was going to Atlanta to pick up kilos.
9    MR. BALAREZO:  To pick up kilos.
10    THE COURT:  See, it seems -- I'm going to sustain it.
11 You're going to open up all kinds of things.  There are things
12 that he said in his testimony that aren't in this paragraph,
13 and otherwise the jury isn't going to be able to go
14 line-by-line and compare what he said that Maynard told him
15 versus what's in here.
16    MR. BALAREZO:  But again, Your Honor -- that's fine,
17 I'll abide by that, but the proffer is not the only universe of
18 what he knows, there's like five or six affidavits which have
19 more information and --
20    THE COURT:  He said he never saw those.  So what are
21 you going to do?  You can create this inference, but you have
22 to have a good basis for it, and that's not it, not the Maynard
23 situation.  Look at it, the facts are not precisely the same
24 line-by-line.  And otherwise, at some point, if you try to
25 create the inference from that document, the jury has got to

---

48

1 read it.  So thank you.
2    (Open court.)
3 BY MR. BALAREZO:
4    Q.  So, Mr. Adams, regarding the conversation with Mr. Maynard,
5 you don't recall when that conversation took place; right?
6    A.  I know it was before I got arrested.
7    Q.  Well, a lot of things happened before you were arrested.
8    A.  I don't remember the exact date, no.
9    Q.  Do you remember the month, the day?
10    A.  No, sir.
11    Q.  You said you were at some room in the club, you didn't even
12 say what room you were in; right?
13    A.  I said we was in a room upstairs, sir.
14    Q.  There are a lot of rooms upstairs; right?
15    A.  Yes, it is.
16    Q.  All right.  And once again, all the jury has to go by is
17 your word on that; right?
18    A.  Yes, sir.
19    Q.  Now, I'm just a little confused about this call 3178 that
20 you mentioned that was played again, or at least portions of
21 it, the one about the jerseys.
22    A.  Yes, sir.
23    Q.  All right.  There is a part where Mr. Jones supposedly
24 says, "I need -- I need two of these jerseys."  Is that drug
25 talk, according to you?

**49**

1    A.   Oh, yes, it is.
2    Q.   All right. How much is each jersey?
3    A.   What do you mean, sir?
4    Q.   Well, how much drugs is each jersey?
5    A.   A half ounce can go for $400 or $500, depending on --
6        THE COURT:   No, he doesn't mean dollars, he means
7 what's the quantity of a jersey.
8        THE WITNESS:   Oh, 14 grams.
9 BY MR. BALAREZO:
10    Q.   So each jersey is 14 grams; is that what you're saying?
11    A.   The large ones, yes.
12    Q.   No, no. If you want to look at page 81. Do you want to
13 look at page 81? Three lines down from the -- or three names
14 up from the bottom where it says, Jones, "I need -- I need two
15 of those jerseys;" right?
16    A.   Yes, sir.
17    Q.   All right. Each of those jerseys is referring to what?
18    A.   A half ounce, 14 grams.
19        THE COURT:   Fourteen grams?
20 BY MR. BALAREZO:
21    Q.   So just so the jury knows, 14 grams equals what?
22    A.   A half ounce.
23    Q.   All right. So that each jersey is a half ounce, so we're
24 talking about one ounce of cocaine?
25    A.   Yes, sir.

**50**

1    Q.   Okay. Now, you indicated I believe that you were going to
2 give 14 ounces -- excuse me, 14 grams to Ty and 14 grams to
3 Brian; right?
4    A.   Yes, sir.
5    Q.   All right. And then you said something about an extra
6 large jersey?
7    A.   Yes, sir.
8    Q.   Now, that's a 62?
9    A.   Yes, sir.
10    Q.   Which is how many ounces?
11    A.   May I have a pencil, please?
12    Q.   I have to ask the Marshal.
13        THE COURT:   Do we have a --
14        THE WITNESS:   I don't add all that good, sir, I mean,
15 so I can add it up for you.
16 BY MR. BALAREZO:
17    Q.   All right. Fourteen grams is half an ounce; right?
18    A.   Yes, sir.
19    Q.   So 28 grams would be one ounce?
20    A.   Yes, sir.
21    Q.   So 28 times two is 56 grams, that would be two ounces; is
22 that correct? Am I right?
23    A.   Yes, sir.
24        THE COURT:   So far so good.
25 BY MR. BALAREZO:

**51**

1    Q.   All right. So 62 grams, is that a little over two ounces?
2 If 56 grams is two ounces, 62 grams is a little over two
3 ounces; does that make sense?
4    A.   Yes.
5    Q.   Okay. So you're saying that out of those two jerseys, you
6 are going to give two half ounces -- excuse me, two half
7 ounces, one to Ty, one to Derrick -- or Brian, and then you're
8 going to have to give 62, which is the extra large jersey, to
9 somebody else?
10    A.   To Derrick, yes.
11    Q.   Where does that 62 come from?
12    A.   What do you mean where did it come from?
13    Q.   I'm just trying to understand the conversation that you're
14 talking about.
15    A.   It came from the coke that was given back to me.
16    Q.   Well, how much was given back to you?
17    A.   Maybe --
18    Q.   I think you talked about an eighth?
19    A.   Yeah, but it was a little -- it may have been a little
20 shorter than an eighth.
21    Q.   Well, you have said an eighth all along.
22    A.   It may have been a little shorter than an eighth.
23    Q.   Well, an eighth is how many grams?
24    A.   Between --
25    Q.   Well, no, an eighth is an eighth.

**52**

1    A.   Sir, excuse me. Excuse me.
2        THE COURT:   Do you want him to answer the question "A
3 eighth is an eighth"?
4        THE WITNESS:   An eighth is 125 grams.
5 BY MR. BALAREZO:
6    Q.   Okay.
7    Some people sell 120 grams, 122 grams, 123 grams, and they
8 still say it's an eighth.
9    Q.   But an eighth refers to an eighth of a?
10    A.   Eighth of a kilo.
11    Q.   Of a kilo?
12    A.   Yes, sir.
13    Q.   A kilo is 1,000 grams?
14    A.   Yes, sir.
15    Q.   125 grams is an eighth of a kilo; right?
16    A.   Yes, sir.
17    Q.   All right. So you're giving 14 to Ty, a 14 to Brian, and
18 then you got a 62 to somebody else?
19    A.   To Derrick.
20    Q.   To Derrick. So that's 28 and 62. If my math is correct,
21 that's 90, 90 grams?
22    A.   Yes, sir.
23    Q.   What happened to the remainder?
24    A.   Sir, that's what I got back from the customer that gave it
25 to me.

53

1  Q.  All right.  So in this case an eighth is 90 grams, not 125?
2  A.  I'm not saying that, sir.  I'm telling you when they
3  brought it back to me, that's what it was.  It was two half
4  ounces and one 62.  It might have been maybe 63, 62, but that's
5  what it basically was.
6  Q.  So you can't account for the other 35 grams basically?
7  A.  No, sir.
8  Q.  All right.  And all we have regarding what actually
9  happened is your word on this; right?
10  A.  Yes.
11  Q.  And you are an experienced drug dealer and you don't know
12  what happened to the other 35 grams; right?
13  A.  I would have to ask the person that gave it back to me.
14  Q.  I'm asking you.  You are the experienced drug dealer since
15  1984, and you don't care about the other 35 grams?
16  A.  Sir, I would have to ask the person that gave it back to
17  me.
18  Q.  And you never did, did you?
19  A.  No, I didn't.
20      MR. BALAREZO:  I have nothing else for this witness.
21      THE COURT:  Anything else?
22      MR. NORRIS:  There is no redirect on behalf of—
23          FURTHER RECROSS-EXAMINATION
24  BY MR. McDANIEL:
25  Q.  Mr. Adams, your partner, Paul Taylor, that was his name?

54

1  A.  Yes.
2  Q.  Do you know if Paul Taylor has been arrested?
3  A.  I don't know, sir.
4  Q.  This was your partner, your 50/50 partner; right?
5  A.  Sir, I don't know if he has been arrested or not.
6      THE COURT:  I think we're way beyond the scope of
7  redirect.
8  BY MR. McDANIEL:
9  Q.  You don't know if your man has been arrested; is that
10  right?
11      THE COURT:  Thank you.
12      THE WITNESS:  I don't know if he has been arrested or
13  not.
14      THE COURT:  Thank you.
15      Anything else, only limited to this redirect?
16      MR. ACREE:  Yes, Your Honor.
17          RECROSS-EXAMINATION
18  BY MR. ACREE:
19  Q.  Mr. Adams, one of the things that you and I talked about
20  was the fact that you had — you claimed to have said to
21  Mr. Jones "What does this half a ticket mean"; right?
22  A.  Yes.  Yes.
23  Q.  And then you and Mr. Geise talked about the fact that you
24  and Mr. Jones had this whole conversation about, you know, they
25  got us because, then somebody was talking about half

55

1  a ticket, and somebody messed up; right?
2  A.  Yes.
3  Q.  Now, on another occasion that you spoke to members of law
4  enforcement in November, you said that — you told them that
5  anyone would know that a half a ticket is a half a kilo.  Do
6  you remember saying that to them?
7  A.  Yes, sir, I probably did.
8  Q.  So if you know, and not only you, but anybody, according to
9  you would know that half a ticket means half a kilo, why would
10  you and Mr. Jones have a conversation where you saying, well,
11  what's a half a ticket mean, and he says, I don't know,
12  somebody messed up?  How can you be involved in both of those
13  kind of conversations?
14  A.  Sir, I can't tell you what somebody else said.  I can only
15  tell you what I said, what I know.
16  Q.  No, but you asked him "What does half a ticket mean?"
17  Right?
18  A.  Sir —
19  Q.  Didn't you say that you asked Jones what half a ticket
20  means?
21  A.  I don't remember saying that.
22  Q.  Sir, you just testified before, we asked you, isn't that
23  what you and Mr. Geise and before that you and I were talking
24  about, that you said to Mr. Jones, what's this whole half a
25  ticket stuff, and he said, I don't know, somebody messed up?

56

1  A.  I think I told him that a half a ticket was a half a kilo a
2  minute ago.
3  Q.  But what I'm asking you now is, didn't you say that you
4  were saying to Mr. Jones, having a conversation with him about
5  the fact that there is this conversation about half a ticket;
6  right?  Right?
7  A.  Yes.
8  Q.  Isn't that what you were talking about, this half a ticket;
9  right?
10  A.  Yes, sir.
11  Q.  And you said to Mr. Jones, what does that mean?
12  A.  Oh, no, sir, excuse me —
13  Q.  And he said —
14  A.  I'm talking reference like, man, what is this, somebody
15  talking about a half a ticket, what is that?  That's in
16  reference, sir.
17      THE COURT:  I think that — I'm sorry, Mr. Acree.  I
18  didn't understand him to be saying what you are saying, at
19  least not on the redirect, at all.
20  BY MR. ACREE:
21  Q.  So what you're saying is that nobody should have been
22  saying half a ticket; is that — is that what you're saying?
23      THE COURT:  You want to approach?  I think we are
24  really getting everybody confused here.
25      MR. ACREE:  Well, I'm just trying — I'm not trying to

**57**

1  get everybody confused. I'm only asking.
2      THE COURT:  Well, you want me to tell you what I
3  understood his redirect to be?
4      MR. ACREE:  No.
5      THE COURT:  I think you are misleading.
6      MR. ACREE:  Well, I'm not trying to, I'm only asking
7  the questions if we can get --
8      THE COURT:  I'm sorry. You are setting it up as if
9  you are interpreting it one way. We will excuse the jury for a
10  movement.
11      MR. ACREE:  Okay.
12      THE COURT:  All right. Take a short recess, ladies
13  and gentlemen.
14      (Jury out at 3:01 p.m.)
15      THE COURT:  You can correct me if I'm wrong,
16  Mr. Acree, but I think we're barking up the wrong tree. He
17  testified on redirect that --
18      MR. ACREE:  Your Honor, can we have this conversation
19  outside the presence of the witness?
20      THE COURT:  Sure.
21      You are limited now to redirect. The scope is very
22  limited. And I'll tell you the way I understood it, we can go
23  back and get the transcript, but on redirect he was explaining
24  about a conversation with Jones in the jail where Jones says,
25  well, they will never figure this out, nobody is going to know

**58**

1  what we are talking about. His point in response was, how
2  could they not know, a half a ticket doesn't make any sense, or
3  a whole ticket doesn't make any sense, and then he said Jones
4  didn't say anything in response. I can assure you the more you
5  go at this the worse it's going to get. If I'm wrong about
6  what he said, I don't understand your questions, but it's going
7  to land up tramping on Mr. Norris' objections, and it's going
8  to open up more of this conversation.
9      MR. ACREE:  Aren't we still talking about -- it just
10  seems to me -- I guess my first point, as far as opening up the
11  door, it just seems to me that we are on just this one
12  conversation regarding this one comment.
13      THE COURT:  Yeah, but he never said that he didn't
14  understand what a whole ticket was or a half ticket.
15      MR. ACREE:  Right.
16      THE COURT:  He said that anybody listening to the
17  tapes would be able to figure out that they weren't talking
18  about real tickets because nobody talks about half tickets or
19  whole tickets. That's what he was saying in response to
20  Mr. Geise. And so your questions are misinterpreting his
21  testimony. You can have her read it back to you, but, one,
22  that's what I heard him say, I wrote it down, that's what I
23  understood him --
24      Right, Mr. Norris? You are the one concerned that we
25  don't get too far afield here.

**59**

1      But you keep on suggesting that he didn't understand
2  the words, and that's not what he was saying in the jail.
3      MR. NORRIS:  Judge, if I could just clarify my
4  objection. I'm not trying to limit my cocounsel in their cross
5  or recross.
6      THE COURT:  I know you're not.
7      MR. NORRIS:  I just don't want it to get into any
8  discussions with Mr. Jackson.
9      THE COURT:  I understand.
10      MR. NORRIS:  And I don't think this opens that, nor do
11  I want the entire proffer to go in.
12      THE COURT:  I know you don't.
13      MR. NORRIS:  Portions are fine, but as long as they
14  don't deal with Mr. Jackson.
15      THE COURT:  I understand. But I'm just telling you
16  that this conversation, the more we go at this conversation to
17  have him explain what he was saying with Mr. Jones, I -- you
18  can go back and read what he said in response to Mr. Geise's
19  question, but the import was not that he didn't understand the
20  words as used in the tape, but rather the odd suggestion that
21  people would talk about half tickets or whole tickets is going
22  to mean that the people listening, i.e., the government, will
23  understand that they are not talking about real tickets.
24  That's what his point was.
25      MR. ACREE:  And I understand what the Court is saying.

**60**

1  So if he is saying that, I know that -- basically, with the
2  point being my follow-up on him would be, well, for example,
3  there was a ticket that said half price, we know that there is
4  a ticket that says half price. So what I'm saying is that if
5  that's where he wants to go, I'll go wherever he wants to go --
6      THE COURT:  No, no. You're limited to the
7  conversation -- his point to Jones, to the extent there was a
8  point, was anybody listening to these tapes would get clued in
9  that we weren't really talking about the real thing. It's not
10  time now to pick a little -- you know, to show there was a real
11  ticket somewhere. Otherwise all you are doing, that's not
12  responsive to his conversation with Jones whatsoever.
13      MR. ACREE:  Well, the problem with that, Your Honor,
14  is that to say that -- to say that if you say half a ticket
15  that it necessarily means half a kilo. How do we get there?
16  Why can't half a ticket mean a half-price ticket of which we
17  know they exist. I'm saying this is a conversation that Mr. --
18  I mean, I think I understand what the Court is saying, and I --
19  and I thought that what we were doing was going back to his
20  conversation and him saying that this is -- this is what it
21  means.
22      THE COURT:  Not exactly at all.
23      MR. ACREE:  Okay. Okay.
24      THE COURT:  We have already gone around what does it
25  mean 3 million times with everybody questioning him and coming

**61**

1  up with flyers and coming up with tickets. We have had tons of
2  that. This is just merely him saying to Jones, Jones' point is
3  they will never catch us, they won't understand these tapes.
4  This guy comes back and says, yeah, they will because there's
5  some very odd things on the tapes. And here we are with that
6  as the government's argument. That's it. That's all. It's
7  not whether there are half tickets, aren't half tickets,
8  whether or not anybody would figure out these tapes. Only that
9  he thinks that they have fooled the government and this guy
10 says, no, and here is why. That's it. There is no more to be
11 gotten out of this conversation going back to show there might
12 be a half ticket in existence. So we're way beyond the scope.
13       MR. ACREE:  Well, and let me just say this for the
14 record. I understand the Court's ruling. I think the
15 problem -- what the Court's saying it that, well, because he
16 said it that makes it so because there is nothing else.
17       THE COURT:  No.
18       MR. ACREE:  And that's the way that it was left on
19 redirect.
20       THE COURT:  No. But you can't go back and rehash the
21 stuff that's already been hashed before. Redirect and recross
22 is not the opportunity to rehash what you've already done. We
23 have rehashed and covered the ground about whether or not there
24 might be such a thing as a half ticket, whether there are real
25 tickets running around, it's all done. That's not what recross

**62**

1  is all about. Thank you.
2        We will be back a quarter past.
3        Have we got any more for this witness? Do we need him
4  anymore? Do you have any more, Mr. Acree? We are not going
5  back to whether he thinks there is such a thing as a half
6  ticket and whether there was one.
7        MR. ACREE:  I guess --
8        THE COURT:  The answer is, do you have anything else?
9  The question, I'm sorry. Do you have anything else?
10       MR. ACREE:  No, Your Honor.
11       THE COURT:  The witness is excused. Thank you.
12       Get your next witness.
13       (3:09 p.m.)
14       MS. LIEBER:  Gikas is coming.
15       MR. BALAREZO:  And this was raised when she last
16 testified, is that based on her reports that we've read, or
17 that I've read, it appears that a lot of her knowledge is not
18 direct knowledge, it's secondhand, it's from other agents. And
19 when she gets on the stand and she testifies, she testifies as
20 if she'd witnessed something, she saw it, she did it.
21       And I'm just a little concerned, because I was reading
22 through her transcript and I missed -- I objected about three
23 questions from when I should have in one instance because I
24 wasn't sure.
25       And I just want -- if the government could tell her to

**63**

1  testify or elicit questions about her direct knowledge and not
2  ask her questions where she'll answer something as if she did
3  it --
4        THE COURT:  Okay.
5        MR. BALAREZO:  -- or saw it herself.
6        THE COURT:  I think --
7        MR. BALAREZO:  Because really, it's misleading to
8  us -- well, to me --
9        THE COURT:  Right.
10       MR. BALAREZO:  -- in a way, because I can't object
11 because I don't know, you know, what she knows or what she did.
12       THE COURT:  Okay.
13       MR. BALAREZO:  And if it comes out later, it's too
14 late.
15       THE COURT:  And if the government would kind of lay a
16 foundation, we'll -- we can avoid the problem. Some of it can
17 go in as non-hearsay, but we've got to understand where we're
18 going.
19       MS. LIEBER:  And there -- I -- I'll try.
20       THE COURT:  Fine. Let's bring in the jury. I'll
21 instruct the witness, then, to limit herself to what she saw
22 and heard.
23       MR. BALAREZO:  Your Honor, just in the interest of
24 time, will the Court allow us to question agent Yanta about the
25 302s that we questioned Mr. Adams about?

**64**

1        THE COURT:  No. But if you want to take her off for a
2  few minutes -- they're not putting her on for that at all.
3        Sorry. Good try.
4        Have a seat. You're still under oath.
5        We put her on for two days so we could go over the
6  302s. If you want her in your case, she'll be available.
7  She's sitting right out there, subject to being asked.
8        (Jury present at 3:26 p.m.)
9        THE COURT:  Everybody okay?
10       All right. Detective, you're still under oath.
11       THE WITNESS:  Yes, ma'am.
12       (Witness, Stephanie Yanta, 3:26 p.m.)
13                DIRECT EXAMINATION
14 BY MS. LIEBER:
15 Q.  Good afternoon, Special Agent Yanta.
16 A.  Good afternoon.
17 Q.  On October 24, was John Adams' wife arrested?
18 A.  Yes, she was.
19 Q.  And did you participate -- well, why was she arrested?
20 A.  Based on the amount of cocaine and the firearms that were
21 recovered from the residence.
22 Q.  Was she present in the residence when those items were
23 recovered?
24 A.  Yes, she was. And she is of adult age.
25 Q.  Is that why she was arrested?

**65**

1  A. Yes.
2  Q. Did you participate in the decision about whether or not to
3  actually formally charge her in connection with those items?
4  A. Yes, I did.
5  Q. And when was that decision made?
6  A. It was actually made on the 24th, once the search warrants
7  had been competed.
8  Q. And what was that decision?
9  A. The decision was to not formally charge her.
10 Q. Okay. And when was she released from custody?
11 A. I believe she was actually released the next day.
12 Q. All right. Why – who was the focus of the investigation
13 that you were working on?
14 A. The investigation was focused on Antoine Jones and the
15 conspiracies surrounding.
16     MR. BALAREZO:   Objection. Calls for legal conclusion.
17 Move to strike.
18     THE COURT:   Well, sustained. The focus was Antoine
19 Jones. After that, I don't see that the rest of the answer is
20 particularly responsive. So it will be stricken.
21     MS. LIEBER:   Thank you, Your Honor.
22 BY MS. LIEBER:
23 Q. And Special Agent Yanta, finally, was John Adams'
24 willingness to cooperate with the government, did that factor
25 in at all to your decision to cut Mrs. Adams loose?

**66**

1  A. No, it did not.
2  Q. How do you know that?
3  A. Because at that point in time, no one had expressed a
4  willingness to cooperate with the government.
5  Q. Thank you.
6     MS. LIEBER:   I don't have anything else.
7     THE COURT:   I can't believe we have any questions on
8  that particular point.
9     MR. BALAREZO:   Believe it, Your Honor. I have a few.
10 Or don't believe it.
11          CROSS-EXAMINATION
12 BY MR. BALAREZO:
13 Q. Good afternoon, Special Agent Yanta, how are you?
14 A. Good afternoon, sir.
15 Q. You were aware at the time you made this decision to
16 release Mrs. Adams, that a weapon had been found in the closet
17 of her shoes – or in – with a box of her shoes; right?
18 A. Yes, sir.
19 Q. And you were aware that a large amount of money, about
20 $9,700, was found in a closet and in a shoe box containing her
21 shoes; right?
22 A. Yes.
23 Q. All right. And you were aware that her husband, Mr. Adams,
24 had also – or you were aware that drugs were also found in her
25 house; correct?

**67**

1  A. Absolutely.
2  Q. Now, you've – normally, possession of drugs and weapons
3  are offenses in certain – certain cases; right?
4  A. I believe it's an offense all the time.
5  Q. All the time. Very good.
6     Now, you indicated that she was not the focus of a – of
7  the investigation; right?
8  A. Yes.
9  Q. That's what you just said?
10 A. That's correct.
11 Q. So are you telling us that because she was not a focus of
12 the investigation, you're willing to overlook a crime that may
13 have been committed by her?
14 A. No, sir.
15 Q. Okay. Did – you just decided not to pursue the charges;
16 right?
17 A. That's correct.
18 Q. Now, you didn't make that decision all on your own?
19 A. No, sir, I did not.
20 Q. You had conversations with the prosecutors; correct?
21 A. Yes, sir.
22 Q. And basically they directed you to release her and not
23 press charges against her; correct?
24 A. It was a collaborative decision, sir.
25 Q. But ultimately, it was their decision; right?

**68**

1  A. I don't know who ultimately made the decision.
2  Q. Well, you don't make a decision to prosecute or not, do
3  you?
4  A. That's correct, I do not.
5  Q. They make that decision?
6  A. They are the prosecutors, yes, sir.
7  Q. Right.
8     So they make the decision?
9  A. They are the prosecutors.
10     MR. BALAREZO:   I have nothing else, Your Honor.
11     MR. NORRIS:   No questions, Your Honor.
12     MR. McDANIEL:   No questions.
13     MR. ACREE:   No questions.
14     THE COURT:   Nothing else?
15     MS. LIEBER:   Nothing. Thank you.
16     THE COURT:   Okay. Call your next witness.
17     MS. LIEBER:   Your Honor, the government calls Andrew
18 Schaeffer.
19     THE COURT:   Right up here, sir, please.
20 (Witness sworn by the clerk at 3:31 p.m.)
21          DIRECT EXAMINATION
22 BY MS. LIEBER:
23 Q. Good afternoon, sir.
24 A. Good day.
25 Q. In a nice, clear voice, can you please introduce yourself

**69**

1  to the jury and spell your first and last names for the court
2  reporter?
3  A.  My name is Andrew Schaeffer, S-C-H-A-E-F-F-E-R.
4  Q.  Sir, how are you employed?
5  A.  I'm the president of Metropolitan Investment Company.
6  Q.  And what is Metropolitan Investment Company?
7  A.  It a property management company for commercial buildings.
8      THE COURT:  Sorry. You'll have to speak up a little
9  bit. It moves your -- if you want to move it closer.
10  BY MS. LIEBER:
11  Q.  Mr. Schaeffer, is one of the properties that your company
12  manages the Hampton Park Storage Facility located at 400
13  Hampton Park Boulevard in Capitol Heights, Maryland?
14  A.  It is.
15  Q.  Okay. And sir, I'm going to show you what I've marked as
16  Government's Exhibits ICE-15, -16, -17, -18 and -19.
17      MS. LIEBER:  First, I'm going to show this to the
18  defense, Your Honor, which they've seen before. And actually,
19  I'll add in ICE 21, while we're at it.
20      MR. BALARESO:  Before we show this, can we lay a
21  proper foundation about --
22      THE COURT:  No. The way you lay it is to show it to
23  him and ask him if he recognizes them. They're not in evidence
24  yet. That's what she's doing.
25      MR. BALARESO:  I understand, Your Honor.

**70**

1      THE COURT:  All right. Go ahead. You can -- has
2  everybody seen them? I'm sure you've seen them before.
3      What page of the list, Gwen, do you know?
4      THE DEPUTY CLERK:  It's page 18.
5      THE COURT:  18, thank you.
6      MS. LIEBER:  Your Honor, if I may approach the
7  witness.
8      THE COURT:  Yes.
9  BY MS. LIEBER:
10  Q.  Mr. Schaeffer I'm showing you Government Exhibits ICE-15,
11  -16, -17, -18, -19 and -21.
12      I'm just going to ask you to take a look at those documents
13  and see if you recognize those documents.
14  A.  I do.
15  Q.  Have you seen those documents today, as a matter of fact?
16  A.  Yes.
17  Q.  Okay. What are those documents?
18  A.  The first one is the front page and the last page of a
19  lease for 400 Hampton Park Boulevard. Exhibit 16 is a credit
20  application, business application, and 17 is a termination
21  letter. 18 is a brochure of the building. And 19 is a plan of
22  the building.
23  Q.  Okay. And I'm going to stop you there for a minute.
24      Just that first -- not the picture, but that first set of
25  documents, are those -- those documents, those lease documents

**71**

1  that you have before you, are those records that you -- well,
2  first of all, do those pertain to a particular lease at the 400
3  Hampton Park Boulevard storage facility?
4      MR. BALARESO:  Objection, Your Honor.
5      THE COURT:  Why?
6      MR. BALARESO:  I think it's getting a little bit ahead
7  of itself before the proper foundation is laid, if it gets into
8  specifics of --
9      THE COURT:  You recognize these?
10      THE WITNESS:  I do, Your Honor.
11      THE COURT:  Did a copy of these come from your files,
12  from your company's files?
13      THE WITNESS:  They did.
14      THE COURT:  And are these documents kept in the
15  regular course of business.
16      THE WITNESS:  They are.
17      THE COURT:  And is it in the regular course of
18  business for your company to maintain tease type of documents?
19      THE WITNESS:  It is.
20      THE COURT:  What's your objection?
21      MR. BALARESO:  Well, none in that -- with that direct.
22      THE COURT:  Anything else?
23      MS. LIEBER:  For the record, those were my next four
24  questions.
25      THE COURT:  You said it was going to be a short

**72**

1  witness. I'm determined to have it be a short witness.
2      Anything else for anybody?
3      MR. BALARESO:  You want to do my cross?
4      MS. LIEBER:  Your Honor, at this time, I seek
5  admission of ICE-15 through -19.
6      THE COURT:  And what about 21, I'm sorry -- okay.
7      Any objection to my laying that foundation?
8      MR. BALARESO:  No, Your Honor.
9      THE COURT:  Mr. Norris?
10      MR. NORRIS:  No.
11      THE COURT:  18 -- 15, 16, 17, 18, 19 are admitted.
12      Thank you.
13
14      (Government's Exhibits ICE-15, ICE-16, ICE-17, ICE-18,
15      and ICE-19 were received into evidence.)
16  BY MS. LIEBER:
17  Q.  Mr. Schaeffer, I'm also now going to put on this Elmo, just
18  for your purposes at this point, it's in the evidence,
19  ICE-21 --
20      THE COURT:  Do you want the jury to see the ones that
21  just went in? I didn't do that.
22      I think you just at least could have him identify the
23  ones that just went into evidence, please, for the purpose of
24  the jury.
25  BY MS. LIEBER:

73

1 Q. Mr. Schaeffer, before we go on to ICE-21, let me ask you,
2 who is the person who leased -- and I'll put this on the Elmo
3 for you, if you look at that little screen.
4     Who is the person who leased this Hampton Park warehouse
5 storage facility?
6 A. Mr. Jones and Mrs. Jones.
7 Q. Okay. And is it Antoine and Denise Jones?
8 A. Yes.
9 Q. And did you, yourself, actually make copies of these
10 documents and give them to anybody a while back?
11 A. Yes.
12 Q. Okay. And who did you give them to, if you remember?
13 A. I received a subpoena, and I gave them -- I only remember
14 the first person, Katerina, I believe her name was.
15 Q. Okay. And in reviewing them again today are these the same
16 documents?
17 A. They are.
18 Q. Okay. Now, let me ask you, finally, Mr. Schaeffer about
19 ICE-21.
20     Do you recognize that picture?
21 A. I do.
22 Q. What is that -- that's actually not in evidence.
23 A. That is the front of 400 Hampton Park Boulevard.
24 Q. Okay. And does that picture fairly and accurately
25 represent the front of a particular storage unit at Hampton

74

1 Park?
2 A. It does.
3 Q. Okay. Which unit was that?
4 A. 400.
5 Q. Okay. And is 400 the unit that we've been talking about?
6 A. It is.
7 Q. Okay. And does that picture fairly and accurately
8 represent how the front of Unit 400 look at the time that it
9 was being leased by Mr. Jones?
10 A. It does.
11     MS. LIEBER:  Your Honor, at this time I would move
12 Government's ICE-21 into evidence.
13     MR. BALAREZO:  At what time?
14     THE COURT:  What's the date of the lease, please?
15 BY MS. LIEBER:
16 Q. Well, let me ask this, actually, Mr. Schaeffer, at the time
17 that Mr. Jones entered into the lease agreement with your
18 company for 400 Hampton Park Storage, did the front door to
19 that unit look like this?
20 A. No.
21 Q. What did the front door of that unit look like when you
22 first rented that space to Antoine Jones?
23     MR. BALAREZO:  Objection, Your Honor.
24 Can we approach one second?
25     THE COURT:  No. Does he know?

75

1     MR. BALAREZO:  It's not about -- it's about something
2 else, Your Honor, please.
3     THE COURT:  All right.
4     (Bench conference.)
5     MR. BALAREZO:  Your Honor, this may be a minor point
6 in the universe, but, number one, there's been no
7 identification of my client yet.
8     Number two, I don't know if this witness can identify
9 my client.
10     Number three, I object to Miss Lieber saying something
11 about Mr. Jones and then pointing to my client.
12     MS. LIEBER:  I'm sorry. I -- I didn't think about it,
13 and you're right.
14     THE COURT:  I don't know. That's all well-taken. I
15 don't know if he can or he can't.
16     He can identify dates. Can he identify him?
17     MS. LIEBER:  He can. He has a picture in his file, a
18 driver's license picture.
19     THE COURT:  Oh, all right. Well then, you'd better
20 establish that.
21     MS. LIEBER:  Okay. And I'm sorry. I didn't think
22 about it.
23     THE COURT:  I don't know how we're using this
24 custodian of records -- very good.
25     MR. BALAREZO:  Well, I didn't object, but he's the

76

1 president of the company. That doesn't necessarily mean he was
2 the custodian. That's one of the things I was objecting to
3 before the Court laid that foundation as it did.
4     And that was really my concern, does he know what
5 these documents are, does he deal with them, I don't know.
6     MS. LIEBER:  He personally made the copies from the
7 file, so he does know.
8     THE COURT:  No, that's not the point. Now the problem
9 is whether he has firsthand knowledge about who is the lessee,
10 and what did he lease, and what did the door look like.
11     So you have to lay that foundation.
12     MS. LIEBER:  Sure. Thank you.
13     THE COURT:  Thank you.
14     MR. BALAREZO:  Before we go, I think there is an issue
15 where he may testify about Mr. Jones putting up a door that
16 cost thousands of dollars. I don't think this guy knows who
17 ordered that door put in there, how much it costs, I mean, so I
18 don't want to get into -- it's hearsay.
19     MS. LIEBER:  Since we're here -- he is going to --
20     THE COURT:  Well, it's not hearsay to say the door
21 went up.
22     MR. BALAREZO:  No, no, but --
23     THE COURT:  He saw it.
24     MR. BALAREZO:  -- but there are other things that I
25 think would be hearsay, related to the door.

77

1    MS. LIEBER:   He is going to test -- I'm going to ask
2  him --
3    THE COURT:   He can testify to what Adam -- what Jones
4  told him, not his wife though.
5    MS. LIEBER:   Right. And he's only going to -- I'm
6  sorry. He's going to testify about a conversation he had with
7  Mr. Jones about putting up the door, why Mr. Jones wanted to
8  put up the door.
9    THE COURT:   It's all staying in.
10    MS. LIEBER:   -- and the fact that the door has to stay
11  because it's permanent.
12    THE COURT:   Okay. Thank you.
13    (Open court.)
14
15  BY MS. LIEBER:
16  Q.  Mr. Schaeffer, before I get to the picture that we have
17  been talking about, in the course of your duties as the manager
18  of that property, did you have occasion to have a conversation
19  or a number of conversations with Antoine Jones?
20  A.  I had one or two.
21  Q.  Okay. And do you actually have a photograph of Antoine
22  Jones in your file?
23  A.  I have a copy of his driver's license.
24  Q.  Okay. Would you -- if you saw Mr. Jones again, would you
25  be able to recognize Mr. Jones?

78

1  A.  Maybe.
2  Q.  Okay. Would seeing that picture that you have in your file
3  refresh your memory as to what Mr. Jones looked like?
4    MR. BALAREZO:   Objection, Your Honor. He didn't
5  indicate that he couldn't.
6    THE COURT:   No, he didn't.
7    The first question is: Can you identify anybody in
8  this courtroom as Mr. Jones?
9    THE WITNESS:   Without looking at the driver's license,
10  I would say no.
11  BY MS. LIEBER:
12  Q.  Would taking a look at that driver's license picture
13  refresh your memory as to the person who calls himself
14  Mr. Jones, who rented this facility?
15  A.  It would.
16    MS. LIEBER:   I'm showing to Mr. Balarezo, Photo 60,
17  just for identification.
18    If I may approach Your Honor, may I approach?
19    THE COURT:   Yes.
20  BY MS. LIEBER:
21  Q.  Mr. Schaeffer, I'm showing you Government's Exhibit Photo
22  60. Taking a look at that photograph, does that refresh your
23  memory as to the person who identified himself as Antoine Jones
24  who rented the storage facility we're talking about?
25  A.  Yes.

79

1  Q.  Okay. Now, having taken a look at that photograph, if you
2  look around the courtroom, do you see the person who you spoke
3  with who represented himself to be Antoine Jones who rep -- who
4  rented this facility?
5  A.  I think he's sitting at that table over there.
6  Q.  Okay. Can you be -- I'm sorry. Can you be a little more
7  specific? There are several people sitting at that table.
8    You can stand up and look, if it helps.
9  A.  I would say the man in the brown suit, but I'm not sure.
10  Q.  Thank you.
11    THE COURT:   You mean that gentleman that's standing?
12    THE WITNESS:   Yes.
13    MR. BALAREZO:   For the record, Mr. Norris' client
14  stood up.
15    MR. NORRIS:   Thank you.
16    THE COURT:   All right. True, for the record.
17    All right. Go ahead.
18  BY MS. LIEBER:
19  Q.  Now, Mr. Schaeffer, I want to show you now what I've marked
20  as Government's Exhibit, again, ICE-21. It's not in evidence.
21  At the time that Mr. Jones rented the storage facility in --
22  I'll put this on the machine, which was on November 17th, 2003,
23  did the storage Unit, 400 Hampton Park Boulevard, actually have
24  that door on it?
25  A.  No.

80

1  Q.  Is that the standard door that is in front of the various
2  warehouse units at your company?
3  A.  No.
4  Q.  Okay. Did there come a point in time during the course of
5  Mr. Jones' rental of that particular space that he installed
6  this overhead door?
7  A.  He did.
8  Q.  Okay. Does this picture fairly an accurately represent the
9  storage facility unit after he had that door installed?
10  A.  It does.
11    MS. LIEBER:   Your Honor, at this time I would move
12  ICE-21 into evidence.
13    MR. BALAREZO:   Your Honor, I object, subject to the
14  objection I made at the bench.
15    THE COURT:   Who --
16    MS. LIEBER:   Your Honor, I --
17    THE COURT:   Fairly and accurately represents the
18  facility after the door was added, but the door wasn't there
19  originally; right?
20    THE WITNESS:   Correct.
21    THE COURT:   Okay. I don't understand the objection to
22  the admission of the paper.
23    MR. BALAREZO:   I'll deal with it on cross.
24    THE COURT:   All right. Then 21 is admitted.
25    (Government's Exhibit ICE-21 was received into

81

1　　　　　evidence.)
2　　　　MR. BALAREZO:　But I still object to it, for the
3　record.
4　　　　　THE COURT:　Okay. Overruled.
5　　　　　Go ahead.
6　BY MS. LIEBER:
7　Q.　Mr. Schaeffer, did you actually have a conversation with
8　Mr. Jones about why he wanted to install that particular
9　overhead door?
10　A.　He did ask if he could have permission to install it, and I
11　said, yes.
12　Q.　Okay. And why -- did he tell you why he wanted to install
13　an overhead door on the front of that warehouse facility?
14　A.　He said that --
15　　　　　MR. BALAREZO:　Objection, Your Honor.
16　　　　　THE COURT:　You want to approach, on what basis?
17　　　　　MR. BALAREZO:　Let me think of one.
18　　　　　THE COURT:　Huh?
19　　　　　MR. BALAREZO:　Yes.
20　　　　　THE COURT:　Have we talked about it before? I've
21　overruled that.
22　　　　　MR. BALAREZO:　Well --
23　　　　　THE COURT:　When you were talking with this person,
24　the person who entered into the lease, is this the same person
25　you talked to?

82

1　　　　　THE WITNESS:　Yes, Your Honor.
2　　　　　THE COURT:　Okay. And did the person who you were
3　talking to give you a name?
4　　　　　THE WITNESS:　He did.
5　　　　　THE COURT:　What did he tell you his name was?
6　　　　　THE WITNESS:　Mr. Jones.
7　　　　　THE COURT:　Okay. You want to approach?
8　　　　　MR. BALAREZO:　Yes.
9　　　　　THE COURT:　All right. Sorry.
10　　　　　(Bench conference.)
11　　　　　THE COURT:　The fact that he can't make an -- can you
12　stand over there, please? Sorry to make you do that. Just
13　stand over there.
14　　　　　Let me -- okay. Never mind. Go ahead -- 21 is
15　admitted. Go ahead.
16　　　　　MR. BALAREZO:　Where is it?
17　　　　　THE COURT:　What are you looking for?
18　　　　　MR. BALAREZO:　Well -- sorry.
19　　　　　THE COURT:　He can't make and in-court identification.
20　　　　　MR. BALAREZO:　Right. No, I understand.
21　　　　　THE COURT:　Where is the photo I.D.?
22　　　　　MS. LIEBER:　Your Honor, if I may, I'm going to ask
23　him was that also kept in his file in the ordinary course of
24　business. He's going to say yes, and I'm going to put it in.
25　　　　　THE COURT:　Did this come from his file?

83

1　　　　　MS. LIEBER:　It did. I took it out of his file and
2　put a sticker on it.
3　　　　　THE COURT:　What -- what is the problem? This is the
4　guy I talked to, this is the guy that signed the lease, this is
5　the guy --
6　　　　　MR. BALAREZO:　Well, he hasn't said that.
7　　　　　THE COURT:　He's about to. I mean, that's the point.
8　That's where we're going.
9　　　　　And what's the answer, though? What is the person
10　saying?
11　　　　　MS. LIEBER:　He says that he wanted more secure -- he
12　wanted to secure it with an overhead door because he ran a
13　moving and storage business.
14　　　　　THE COURT:　We're fighting over this?
15　　　　　MR. BALAREZO:　Well, Your Honor, because -- no.
16　Because the implication is --
17　　　　　THE COURT:　I'm working so hard that my brain cells
18　are gone.
19　　　　　MR. BALAREZO:　Mine are gone.
20　　　　　But the implication, I think, is that the warehouse
21　had a glass front at some point, and Mr. Jones put that in so
22　he could secure his drugs.
23　　　　　THE COURT:　The implication, but the more you bring it
24　out -- we didn't know anything about glass doors, I'll tell you
25　that.

84

1　　　　　MR. BALAREZO:　Well, I don't particularly want to get
2　into it. The thing is, it's --
3　　　　　THE COURT:　But in any case, it's not fatal to her
4　being able to elicit this. When a person who looks like this
5　who says, "My name's Jones and signs the lease," says the
6　following. It's an admission of the party opponent.
7　　　　　MR. BALAREZO:　That's what I'm reading right now. I
8　thought there was one of the subsections there that I could
9　throw at the government, but --
10　　　　　MR. GEISE:　I think it's 801(d)(2)-1.
11　　　　　MR. BALAREZO:　I have it, yeah.
12　　　　　MR. NORRIS:　While Mr. Balarezo is looking at that,
13　how do we deal with the issue of the false identification of my
14　client as Mr. Jones, with the jury?
15　　　　　THE COURT:　I think that they have to be told that he
16　has done that. We can stipulate after he leaves.
17　　　　　MR. NORRIS:　Very well.
18　　　　　THE COURT:　I don't think we ought to clue him in, so
19　that he goes back --
20　　　　　MR. NORRIS:　No, no. I don't want to do it in front
21　of the witness.
22　　　　　THE COURT:　But for the record, it's been done as
23　identified as your client, and we can certainly say that, you
24　know, it wasn't -- there was no suggestion that it was your
25　client that was renting this.

85

1　　　　MR. NORRIS:   I can work on that.

2　　　　MS. LIEBER:   Your Honor, that's why I didn't say for

3　the record he identified -- because I didn't want to tip him

4　off.

5　　　　THE COURT:   Right. Okay. I've had enough.

6　　　　MR. BALAREZO:   I'm sorry, Your Honor.

7　　　　THE COURT:   Thank you.

8　　　　MS. LIEBER:   She has enough of a recollection of the

9　rules of evidence. Thank you.

10　　　　(Open court.)

11　　　　THE COURT:   Thank you, sir. Would you retake the

12　stand?

13　　　　You notice our bench conferences, ladies and

14　gentlemen, get longer as the day gets later. It's harder to

15　think fast enough.

16　　　　Okay. Go ahead. Sorry.

17　　　　MS. LIEBER:   Mr. Norris gets funnier.

18　BY MS. LIEBER:

19　Q.   Let me ask this, Mr. Schaeffer, the item that I identified

20　for you as Photo 60 and brought up there that you looked at --

21　　　　THE COURT:   This is ICE-60, Gwen.

22　　　　MS. LIEBER:   I'm sorry, it's Photo 60.

23　　　　THE COURT:   Photo 60. Okay, Photo 60.

24　BY MS. LIEBER:

25　Q.   Is that photocopy a document that you also kept in the

86

1　ordinary course of business?

2　A.   It is.

3　Q.   Okay.

4　　　　MS. LIEBER:   At this time, Your Honor, I would move

5　Photo 60 into evidence.

6　　　　THE COURT:   Do you know whether that came from your

7　files, sir?

8　　　　THE WITNESS:   It did, Your Honor.

9　　　　THE COURT:   Any objection?

10　　　　MR. BALAREZO:   No, Your Honor.

11　　　　THE COURT:   That means Photo 60 is in evidence, and it

12　can be shown.

13

14　(Government's Exhibit Photo 60 was received into evidence.)

15　　　　MR. NORRIS:   Your Honor, no objection, but just for

16　the record, can we say that that appeared to be a photocopy of

17　a driver's license that's been enlarged several times.

18　　　　THE COURT:   Okay. I think we can agree that that's

19　probably a correct photocopy of an enlarged driver's license.

20　BY MS. LIEBER:

21　Q.   Mr. Schaeffer, I have been asking a lot of questions about

22　the person who rented the location and the person who installed

23　this overhead door.

24　　　　The person who did all of those things, did he also give

25　you this driver's license?

87

1　A.   He did.

2　Q.   As part of his identification?

3　A.   He did.

4　Q.   Okay. Thank you.

5　　　　THE COURT:   Is that the person you talked to?

6　　　　THE WITNESS:   Yes, it is.

7　BY MS. LIEBER:

8　Q.   And did he say his name was Antoine Jones?

9　A.   Yes, he did.

10　Q.   Okay, thank you.

11　　　　Back to the overhead door.

12　　　　When you had a conversation with Mr. Jones, what did he

13　tell you about why he wanted to install this overhead door?

14　A.   He said that he was in the moving and storage business, and

15　he felt that the glass door front was not secure enough.

16　Q.   And tell the jury, what was the glass door? What did it

17　look like?

18　A.   It was a glass door front, and then it had a personnel door

19　to go in and out of.

20　Q.   When you say personnel door --

21　A.   Or a people door.

22　Q.   Like the one behind you, for instance?

23　A.   Yes. And then -- yes.

24　Q.   And for the record, I'm talking about the door to the jury

25　room.

88

1　　　　And when you say a glass front, what kind of grass was?

2　A.   It was tempered glass.

3　Q.   Okay. And when he said that he wanted to do that, did you

4　grant him permission to do that?

5　A.   I did.

6　Q.   Okay. Did you give him any sort of instructions about what

7　would have to happen to that door come time that he ended his

8　lease?

9　A.   I told him that it became affixed to the building, that

10　when he terminated his lease, that it would stay. And he

11　agreed.

12　Q.   Okay.

13　　　　MS. LIEBER:   Court's indulgence.

14　　　　THE COURT:   What was the day the lease was signed? D

15　you have the documents in front of you?

16　BY MS. LIEBER:

17　Q.   And this part of the --

18　　　　THE COURT:   I just asked him the date the lease was

19　signed.

20　　　　MS. LIEBER:   Oh, I'm sorry.

21　BY MS. LIEBER:

22　Q.   I was going to show you this anyway.

23　　　　Looking at this, when was the lease signed, sir?

24　A.   The lease was signed November 17, 2003.

25　Q.   And was it signed by Mr. Jones, and anybody else?

**89**

1　A.　Mrs. Jones.
2　Q.　Did she actually come there in person, herself?
3　A.　She came at least once. I don't know if he brought it
4　signed or if she came.
5　Q.　Okay. But you actually -- she came at least one time?
6　A.　Yes.
7　Q.　Okay. And finally, sir, with respect to the overhead door,
8　how much do those cost, do you know?
9　　　　MR. BALAREZO:　Objection.
10　　　THE COURT:　And how would he know?
11　　　MS. LIEBER:　Well --
12　　　THE COURT:　Do you know?
13　BY MS. LIEBER:
14　Q.　Do you have firsthand knowledge of how much an overhead
15　door like that costs?
16　A.　Approximately, yes.
17　　　　MR. BALAREZO:　Objection.
18　BY MS. LIEBER:
19　Q.　And how do you know?
20　A.　I've had other doors like that installed.
21　　　THE COURT:　Did you pay for them or see the bill?
22　　　THE WITNESS:　I paid for them.
23　　　THE COURT:　Okay. Overruled.
24　BY MS. LIEBER:
25　Q.　And how much does an overhead door like that cost?

**90**

1　A.　Between 3,000 and $3,500.
2　Q.　Okay. Thank you very much, sir.
3　　　THE COURT:　Go ahead.
4　　　MS. LIEBER:　Oh, I'm sorry. I said "Thank you very
5　much." I meant that's all I had.
6　　　　Thank you very much.
7　　　THE COURT:　That's why she sat down.
8　　　　Okay.
9　　　　　　　CROSS-EXAMINATION
10　BY MR. BALAREZO:
11　Q.　Good afternoon, Mr. Schaeffer. How are you?
12　　　My name is Eduardo Balarezo. I think you might recall, you
13　and I spoke a few times over the phone?
14　A.　Yes.
15　Q.　How are you?
16　A.　Fine, thank you.
17　Q.　Mr. Schaeffer, what was the date of this lease that we were
18　talking about?
19　A.　November 17, 2003.
20　Q.　So that was approximately three years ago?
21　A.　Approximately, yes.
22　Q.　Did you, yourself, accept the lease from this Mr. Jones?
23　A.　I did.
24　Q.　Okay. And you've identified an individual here that is Mr.
25　Jones; right?

**91**

1　A.　I did.
2　Q.　Okay. Now, you've also talked about Mrs. Jones.
3　　　Did you do anything to confirm that the person you are
4　calling Mrs. Jones was, in fact, Mrs. Jones?
5　A.　When they first came in, they came in together. They
6　were -- I believe there were three people. There was
7　Mr. Jones, Mrs. Jones, and Lawrence.
8　　　And I asked for their driver's licenses at that time. And
9　then I ran a credit check. And they came back later once the
10　process had been completed, but I'm not sure if Mrs. Jones came
11　back.
12　Q.　Right.
13　　　But my question -- and I'll try to make it very specific,
14　is, did you do anything to confirm that Mr. Jones and
15　Mrs. Jones were, in fact, married, besides check their
16　licenses?
17　A.　No, that's all I did, yes.
18　Q.　Okay. So --
19　A.　I mean, and I did run a credit report, but I -- I -- that's
20　all I did, yes.
21　Q.　And the -- the warehouse that you own over in Hampton Park,
22　that is a large -- well, a fairly large --
23　　　THE COURT:　What town is it in again?
24　　　THE WITNESS:　Capitol Heights.
25　BY MR. BALAREZO:

**92**

1　Q.　Let me show you or put up on the Elmo, ICE-19. I think
2　it's already been admitted.
3　　　Okay. Do you see that, sir?
4　A.　I do.
5　Q.　Exhibit 19?
6　　　Now, is this the -- would this diagram, would that
7　represent the entirety of the warehouse that you own in Hampton
8　Park?
9　A.　It does.
10　Q.　And the one that -- the space that we've been talking about
11　is Number 400; right?
12　A.　It is.
13　Q.　As that's -- as we can see, that's at the end of the
14　warehouse?
15　A.　It is.
16　Q.　Okay. What's -- what's on this side over here?
17　A.　There's a fence.
18　Q.　Okay.
19　A.　And then there's a parking lot. And then there's a --
20　another industrial building. I believe it's Con Paper
21　Products.
22　Q.　All right. Now, the -- the area, it's basically -- let's
23　say after hours, it's pretty desolate, is it not?
24　A.　I would say yes.
25　Q.　It's a parking lot and some other industrial complex;

93

1  right?
2  A.  Yes.
3  Q.  There's not a lot of people coming and going; correct?
4  A.  The tenant next to him sometimes stays open until 7:00 or
5  8:00, yeah, 404 and 408.
6  Q.  And that's the --
7  A.  Snack food --
8  Q.  And that's the Snack Shack; is that right?
9  A.  Yes.
10  Q.  And the Snack Shack is still there?
11  A.  It is.
12  Q.  Now, you are aware, since you're the owner and you deal
13  with these people, that the snack shack, in the past -- I'm not
14  asking about right now -- but in the past, had a lot of
15  break-ins; correct?
16  A.  I don't recall that.  I remember when there was a bicycle
17  shop in unit -- I think it was 412 or 418, they were broken
18  into.  I don't remember the snack shack being broken into, but
19  I remember at least one break in.
20  Q.  And most of these -- most, if not all of those spaces,
21  again, each of these spaces is an individual warehouse; right?
22  A.  Some of them are combined units like 404 and 408, there
23  would be no wall in-between, it would be just open space.
24  Q.  But the front of these were all the same, basically that
25  plate grass that you were talking about; right?

94

1  A.  Right.
2  Q.  Okay.  So, for example, when the bicycle shop was broken
3  into, somebody broke the plate glass and got in; correct?
4  A.  Yes.
5  Q.  Now, you indicated that Mr. Jones told you that he was
6  going to use this as -- what was it, a furniture --
7  A.  I thought he said moving and storage.
8  Q.  A moving and storage company.
9      Did you ever go into the space at the time that Mr. Jones
10  had the lease?
11  A.  Not that I remember, no.
12  Q.  Can you tell this jury that Mr. Jones never had any
13  furniture in that -- in that particular space, Number 400?
14  A.  No, I couldn't say that.
15  Q.  Now, if Mr. Jones was conducting this business, this
16  furniture moving business, and considering that you've had
17  break-ins into your other warehouse spaces, it's not really
18  unusual for him to want to secure his space, is it?
19          MS. LIEBER:  Objection.
20          THE COURT:  Sustained.  Sustained.
21  BY MR. BALAREZO:
22  Q.  Now, you indicated that you, yourself, had some of these
23  overhead doors installed.
24      Were they installed in these other spaces?
25  A.  They were not installed in this building, no.

95

1  Q.  Why did you have those installed?
2  A.  For security.
3  Q.  To prevent break-ins; correct?
4  A.  Yes.
5  Q.  Now, you indicated that you gave the documents that Miss
6  Lieber showed you, the lease and the brochures, you gave them
7  to somebody named Katerina?
8  A.  Yes.
9  Q.  Do you recall when you gave her those documents?
10  A.  No.
11  Q.  Was it within the last month, or was it within the last
12  year, do you recall?
13  A.  It certainly wasn't within the last year.
14  Q.  Was it before last year, let's say?
15  A.  It was.
16  Q.  Okay.  And that was in response to a subpoena; is that
17  correct?
18  A.  It was.
19  Q.  All right.  And is it not true that you also agreed to
20  allow her agency, the Immigration and Customs Enforcement
21  Agency, to use another location to conduct surveillance?
22  A.  I never did that, no.
23  Q.  Are you -- you're the owner of this location; right?
24  A.  I'm the owner of this building, yes.
25          MR. BALAREZO:  If I could just have one second.

96

1  BY MR. BALAREZO:
2  Q.  Do you know who someone by the name of Larry Gasner
3  (phonetic) is?
4  A.  No.
5  Q.  Do you know what Crystal Management, LLC is?
6  A.  No.
7  Q.  How about Hampton Park Center, LLC?
8  A.  No.
9  Q.  What is the name of your particular company?
10  A.  9000 Hampton Park Limited Partnership.
11  Q.  And do you know what the building at 401 Hampton Park
12  Boulevard is -- where that is?
13          MS. LIEBER:  Objection.  Beyond the scope.
14          THE COURT:  It is.
15      If you know, you can answer this.
16          THE WITNESS:  I assume it's across the street.  You
17  know, without going out there, I don't know.  I assume 401
18  would be across from 400, I assume.
19          THE COURT:  But you don't have any interest?
20          THE WITNESS:  No.
21          THE COURT:  Okay.  Go ahead.
22  BY MR. BALAREZO:
23  Q.  No interest, just to clarify that -- because I anticipate
24  the following witness.
25      You have no interest as in you have no ownership interest?

97

1  A. That and this is the only building I own in Hampton Park.
2  Q. I understand.
3      MR. BALAREZO:  And, Your Honor, actually, can we
4  approach before I continue, just so -- I know it's late.
5      THE COURT:  Just finish it up please.
6      Go ahead.
7  BY MR. BALAREZO:
8  Q. This person, Katerina, did there come a time when she --
9  when you allowed her to enter the premises at 400 Hampton Park?
10 A. I may have.
11 Q. As best as you can, did you, or did you not?
12 A. I didn't have a key when the tenant was in. After the
13 tenant left, if she asked me for the key, I would have given
14 her the key.
15 Q. Well, but my question is -- I'm not asking you to speculate
16 as to whether you did or not.
17     To the best of your recollection, did she ask you to --
18 whether --
19 A. I do not remember.
20 Q. All right. Do you remember speaking to an individual by
21 the name of Mark Glick?
22 A. Yes.
23 Q. About a month ago?
24 A. Yes.
25 Q. And you're aware that Mr. Glick is my investigator?

98

1  A. I am.
2  Q. Okay. And do you recall Mr. Glick asking you questions to
3  that effect, whether or not you allowed agent Katerina -- Gikas
4  is her last name -- to enter the premises?
5  A. I do.
6  Q. And do you remember that you told Mr. Glick that you did
7  not give Agent Gikas authority to enter the premises?
8  A. No. I said I did not remember.
9  Q. Now, the -- the inside of 400, it just wasn't one big open
10 space; correct?
11     There was an office --
12 A. There was an office in the front part, yes.
13 Q. And that office had doors -- well, the office is what
14 fronted the glass partition at the front; correct?
15 A. Yes.
16 Q. All right. Now, were you aware that Mr. Jones kept
17 furniture in the office?
18 A. No.
19 Q. So you had no inspections of the premises while he had the
20 lease?
21 A. He was there a very short time. I don't remember going out
22 while he was a tenant.
23     THE COURT:  When did he leave? When was the tenancy
24 over?
25     THE WITNESS:  April 30th. I think he was there for

99

1  about five months.
2      THE COURT:  April 30, '04?
3      THE WITNESS:  '04.
4  BY MR. BALAREZO:
5  Q. And did you, yourself, enter the premises upon his
6  departure?
7  A. I don't remember, but it's customary for me to go out and
8  inspect the premises, so he could get his security deposit
9  back.
10 Q. And did you give Mr. Jones his --
11 A. I did.
12 Q. And part of the reason you gave the security deposit back
13 was because there was no damage to the property; right?
14 A. Correct.
15 Q. And when Mr. Jones left the property, he cleared it out; is
16 that correct?
17 A. I don't -- I don't remember.
18 Q. Well, if Mr. Jones had left garbage and equipment and all
19 kinds of items in the -- in the location, would you have
20 considered that basically completing his lease and given him
21 all his money back, or would you have taken money for cleanup,
22 let's say?
23 A. Yes. Normally, if there's a small amount of debris or
24 stuff left, I still return the security deposit.
25 Q. Let me ask you this, do you recall whether or not once

100

1  Mr. Jones left the premises, whether there was a -- any
2  clothing, any uniforms, anything of that nature?
3  A. I do not know.
4  Q. Don't know or don't recall?
5  A. I guess I would say I don't recall. I don't remember
6  anything like that.
7  Q. Do you remember whether or not when Mr. Jones left the
8  premises, if there were any sort of inflatable mattresses or
9  any sort of equipment like that?
10 A. I don't recall.
11 Q. Do you know whether or not when Mr. Jones left the
12 premises, if there were any bags, duffle bags, suitcases,
13 anything of that nature?
14 A. No, I don't know.
15 Q. And do you know when Mr. Jones left the premises, if there
16 were any heat-sealing equipment, any wrapping materials,
17 anything of that nature?
18 A. I do not know.
19 Q. And when Mr. Jones left the premises do you know if there
20 was --
21     THE COURT:  Can we ask you, do you have any idea what
22 was in it when he left?
23     THE WITNESS:  I have no idea, Your Honor.
24     MR. BALAREZO:  Well, Your Honor, I have to ask those
25 specific ones.

---

**101**

1    THE COURT:  Well, you did.  Thank you.
2    MR. BALAREZO:  Am I done?
3    THE COURT:  I hope so.
4    Anybody else?
5    MR. BALAREZO:  I may have had one more, but I'll defer
6    to the –
7    MR. NORRIS:  I'll defer to Mr. Balarezo.
8    THE COURT:  Do you want to give him your one question,
9    that will be fine.  Go ahead.
10    MR. BALAREZO:  I'll turn it into three.
11    THE COURT:  Okay, Mr. Norris.
12    MR. NORRIS:  Thank you.
13                CROSS-EXAMINATION
14    BY MR. NORRIS:
15    Q.  Good afternoon, Mr. Schaeffer.
16    A.  Good afternoon.
17    Q.  I believe you've mentioned three names in connection with
18    this lease, Mr. Antoine Jones, his wife, I believe you said was
19    Denise Jones, and someone named Lawrence; is that correct?
20    A.  Yes.
21    Q.  Okay.  And Lawrence, would that be Lawrence Maynard?
22    A.  It would be.
23    Q.  Okay.  And the name Adrian Jackson is not anything that
24    you're familiar with in connection with the rental of this
25    unit; is that correct?

---

**102**

1    A.  No.
2    Q.  And that's not one that you've met –
3    THE COURT:  Wait, no.  Is that correct meaning yes?
4    Correct, you're agreeing with him?
5    The name Adrian Jackson is meaningless to you?
6    THE WITNESS:  Yes, I have no knowledge of him.
7    BY MR. NORRIS:
8    Q.  No knowledge of Adrian Jackson?
9    A.  Correct.
10    Q.  Okay.
11    MR. NORRIS:  Nothing further.
12    MR. McDANIEL:  No thank you, Your Honor.
13    MR. ACREE:  No, Your Honor.
14
15                REDIRECT
16    BY MS. LIEBER:
17    Q.  Mr. Schaeffer, very briefly, I'm going to show you – I'll
18    just put them on the monitor here.
19    THE COURT:  They're not in evidence?
20    MS. LIEBER:  They're not in evidence yet.
21    BY MS. LIEBER:
22    Q.  Photo 61, do you see that?
23    A.  Yes.
24    Q.  And what is Photo 61?
25    A.  It's a driver's license of Lawrence Maynard.

---

**103**

1    Q.  Is it a photocopy of that driver's license?
2    A.  It is.
3    Q.  Okay.  Now I'm going to show you Photo 62; do you see that?
4    A.  I do.
5    Q.  And what is that?
6    A.  That's a photocopy of a driver's license of Mrs. Jones.
7    Q.  Now, Mr. Schaeffer, were these also kept in your rental
8    file in the ordinary course of business?
9    A.  It was.
10    Q.  Okay.  Were these actual photocopies that you or someone
11    like you made of the driver's licenses presented by Mrs. Jones
12    and Mr. Maynard?
13    A.  It was.
14    Q.  Okay.
15    MS. LIEBER:  Your Honor, at this time I would move
16    Photos 61 and 62 into evidence.
17    THE COURT:  Are these copies from your files?
18    THE WITNESS:  They are, Your Honor.
19    THE COURT:  Any objection?
20    MR. BALAREZO:  No.
21    THE COURT:  Photo 61 and -2 are in.
22    (Government's Exhibits Photo 61 and Photo 62 were
23    received into evidence.)
24    BY MS. LIEBER:
25    Q.  And finally, Mr. Schaeffer –

---

**104**

1    THE COURT:  Are you going to put them on the screen
2    though?
3    MS. LIEBER:  I'm sorry.
4    BY MS. LIEBER:
5    Q.  Here's Photo 62; is that right?
6    A.  Yes, it is.
7    Q.  Okay.  And that's Denise Jones?
8    A.  Yes, it is.
9    Q.  Now Photo 61?
10    A.  That's Lawrence.
11    Q.  Okay.  Thank you.
12    Did you actually see Lawrence around that property from
13    time to time?
14    A.  I did.
15    Q.  Finally, Mr. Schaeffer, when Mr. Jones was the renter of
16    that space, so we're talking now the winter of 2004, did you
17    have a key to that overhead door?
18    A.  I did not.
19    Q.  How did you get the key when he vacated the premises?
20    A.  He took the locks off the door when he left.
21    Q.  Okay.  And it was at that time that you had access to it?
22    A.  It was.
23    Q.  Okay.  Thank you.
24    MS. LIEBER:  Nothing else.
25    THE COURT:  Thank you, you may step down.

105

1    MR. BALAREZO:   Your Honor, administratively, can I
2  just discuss one quick issue with Mr. Schaeffer?
3    THE COURT:   You mean on the stand?
4    MR. BALAREZO:   No, no, just before he have leaves.
5    THE COURT:   I don't know.  You can walk out with him,
6  as far as I'm concerned.
7    MR. BALAREZO:   I'll let --
8    THE COURT:   In the meantime, can you get your next
9  witness?
10    Did you finish?
11    MR. BALAREZO:   Yes, thank you, Your Honor.
12    MS. LIEBER:   My next witness is coming.
13    THE COURT:   Good afternoon.  Welcome back from
14  Atlanta.  We haven't gone anywhere since you left.
15    You're still under oath.
16    MS. LIEBER:   Can I object to that, actually?
17    THE COURT:   I don't mean that we haven't progressed.
18  We're still in the same courtroom --
19    MS. LIEBER:   I think we would all object to that.
20    THE COURT:   Yeah.  Some people are wearing different
21  clothes, I hope.
22    Have a seat.  You're still under oath.  I just wanted
23  to reorient you to where you are.
24    (Special Agent Katerina Gikas, 4:10 p.m.)
25    DIRECT EXAMINATION (continued)

106

1  BY MS. LIEBER:
2  Q.  Good afternoon, ma'am.
3  A.  Good afternoon.
4  Q.  Welcome back.
5  A.  Thank you.
6  Q.  Now, when last we spoke a few weeks ago, you were talking
7  about an investigation that was begun by a phone call from ICE
8  agents in McAllen, Texas; is that right?
9  A.  Yes.
10  Q.  Okay.  And the first -- just want to step back for a
11  minute, but first, did you ultimately, in the course of your
12  investigation that was kicked off by that phone call, identify
13  three locations of interest in the metropolitan
14  Washington, D.C. area?
15  A.  Yes.
16  Q.  Okay.  Remind the jury, just so we know where we are,
17  remind the jury what those three locations were in, I guess I
18  should actually say suburban Maryland, outside of
19  Washington, D.C.?
20  A.  The first location was an apartment in Summit Circle in
21  Largo, Maryland.  The second location was a single-family home,
22  8550 Myrtle Avenue in Bowie, Maryland.
23    And actually, two more locations, one location -- the third
24  location was a warehouse in Capitol Heights, Maryland 400
25  Hampton Park Boulevard.

107

1  Q.  Okay.
2  A.  And then a club in D.C. on Montana Avenue.
3  Q.  Okay.
4  A.  Club Levels.
5  Q.  Okay.  Now, what I want to do is, first, we had some
6  discussion back when we -- before we broke the last time, about
7  what led you to focus on the residence of this apartment in
8  Summit Circle.  And what was it that, without getting, again,
9  into all the detail of your investigation, that got you there?
10    What was it about a particular apartment in Summit Circle
11  Apartments in Largo, Maryland, that peaked your interest?
12  A.  Well, we had followed one of the subjects that we were
13  following from -- that had come from Texas --
14    THE COURT:   Remind us of his name again.  You told us
15  before.
16    THE WITNESS:   Javier.
17    THE COURT:   Full name?
18    THE WITNESS:   Francisco Javier Ruan Gonzalez.
19  BY MS. LIEBER:
20  Q.  Okay.  And did you call him Javier?
21  A.  I did.
22  Q.  And for purposes of this testimony, we'll call him Javier,
23  okay?
24  A.  Right.
25  Q.  Okay.  And how is it that you linked this Javier to an

108

1  apartment at Summit Circle?
2  A.  We followed him there, and we saw him go into an apartment
3  on the third -- on the third floor.
4  Q.  And when you say "we," it was actually you, personally, who
5  saw him go into an apartment on the third floor?
6  A.  Yes.
7  Q.  Okay.  Now, in connection with your investigation of where
8  he might be going and what he might be doing, did you obtain
9  rental documents for a particular apartment within the Summit
10  Circle apartment complex?
11  A.  Yes.
12  Q.  Okay.  And a how is it that you pinpointed a specific
13  apartment within the Summit Circle apartments?
14  A.  We looked at the list of all the renters in that apartment,
15  and one of them was the same name as the registrant of the
16  vehicle that picked up one of the --
17    MR. BALAREZO:   Objection.  Objection, Your Honor.  I
18  have to approach on this.  This is what we were talking about.
19    THE COURT:   No, no.  It's all right.  Hold on.  I know
20  what you're talking about, but we would like to know what you
21  learned on your own as opposed to being told something else.
22  But it may be that we will get to the second question next.
23    Did you actually search the titles to the cars, or did
24  somebody do that and tell you?
25    THE WITNESS:   Someone told me.

109

1  THE COURT:  Okay. But this is not going in for the
2  truth of the contents whatsoever.
3  MR. BALAREZO:  Yes, it is, Your Honor.
4  THE COURT:  Do you want to approach?
5  MR. BALAREZO:  Yeah.
6  (Bench conference.)
7  THE COURT:  I take it the rental car belongs to --
8  remind me. We've already probably gone over this.
9  MS. LIEBER:  We have not. Actually, something
10  developed since we were last here in terms of my ability to
11  prove certain aspects, which is why I'm eliciting this.
12  I'm not asking her now for the specific names. This
13  just goes to her state of mind, how she figured out which
14  apartment to focus on. This is -- this is what's going to
15  happy eventually.
16  At some point, Javier and his -- one of his
17  compatriots head back to Texas fairly quickly. A car comes and
18  picks up one of these people and takes them to BWI. The car
19  that picked him up was registered to Antoine Jones. I have --
20  we have the witness who was in the parking lot surveilling that
21  and seeing Mr. Jones get into -- I'm sorry, seeing the unknown
22  Hispanic male get into the black Cadillac registered to Antoine
23  Jones.
24  We have that witness who is going to be here tomorrow
25  or Monday who will testify that "I observed this particular

110

1  license plate."
2  THE COURT:  Do you have something that tells us that
3  the license plate belongs to him? Because that you are
4  introducing for the truth.
5  MS. LIEBER:  I have the DMV record that she obtained
6  that has that license plate tag number. Based on their
7  identification of that person, they looked at the Summit Circle
8  leases for the third floor -- I think there are four units up
9  there, 9719.
10  And when they looked at the four possible apartments,
11  one was rented by the guy who registered the car that picked up
12  the unknown Hispanic male, Jones.
13  THE COURT:  So what are you objecting to? Now, she's
14  only -- she said that to say that she identified the apartment.
15  Did she go search the apartment or something? What do
16  you care?
17  MS. LIEBER:  She looked -- in other words, the
18  question may be out there. I certainly had that question.
19  She testified there are four apartments on the third
20  floor. How did you know which one to be curious about?
21  Because all she saw -- she personally saw Javier go up to the
22  third level and didn't know which apartment.
23  THE COURT:  Right.
24  MS. LIEBER:  Well, in the days that followed, she
25  looked at the registrants of those four apartments, the leases,

111

1  and she realized that Antoine Jones rented Apartment 3-B, and
2  that Antoine Jones' vehicle picked up unknown Hispanic Male 2
3  and took him to BWI.
4  THE COURT:  And so are you intending to elicit the
5  latter fact from someone tomorrow?
6  MS. LIEBER:  Tomorrow or Monday, I mean, as soon as we
7  can get him here, yes. But I have his phone number now, and he
8  knows he's going to be a witness.
9  THE COURT:  Are you going to ask her?
10  MS. LIEBER:  No.
11  THE COURT:  So there's no hearsay coming out anyways.
12  MS. LIEBER:  I just want -- I just want the dots to be
13  connected that this is the process she employed, and then we
14  will connect it up.
15  THE COURT:  She can testify that the rental was to
16  Antoine Jones, we know that. Because she's -- those documents
17  are in can. She's going to say it matches the car, and they're
18  going to prove the car tomorrow.
19  MR. BALAREZO:  Well, that was --
20  THE COURT:  Okay. We're all set.
21  MR. BALAREZO:  -- my primary objection because I
22  didn't have that information before.
23  THE COURT:  Yeah.
24  MR. ACREE:  I was just going to say that Mr. Huggins
25  keeps asking me to ask you if he can go to the bathroom. I

112

1  think what might have happened was the last time, they didn't
2  go back. I'm not sure, but --
3  THE COURT:  I don't know. We have to let the jury go
4  back there. I can excuse him. I'm not going to stop the trial
5  at 4:15. So we'll give him a two-minute break.
6  MR. ACREE:  I apologize, but he said he really had to
7  go.
8  THE COURT:  Fine. Okay.
9  (Open court.)
10  THE COURT:  Ladies and gentlemen, I'm going to excuse
11  the jury for two minutes. Please don't go away. This is a
12  two-minute recess only. File out, and we'll bring you right
13  back. Believe me.
14  (Jury out at 4:18 p.m.)
15  THE COURT:  Okay. Go ahead.
16  When they come back in -- we don't have to be on the
17  record.
18  (Off the record, 4:19 p.m.)
19  (Back on the record, 4:20 p.m.)
20  THE COURT:  I intend to tell the jury when they come
21  back in two minutes, that Mr. Schaeffer mistakenly identified
22  Mr. Jackson in his testimony and that -- as Mr. Jones, and
23  there's no evidence that Mr. Jackson had anything to do with
24  this property.
25  MR. NORRIS:  Property or rental unit, whatever.

113

1  THE COURT:  And it's agreed, it's stipulated?
2  MS. LIEBER:  Yes.
3  MR. NORRIS:  Thank you.
4  MR. BALAREZO:  Your Honor, I know I don't have a
5  question with that, but I would object to the mistakenly part.
6  That's for the jury to make up its mind about.  He identified
7  Mr. Jackson, and I would ask that the "mistakenly" be left out.
8  MR. NORRIS:  I mean, it's clear from his testimony
9  that the person he was dealing with was Mr. Jones, both from
10  his testimony and from the driver's license record.  So I think
11  for my client's purposes, it's important that it be pointed out
12  that the identification was a mistaken identification.
13  THE COURT:  I bet maybe it's better just to say he
14  inaccurately identified Mr. Jackson as Mr. Jones.  We all know
15  Mr. Jackson is not Mr. Jones, so that's not accurate.
16  MR. NORRIS:  I'm fine with that.
17  THE COURT:  Okay.
18  MR. NORRIS:  Thank you.
19  THE COURT:  All right.
20  We are going to bring back the jury in two seconds.
21  Mr. Huggins is here now, we can proceed.  I just want you to
22  know, if you put in a summary chart, under the rule, once it
23  goes in, you're not required by the law to put in underlying
24  evidence, as long as they have access to it.
25  MS. LIEBER:  And that's the point of it.  Instead of

114

1  having him come up and testify about various days --
2  THE COURT:  Right.  The same thing with calls and
3  everything else.  The point for a summary is to avoid that.
4  MS. LIEBER:  Right.
5  THE COURT:  I'm just hoping that Detective Horne
6  really is not needed.  I understand Hunter.  Okay.
7  (Jury present at 4:24 p.m.)
8  THE COURT:  Okay.  Sorry for the interruption, ladies
9  and gentlemen.  We apologize.
10  All right.  Thank you very much.
11  We will resume.
12  BY MS. LIEBER:
13  Q.  Agent Gikas, you testified -- and we're still at Summit
14  Circle Apartments -- that you identified the apartment of
15  interest by comparing two things.
16  Let me ask you, first -- and remind the jury, after you --
17  you followed Javier to 9719 Summit Circle, that garden-style
18  apartment building, did there come a time that some folks left
19  that apartment?
20  A.  Yes.
21  Q.  Okay.  Did you personally observe where the people who were
22  in that apartment went?
23  A.  When they left the first time, or when they left --
24  Q.  When they left to go -- when they departed permanently?
25  A.  No, I was not there.  My ICE team had been relieved because

115

1  we had been there all night.  And this was -- it was a Saturday
2  afternoon.  It was the next day in the afternoon when -- when
3  they left.
4  Q.  Okay.  Did other members of ICE continue the surveillance
5  that you left off?
6  A.  Yes.
7  Q.  And did other members of your team see the people of
8  interest leave that apartment building?
9  A.  Yes.
10  Q.  And based on what they observed, did you identify a license
11  plate of interest?
12  A.  Yes.
13  Q.  Okay.  Without getting into who that person was, whose car
14  that was, based on that information, were you able to pinpoint
15  which apartment on that third floor that you had talked about
16  was the apartment of interest?
17  A.  Yes.
18  Q.  Okay.  And what apartment, what specific apartment was that
19  on the third floor at 9719 Summit Circle?
20  A.  It was apartment 3-B.
21  Q.  3-B, as in boy?
22  A.  Yes.
23  Q.  And who resided in that apartment?
24  A.  Antoine Jones.
25  Q.  In the course of your investigation of this activity, did

116

1  you actually obtain a lease application and other lease
2  documents from the rental office at the Summit Circle apartment
3  complex?
4  A.  Yes, I did.
5  MS. LIEBER:  Your Honor, I'm now going to show Special
6  Agent Gikas a number of documents already in evidence.  ICE-2,
7  ICE-3, ICE-4, ICE-5 and ICE-6.
8  BY MS. LIEBER:
9  Q.  And first, Agent Gikas, I'm going to show you ICE-2.
10  Is this the lease, a copy of the lease agreement that you
11  obtained from the Summit Properties?
12  A.  It looks like it's the application for the lease.
13  Q.  Okay.  And who is the applicant?
14  A.  Antoine Jones.
15  Q.  And who does he indicate his present employer is on this
16  lease?
17  A.  Thomas Brown Agency.
18  Q.  And does he give a second employer?
19  A.  Yes, D.C. Parks and Recreation.
20  Q.  Okay.  And did Mr. Jones appear to have signed that lease
21  application on November 15th of 2003?
22  A.  Yes.
23  Q.  Included, also, Agent Gikas -- and you may have actually
24  testified about this before, but I'll do it very quickly --
25  ICE-3, is this the actual lease agreement entered into by

117

1  Mr. Jones for Apartment 3-B at 9719 Summit Circle in Largo,
2  Maryland?
3  A.  Yes.
4  Q.  Does it list the date of occupancy as November --
5          MR. BALAREZO:  Objection as to form.
6          THE COURT:  The document says what it says.
7  BY MS. LIEBER:
8  Q.  Do you know the date of the lease?
9          THE COURT:  What does the document say?  It's in
10  evidence.
11  BY MS. LIEBER:
12  Q.  Now, when you obtained these rental -- related rental
13  documents, did you also obtain ICE Number 4?
14  A.  Yes, that was part of the --
15          MR. BALAREZO:  Objection.  I thought the Court ruled
16  on these particular ones.
17          THE COURT:  I thought we got them in.
18          MR. BALAREZO:  I thought these ones didn't.
19          THE COURT:  No, they were part the record that came in
20  with the custodian; right?
21          MS. LIEBER:  Yes.
22          THE COURT:  They're already in evidence; right?
23          MS. LIEBER:  Yes.
24          THE COURT:  Yeah.
25  BY MS. LIEBER:

118

1  Q.  Are these the actual documents that you obtained from that
2  rental agency?
3  A.  Yes.
4  Q.  Okay.  These statement of earnings?
5  A.  Yes.  They would have been submitted with the application.
6  Q.  Okay.  And finally, ICE-6, a statement of earnings from the
7  D.C. Government?
8  A.  Yes.
9  Q.  I said finally, but I was wrong.
10      I'm going to show you ICE-5 also.
11      Did you obtain this parking registration form?
12  A.  Yes, I did.
13  Q.  And does it indicate what type of car was registered there
14  to Mr. Jones?
15  A.  Yes, a Jeep Cherokee, champagne in color, 2001.
16  Q.  And do you recognize that license tag number, M667480?
17  A.  Yes, that is -- I observed Antoine Jones driving that car
18  on several occasions.
19  Q.  And this is back in 2004 when you made those observations?
20  A.  Yes.
21          MR. BALAREZO:  Your Honor, continuing objection to tl
22  form of the question.
23          THE COURT:  Yes.  He's right about that.
24          MS. LIEBER:  Okay.
25  BY MS. LIEBER:

119

1  Q.  And Special Agent Gikas, the second page of ICE-5, what is
2  that?
3  A.  It's another parking registration form for a Summit Circle,
4  listing another vehicle to Antoine Jones.
5  Q.  And what kind of vehicle is that?
6  A.  A white Plymouth Caravan.
7  Q.  Now, in the course of your investigation -- and I think
8  this is where we left off last time -- well, I'm sorry.  Strike
9  that.
10      In terms of other vehicles of interest in your
11  investigation, did you personally observe Javier as he left BWI
12  that first time that you -- the day that you began your
13  surveillance of Javier, did you actually see him come through
14  the terminal at BWI?
15  A.  Yes.
16  Q.  And did you personally see him get into a particular
17  vehicle and depart BWI?
18  A.  Yes.
19  Q.  Do you remember, what was that car?
20  A.  It was a silver Impala, Chevy Impala.
21  Q.  Sitting here right now, do you recall the tag number on
22  that car?
23  A.  I remember it was a temporary Delaware tag.
24  Q.  Okay.  Sorry.  Would looking at your report -- a report
25  refresh your memory as to the precise digits that you

120

1  personally observed on that tag number?
2  A.  Yes, it would.
3          MS. LIEBER:  And, Your Honor, I'll mark this for
4  identification only, as ICE-38.  And I'm just going to put it
5  on the machine here.
6  BY MS. LIEBER:
7  Q.  Special Agent Gikas, I'm showing you what I've marked as
8  ICE-38 for identification.  I'll show it to Mr. Balarezo, I'm
9  sorry.
10          MS. LIEBER:  Court's indulgence.
11  BY MS. LIEBER:
12  Q.  Special Agent Gikas, I'm showing you on the projector
13  here -- take a look at that.
14      Does that refresh your memory as to the precise tag number
15  that you personally observed on that Chevy Impala on
16  February 6, 2004?
17  A.  Yes it does.  I remember it began with "XA."
18  Q.  And what is that number?
19  A.  X, as in x-ray, A, as in apple, 913316.
20  Q.  Okay.  Now, you told the jury when you were here last,
21  about a second time that you began to investigate whether or
22  not Javier was back in the D.C. metropolitan area.
23      Is that right?
24  A.  Yes.
25  Q.  Okay.  And did you -- through various investigative

121

1 measures, were you able to pinpoint a house where you suspected
2 that Javier was?
3 A.  Yes.
4 Q.  Okay.  Again, just describe briefly for the jury what that
5 block looked like?
6 A.  The neighborhood block?
7 Q.  Yes, I'm sorry, the neighborhood block?
8 A.  It was near Old Town Bowie in Maryland, quiet street with
9 single-family homes.
10 Q.  And in the course of your search -- and I think we talked
11 about a red Jeep with Mexican tags; is that right?
12 A.  Yes.
13 Q.  Okay.  And, in the course of your search for that vehicle,
14 were you able to, within that block, pinpoint a couple of
15 houses where you thought Mr. Javier might be located?
16 A.  Yes, we had pretty much narrowed it down to two homes that
17 the equipment that we were using, kind of pointed to.
18 Q.  Okay.  And what -- what block was this in Bowie, Maryland?
19 A.  8550 Myrtle Avenue.
20 Q.  Okay.  Was that the actual house that you pinpointed?
21 A.  I'm sorry.  It was Myrtle Avenue, yes, but the 8550 was the
22 house that had a vehicle parked halfway in the driveway,
23 halfway in the yard that also had a temporary Delaware tag,
24 that initially, I thought was the exact same tag number, but it
25 was actually off just by a few digits.

122

1 Q.  Okay.  And sitting here today, do you recall the specific
2 numbers on the temporary Delaware tag that you personally
3 observed in the driveway and yard of 8550 Myrtle Avenue?
4 A.  I don't remember the entire number.  I remember it began
5 with an XA, again 99.  I think the last two digits are
6 different.  I do remember that.
7 Q.  Special Agent Gikas, I'm going to show you, again, what's
8 been marked for identification purposes only, as ICE-38, and
9 show you a page within that document, and see if that refreshes
10 your recollection of the precise tag number in that -- on that
11 van?
12 A.  Yes, it's x-ray, Alpha, 913310.  The other plate, this van
13 that was parked at that house had a regular plate in the dash
14 that had expired, and then also the -- a temporary tag which
15 was also expired, but it was also in the dash.  But it was the
16 most current of the two.
17 Q.  And sitting here today, without looking, do you know what
18 the tag number was, the permanent tag that was sitting in the
19 dashboard?
20   Do you remember the exact numbers and letters on that
21 plate?
22 A.  No.
23 Q.  Would looking at your report also refresh your memory as to
24 that?
25 A.  Yes.

123

1 Q.  Okay.  What was that?
2 A.  Papa, Charlie 128651.
3 Q.  Now, did you -- did there come a point in time when you
4 compared the registrant of the Impala to the registrant of the
5 but van in the driveway of 8550 Myrtle Avenue?
6 A.  Yes.
7 Q.  And without saying who that was, how did those two
8 registrants compare?
9 A.  It was the same registrant.
10 Q.  Now, Special Agent Gikas, you spoke of the employer that
11 Mr. Jones listed on his rental application and lease as the
12 Thomas Brown Agency; is that correct?
13 A.  Yes.
14 Q.  Okay.  And did you, based on your investigation, did you
15 look into the existence of a Thomas Brown Agency?
16 A.  Yes, I did.  I don't think it exists.
17   MR. BALAREZO:  Objection.  Foundation.
18   THE COURT:  Yes.  She can lay -- but before you reach
19 your conclusion, can you tell us what you did?
20   THE WITNESS:  Yes, Your Honor.
21   I went to the address listed for Thomas Brown Agency
22 601 Pennsylvania Avenue, which is a building near here.  There
23 was no Thomas Brown Agency anywhere in the building.
24   I looked for a Thomas Brown as a residence of the
25 building, couldn't find a Thomas Brown.  I searched several

124

1 commercial databases and corporate data bases for this company
2 and couldn't find anything.
3 BY MS. LIEBER:
4 Q.  Okay.  And why -- what was it about -- why did you look
5 into Thomas Brown Agency?
6 A.  Just to -- to-to see if Mr. Jones had a legitimate source
7 of income, had a legitimate employer or employment.
8 Q.  Did you go also to the D.C. Department of wage and
9 earnings?
10 A.  Yes, I also checked D.C. wage and earnings, Maryland wage
11 and earnings, to see -- to check for, again, legitimate
12 earnings or income reported by Mr. Jones to the tax
13 authorities.
14   The only thing I found was from the D.C --
15   MR. BALAREZO:  Objection.  I think it's still hearsay.
16 Now we're talking about public records.
17   THE COURT:  Sustained.
18 BY MS. LIEBER:
19 Q.  Now, we've been talking about this house at 8550 Myrtle
20 Avenue in Bowie, Maryland.
21   Did you personally spend some time surveilling 8550 Myrtle
22 Avenue in Bowie, Maryland?
23 A.  Yes.
24 Q.  Okay.  And over the course of how many days -- well, did
25 other ICE agents also conduct surveillance of that residence?

125

```
1   A.  Yes.
2   Q.  So -- okay.
3       And over the course of how many days in total did your team
4   of agents surveil 8550 Myrtle Avenue?
5       And now we're talking about late in February of 2004.
6   A.  Right.
7       It wasn't -- I remember it was a Sunday evening when we had
8   positively identified that house. We had been -- the whole
9   previous week, we had been looking for the red Jeep. And over
10  the weekend, we had, using that, the equipment, had been
11  looking in the neighborhood. And it was Sunday evening when we
12  actually identified the house.
13      We broke off at that point, and resumed surveillance the
14  next morning, Monday morning, I believe it was February 23rd.
15  I may be off a day, but it was --
16          THE COURT:  I'm sorry '04?
17          THE WITNESS:  Yes, 2004.
18          THE COURT:  Okay.
19          THE WITNESS:  It's either the 22nd, 23rd, or 24th,
20  that Monday in February we resumed surveillance the next
21  morning, approximately 9:00 or 10:00 o'clock.
22  BY MS. LIEBER:
23  Q.  And in the course of your continued surveillance, first of
24  all, how many days did that round-the-clock surveillance of
25  8550 Myrtle Avenue, how many days did that go on?
```

126

```
1   A.  From that Monday through Friday.
2   Q.  And did you personally see anybody coming or going from
3   that -- into that house or out from that house during that
4   time?
5   A.  Yes. One -- one coming and going, one vehicle with two
6   individuals.
7   Q.  And who -- what kind of vehicle was that?
8   A.  It was a white Isuzu box truck.
9   Q.  And this is something that you, yourself, saw; is that
10  correct?
11  A.  Yes.
12  Q.  Okay. And did you look into who the registrant of that
13  truck was?
14  A.  Yes, I did.
15  Q.  Who was the registrant on that truck?
16          MR. BALAREZO:  Objection.
17          THE COURT:  So that's hearsay?
18          MS. LIEBER:  Your Honor, I'm about to show some
19  documents to Mr. Balarezo.
20          THE COURT:  Go ahead then. Show it to him. And put
21  the documents in, if you can.
22          You want to introduce them? Are they records?
23          MS. LIEBER:  Yes.
24  BY MS. LIEBER:
25  Q.  Let me ask, Special Agent Gikas, in the course of your
```

127

```
1   investigation of vehicles in connection with this case, did you
2   obtain from the Maryland Department of Motor Vehicles, I guess
3   the Motor Vehicle Administration, certified copies of
4   registrations for various vehicles?
5   A.  Yes.
6   Q.  Okay. Was one of those the Jeep Cherokee, license M667480?
7   A.  Yes.
8   Q.  Was one of those a 1994 Plymouth van, licensed M950354?
9   A.  Yes.
10  Q.  Was one of those an Isuzu truck, year 1999, tag 63M462?
11  A.  Yes.
12  Q.  Was one of them a 1998 Cadillac, license plate M, Mary,
13  CW738?
14  A.  Yes.
15  Q.  I want to show you now what I've marked as ICE Exhibits
16  ICE-1, ICE-7, ICE-34 and ICE-35, and see if you recognize those
17  documents.
18          THE COURT:  They are certified by the Department of
19  Motor Vehicles?
20  BY MS. LIEBER:
21  Q.  Ma'am, are those certified by the Department of Motor
22  Vehicles?
23  A.  Yes, ma'am.
24          THE COURT:  Okay. Any objection to 1, 7, 34 and 35?
25          MR. BALAREZO:  No.
```

128

```
1           THE COURT:  All right. They're admitted -- sorry,
2   ICE-1, -7, -34 and -35.
3           (Government's Exhibits ICE-1, ICE-7, ICE-34 and ICE-35
4           were received into evidence.)
5   BY MS. LIEBER:
6   Q.  Special Agent Gikas, what did you just ask me, just when I
7   was just up there?
8   A.  I'm sorry. When I went to MVA, the Maryland Vehicle
9   Administration, I basically searched for all vehicles
10  registered to Antoine Jones and his wife Denise Jones. And
11  there were a few -- there was at least one more.
12      I was just asking if you had -- if you had had -- if that
13  was in the pile. It doesn't seem to be.
14          MR. BALAREZO:  Your Honor, I object to the witness
15  having side communications with the prosecutor.
16          THE COURT:  Okay.
17          MS. LIEBER:  That's why I asked the question.
18          THE COURT:  You can't ask questions unless you put
19  them on the record here, if you want to ask a question.
20          THE WITNESS:  I apologize.
21          THE COURT:  Okay.
22  BY MS. LIEBER:
23  Q.  And first, ICE-1, the Cadillac registration, who is that
24  registered to?
25  A.  Antoine Jones.
```

129

1    THE COURT:   What color is the Cadillac?
2  BY MS. LIEBER:
3  Q.  What color, do you know?
4  A.  Well, I know that it's the same vehicle that -- I'm just
5  trying to see if the color is listed.
6    MR. BALAREZO:   Objection.
7    THE COURT:   If she knows, if she has seen the vehicle,
8  she can tell it, or else it's on the thing, one or the other.
9  I'm asking her.
10    THE WITNESS:   Your Honor, I have not personally seen
11  the vehicle, but I don't know if the --
12  BY MS. LIEBER:
13  Q.  We can move on the ICE-7, the Isuzu truck, who is that
14  registered to?
15  A.  Antoine Jones.
16  Q.  And is that the same address as the registration for the
17  Cadillac?
18  A.  Yes.
19  Q.  What is that?
20  A.  12221 Brandywine Road in Brandywine, Maryland.
21  Q.  ICE-34, the Jeep Cherokee, who is that registered to?
22  A.  Denise Jones.
23  Q.  And at what address?
24  A.  12221 Brandywine Road.
25  Q.  And finally ICE-35, the '94 Plymouth van, who is that

130

1  registered to?
2  A.  Antoine Jones at 12221 Brandywine Road.
3  Q.  And just -- I know we're coming up with the break.  Let me
4  just ask you one question.
5    You said that you personally saw the Isuzu truck at the
6  8550 Myrtle Avenue location; is that correct?
7  A.  Yes.
8  Q.  Okay.  Who was driving that when you saw it there?
9  A.  Lawrence Maynard, I believe.
10  Q.  And when you say, Lawrence Maynard, you believe, do you
11  know who Lawrence Maynard is?
12  A.  Yes.
13  Q.  Have you seen him personally on a number of occasions?
14  Have you surveilled him?
15  A.  Yes.
16  Q.  And what was he usually driving when you saw him?
17  A.  A white Isuzu box truck.
18  Q.  And did you personally see him the day that he showed up at
19  the 8550 --
20  A.  Yes.  The only reason that I believe it was -- it was at a
21  distance.
22    MR. BALAREZO:   Objection.  The questions are assuming
23  facts not in evidence, and there is a lot of leading.  And I
24  object to that.
25    THE COURT:   All we know is she saw him at some point

131

1  in time at Myrtle Avenue.
2    MR. BALAREZO:   Well, no one can identify this as being
3  seen at the house yet.
4    THE COURT:   I'm sorry.  I thought identified that
5  Isuzu truck, and that from later on that day in question.
6    Is that right?
7    THE WITNESS:   Yes, Your Honor.
8    MS. LIEBER:   Yes.  And I'm asking the foundation for
9  how she would be able to identify Lawrence Maynard.
10    THE COURT:   Is that what your objection is to?
11    MR. BALAREZO:   I don't want to have the discussion in
12  open court, Your Honor.
13    THE COURT:   Did you know it was Lawrence Maynard at
14  the time you saw him in the truck?
15    THE WITNESS:   The very first time I saw him, no.
16  BY MS. LIEBER:
17  Q.  And after you saw him, did you investigate who Lawrence
18  Maynard was?
19  A.  Yes.
20  Q.  Why did you start looking around into who Lawrence Maynard
21  was?
22  A.  Because he was the lessee of that house.
23    EUFPLT:   Objection, Your Honor.  That's hearsay, I
24  believe, at this point.
25    THE COURT:   It's in evidence.  Overruled.  It's

132

1  pending.
2    MS. LIEBER:   Your Honor, I think the lease is actually
3  in evidence from the last time Gikas was here.
4    THE COURT:   Oh, really?  For which property?
5    MS. LIEBER:   Myrtle Avenue.
6    THE COURT:   I'm sorry.  Only Gwen can tell us.  I
7  think if it isn't, it will be.
8    Overruled.
9  BY MS. LIEBER:
10  Q.  In the course of your investigation of Lawrence Maynard,
11  did you obtain any information that contained a picture of
12  Lawrence Maynard?
13  A.  Yes.
14  Q.  What was that?
15  A.  DMV photos.
16  Q.  And how did the person that you thought was Lawrence
17  Maynard compare to the photographs that you saw from DMV?
18  A.  It seemed to be the same person.  He is a very large man.
19  Q.  Okay.  And just finally, we've been talking about the Isuzu
20  box truck.  I want to show you Photo 38, which is not in
21  evidence.
22    MS. LIEBER:   Sorry.
23    THE COURT:   Any objection to the Photo, Photo 38?
24    MS. LIEBER:   It's going to be 38, 39 and 40, Your
25  Honor.

**133**

1  THE COURT: All right. 38, 39, and 40 photo, any
2  objections, gentlemen?
3  MR. BALAREZO: No, Your Honor.
4  THE COURT: All right. They're in.
5  (Government's Photo 38, Photo 39, and Photo 40 were
6  received into evidence.)
7  BY MS. LIEBER:
8  Q. Agent Gikas, just very quickly, Photo 38, what is that?
9  A. It's a white box truck.
10  Q. And I'm going to show you a close-up of the license plate
11  on Photo 39 of that white box truck.
12  Do you see that license plate?
13  A. Yes. That's the 63M, as in Mike, 462, the tag that comes
14  back to Antoine Jones.
15  Q. And is that the truck that you saw Lawrence Maynard
16  driving?
17  A. Yes.
18  Q. And finally, Photo 40, do you recognize what that is?
19  A. That's the building where Club Levels is located.
20  Q. And is it at the edge of the box truck?
21  A. Yes.
22  MS. LIEBER: Your Honor. That's it.
23  THE COURT: Ladies and gentlemen, I want to inform you
24  of one thing. As you are aware, Mr. Schaffer, who preceded
25  this witness, inaccurately identified Mr. Jackson, who is Mr.

**134**

1  Norris' client, as Mr. Jones. And it's stipulated between the
2  parties that Mr. Jackson had no connection with that property
3  at Hampton.
4  If you remember, the prior witness identified the --
5  Mr. Jackson. By that, we all agree it is an inaccurate one.
6  Okay. Thank you. You may -- anything else before the
7  jury is excused?
8  Tomorrow, if you recall, we're going to start at
9  10:00, breakfast will be here before then, it will be here
10  probably as early as 9:00. Nobody be later than 10:00. We
11  only have tomorrow for the rest of this week, okay.
12  Have a good evening. Don't talk about the case.
13  Thank you very much.
14  (Jury out at 4:51 p.m.)
15  THE COURT: You may step down.
16  And I remind counsel, if anybody has any objection to
17  what's been referred to as the time line, they ought to put it
18  in writing by Monday morning.
19  MR. BALAREZO: Your Honor, I'm, I guess, a little
20  confused when I heard the discussion that the Court had with
21  Miss Lieber earlier. Because I also understood that the
22  summary would come in as sort of -- instead of all the calls
23  and that sort of thing.
24  Is it coming in, in lieu of or on top of?
25  THE COURT: Well, you can't stop them from putting in

**135**

1  the calls. And they have to make available, under the rules,
2  the stuff that they're summarizing, that much is clear. I
3  don't think you can stop them from playing some of it, except
4  just begging them not to.
5  And the point of summary is to avoid piling stuff into
6  the record so --
7  MS. LIEBER: If I may --
8  THE COURT: The problem, what they're doing here
9  though, is coordinating two types of evidence, GPS plus the
10  calls. I'm hoping when you get these in, you'll stop putting
11  in more and more call and stuff. It's not necessary.
12  MS. LIEBER: If I may?
13  THE COURT: Yeah.
14  MS. LIEBER: The -- the whole point of this -- I won't
15  get into the evolution of the time line, but in lieu of playing
16  all the Kevin Holland calls or all the Mike Huggins calls, what
17  we're doing is synthesizing that and putting it into the time
18  line.
19  Now, there are certain calls to which we want the
20  jury's attention directed.
21  THE COURT: Right. You're not going to play every one
22  of the calls --
23  MS. LIEBER: Absolutely not, no. We're going to play
24  samplings of them for very specific reasons.
25  THE COURT: Right. That's response to -- all right.

**136**

1  But if there's any other objection, what I'm suggesting to you,
2  is you will have until Monday morning to check the accuracy of
3  what she's doing. Because once that's done, you'll have
4  no real standing to object to a summary, I don't think.
5  So if you have anything, put it in writing and send it
6  to us by e-mail.
7  MS. LIEBER: And the only reason I gave everyone the
8  cases was because before I presented it, I wanted to be
9  competent in this sort of archaic area of the law, at least
10  archaic for me. And so I found a D.C. Circuit case, talked
11  about a time line, and a second Circuit case that talks about
12  wiretaps.
13  THE COURT: Okay. Anything else at this time?
14  Thank you. We'll resume -- if everybody will be here
15  at a quarter of 10:00.
16  Mr. Balarezo, if you're going to run late, if you're
17  going to be much later that a quarter of 10:00, please call the
18  courtroom, so we don't all just sit here.
19  MR. BALAREZO: I thought I got a half hour, by
20  request, Your Honor.
21  THE COURT: Well, yeah, but if it's going to run too
22  much, if you don't think you're going to get here by 10:00 --
23  well, I should tell counsel, everybody be here a five of 10:00.
24  If we don't hear from you, we'll assume you're going to be here
25  within five minutes of then.

**137**

1  Second of all, I have looked at this -- I guess it's a
2  Report Number 003 by this witness. It's pretty clear to me it
3  has nothing to do with what we're talking about here. She's not
4  going to go too far afield after this.
5  MS. LIEBER:  No. She's only testifying about the
6  Maryland end of it.
7  THE COURT:  All right. I'll give that back. Okay.
8  There's no Jencks in there. Thank you. Okay.
9  (Proceedings adjourned at 4:55 p.m.)

**138**

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN ADAMS | | | | |
| By Mr. Acree | | 9 | | 54 |
| By Mr. Geise | | | 11 | |
| By Mr. Balarezo | | | | 40 |
| By Mr. McDaniel | | | | 53 |
| STEPHANIE YANTA | | | | |
| By Ms. Lieber | 2 | | | |
| By Mr. Balarezo | | 4 | | |
| ANDREW SCHAEFFER | | | | |
| By Ms. Lieber | 9 | | 41 | |
| By Mr. Balarezo | | 28 | | |
| By Mr. Norris | | 39 | | |
| KATERINA GIKAS | | | | |
| By Ms. Lieber | | 44 | | |

**139**

EXHIBITS

| | RECEIVED |
|---|---|
| Jones Exhibit No. 24 | 34 |
| Government's ICE-15 | 11 |
| Government's ICE-16 | 11 |
| Government's ICE-17 | 11 |
| Government's ICE-18 | 11 |
| Government's ICE-19 | 11 |
| Government's ICE-21 | 19 |
| Government's Photo 60 | 25 |

EXHIBITS  (Cont'd.)

| | RECEIVED |
|---|---|
| Government's Photo 61 | 42 |
| Government's Photo 62 | 42 |
| Government's ICE-1 | 66 |
| Government's ICE-7 | 66 |
| Government's ICE-34 | 66 |
| Government's ICE-35 | 66 |
| Government's Photo 38 | 71 |
| Government's Photo 39 | 71 |
| Government's Photo 40 | 71 |

**140**

CERTIFICATE OF COURT REPORTER

I, ANNIE R. SHAW, certify that the foregoing is a
correct transcript from the record of proceedings in
the above matter.

Date:  November 16, 2007

_Signature of Court Reporter_

**-**

**- [380]**

————X [2] 1/2 1/8

**A**

a – [7] 7/4 22/10 22/16 50/13 67/6 92/19 100/1
abide [1] 47/17
ability [1] 109/10
able [9] 5/3 47/13 58/17 77/25 84/4 115/14 121/1 121/14 131/9
about [193]
about – [10] 6/4 16/7 22/11 26/7 29/3 37/8 47/6 58/9 75/1 124/4
above [1] 140/6
Absolutely [2] 67/1 135/23
accept [1] 90/22
access [2] 104/21 113/24
accessible [2] 34/20 34/22
accommodate [1] 5/24
according [2] 48/25 55/8
account [1] 53/6
accuracy [1] 136/2
accurate [1] 113/15
accurately [4] 73/24 74/7 80/8 80/17
acknowledged [1] 46/1
acquired [1] 23/3
ACREE [17] 2/5 3/10 8/17 12/5 12/6 12/13 13/22 14/4 15/3 17/1 22/7 22/20 23/17 56/17 57/16 62/4 138/6
across [2] 96/16 96/18
activity [1] 115/25
actual [7] 22/4 34/15 46/13 103/10 116/25 118/1 121/20
actually [35] 5/10 5/17 16/12 22/8 34/2 36/24 38/16 47/4 53/8 65/3 65/6 65/11 69/18 73/9 73/22 74/16 77/21 79/23 81/7 89/2 89/5 97/3 104/12 105/16 106/18 106/23 108/4 108/23 109/9 116/1 116/23 119/13 121/25 125/12 132/2
actually – [1] 89/5
ad [1] 41/2
ad nauseam [1] 41/2
Adam [1] 77/3
Adams [18] 7/4 9/6 11/24 18/1 18/23 21/17 40/15 41/8 41/20 43/17 48/4 53/25 54/19 63/25 65/25 66/16 66/23 138/5
Adams' [3] 5/11 64/17 65/23
add [3] 50/14 50/15 69/19
added [1] 80/18
address [3] 123/21 129/16 129/23
adjourned [1] 137/9
Administration [2] 127/3 128/9
administratively [1] 105/1
admission [4] 9/13 72/5 80/22 84/6
admits [1] 8/15
admitted [6] 34/9 72/11 80/24 82/15 92/2 128/1
admitted – [1] 128/1
ADRIAN [4] 1/6 101/23 102/5 102/8
adult [1] 64/24
affidavits [1] 47/18
affixed [1] 88/9
afield [2] 58/25 137/4
afraid [1] 6/13
after [20] 13/14 16/13 25/20 27/2 32/13 33/13 36/10 41/23 44/5 46/2 46/21 65/19 80/9 80/18 84/16 92/23 97/12 114/16 131/17 137/4
afternoon [21] 1/7 3/2 11/24 11/25 12/1 12/2 40/15 40/16 64/15 64/16 66/13 66/14 68/23

again [22] 10/6 17/14 17/24 24/3 25/7 35/3 37/24 40/1 47/16 48/16 48/20 73/15 77/24 79/20 91/23 93/21 107/8 107/14 121/4 122/5 122/7 124/11
against [3] 44/21 44/24 67/23
age [1] 64/24
agency [9] 95/20 95/21 116/17 118/2 123/12 123/15 123/21 123/23 124/5
agent [23] 3/18 4/24 9/24 9/24 63/24 64/15 65/23 66/13 98/3 98/7 105/24 114/13 116/6 116/9 116/23 119/1 120/7 120/12 122/7 123/10 126/25 128/6 133/8
agents [6] 10/3 22/9 62/18 106/8 124/25 125/4
ago [5] 37/2 56/2 90/20 97/23 106/6
agree [3] 35/12 86/18 134/5
agreed [3] 88/11 95/19 113/1
agreeing [1] 102/4
agreement [7] 38/17 39/7 40/23 41/8 74/17 116/10 116/25
ahead [16] 30/8 40/12 43/5 70/1 71/6 79/17 81/5 82/14 82/15 85/16 90/3 96/21 97/6 101/9 112/15 126/20
alerted [2] 31/21 32/16
alerting [1] 32/19
all [119]
all – [1] 21/23
allow [4] 3/7 25/12 63/24 95/20
allowed [4] 46/17 47/2 97/9 98/3
almost [1] 14/19
along [2] 11/10 51/21
Alpha [1] 122/12
already [14] 8/18 17/12 17/13 33/20 37/19 38/24 39/7 60/24 61/21 61/22 92/2 109/8 116/6 117/22
also [30] 9/15 10/24 14/20 14/22 21/5 22/6 23/16 38/6 46/10 66/24 66/24 72/17 82/23 85/25 86/24 91/2 95/19 103/7 116/23 117/13 118/10 121/23 122/14 122/15 122/15 122/23 124/8 124/10 124/25 134/21
also – [1] 66/24
although [2] 26/6 37/2
Always [1] 18/7
am [6] 4/21 6/7 6/7 50/22 98/1 101/2
AMERICA [1] 1/3
amount [4] 37/12 64/20 66/19 99/23
and – [4] 25/8 25/21 37/6 47/19
and Fats [1] 30/1
and the [1] 77/10
Andrew [3] 68/17 69/3 138/14
ANNIE [2] 2/12 140/4
another [8] 39/3 39/21 46/10 55/3 92/20 95/21 119/3 119/4
answer [7] 41/15 52/2 62/8 63/2 65/19 83/9 96/15
anticipate [1] 96/23
anticipating [1] 16/5
ANTOINE [36]
Antoine's [1] 30/23
any [38]
anybody [11] 55/8 58/16 60/8 61/8 72/2 73/10 78/7 88/25 101/4 126/2 134/16
anymore [2] 27/2 62/4
anyone [1] 55/5
anything [9] 3/8 4/13 11/10 11/12 11/13 25/10 25/12 26/12 28/9 44/23 53/21 54/15 58/4 62/8 62/9 66/6 71/22 72/22 83/24 91/3 91/14 100/2 100/6 100/13 100/17 101/23 112/23 124/2 134/6 136/5 136/13
anyway [4] 4/16 5/3 6/11 88/22

Anyway – [1] 4/16
anyways [2] 31/15 111/11
anywhere [2] 105/14 123/23
apartment [28] 106/20 107/7 107/10 108/1 108/2 108/5 108/9 108/10 108/13 108/14 109/14 110/14 110/15 110/22 111/1 114/14 114/18 114/19 114/22 115/8 115/15 115/16 115/18 115/18 115/20 115/22 116/2 117/1
apartments [6] 107/11 108/13 110/10 110/19 110/25 114/14
Apartments – [1] 114/14
apologize [2] 112/6 114/9 128/20
apparently [1] 38/25
appear [1] 116/20
APPEARANCES [2] 1/14 2/1
appeared [1] 86/16
appears [1] 62/17
apple [1] 120/19
applicant [1] 116/13
application [7] 70/20 70/20 116/1 116/12 116/21 118/5 123/11
approach [19] 16/2 16/3 20/9 20/15 20/16 25/20 26/21 31/4 44/10 56/23 70/6 74/24 78/18 78/18 81/16 82/7 97/4 108/18 109/4
approaching [1] 5/25
appropriate [1] 7/3
approximately [4] 89/16 90/20 90/21 125/21
April [2] 98/25 99/2
archaic [2] 136/9 136/10
are [99]
aren't [4] 47/6 47/12 58/9 61/7
argue [1] 17/7
argument [1] 61/6
around [9] 13/15 13/18 32/5 33/4 60/24 61/25 79/2 104/12 131/20
arrest [3] 43/15 44/5 46/2
arrested [11] 33/16 41/23 48/6 48/7 54/2 54/5 54/9 54/12 64/17 64/19 64/25
as [84]
as – [1] 94/6
as November [1] 117/4
ask [1] 47/2
asked [37]
asking [21] 17/1 17/2 40/3 41/3 43/10 45/23 46/5 46/7 53/14 56/3 57/1 57/6 86/21 93/14 97/15 98/2 109/12 111/25 128/12 129/9 131/8
aspects [1] 109/11
assume [4] 96/16 96/17 96/18 136/24
assuming [1] 130/22
assure [1] 58/4
Atlanta [3] 33/11 47/8 105/14
attempted [1] 25/8
attention [1] 135/20
Attorney [1] 1/16
Attorney's [1] 41/13
attributed [1] 25/22
authorities [1] 124/13
authority [1] 98/7
available [2] 64/6 135/1
Avenue [18] 2/2 2/6 2/9 2/14 106/22 107/2 121/19 121/21 122/3 123/5 123/22 124/20 124/22 125/4 125/25 130/6 131/1 132/5
avoid [4] 26/14 63/16 114/3 135/5
aware [8] 66/15 66/19 66/23 66/24 93/12 97/25 98/16 133/24
away [4] 21/22 23/14 46/25 112/11

**B**

back [49]

15:

## W

was — [4] 29/21 111/19 115/1 125/15
was added [1] 80/18
Washington [9] 1/4 1/17 1/20 2/3 2/7 2/10
2/15 106/14 106/19
wasn't [9] 32/13 44/23 47/2 62/24 80/18
84/24 95/13 98/9 125/7
wasn't — [2] 84/24 125/7
way [17] 10/23 17/6 21/12 21/13 24/24
26/24 30/20 32/23 35/1 37/7 54/6 57/9 57/22
61/12 61/18 63/10 69/22
we [143]
we — [1] 107/6
we'll [13] 4/11 5/23 26/13 26/13 26/19 32/21
39/2 63/16 107/22 112/5 112/12 136/14
136/24
we'll — [2] 26/19 63/16
we're [28] 5/10 6/13 32/19 38/22 43/13
44/19 49/23 54/6 57/16 61/12 63/17 69/19
75/23 76/19 78/24 83/8 83/14 104/16 105/18
111/20 114/13 124/16 125/5 130/3 134/8
135/17 135/23 137/3
we've [10] 5/15 45/2 45/2 62/16 63/17 74/5
92/10 109/8 124/19 132/19
weapon [1] 66/16
weapons [1] 67/2
wearing [1] 105/20
Wednesday [1] 1/5
week [5] 5/12 44/5 46/2 125/9 134/11
weekend [1] 125/10
weeks [1] 106/6
Welcome [2] 105/13 106/4
well [89]
Well — [1] 81/22
well-taken [1] 75/14
went [14] 11/1 11/4 12/5 13/15 13/18 28/21
36/11 46/25 72/21 72/23 76/21 114/22
123/21 128/8
were [81]
were — [2] 43/9 91/6
weren't [2] 58/17 60/9
what [247]
what — [3] 24/1 37/24 121/18
What'd [1] 30/25
what's [26] 5/4 16/20 18/18 19/9 20/2 21/2
21/15 22/14 22/15 23/6 28/2 31/14 33/20
37/3 47/15 49/7 55/11 55/24 71/20 74/14
83/9 92/16 92/16 109/14 122/7 134/17
What's — [1] 92/16
whatever [2] 44/20 112/25
whatnot [1] 13/23
whatsoever [2] 60/12 109/2
when [91]
when — [2] 10/24 115/2
where [36]
wherever [1] 60/5
whether [36]
whether — [1] 97/18
which [29] 3/22 18/3 18/16 24/17 30/10
30/22 33/21 36/18 37/17 39/7 46/4 46/11
47/18 50/10 51/8 60/16 69/18 74/3 79/22
109/11 109/13 110/20 110/22 115/15 122/14
123/22 132/4 132/20 135/19
while [5] 69/19 73/10 84/12 98/19 98/22
white [5] 119/6 126/8 130/17 133/9 133/11
Whitehead [1] 31/8
who [75]
who — [2] 80/15 126/7
whole [15] 20/20 21/1 24/18 28/1 28/3 28/3
46/6 54/24 55/24 58/3 58/14 58/19 59/21
125/8 135/14

whom [1] 21/25
whose [2] 13/16 115/13
why [32] 5/21 5/25 6/1 6/11 7/14 7/18 17/8
31/15 34/22 35/9 46/5 46/6 55/9 60/16 61/10
64/19 64/25 65/12 71/5 77/7 81/8 81/12
81/12 85/2 87/13 90/7 95/1 109/11 124/4
124/4 128/17 131/20
why — [3] 65/12 81/12 124/4
wife [8] 11/3 11/4 12/7 34/23 64/17 77/4
101/18 128/10
will [26] 4/12 36/5 39/4 39/4 39/12 39/22
40/18 45/21 57/9 57/25 59/22 61/3 61/4 62/2
63/24 65/20 101/9 108/22 109/25 111/14
114/11 132/7 134/9 134/9 136/2 136/14
will be [1] 136/14
willing [1] 67/12
willingness [2] 65/24 66/4
winter [1] 104/16
wire [1] 6/10
wiretaps [1] 136/12
with — [1] 8/25
withdraw [1] 12/11
within [10] 44/5 46/2 95/11 95/11 95/13
108/9 108/13 121/14 122/9 136/25
without [7] 24/21 78/9 96/17 107/8 115/13
122/17 123/7
witness [34] 5/5 5/17 6/15 16/6 24/11 25/18
34/3 39/6 40/8 53/20 57/19 62/3 62/11 62/12
63/21 64/12 68/16 68/20 70/7 72/1 72/1 75/8
84/21 96/24 105/9 105/12 109/20 109/24
111/8 128/14 133/25 134/4 137/2 138/3
witnessed [1] 62/20
witnesses [1] 5/6
wives [1] 12/9
won't [4] 5/2 5/2 61/3 135/14
won't — [1] 5/2
word [4] 42/7 44/25 48/17 53/9
words [8] 4/8 11/16 15/3 15/4 23/25 59/2
59/20 110/17
work [3] 5/8 26/17 85/1
working [4] 14/10 14/12 65/13 83/17
world [1] 26/14
worms [1] 43/2
worse [1] 58/5
worth [1] 25/10
would [75]
wouldn't [1] 34/24
wrap [1] 38/3
wrapping [1] 100/16
writing [2] 134/18 136/5
wrong [4] 57/15 57/16 58/5 118/9
wrote [1] 58/22

## X

x-ray [2] 120/19 122/12
XA [2] 120/17 122/5

## Y

Yanta [7] 9/24 63/24 64/12 64/15 65/23
66/13 138/11
yard [2] 121/23 122/3
yeah [23] 3/16 4/13 7/10 8/8 16/23 17/15
19/1 24/7 32/4 32/12 44/23 47/4 51/19 58/13
61/4 84/11 93/5 105/20 109/5 111/23 117/24
135/13 136/21
year [4] 95/12 95/13 95/14 127/10
years [1] 90/20
yes [216]
yesterday [2] 3/17 18/3
yet [6] 26/13 27/4 69/24 75/7 102/20 131/3
you [720]
you — [9] 9/25 71/1 77/24 95/23 102/17

114/16 119/12 120/25 123/3
you know [1] 89/12
you'd [1] 75/19
you'll [4] 38/17 69/8 135/10 136/3
you're [35] 17/15 25/4 32/10 40/18 45/11
45/15 45/19 47/11 49/10 51/5 51/7 51/13
52/17 56/21 56/22 59/6 60/6 64/4 64/10
67/12 75/13 93/12 95/23 97/25 101/24 102/4
105/15 105/22 108/20 113/23 135/21 136/16
136/16 136/22 136/24
you've [10] 39/15 42/12 61/22 67/2 70/2
90/24 91/2 94/16 101/17 102/2
you've — [1] 67/2
your [208]
your — [1] 69/9
yours [1] 12/10
yourself [6] 68/25 73/9 90/22 94/22 99/5
126/9
yourselves [1] 6/6

152

**T**

that's [97]
that's -- [2]  8/5 92/13
the -- [21]  4/17 8/16 12/4 16/7 24/1 25/3
43/1 46/9 49/13 91/21 92/6 92/22 93/6 98/9
99/19 108/16 117/14 122/14 129/11 134/4
135/14
the third [1]  110/8
their [6]  4/19 59/4 67/25 91/8 91/15 110/6
them [35]  4/18 9/25 10/4 20/8 20/12 22/12
30/10 32/21 33/15 55/4 55/6 59/23 70/2 70/2
73/10 73/12 73/13 73/15 76/5 89/21 89/22
93/22 95/6 102/18 104/1 108/15 109/18
117/17 126/22 127/12 128/19 134/25 135/3
135/4 135/24
them -- [1]  73/13
themselves [1]  11/8
then [38]
then -- [1]  32/3
there [96]
there's [15]  4/5 27/3 30/2 47/18 61/4 75/6
92/17 92/19 92/19 93/3 99/23 111/11 112/23
136/1 137/8
these [39]
these -- [1]  93/20
they [91]
they're [11]  43/3 64/2 69/23 102/19 102/20
111/17 117/22 128/11 133/4 135/2 135/8
they've [1]  69/18
thick [1]  19/22
thing [15]  3/15 9/6 24/18 29/23 37/9 42/6
60/9 61/24 62/5 84/2 114/2 124/14 129/8
133/24 134/23
things [22]  5/18 9/22 10/3 10/25 12/5 18/2
21/1 24/19 26/16 26/20 30/14 34/18 35/19
47/11 47/11 48/7 54/19 61/5 76/2 76/24
86/24 114/15
think [81]
think -- [1]  63/6
thinks [2]  61/9 62/5
third [9]  106/23 108/3 108/3 108/5 110/8
110/19 110/22 115/15 115/19
third -- [1]  108/3
Thirty-six [1]  15/17
this [194]
this -- [2]  135/14 137/1
Thomas [8]  116/17 121/12 123/15 123/21
123/23 123/24 123/25 124/5
those [38]
those -- [1]  70/25
though [8]  5/20 17/13 22/23 24/18 77/4 83/9
104/2 135/9
thought [14]  3/13 4/15 39/16 60/19 84/8
94/7 117/15 117/17 117/18 121/15 121/24
131/4 132/16 136/19
thousands [1]  76/16
three [16]  3/23 3/24 15/2 20/23 25/19 45/20
49/13 49/13 62/22 75/10 90/20 91/6 101/10
101/17 106/13 106/17
through [8]  3/21 4/24 12/5 62/22 72/5
119/13 120/25 126/1
throw [1]  84/9
ticket [39]
tickets [30]  13/23 15/4 15/4 17/1 17/3 22/7
22/8 22/9 22/22 23/15 23/15 23/15 23/16
23/19 23/20 24/8 25/13 26/4 26/18 28/1
58/18 58/18 58/19 59/21 59/21 59/23 61/1
61/7 61/7 61/25
tier [2]  42/1 42/2
time [57]
time -- [1]  119/8

times [11]  10/24 14/7 14/9 14/13 14/25
28/16 41/4 50/21 60/25 86/17 90/13
timing [1]  38/3
tip [1]  85/3
titles [1]  108/23
to -- [7]  18/17 37/12 46/10 77/5 97/17 124/6
135/25
to-to [1]  124/6
today [6]  4/24 18/3 70/15 73/15 122/1
122/17
together [2]  26/7 91/5
told [35]  3/25 4/18 9/25 10/3 15/6 22/9
22/12 23/19 26/4 30/14 30/25 31/11 31/20
31/21 32/2 32/2 32/15 33/2 37/8 42/10 46/3
46/16 47/7 47/14 55/4 56/1 77/4 84/15 88/9
94/5 98/6 107/14 108/21 108/25 120/20
tomorrow [8]  38/22 39/2 109/24 111/5
111/6 111/18 134/8 134/11
tons [1]  61/1
too [5]  24/23 58/25 63/13 136/21 137/4
took [8]  13/24 14/2 24/6 33/15 48/5 83/1
104/20 111/3
top [3]  42/1 42/2 134/24
total [1]  125/3
touching [1]  27/2
town [2]  91/23 121/8
tramping [1]  58/7
transaction [1]  13/21
transcribed [1]  3/6
transcript [7]  1/11 2/24 3/5 18/16 57/23
62/22 140/5
transcription [1]  2/24
transcripts [5]  12/18 12/21 12/21 12/22
35/21
transcripts -- [1]  12/22
tree [1]  57/16
trial [4]  1/11 40/2 40/6 112/4
tried [1]  46/12
truck [14]  126/8 126/13 126/15 127/10
129/13 130/5 130/17 131/5 131/14 132/20
133/9 133/11 133/15 133/20
true [5]  13/2 12/17 25/2 79/16 95/19
trust [1]  12/9
trusted [1]  7/1
truth [5]  30/5 40/18 41/16 109/2 110/4
try [5]  46/10 47/24 63/19 64/3 91/13
trying [11]  20/19 24/13 45/9 45/11 45/15
51/13 56/25 56/25 57/6 59/4 129/5
trying -- [1]  56/25
turn [1]  101/10
Twenty-five [2]  42/13 42/14
two [31]  3/23 5/6 15/2 20/23 35/24 35/25
48/24 49/14 50/21 50/21 51/1 51/2 51/2 51/5
51/6 51/6 53/3 64/5 75/8 77/20 106/23
112/11 112/21 113/20 114/15 121/16 122/5
122/16 123/7 126/5 135/9
two-minute [2]  112/5 112/12
two-page [1]  4/22
Ty [6]  37/15 38/9 38/10 50/2 51/7 52/17
type [2]  71/18 118/13
types [1]  135/9

**U**

U.S [2]  1/16 41/13
ultimately [5]  39/12 39/22 67/25 68/1
106/11
under [10]  15/17 15/22 35/24 35/25 64/4
64/10 105/15 105/22 113/22 135/1
underlying [1]  113/23
understand [25]  5/21 7/10 15/7 23/12 39/12
39/21 51/13 56/18 58/6 58/14 59/1 59/9
59/15 59/19 59/23 59/25 60/18 61/3 61/14

63/17 69/25 80/21 82/20 97/2 114/6
understands [2]  35/14 39/10
understood [4]  57/3 57/22 58/23 134/21
uniforms [1]  100/2
unit [11]  73/25 74/3 74/5 74/8 74/19 74/21
79/23 80/9 93/17 101/25 112/25
unit -- [1]  93/17
UNITED [4]  1/1 1/3 1/12 2/13
units [3]  80/2 93/22 110/8
universe [2]  47/17 75/6
Unk [3]  33/17 33/17 33/18
unknown [3]  109/21 110/12 111/2
unless [1]  128/18
until [6]  4/14 5/3 5/12 6/21 93/4 136/2
unusual [1]  94/18
up [62]
upon [2]  39/10 99/5
upstairs [3]  30/19 48/13 48/14
us [16]  3/17 12/9 26/8 27/20 31/18 54/25
61/3 63/8 63/24 67/11 107/14 107/14 110/2
123/19 132/6 136/6
us -- [1]  63/8
use [7]  16/25 17/14 23/2 23/9 23/11 94/6
95/21
used [5]  12/14 15/4 17/3 17/4 59/20
useful [1]  25/25
using [4]  21/20 75/23 121/17 125/10
usually [1]  130/16
usurping [1]  40/5

**V**

vacated [1]  104/19
van [9]  33/4 33/5 33/5 33/15 122/11 122/12
123/5 127/8 129/25
various [4]  80/1 114/1 120/25 127/4
vehicle [14]  108/16 111/2 119/4 119/5
119/17 121/13 121/22 126/5 126/7 127/3
128/8 129/4 129/7 129/11
vehicles [7]  119/10 127/1 127/2 127/4
127/19 127/22 128/9
versus [1]  47/15
very [23]  5/6 13/2 17/1 24/17 32/1 57/21
61/5 67/5 75/24 84/17 90/2 90/4 90/6 91/13
98/21 102/17 114/10 116/24 131/15 132/18
133/8 134/13 135/24
view [1]  6/9
VIP [3]  15/4 17/1 17/3
VIPs [1]  16/22
virtue [1]  9/12
voice [1]  68/25
voices [1]  18/23
volume [12]/19 12/20 12/21 15/11 15/11
15/18 35/22 35/24 35/25
Volume I [4]  12/19 12/21 15/11 15/18

**W**

wage [3]  124/8 124/10 124/10
wait [3]  12/23 18/25 102/3
waited [1]  6/21
walk [1]  105/5
wall [1]  93/23
want [45]
want -- [2]  62/25 111/12
wanted [16]  4/25 6/22 9/6 9/22 29/25 34/2
35/6 77/7 81/8 81/12 83/11 83/12 87/13 88/3
105/22 136/8
wants [4]  5/21 44/20 60/5 60/5
warehouse [10]  73/4 80/2 81/13 83/20 91/21
92/7 92/14 93/21 94/17 106/24
warrant [1]  5/11
warrants [1]  65/6
was [310]

**S**

showing [6] 31/9 70/10 78/16 78/21 120/7 120/12
shown [1] 86/12
shows [1] 32/12
side [6] 4/8 29/21 29/22 29/22 92/16 128/15
sign [2] 41/8 41/9
Signature [1] 140/10
signed [5] 41/9 83/4 88/14 88/19 88/23 88/24 88/25 89/4 116/20
signs [1] 84/5
silly [1] 24/17
silver [1] 119/20
similar [1] 11/13
similar-type [1] 35/15
since [5] 53/14 76/19 93/12 105/14 109/10
single-family [2] 106/21 121/9
sir [106]
Sir — [1] 55/18
sit [1] 136/18
sitting [9] 13/17 30/18 64/7 79/5 79/7 119/21 122/1 122/17 122/18
situation [1] 47/23
six [1] 47/18
small [1] 99/23
smelled [1] 33/4
snack [5] 93/7 93/8 93/10 93/13 93/18
so [103]
so — [9] 6/11 27/3 30/1 45/7 46/16 91/18 97/4 125/2 135/6
solely [1] 39/11
some [33] 12/5 15/3 18/2 20/6 26/15 26/16 29/3 29/6 29/24 30/2 30/14 30/15 31/22 32/19 33/11 37/5 47/24 48/11 52/7 61/5 63/16 83/21 92/25 93/22 94/22 105/20 107/5 109/16 114/18 124/21 126/18 130/25 135/3
somebody [18] 10/2 17/19 21/18 21/19 23/23 26/16 31/11 51/9 52/18 54/25 55/1 55/12 55/14 55/25 56/14 94/3 95/7 108/24
someone [5] 96/2 101/19 103/10 108/25 111/5
something [19] 3/14 10/21 19/21 22/17 29/18 32/3 33/4 38/1 44/17 50/5 62/20 63/2 75/1 75/10 108/21 109/9 110/2 110/15 126/9
sometimes [2] 17/13 93/4
somewhere [1] 60/11
soon [1] 111/6
sorry [48]
sort [6] 88/6 100/8 100/9 134/22 134/23 136/9
source [1] 124/6
south [1] 31/22
space [9] 74/22 80/5 92/10 93/23 94/9 94/13 94/18 98/10 104/16
spaces [4] 93/20 93/21 94/17 94/24
speak [1] 69/8
speaker [1] 19/3
speaking [2] 19/6 97/20
Special [13] 4/24 64/15 65/23 66/13 105/24 116/5 119/1 120/7 120/12 122/7 123/10 126/25 128/6
specific [12] 21/24 23/3 23/16 30/3 79/7 91/13 100/25 108/12 109/12 115/18 122/1 135/24
specifically [3] 10/17 11/16 23/10
specifics [1] 71/8
speculate [1] 97/15
spell [1] 69/1
spend [1] 124/21
spoke [5] 55/3 79/2 90/13 106/6 123/10
stand [7] 17/24 62/19 79/8 82/12 82/13

85/12 105/3
standard [1] 80/1
standing [2] 79/11 136/4
star [1] 4/16
start [7] 38/22 39/2 39/4 40/17 46/20 131/20 134/8
started [1] 47/1
starts [1] 26/22
state [1] 109/13
statement [2] 118/4 118/6
statements [1] 31/17
STATES [4] 1/1 1/3 1/12 2/13
stay [2] 77/10 88/10
staying [1] 77/9
stays [1] 93/4
step [3] 104/25 106/10 134/15
Stephanie [2] 64/12 138/11
sticker [1] 83/2
still [12] 52/8 58/9 64/4 64/10 81/2 93/10 99/24 105/15 105/18 105/22 114/13 124/15
stipulate [2] 5/19 84/16
stipulated [2] 113/1 134/1
stipulation [2] 5/8 5/17
stood [1] 79/14
stop [12] 25/9 30/25 31/18 31/19 32/18 42/9 44/9 70/23 112/4 134/25 135/3 135/10
stopped [1] 30/24
storage [13] 69/12 71/3 73/5 73/25 74/18 78/24 79/21 79/23 80/9 83/13 87/14 94/7 94/8
story [3] 21/23 22/14 23/14
street [4] 1/16 1/19 96/16 121/8
stricken [1] 65/20
strike [3] 28/10 65/17 119/8
striking [1] 26/11
stuck [1] 10/21
stuff [11] 20/20 21/14 26/16 34/22 34/24 55/25 61/21 99/24 135/2 135/5 135/11
subject [5] 6/1 64/7 80/13
subjects [1] 107/12
submitted [1] 118/5
subpoena [2] 73/13 95/16
subsections [1] 84/8
substantial [1] 39/16
suburban [1] 106/18
such [3] 45/1 61/24 62/5
suggesting [2] 59/1 136/1
suggestion [2] 59/20 84/24
suit [3] 18/6 18/7 79/9
suitcases [1] 100/12
Suite [3] 1/19 2/6 2/10
summarizing [1] 135/2
summary [5] 113/22 114/3 134/22 135/5 136/4
Summit [14] 106/20 107/8 107/10 108/1 108/9 108/13 110/7 114/13 114/17 115/19 116/2 116/11 117/1 119/3
Sunday [3] 19/8 125/7 125/11
supplier [1] 33/19
suppliers [1] 15/14
support [1] 19/22
suppose [1] 25/6
supposed [4] 6/5 31/12 37/13 37/15
supposedly [1] 48/23
sure [17] 3/16 4/11 11/10 11/10 13/19 13/20 30/4 38/15 46/18 47/4 57/20 62/24 70/2 76/12 79/9 91/10 112/2
surrounding [1] 65/15
surveil [1] 125/4
surveillance [8] 95/21 115/4 119/13 124/25 125/13 125/20 125/23 125/24
surveilled [1] 130/14

surveilling [2] 109/20 124/21
suspected [1] 121/1
sustain [2] 17/20 47/10
sustained [6] 39/19 41/18 65/18 94/20 94/20 124/17
sworn [1] 68/20
synthesizing [1] 135/17

**T**

tab [6] 15/13 15/15 15/17 15/23 35/24 35/25
table [2] 79/5 79/7
tag [15] 110/6 118/16 119/21 119/23 120/1 120/14 121/23 121/24 122/2 122/10 122/1 122/18 122/18 127/10 133/13
tags [1] 121/11
take [7] 5/17 17/24 57/12 64/1 70/12 109/7 120/13
taken [2] 79/1 99/21
taken money [1] 99/21
takes [1] 109/18
taking [3] 78/12 78/22 137/3
talk [5] 12/4 33/17 48/25 59/21 134/12
talked [14] 5/15 18/12 47/7 51/18 54/19 54/23 81/20 81/25 83/4 87/5 91/2 115/15 121/10 136/10
talking [47]
talks [2] 58/18 136/11
tape [3] 45/4 45/5 59/20
tapes [6] 45/2 58/17 60/8 61/3 61/5 61/8
tax [1] 124/12
Taylor [2] 53/25 54/2
team [3] 114/25 115/7 125/3
tease [1] 71/18
tell [33] 4/17 13/24 16/15 19/15 20/21 24/1 26/8 30/17 31/18 32/21 33/6 33/8 33/10 33/13 41/16 43/1 55/14 55/15 57/2 57/22 62/25 81/12 82/5 83/24 87/13 87/16 94/12 108/24 112/20 123/19 129/8 132/6 136/23
telling [6] 30/20 31/12 40/18 53/2 59/15 67/11
tells [1] 110/2
tempered [1] 88/2
temporary [4] 119/23 121/23 122/2 122/14
ten [1] 10/12
tenancy [1] 98/23
tenant [4] 93/4 97/12 97/13 98/22
term [3] 17/1 17/3 21/20
terminal [1] 119/14
terminated [1] 88/10
termination [1] 88/10
terms [3] 5/11 109/10 119/10
test [1] 77/1
test — [1] 77/1
testified [13] 6/11 31/8 32/23 37/2 43/17 45/25 46/2 55/22 57/17 62/16 110/19 114/13 116/24
testified — [1] 114/13
testifies [3] 4/14 62/19 62/19
testify [8] 44/21 63/1 76/15 77/3 77/6 109/25 111/15 114/1
testifying [3] 3/19 44/20 137/5
testimony [10] 4/5 4/15 32/19 39/23 47/12 58/21 107/22 112/22 113/8 113/10
Texas [4] 4/8 106/8 107/13 109/17
than [5] 5/17 10/12 24/17 25/25 51/20 51/22 134/10
thank [43]
that [655]
that — [21] 7/6 15/6 19/22 20/14 25/11 55/4 56/17 56/22 57/17 60/1 60/14 71/21 73/22 81/14 92/10 94/13 96/23 112/22 122/10 126/3 129/4

**R**

recognize... [4]  77/25 118/16 127/16 133/18
recognizes [1]  69/23
recollection [4]  26/5 85/8 97/17 122/10
record [19]  7/17 61/14 71/23 79/13 79/16
 81/3 84/22 85/3 86/16 87/24 110/5 112/17
 112/18 112/19 113/10 117/19 128/19 135/6
 140/5
recorded [1]  2/24
records [4]  71/1 75/24 124/16 126/22
records -- [1]  75/24
recovered [4]  9/8 9/14 64/21 64/23
Recreation [1]  116/19
recross [6]  40/24 46/19 59/5 61/21 61/25
 138/3
RECROSS-EXAMINATION [2]  53/23
 54/17
red [2]  121/11 125/9
redirect [19]  11/22 26/23 41/1 42/22 43/24
 46/18 46/22 53/22 54/7 54/15 56/19 57/3
 57/17 57/21 57/23 61/19 61/21 102/15 138/3
reference [9]  16/25 17/10 17/11 19/19 23/4
 33/17 46/11 56/14 56/16
references [1]  30/3
referred [1]  134/17
referring [3]  13/7 13/11 49/17
refers [1]  52/9
refresh [6]  78/3 78/13 78/22 119/25 120/14
 122/23
refreshes [1]  122/9
regarding [6]  30/3 40/25 42/9 48/4 53/8
 58/12
regards [1]  11/7
registered [9]  109/19 109/22 110/11 118/13
 128/10 128/24 129/14 129/21 130/1
registrant [6]  108/15 123/4 123/4 123/9
 126/12 126/15
registrants [2]  110/25 123/8
registration [4]  118/11 119/3 128/23 129/16
registrations [1]  127/4
regular [3]  71/15 71/17 122/13
rehash [2]  61/20 61/22
rehashed [1]  61/23
related [3]  3/18 76/25 117/12
release [2]  66/16 67/22
released [2]  65/10 65/11
relevant [3]  5/4 22/23 24/19
relieved [1]  114/25
remainder [1]  52/23
remember [47]
remembers [1]  32/12
remind [6]  106/16 106/17 107/14 109/8
 114/16 134/16
rental [12]  80/5 101/24 103/7 108/9 109/7
 111/15 112/25 116/2 117/12 117/12 118/2
 123/11
rental -- [1]  117/12
rented [8]  74/22 78/14 78/24 79/4 79/21
 86/22 110/11 111/1
renter [1]  104/15
renters [1]  108/14
renting [1]  84/25
reorient [1]  105/23
rep [1]  79/3
repeat [3]  25/12 29/5 44/4
rephrase [3]  24/24 25/5 46/14
report [8]  4/2 4/22 4/22 91/19 119/24
 119/24 122/23 137/2
report -- [1]  119/24
reported [1]  124/12
reporter [4]  2/12 69/2 140/2 140/10

reports [2]  3/22 62/16
represent [4]  73/25 74/8 80/8 92/7
represented [1]  79/3
represents [1]  80/17
request [1]  136/20
required [1]  113/23
resided [1]  115/23
residence [5]  64/21 64/22 107/7 123/24
 124/25
respect [1]  89/7
response [10]  28/5 28/8 28/14 30/13 58/1
 58/4 58/19 59/18 95/16 135/25
responsive [3]  23/6 60/12 65/20
rest [2]  65/19 134/11
result [1]  9/12
resume [2]  114/11 136/14
resume -- [1]  136/14
resumed [2]  125/13 125/20
retake [1]  85/11
return [1]  99/24
retyped [1]  3/4
retyped -- [1]  3/4
reviewing [1]  73/15
right [144]
Road [3]  129/20 129/24 130/2
role [1]  40/5
room [6]  2/14 29/22 30/11 30/19 48/11
 48/12 48/13 87/25
rooms [1]  48/14
round-the-clock [1]  125/24
RPR [1]  2/12
Ruan [1]  107/18
RUDOLPH [1]  2/5
rule [3]  5/3 43/14 113/22
ruled [1]  117/15
rules [2]  85/9 135/1
ruling [1]  61/14
run [3]  91/19 136/16 136/21
running [3]  19/14 19/15 61/25

**S**

S-C-H-A-E-F-F-E-R [1]  69/3
said [80]
said -- [4]  27/18 31/1 31/2 56/13
same [13]  42/4 47/23 73/15 81/24 93/24
 105/18 108/15 114/2 121/24 123/9 129/4
 129/16 132/18
samplings [1]  135/24
sat [1]  90/7
Saturday [1]  115/1
saw [20]  47/20 62/20 63/5 63/21 76/23 77/24
 108/2 108/5 110/21 110/21 126/9 130/5
 130/8 130/16 130/25 131/14 131/15 131/17
 132/17 133/15
saw -- [1]  110/21
say [68]
saying [31]  11/17 20/14 22/11 33/2 46/3
 49/10 51/5 53/2 55/6 55/10 55/21 56/4 56/18
 56/18 56/21 56/22 56/22 58/19 59/2 59/17
 59/25 60/1 60/4 60/17 60/18 60/20 61/2
 61/15 75/10 83/10 123/7
says [16]  21/17 21/17 21/25 39/9 48/24
 49/14 55/11 57/24 60/4 61/4 61/10 83/11
 84/5 84/5 117/6 117/6
scene [1]  31/3
Schaeffer [24]  68/18 69/3 69/11 70/10 72/17
 73/1 73/18 74/16 77/16 78/21 79/19 81/7
 85/19 86/21 90/11 90/17 101/15 102/17
 103/7 103/25 104/15 105/2 112/21 138/14
Schaffer [1]  133/24
scope [7]  22/5 42/22 43/23 54/6 57/21 61/12
 96/13

screen [2]  73/3 104/1
search [6]  5/11 65/6 108/23 110/15 121/10
 121/13
search -- [1]  121/10
searched [3]  33/5 123/25 128/9
seat [2]  64/4 105/22
second [10]  23/10 74/24 95/25 106/21
 108/22 116/18 119/1 120/21 136/11 137/1
secondhand [1]  62/18
seconds [1]  113/20
section [1]  44/7
secure [5]  83/11 83/12 83/22 87/15 94/18
secure -- [1]  83/11
security [4]  95/2 99/8 99/12 99/24
see [35]  11/3 14/10 14/16 14/18 18/22 20/16
 24/8 24/9 26/24 34/5 34/13 44/10 46/6 47/10
 65/19 70/13 72/20 79/2 89/21 92/3 92/13
 102/22 103/3 104/12 115/7 119/13 119/16
 122/9 124/6 124/11 126/2 127/16 129/5
 130/18 133/12
see -- [1]  124/11
seeing [6]  10/14 14/7 14/24 78/2 109/21
 109/21
seek [1]  72/4
seem [1]  128/13
seemed [2]  25/25 132/18
seems [3]  47/10 58/10 58/11
seems -- [1]  47/10
seen [12]  14/8 14/12 14/13 14/25 69/18 70/2
 70/2 70/15 129/7 129/10 130/13 131/3
SEGAL [1]  1/11
seized [1]  6/2
sell [2]  30/10 52/7
send [1]  136/5
sense [3]  51/3 58/2 58/3
sentence [2]  39/10 39/12
sentencing [1]  40/3
September [2]  36/5 36/17
sequentially [1]  3/22
series [1]  28/11
serve [1]  6/9
session [2]  1/7 3/2
set [4]  3/18 36/24 70/24 111/20
setting [1]  57/8
several [8]  28/14 28/15 37/2 39/14 79/7
 86/17 118/18 123/25
several -- [1]  28/15
shack [4]  93/8 93/10 93/13 93/18
share [1]  39/3
SHAW [2]  2/12 140/4
she [59]
she -- [1]  97/8
she'd [1]  62/20
she'll [2]  63/2 64/6
she's [8]  64/7 69/24 110/13 111/16 111/17
 136/3 137/3 137/5
she's -- [1]  111/16
shoe [1]  66/20
shoes [3]  66/17 66/17 66/21
shoes -- [1]  66/17
shop [2]  93/17 94/2
short [6]  4/22 5/6 57/12 71/25 72/1 98/21
shorter [2]  51/20 51/22
shorthand [1]  2/24
should [6]  4/17 25/15 56/21 62/23 106/18
 136/23
show [26]  20/2 3 4/2 34/12 39/6 60/10 61/11
 69/15 69/17 69/20 69/22 79/19 88/22 92/1
 102/17 103/3 116/5 116/9 118/10 120/8
 122/7 122/9 126/18 126/20 127/15 132/20
 133/10
showed [2]  95/6 130/18

## P

part [14]  26/11 30/10 30/18 31/5 31/9 47/6
48/23 87/2 88/17 98/12 99/12 113/5 117/14
117/19
participate [2]  64/19 65/2
particular [16]  17/20 25/1 35/19 46/8 66/8
71/2 73/25 80/5 81/8 94/13 96/9 107/10
108/9 109/25 117/16 119/16
particularly [2]  65/20 84/1
parties [3]  16/13 16/15 134/2
partition [1]  98/14
partner [3]  53/25 54/4 54/4
Partnership [1]  96/10
party [3]  33/22 34/13 84/6
past [3]  62/2 93/13 93/14
past -- [1]  93/13
Paul [2]  53/25 54/2
pay [1]  89/21
peaked [1]  107/11
pencil [1]  50/1
pending [1]  132/1
Pennsylvania [1]  123/22
people [17]  5/18 15/6 25/19 27/25 29/12
52/7 59/21 59/22 79/7 87/21 91/6 93/3 93/13
105/20 109/18 114/21 115/7
people's [1]  14/5
period [1]  31/14
permanent [2]  77/11 122/18
permanently [1]  114/24
permission [2]  81/10 88/4
permitted [1]  7/6
person [30]  9/15 11/11 19/14 19/15 53/13
53/16 73/2 73/4 73/14 78/13 78/23 79/2
81/23 81/24 81/24 82/2 83/9 84/4 86/22
86/22 86/24 87/5 89/2 91/3 97/8 110/7 113/9
115/13 132/16 132/18
personally [15]  76/6 108/4 110/21 114/21
119/11 119/16 120/1 120/15 122/2 124/21
126/2 129/10 130/5 130/18 130/18
personnel [2]  87/18 87/20
pertain [1]  71/2
phone [4]  90/13 106/7 106/12 111/7
phonetic [1]  96/3
photo [35]  14/24 78/16 78/21 82/21 85/20
85/22 85/23 85/23 86/5 86/11 86/14 102/22
102/24 103/3 103/21 103/22 103/22 104/5
104/9 132/20 132/23 132/23 133/1 133/5
133/5 133/5 133/8 133/11 133/18 139/11
139/14 139/15 139/20 139/21 139/22
photo -- [1]  14/24
photocopies [1]  103/10
photocopy [5]  85/25 86/16 86/19 103/1
103/6
photograph [8]  10/14 10/18 10/18 11/8
11/11 77/21 78/22 79/1
photographs [5]  10/8 10/10 11/8 11/9
132/17
photos [7]  14/4 14/5 14/7 14/14 14/24
103/16 132/15
physically [1]  5/19
pick [7]  20/24 33/11 44/16 45/11 47/8 47/9
60/10
picked [7]  7/4 14/5 36/13 108/16 109/19
110/11 111/2
picks [1]  109/18
picture [12]  10/22 70/24 73/20 73/24 74/7
75/17 75/18 77/16 78/2 78/12 80/8 132/11
pictures [1]  45/3
pile [1]  128/13
piled [1]  34/24
piling [1]  135/5

pinpoint [4]  32/14 115/14 121/1 121/14
pinpointed [2]  108/12 121/20
place [5]  13/25 14/2 24/6 42/4 48/5
plan [2]  37/22 70/21
plate [12]  93/25 94/3 110/1 110/3 110/6
115/11 122/12 122/13 122/21 127/12 133/10
133/12
play [9]  16/13 18/16 18/22 36/7 36/23 36/24
37/22 135/21 135/23
played [7]  13/5 16/18 18/20 18/24 36/8
36/25 48/20
playing [1]  135/3 135/15
plea [6]  3/5 38/17 39/7 40/23 41/8 41/10
please [13]  6/15 13/1 20/17 50/11 68/19
68/25 72/23 74/14 75/2 82/12 97/5 112/11
136/17
plus [1]  135/9
Plymouth [3]  119/6 127/8 129/25
point [39]
pointed [1]  35/6 46/20 113/11 121/17
pointing [1]  75/11
police [3]  30/25 31/3 33/13
portion [1]  36/23
portions [2]  48/20 59/13
position [1]  44/19
positive [3]  31/10 32/16 32/20
positively [1]  125/8
possession [8]  7/8 7/20 7/21 8/9 8/9 9/13
9/16 67/2
possession when [1]  8/9
possible [3]  35/15 35/16 110/10
possibly [1]  41/3
preceded [1]  133/24
precise [3]  119/25 120/14 122/10
precisely [1]  47/23
premises [12]  97/9 98/4 98/7 98/19 99/5
99/8 100/1 100/8 100/12 100/15 100/19
104/19
presence [1]  57/19
present [7]  3/3 6/16 9/23 64/8 64/22 114/7
116/15
presented [2]  103/11 136/8
president [2]  69/5 76/1
press [1]  67/23
pretty [3]  92/23 121/16 137/2
prevent [1]  95/3
previous [1]  125/9
previously [1]  9/9
price [1]  60/3 60/4
primary [1]  111/21
prior [17]  7/4 7/7 7/17 7/19 7/20 8/6 8/7
8/18 8/19 8/20 14/7 14/24 15/1 33/16 44/8
45/24 134/4
probably [6]  5/19 21/13 55/7 86/19 109/8
134/10
probably -- [1]  5/19
problem [12]  9/2 20/25 24/8 25/14 44/1
45/11 60/13 61/15 63/16 76/8 83/3 135/8
problem -- [1]  61/15
problems [2]  26/25 29/24
proceed [1]  113/21
proceedings [3]  2/24 137/9 140/5
process [2]  91/10 111/13
produced [1]  2/24
Products [1]  92/21
proffer [32]  19/21 21/9 21/22 22/4 22/5 23/1
23/2 23/3 23/7 23/8 24/10 24/22 25/1 25/4
27/2 42/12 42/20 43/7 43/19 44/5 44/7 44/15
44/17 44/18 46/13 46/13 46/14 46/18 46/19
46/23 47/17 59/11
proffer -- [1]  42/12
proffer's [1]  24/11

proffers [1]  26/22
progressed [1]  105/17
projector [1]  120/12
promoter's [1]  18/13
promoters [1]  19/16
proper [2]  69/21 71/7
properties [2]  69/11 116/11
property [9]  69/7 77/18 99/13 99/15 104/12
112/24 112/25 132/4 134/2
prosecute [1]  68/2
prosecutor [2]  128/15
prosecutors [5]  9/24 10/4 67/20 68/6 68/9
92/9 109/11 111/18
prove [2]  109/11 111/18
provide [2]  3/24 4/10
provided [2]  3/17 4/21
province [2]  40/1
public [1]  124/16
pull [1]  38/19
purpose [2]  6/8 72/23
purposes [6]  40/2 40/6 72/18 107/22 113/11
122/8
pursue [1]  67/15
put [31]  5/18 5/21 6/1 33/3 34/1 34/5 35/18
44/18 44/19 45/19 45/20 46/23 64/5 72/17
73/2 76/17 77/8 79/22 82/24 83/2 83/21 92/1
102/18 104/1 113/22 113/23 120/4 126/20
128/18 134/17 136/5
putting [9]  17/8 21/13 46/20 64/2 76/15 77/7
134/25 135/10 135/17

## Q

quantity [1]  49/7
quarter [3]  62/2 136/15 136/17
question [39]
question -- [1]  91/13
questioned [1]  63/25
questioning [2]  31/2 60/25
questions [30]  3/11 9/16 11/21 18/1 28/11
28/21 29/3 29/6 35/15 38/4 38/17 40/7 40/10
41/1 42/12 57/7 58/6 58/20 62/23 63/1 63/2
66/7 68/11 68/12 68/13 71/24 86/21 98/2
128/18 130/22
quick [2]  3/15 105/2
quickly [4]  40/12 109/17 116/24 133/8
quickly -- [1]  116/24
quiet [1]  121/8

## R

RACHEL [1]  1/15
raised [2]  22/20 62/15
ran [2]  83/12 91/9
rather [1]  59/20
reach [2]  35/2 123/18
read [11]  42/20 43/7 43/15 43/19 44/5 45/24
48/1 58/21 59/18 62/16 62/17
reading [4]  17/8 24/17 62/21 84/7
ready [1]  13/2
real [7]  23/15 58/18 59/23 60/9 60/10 61/24
136/4
realized [1]  111/1
really [12]  13/20 14/1 25/9 29/23 56/24 60/9
63/7 76/4 94/17 112/6 114/6 134/2
reason [4]  32/1 99/12 130/20 136/7
reasons [1]  135/24
rebuttal [1]  37/24
recall [18]  10/14 12/13 12/15 38/17 46/18
48/5 90/12 93/16 95/9 95/12 98/2 99/25
100/4 100/5 100/10 119/21 122/1 134/8
received [11]  13/20 34/10 72/15 73/13 80/25
86/14 103/23 128/4 133/6 139/3 139/13
recess [2]  57/12 112/12
recognize [9]  18/22 20/3 70/13 71/9 73/20

**M**

Mr. Norris' [1] 58/7
Mr. Schaeffer [1] 69/11
Mr. Schaffer [1] 133/24
Mrs. [12] 65/25 66/16 73/6 89/1 91/2 91/4 91/4 91/7 91/10 91/15 103/6 103/11
Mrs. Adams [2] 65/25 66/16
Mrs. Jones [10] 73/6 89/1 91/2 91/4 91/4 91/7 91/10 91/15 103/6 103/11
Ms [3] 138/12 138/15 138/19
much [18] 24/17 33/6 49/2 49/4 51/16 76/17 89/8 89/14 89/25 90/2 90/5 90/6 114/10 121/16 134/13 135/2 136/17 136/22
MVA [1] 128/8
my [43]
my – [1] 13/19
Myrtle [12] 106/22 121/19 121/21 122/3 123/5 124/19 124/21 125/4 125/25 130/6 131/1 132/5

**N**

N.W [6] 1/16 1/19 2/2 2/6 2/9 2/14
name [20] 12/13 12/14 19/17 25/19 53/25 69/3 73/14 82/3 82/5 87/8 90/12 96/2 96/9 97/21 98/4 101/23 102/5 107/14 107/17 108/15
name – [2] 12/13 98/4
name's [1] 84/5
named [2] 95/7 101/19
names [5] 29/10 49/13 69/1 101/17 109/12
narrowed [1] 121/16
nature [3] 100/2 100/13 100/17
nauseam [1] 41/2
near [3] 23/18 121/8 123/22
necessarily [2] 60/15 76/1
necessary [2] 32/1 135/11
need [6] 26/21 48/24 48/24 49/14 49/14 62/3
need – [2] 48/24 49/14
needed [2] 35/2 114/6
neighborhood [3] 121/6 121/7 125/11
nephew [2] 30/23 30/24
never [12] 11/9 11/12 35/10 38/10 47/20 53/18 57/25 58/13 61/3 82/14 94/12 95/22
next [14] 5/5 5/12 37/17 62/12 65/11 68/16 71/23 93/4 105/8 105/12 108/22 115/2 125/14 125/20
nice [3] 18/6 18/7 68/25
night [1] 115/1
no [131]
no real [1] 136/4
nobody [4] 56/21 57/25 58/18 134/10
non-hearsay [1] 63/17
none [4] 7/18 22/3 22/23 71/21
normally [2] 67/2 99/23
NORRIS [10] 2/2 25/8 43/4 45/21 47/1 58/24 72/9 85/17 101/11 138/17
Norris' [3] 58/7 79/13 134/1
North [7] 30/15 30/20 30/24 31/18 31/19 42/9 44/8
not [142]
not – [1] 32/16
notes [1] 23/17
nothing [15] 3/25 4/5 4/6 27/19 27/25 44/21 44/24 53/20 61/16 68/10 68/14 68/15 102/11 104/24 137/3
notice [2] 36/5 85/13
noticed [1] 3/21
notion [1] 20/25
November [14] 1/5 10/4 11/13 24/2 24/2 28/24 43/22 55/4 79/22 88/24 90/19 116/21 117/4 140/8

November of [1] 10/4
November the [1] 43/22
now [81]
now – [1] 93/14
number [26] 3/24 28/16 34/10 36/1 37/9 75/6 75/8 75/10 77/19 92/11 94/13 110/6 111/7 116/6 117/13 118/16 119/21 120/1 120/14 120/18 121/24 122/4 122/10 122/18 130/13 137/2
numbered [1] 3/22
numbers [3] 4/19 122/2 122/20
Numerous [1] 14/9

**O**

o'clock [1] 125/21
oath [4] 64/4 64/10 105/15 105/22
object [15] 25/16 26/21 30/2 35/13 63/10 75/10 75/25 80/13 81/2 105/16 105/19 113/5 128/14 130/24 136/4
objected [5] 25/15 25/20 31/9 47/2 62/22
objecting [3] 47/1 76/2 110/13
objection [45]
objections [3] 25/9 58/7 133/2
observations [1] 118/19
observe [2] 114/21 119/11
observed [6] 109/25 115/10 118/17 120/1 120/15 122/3
obtain [6] 108/8 116/1 117/13 118/11 127/2 132/11
obtained [4] 110/5 116/11 117/12 118/1
obviously [1] 8/25
occasion [3] 11/3 55/3 77/18
occasions [2] 118/18 130/13
occupancy [1] 117/4
October [9] 9/8 9/14 12/24 15/25 18/19 33/16 36/22 38/6 64/17
odd [3] 17/6 59/20 61/5
of – [1] 53/22
of the [1] 88/17
off [10] 64/1 85/4 104/20 106/12 112/18 115/5 119/8 121/25 125/13 125/15
off for [1] 64/1
offense [2] 9/20 67/4
offenses [1] 67/3
offer [1] 41/10
offered [3] 30/4 30/6 31/14
offering [1] 31/15
offhand [1] 14/1
office [8] 1/16 41/13 98/11 98/12 98/13 98/13 98/17 116/2
Officer [1] 31/8
officers [1] 31/17
often [3] 14/10 14/16 14/18
oh [12] 8/11 15/15 15/21 27/18 47/7 49/1 49/8 56/12 75/19 88/20 90/4 132/4
okay [147]
old [3] 7/14 10/18 121/8
older [1] 10/22
on – [3] 5/1 7/12 49/5
once [11] 16/19 25/9 37/23 46/20 48/16 65/6 89/3 91/9 99/25 113/22 136/3
one [85]
One – [1] 126/5
one-count [1] 7/11
ones [8] 5/16 15/7 49/11 72/20 72/23 100/25 117/16 117/18
only [31] 8/8 16/21 19/25 22/10 29/23 32/6 37/9 37/21 38/10 42/6 45/24 47/17 54/15 55/8 55/14 57/1 57/6 61/8 73/13 77/5 97/1 110/14 112/12 120/4 122/8 124/14 130/20 132/6 134/11 136/7 137/5
only – [2] 16/21 110/14

open [22] 9/4 17/23 20/21 24/3 25/10 26/1 27/8 32/25 43/2 44/15 45/14 45/14 47/11 48/2 58/8 77/13 85/10 93/4 93/23 98/9 112/9 131/12
open – [1] 26/1
opened [6] 20/10 24/18 26/2 26/3 46/7 46/19
opening [2] 26/22 58/10
openly [1] 7/24
opens [2] 26/16 59/10
opponent [1] 84/6
opportunity [2] 43/18 61/22
opposed [1] 108/21
or – [2] 7/9 34/13
ordered [2] 38/24 76/17
ordinary [3] 82/23 86/1 103/8
originally [1] 80/19
other [33] 4/8 11/16 23/25 24/16 24/19 26/22 27/3 29/12 29/22 30/10 30/10 31/24 40/10 44/25 46/6 53/6 53/12 53/15 62/18 76/24 89/20 92/25 94/7 94/24 110/17 115/4 115/7 116/1 119/10 122/12 124/25 129/8 136/1
other – [1] 44/25
otherwise [4] 21/2 47/13 47/24 60/11
ought [3] 13/10 84/18 134/17
ounce [8] 37/10 49/5 49/18 49/22 49/23 49/24 50/17 50/19
ounces [10] 37/11 50/2 50/10 50/21 51/1 51/2 51/3 51/6 51/7 53/4
ounces – [1] 51/6
our [5] 12/9 22/1 4 26/24 33/19 85/13
our – [1] 33/19
out [41]
out – [2] 7/15 83/24
out which [1] 109/13
outside [2] 57/19 106/18
over [16] 41/2 51/1 51/2 64/5 79/5 82/12 82/13 83/14 90/13 91/21 92/16 98/24 109/8 124/24 125/3 125/9
overhead [12] 80/6 81/9 81/13 83/12 86/23 87/11 87/13 89/7 89/14 89/25 94/23 104/17
overlook [1] 67/12
overruled [11] 20/10 28/12 30/8 32/9 32/24 35/14 81/4 81/21 89/23 131/25 132/8
own [5] 67/18 91/21 92/7 97/1 108/21
owned [1] 29/18
owner [3] 93/12 95/23 95/24
ownership [1] 96/25

**P**

P-R-O-C-E-E-D-I-N-G-S [1] 3/1
p.m [15] 1/5 3/2 6/16 57/14 62/13 64/8 64/12 68/20 105/24 112/14 112/18 112/19 114/7 134/14 137/9
page [23] 12/18 12/20 12/21 12/22 15/11 15/24 35/21 35/23 36/1 36/2 36/18 36/21 37/18 37/22 44/12 49/12 49/13 70/3 70/4 70/18 70/18 119/1 122/9
pages [1] 46/6
paid [1] 89/22
Papa [1] 123/2
paper [3] 19/8 80/22 92/20
paragraph [10] 39/6 39/9 45/16 45/20 46/4 46/8 46/9 46/20 46/21 47/12
paragraphs [1] 44/16
Park [17] 69/12 69/13 70/19 71/3 73/4 73/23 74/1 74/18 79/23 91/21 92/8 96/7 96/10 96/11 97/1 97/9 1 06/25
parked [2] 121/22 122/13
parking [5] 92/19 92/25 109/20 118/11 119/3
Parks [1] 116/19

**L**

Levels [5]  29/21 29/21 29/23 107/4 133/19
license [20]  75/18 77/23 78/9 78/12 86/17
  86/19 86/25 102/25 103/1 103/6 110/1 110/3
  110/6 113/10 115/10 118/16 127/6 127/12
  133/10 133/12
licensed [1]  127/8
licenses [3]  91/8 91/16 103/11
LIEBER [8]  1/15 36/24 75/10 95/6 134/21
  138/12 138/15 138/19
lieu [2]  134/24 135/15
like [30]  4/16 10/12 11/12 12/4 15/4 18/15
  26/10 26/23 27/20 31/1 35/15 47/18 56/14
  74/19 74/21 76/10 78/3 84/4 87/17 87/22
  89/15 89/20 89/25 93/22 100/6 100/9 103/11
  108/20 116/12 121/5
limit [4]  7/19 26/14 59/4 63/21
limited [5]  54/15 57/21 57/22 60/6 96/10
limits [1]  26/17
line [4]  134/17 135/15 135/18 136/11
line-by-line [3]  47/5 47/14 47/24
line-by-line and [1]  47/14
lines [2]  11/10 49/13
linked [1]  107/25
Lissen [1]  19/20
list [3]  70/3 108/14 117/4
listed [3]  123/11 123/21 129/5
listened [2]  3/5 3/8
listening [3]  58/16 59/22 60/8
listing [1]  119/4
little [19]  5/13 16/5 18/22 30/18 30/19 37/22
  48/19 51/1 51/2 51/19 51/19 51/22 60/10
  62/21 69/8 71/6 73/3 79/6 134/19
little -- [2]  51/19 60/10
LLC [2]  96/5 96/7
located [4]  5/19 69/12 121/15 133/19
location [9]  86/22 95/21 95/23 99/19 106/20
  106/21 106/23 106/24 130/6
location -- [1]  106/23
locations [3]  106/13 106/17 106/23
locks [1]  104/20
long [2]  59/13 113/24
longer [2]  5/17 85/14
look [27]  4/12 12/18 15/10 21/7 35/21 36/18
  37/17 39/9 47/23 49/12 49/13 70/12 73/3
  74/8 74/19 74/21 76/10 78/12 78/22 79/1
  79/2 79/8 87/17 120/13 123/15 124/4 126/12
looked [15]  4/16 10/9 10/23 14/14 31/1 78/3
  85/20 108/14 110/7 110/10 110/17 110/25
  121/5 123/24 137/1
looked -- [1]  110/17
looking [12]  11/9 21/2 78/9 82/17 84/12
  88/23 119/24 122/17 122/23 125/9 125/11
  131/20
looks [2]  84/4 116/12
loose [1]  65/25
lost [2]  5/13 5/20
lot [16]  10/9 14/15 20/20 34/24 38/17 42/12
  48/7 48/14 62/17 86/21 92/19 92/25 93/3
  93/14 109/20 130/23
lunch [2]  3/9 6/17
lying [1]  39/16

**M**

ma'am [10]  12/20 12/25 13/4 15/19 35/25
  40/4 64/11 106/2 127/21 127/23
machine [3]  2/24 79/22 120/5
made [16]  13/21 21/18 21/19 23/2 23/9 28/2
  32/4 35/1 65/5 65/6 66/15 68/1 76/6 80/14
  103/11 118/19
maintain [1]  71/18

make [21]  7/24 17/17 17/18 23/11 26/15
  40/23 41/10 51/3 58/2 58/3 67/18 68/2 68/5
  68/8 73/9 82/11 82/12 82/19 91/13 113/6
  135/1
makes [1]  61/16
male [3]  122/22 110/12 111/2
man [8]  18/10 19/10 27/19 27/24 54/9 56/14
  79/9 132/18
management [2]  69/7 96/5
manager [1]  77/17
manages [1]  69/12
many [9]  14/7 14/13 14/25 50/10 51/23
  124/24 125/3 125/24 125/25
March [1]  18/10
mark [2]  97/21 120/3
marked [7]  19/25 20/2 69/15 79/19 120/7
  122/8 127/15
married [1]  91/15
Marshal [1]  50/12
Mary [1]  127/12
Maryland [18]  8/4 8/12 69/13 106/18
  106/21 106/22 106/24 107/11 117/2 121/8
  121/18 124/10 124/20 124/22 127/2 128/8
  129/20 137/6
matches [1]  111/17
materials [1]  100/16
math [1]  52/20
matter [3]  3/25 70/15 140/6
mattresses [1]  100/8
may [28]  11/4 24/19 24/25 26/6 32/9 34/12
  45/12 50/11 51/19 51/22 67/12 70/6 75/5
  76/15 78/18 78/18 82/22 97/10 101/5 104/25
  108/22 110/18 116/23 125/15 134/6 134/15
  135/7 135/12
may -- [2]  134/6 135/7
maybe [4]  51/17 53/4 78/1 113/13
Maybe -- [1]  61/10
Maynard [34]  14/13 30/14 30/17 31/12
  31/17 31/19 31/20 31/25 32/2 32/13 32/14
  32/2 42/10 44/9 45/5 46/3 47/7 47/14 47/22
  48/4 101/21 102/25 103/12 130/9 130/10
  130/11 131/9 131/13 131/18 131/20 132/10
  132/12 132/17 133/15
McAllen [1]  106/8
McDANIEL [8]  2/9 18/2 18/3 18/9 19/21
  20/5 35/3 138/9
MCI [2]  19/9 19/11
me [58]
me -- [5]  45/17 56/12 58/10 63/8 82/14
mean [37]
meaning [1]  102/3
meaningless [1]  102/3
means [7]  21/22 49/6 55/9 55/20 60/15
  60/21 86/11
meant [4]  10/2 16/9 16/14 90/5
meantime [1]  105/8
measures [1]  121/1
meeting [3]  28/19 28/24 45/25
meetings [1]  9/23
member [1]  31/1
members [4]  13/24 55/3 115/4 115/7
memory [6]  78/3 78/13 78/23 119/25 120/14
  122/23
mention [1]  46/19
mentioned [10]  14/4 15/6 20/5 25/19 28/14
  29/17 30/14 34/17 48/20 101/17
merely [1]  61/2
mess [1]  46/21
messed [6]  8/15 10/2 23/23 55/1 55/12 55/25
messier [1]  25/25
met [8]  10/4 24/1 24/2 28/15 43/18 43/21
  46/1 102/2

met -- [1]  102/2
metropolitan [4]  69/5 69/6 106/13 120/22
Mexican [1]  121/11
MICHAEL [2]  1/6 14/24
might [11]  10/13 42/16 46/10 53/4 61/11
  61/24 90/12 108/8 108/8 112/1 121/15
Mike [5]  12/14 13/7 14/25 133/13 135/16
Mike's [4]  13/15 13/16 36/11 36/12
million [3]  18/10 19/10 60/25
mind [4]  6/19 82/14 109/13 113/6
Mine [1]  83/19
minor [1]  75/5
minute [6]  13/1 24/9 38/19 56/2 70/23
  106/11
minutes [5]  39/3 64/2 112/11 112/21 136/25
misinterpreting [1]  58/20
misleading [2]  57/5 63/7
Miss [5]  3/4 36/24 75/10 95/5 134/21
missed [1]  62/22
missed -- [1]  62/22
misstatement [1]  45/2
mistake [3]  21/18 21/19 28/2
mistaken [2]  37/5 113/12
mistakenly [3]  112/21 113/5 113/7
moment [2]  10/9 39/25
Monday [7]  109/25 111/6 125/14 125/20
  126/1 134/18 136/2
money [15]  31/21 32/18 32/23 33/5 33/6
  33/8 33/10 33/14 34/18 35/2 36/13 36/14
  66/19 99/21 99/21
monitor [1]  102/18
Montana [1]  107/2
month [3]  48/9 95/11 97/23
months [1]  99/1
more [27]  3/11 9/6 10/12 18/22 21/13 25/4
  28/21 28/21 34/20 34/22 43/2 47/5 47/19
  58/4 58/8 59/16 61/10 62/5 62/4 79/6 83/11
  83/23 101/5 106/23 128/11 135/11 135/11
morning [7]  23/18 39/4 125/14 125/14
  125/21 134/18 136/2
most [5]  93/20 93/20 122/16
mostly [2]  14/12 26/5
motion [1]  41/12
Motor [4]  127/2 127/3 127/19 127/21
move [11]  5/10 25/13 28/10 34/25 65/17
  69/9 74/11 80/11 86/4 103/15 129/13
movement [2]  19/10 57/10
moves [1]  69/9
movie [1]  4/16
moving [6]  25/14 83/13 87/14 94/7 94/8
  94/16
Mr [94]
Mr. [109]
Mr. -- [1]  60/17
Mr. Acree [15]  3/10 8/17 12/5 12/6 12/13
  13/22 14/4 15/3 17/1 22/7 22/20 23/17 56/17
  57/16 62/4
Mr. Adams [2]  9/6 40/15
Mr. Antoine [1]  101/18
Mr. Balarezo [1]  33/20
Mr. Geise [2]  26/22 58/20
Mr. Geise's [1]  59/18
Mr. Glick [3]  97/25 98/2 98/6
Mr. Holland [1]  19/16
Mr. Jones [60]
Mr. Jones get [1]  109/21
Mr. Jones his [1]  99/10
Mr. Jones' [2]  30/23 80/5
Mr. Maynard [4]  30/17 33/2 48/4 103/12
Mr. McDaniel [6]  18/2 18/3 18/9 19/21 20/5
  35/3
Mr. Norris [5]  25/8 43/4 45/21 47/1 58/24

**I**

imagine [1] 4/23
Immigration [1] 95/20
Impala [4] 119/20 119/20 120/15 123/4
implication [3] 83/16 83/20 83/23
import [1] 59/19
important [1] 113/11
imposed [1] 39/10
in -- [2] 79/21 112/16
in as [1] 134/22
in-between [1] 93/23
in-court [1] 82/19
inaccurate [1] 134/5
inaccurately [2] 113/14 133/25
Included [1] 116/23
income [2] 124/7 124/12
incorrectly [1] 3/6
independently [1] 34/13
Indiana [1] 2/2
indicate [3] 78/5 116/15 118/13
indicated [5] 50/1 67/6 94/5 94/22 95/5
individual [3] 90/24 93/21 97/20
individuals [2] 11/14 126/6
indulgence [3] 39/25 88/13 120/10
industrial [2] 92/20 92/25
inference [3] 47/5 47/21 47/25
inflatable [1] 100/8
inform [1] 133/23
information [7] 23/3 23/6 45/8 47/19 111/22 115/14 132/11
information -- [1] 23/6
initially [2] 7/11 121/24
inquiring [1] 38/23
inquiry [1] 26/15
inside [1] 98/9
insinuate [3] 20/19 44/16 45/15
inspect [1] 99/8
inspections [1] 98/19
install [4] 81/8 81/10 81/12 87/13
installed [8] 80/5 80/9 86/22 89/20 94/23 94/24 94/25 95/1
instance [2] 62/23 87/22
instead [3] 34/25 113/25 134/22
instruct [1] 63/21
instruction [1] 26/10
instructions [1] 88/6
intend [1] 112/20
intending [1] 111/4
interception [1] 44/8
interest [13] 6/1 63/23 96/19 96/23 96/25 96/25 106/13 107/11 114/15 115/8 115/11 115/16 119/10
interpreted [1] 37/23
interpreting [1] 57/9
interrupting [1] 26/23
interruption [1] 114/8
introduce [2] 68/25 126/22
introducing [1] 110/4
investigate [2] 120/21 131/17
investigation [18] 3/18 4/8 4/9 29/14 65/12 65/14 67/7 67/12 106/7 106/12 107/9 108/7 115/25 119/7 119/11 123/14 127/1 132/10
investigation -- [1] 119/7
investigative [1] 120/25
investigator [1] 97/25
Investment [2] 69/5 69/6
involved [1] 55/12
involvement [1] 18/13
involving [1] 44/9
is [322]
is -- [9] 8/15 18/16 21/4 60/20 83/16 96/12

97/15 109/14 118/17
isn't [14] 9/9 9/20 9/24 10/3 10/10 10/12 10/15 11/14 32/15 37/24 47/13 55/22 56/8 132/7
issue [6] 23/6 38/3 46/11 76/14 84/13 105/2
Isuzu [7] 126/8 127/10 129/13 130/5 130/17 131/5 132/19
It [366]
it -- [6] 4/11 7/18 17/15 28/21 32/8 63/3
it's [112]
it's -- [1] 84/2
item [1] 85/19
items [3] 64/22 65/3 99/19
its [1] 113/6
itself [1] 71/7

**J**

JACK [2] 1/15 44/22
JACKSON [21] 1/6 2/2 2/5 20/13 25/20 25/22 26/6 27/14 59/8 59/14 101/23 102/5 102/8 112/22 112/23 113/7 113/14 113/15 133/25 134/2 134/5
Jackson -- [1] 27/14
jail [15] 8/19 20/6 20/12 22/13 22/24 23/1 24/4 27/12 41/21 41/25 42/1 45/4 46/16 57/24 59/2
jailhouse [2] 25/17 25/18
Javier [13] 107/16 107/18 107/20 107/22 107/25 109/16 110/21 114/17 119/11 119/13 120/22 121/2 121/15
Jeep [5] 118/15 121/11 125/9 127/6 129/21
Jencks [2] 4/6 137/8
jersey [8] 37/10 49/2 49/4 49/7 49/10 49/23 50/6 51/8
jerseys [6] 37/11 48/21 48/24 49/15 49/17 51/5
John [3] 64/17 65/23 138/5
JON [1] 2/2
JONES [155]
Jones -- [1] 21/6
Jones' [5] 28/8 30/23 61/2 80/5 111/2
judge [16] 1/12 20/9 20/21 22/24 24/10 25/14 26/20 39/3 39/13 39/15 39/16 39/24 40/18 40/23 41/8 59/3
July [2] 34/14 34/16
July the [1] 34/16
jurors [2] 4/15 38/21
jury [43]
jury's [2] 40/5 135/20
jury's attention [1] 135/20
just [111]
just -- [4] 17/16 40/11 45/15 130/3

**K**

Katerina [6] 73/14 95/7 97/8 98/3 105/24 138/18
Katerina -- [1] 98/3
keep [3] 21/12 21/14 59/1
keeps [1] 111/25
kept [6] 37/6 71/14 82/23 85/25 98/16 103/7
KEVIN [6] 1/7 18/12 19/20 35/3 35/6 135/16
key [5] 97/12 97/13 97/14 104/17 104/19
ki's [1] 33/11
kicked [1] 106/12
kilo [9] 28/3 52/10 52/11 52/13 52/15 55/5 55/9 56/1 60/15
kilos [3] 31/22 47/8 47/9
kind [6] 55/13 63/15 88/1 119/5 121/17 126/7
kinds [2] 47/11 99/19
knew [2] 24/16 28/18

know [114]
knowledge [9] 14/8 17/20 62/17 62/18 63/1 76/9 89/14 102/6 102/8
known [1] 21/1
knows [7] 8/18 47/18 49/21 63/11 76/16 111/8 129/7

**L**

ladies [8] 6/24 12/17 38/22 57/12 85/13 112/10 114/8 133/23
laid [2] 71/7 76/3
land [1] 58/7
large [9] 37/10 37/11 49/11 50/6 51/8 66/19 91/22 91/22 132/18
large -- [1] 91/22
Largo [3] 106/21 107/11 117/1
Larry [1] 96/2
last [18] 19/17 40/17 62/15 69/1 70/18 95/11 95/11 95/13 95/14 98/4 106/6 107/6 109/10 112/1 119/8 120/20 122/5 132/3
late [6] 18/2 38/22 63/14 97/4 125/5 136/16
later [6] 63/13 85/14 91/9 131/5 134/10 136/17
latter [1] 111/5
law [5] 9/19 24/2 55/3 113/23 136/9
lawoffice [1] 1/20
Lawrence [24] 14/13 30/14 31/19 42/10 44/9 46/3 91/7 101/19 101/21 101/21 102/25 104/10 104/12 130/9 130/10 130/11 131/9 131/13 131/17 131/20 132/10 132/12 132/16 133/15
lawyer [1] 39/3
lay [5] 63/15 69/20 69/22 76/11 123/18
lay -- [1] 123/18
laying [1] 72/7
leading [1] 130/23
learn [1] 23/7
learned [10] 20/20 21/1 22/4 23/7 31/19 32/13 32/14 44/17 45/15 108/21
lease [33] 70/19 70/25 71/2 74/14 74/17 76/10 81/24 83/4 84/5 88/8 88/10 88/14 88/18 88/23 88/24 90/17 90/22 94/10 95/6 98/20 99/20 101/18 116/1 116/1 116/10 116/10 116/12 116/16 116/20 116/25 117/8 123/11 132/2
leased [3] 73/2 73/4 74/9
leased -- [1] 73/2
leases [2] 110/8 110/25
least [11] 8/14 20/23 43/11 48/20 56/19 72/22 89/3 89/5 93/19 128/11 136/9
leave [2] 98/23 115/8
leaves [3] 3/8 84/16 105/4
led [1] 107/7
left [23] 20/25 61/18 97/13 99/15 99/18 99/24 100/1 100/7 100/11 100/15 100/19 100/22 104/20 105/14 113/7 114/18 114/23 114/24 114/24 115/3 115/5 119/8 119/11
left -- [1] 114/18
legal [1] 65/16
legitimate [5] 21/14 23/15 124/6 124/7 124/11
lessee [2] 76/9 131/22
let [25] 6/3 10/25 32/10 33/15 34/12 37/25 39/6 39/21 44/10 45/17 45/20 61/13 73/1 73/18 74/16 81/17 82/14 85/19 92/1 99/25 105/7 112/3 114/16 126/25 130/3
let's [18] 6/15 6/19 13/2 15/10 16/3 18/22 21/2 34/13 35/21 36/7 36/18 37/17 39/9 44/10 63/20 92/22 95/14 99/22
letter [1] 70/21
letters [1] 122/20
level [1] 110/22

**F**

frankly [2]  45/18 46/19
Friday [2]  34/14 126/1
from -- [2]  9/19 107/13
front [21]  17/8 24/11 25/17 46/23 70/18
73/23 73/25 74/8 74/18 74/21 80/1 81/13
83/21 84/20 87/15 87/18 88/1 88/15 93/24
98/12 98/14
fronted [1]  98/14
full [2]  29/10 107/17
funnier [1]  85/17
furniture [4]  94/6 94/13 94/16 98/17
further [5]  29/14 40/7 40/13 53/23 102/11

**G**

gang [1]  31/1
garbage [1]  99/18
garble [1]  27/20
garden-style [1]  114/17
Gasner [1]  96/2
gave [15]  13/19 13/19 24/11 38/8 38/10
38/10 52/24 53/13 53/16 73/13 95/5 95/6
95/9 99/12 136/7
GEISE [9]  1/15 16/6 25/15 26/22 40/17
54/23 55/23 58/20 138/7
Geise -- [1]  25/15
Geise's [1]  59/18
gentleman [3]  13/17 18/4 79/11
gentlemen [9]  6/24 12/17 38/23 57/13 85/14
112/10 114/9 133/2 133/23
get [35]  4/11 4/24 21/22 23/14 32/19 35/2
43/12 46/12 46/14 46/17 47/2 57/1 57/7
57/23 58/5 58/25 59/7 60/8 60/15 62/12
76/18 77/16 84/1 85/14 99/8 104/19 105/8
108/22 109/21 109/22 111/7 119/16 135/10
135/15 136/22
gets [4]  62/19 71/7 85/14 85/17
getting [5]  25/9 56/24 71/6 107/8 115/13
Gikas [23]  3/19 4/2 4/3 4/4 4/24 62/14 98/3
98/7 105/24 114/13 116/6 116/9 116/23
119/1 120/7 120/12 122/7 123/10 126/25
128/6 132/3 133/8 138/18
Gikas -- [1]  116/23
give [18]  4/25 29/10 37/15 38/12 50/2 51/6
51/8 73/10 73/12 82/3 86/24 88/6 98/7 99/10
101/8 112/5 116/18 137/7
given [7]  3/7 39/15 39/22 51/15 51/16 97/13
99/20
giving [2]  27/5 52/17
glass [9]  83/21 83/24 87/15 87/16 87/18 88/1
88/2 94/3 98/14
Glick [4]  97/21 97/25 98/2 98/6
go [61]
go -- [2]  60/5 114/24
goes [5]  21/5 22/3 84/19 109/13 113/23
going [109]
gone [6]  41/2 60/24 83/18 83/19 105/14
109/8
Gonzalez [1]  107/18
good [28]  6/17 11/24 11/25 12/1 12/2 13/2
39/19 40/15 40/16 47/22 50/14 50/24 64/3
64/15 64/16 66/13 66/14 67/5 68/23 68/24
75/24 90/1 101/15 101/16 105/13 106/2
106/3 134/12
Gordon [2]  14/18 30/23
got [24]  5/14 6/20 8/15 21/25 27/20 27/25
27/25 30/19 30/24 42/23 45/2 45/2 46/22
47/25 48/6 52/18 52/24 54/25 62/3 63/17
94/3 107/9 117/17 136/19
gotten [2]  37/14 61/11
government [25]  1/15 3/17 3/24 5/21 8/15

9/23 28/15 29/4 29/7 29/14 39/14 43/18
43/21 45/25 46/1 59/22 61/9 62/25 63/15
65/24 66/4 68/17 70/10 84/9 118/7
government's [29]  6/9 41/1 61/6 69/16
72/14 74/12 78/21 79/20 80/25 86/14 103/2
128/3 133/5 139/5 139/6 139/7 139/8 139/9
139/10 139/11 139/14 139/15 139/16 139/17
139/18 139/19 139/20 139/21 139/22
GPS [1]  135/9
grams [25]  49/8 49/10 49/18 49/19 49/21
50/2 50/2 50/17 50/19 50/21 51/1 51/2 51/2
51/23 52/4 52/7 52/7 52/7 52/13 52/15 52/21
53/1 53/6 53/12 53/15
grant [1]  88/4
grass [2]  88/1 93/25
Griffith [1]  3/4
ground [1]  61/23
group [1]  23/10
guess [10]  4/22 5/13 7/3 58/10 62/7 100/5
106/17 127/2 134/19 137/1
guess -- [1]  62/7
gun [1]  8/10
guy [8]  44/20 61/4 61/9 76/16 83/4 83/4 83/5
110/11
Gwen [3]  70/3 85/21 132/6

**H**

had [88]
had -- [3]  54/20 128/12 128/12
half [64]
half-price [1]  60/16
halfway [2]  121/22 121/23
Hampton [18]  69/12 69/13 70/19 71/3 73/4
73/23 73/25 74/18 79/23 91/21 92/7 96/7
96/10 96/11 97/1 97/9 106/25 134/3
happen [1]  88/7
happened [9]  19/12 22/12 32/3 33/13 48/7
52/23 53/9 53/12 112/1
happy [2]  4/9 109/15
hard [1]  83/17
harder [1]  85/14
has [40]
hashed [1]  61/21
hasn't [5]  7/14 16/18 17/16 41/3 83/6
hasn't -- [1]  17/16
hate [1]  26/23
have [169]
have -- [4]  4/4 4/22 45/22 109/19
haven't [4]  38/1 41/5 105/14 105/17
having [8]  18/12 29/24 31/18 34/25 56/4
79/1 114/1 128/15
he [245]
he -- [2]  45/23 47/7
he's [15]  7/23 17/8 21/4 25/22 27/1 31/20
32/5 75/25 77/5 77/6 79/5 82/24 83/7 111/8
118/23
he's -- [1]  32/5
head [1]  109/17
heading [1]  31/22
heads [1]  4/25
heads-up [1]  27/5
hear [6]  4/14 5/3 21/3 43/4 43/25 136/24
heard [9]  31/24 31/25 32/7 32/7 37/19 42/12
58/22 63/22 134/20
hearsay [9]  30/2 31/16 76/18 76/20 76/25
111/11 124/15 126/17 131/23
heat-sealing [1]  100/16
heavens [1]  39/19
Heights [3]  69/13 91/24 106/24
helpful [1]  3/7
helpful -- [1]  3/7
helps [1]  79/8

her [37]
here [41]
here -- [2]  76/19 120/13
here's [2]  25/3 104/5
herself [3]  63/5 63/21 89/2
him [113]
him -- [5]  17/6 22/1 44/21 58/23 77/2
him the [1]  130/18
himself [3]  78/13 78/23 79/3
his [50]
his -- [1]  109/16
Hispanic [3]  109/22 110/12 111/2
Hold [1]  108/19
hole [1]  28/1
HOLLAND [7]  1/7 2/9 19/16 35/4 35/7
35/10 135/16
Holland -- [1]  35/4
home [3]  9/14 11/5 106/21
homes [2]  121/9 121/16
honest [1]  39/22
Honor [119]
Honor -- [2]  45/13 47/16
HONORABLE [1]  1/11
hope [6]  6/19 42/25 101/3 105/21
hoping [2]  114/5 135/10
Horne [2]  9/24 114/5
hour [2]  38/22 136/19
hours [1]  92/23
house [23]  5/11 5/14 6/2 9/8 11/1 13/15
13/16 13/16 13/18 36/11 36/12 66/25 121/1
121/20 121/22 122/13 124/19 125/8 125/12
126/3 126/3 131/3 131/22
housed [1]  42/4
houses [1]  121/15
how [51]
huge [1]  46/21
HUGGINS [7]  1/6 13/9 14/25 14/25 111/24
113/21 135/16
Huggins' [2]  11/1 11/3
huh [3]  14/21 43/9 81/18
Huh-uh [1]  16/10
Hunter [1]  114/6
husband [1]  66/23
HUVELLE [1]  1/11

**I**

I -- [10]  4/1 4/4 31/20 46/24 59/17 60/18
63/19 75/12 91/19 91/19
I'd [1]  12/4
I'll [26]  12/11 20/2 22/1 38/3 40/17 43/25
47/17 57/22 60/5 63/19 63/20 69/19 73/2
79/22 80/23 83/24 91/13 101/5 101/7 101/10
102/17 105/7 116/24 120/3 120/8 137/7
I'm [133]
I've [8]  62/17 69/15 79/19 81/20 85/5 89/20
120/7 127/15
I.D [1]  82/21
Ie [1]  59/22
ICE [8]  3/18 69/19 106/7 114/25 115/4
117/13 124/25 127/15
ID [1]  19/25
idea [4]  16/14 41/3 100/21 100/23
identification [12]  20/3 75/7 78/17 82/19
84/13 87/2 110/7 113/12 113/12 120/4 120/8
122/8
identified [18]  29/4 29/7 29/12 78/23 84/23
85/3 85/19 90/24 110/14 112/21 113/6
113/14 114/14 125/8 125/12 131/4 133/25
134/4
identified -- [1]  85/3
identify [11]  11/11 19/2 72/22 75/8 75/16
75/16 78/7 106/12 115/10 131/2 131/9

**D**

documents... [15]  73/10 73/16 76/5 88/15
95/5 95/9 108/9 111/16 116/2 116/6 117/13
118/1 126/19 126/21 127/17
does [29]  6/8 12/10 13/11 51/3 51/11 54/21
55/16 56/11 60/24 73/24 74/2 74/7 74/10
74/25 76/4 76/5 76/7 78/22 80/8 80/10 89/25
92/9 116/15 116/18 117/4 117/9 118/13
120/14 120/17
doesn't [7]  4/4 24/3 49/6 58/2 58/3 76/1
128/13
dog [10]  31/3 31/9 31/21 32/10 32/15 32/16
32/19 33/3 33/3 33/4
doing [13]  17/15 17/18 17/19 29/15 45/18
46/5 60/1 60/19 69/24 108/8 135/8 135/17
136/3
dollars [2]  49/6 76/16
don't [106]
don't – [2]  26/1 99/17
done [8]  20/23 26/24 61/22 61/25 84/16
84/22 101/2 136/3
door [37]
doors [8]  29/24 34/23 45/14 45/14 83/24
89/20 94/23 98/13
doors – [1]  98/13
dots [1]  111/12
doubt [1]  24/17
doughnut [1]  6/20
down [6]  49/13 58/22 90/7 104/25 121/16
134/15
driver's [13]  75/18 77/23 78/9 78/12 86/17
86/19 86/25 91/8 102/25 103/1 103/6 103/11
113/10
driveway [3]  121/22 122/3 123/5
driving [4]  118/7 130/8 130/16 133/16
drug [5]  13/21 32/18 48/24 53/11 53/14
drugs [15]  13/20 13/20 17/5 31/10 35/7
35/10 37/5 38/9 38/10 38/11 38/12 49/4
66/24 67/2 83/22
duffle [1]  100/12
during [4]  26/18 27/10 80/4 126/3
duties [1]  77/17

**E**

e-mail [1]  136/6
each [6]  49/2 49/4 49/10 49/17 49/23 93/21
earlier [3]  18/3 43/17 134/21
early [1]  134/10
earnings [6]  118/4 118/6 124/9 124/10
124/11 124/12
easy [1]  35/1
edge [1]  133/20
EDUARDO [2]  1/18 90/12
effect [1]  98/3
eighth [19]  37/6 37/7 37/8 51/18 51/20 51/21
51/22 51/23 51/25 52/3 52/3 52/4 52/8
52/9 52/9 52/10 52/15 53/1
either [2]  9/23 125/19
elegantly [1]  21/13
elicit [3]  63/1 84/4 111/4
eliciting [1]  109/11
ELLEN [1]  1/11
Elmo [3]  72/17 73/2 92/1
else [28]  3/8 25/2 26/16 31/11 38/16 51/9
52/18 53/20 53/21 54/15 55/14 61/16 62/8
62/9 66/6 68/10 68/14 71/22 72/2 75/2 88/25
101/4 104/24 108/21 114/3 129/8 134/6
136/13
employed [4]  14/20 14/22 69/4 111/13
employer [4]  116/15 116/18 123/10 124/7
employment [1]  124/7

end [4]  4/7 23/18 92/13 137/6
ended [1]  88/7
enforcement [4]  9/19 24/2 55/4 95/20
enlarged [2]  86/17 86/19
enough [6]  11/12 16/17 85/5 85/8 85/15
87/15
enter [4]  97/9 98/4 98/7 99/5
entered [4]  33/21 74/17 81/24 116/25
entire [2]  59/11 122/4
entirety [1]  92/7
equals [1]  49/21
equipment [5]  99/18 100/9 100/16 121/17
125/10
ESQUIRE [6]  1/15 1/15 1/18 2/2 2/5 2/9
essentially [2]  7/5 9/25
establish [1]  75/20
even [5]  5/25 17/13 24/21 28/2 48/11
evening [3]  125/7 125/11 134/12
event [5]  19/10 19/11 19/12 19/14 19/15
events [2]  30/15 30/17
eventually [3]  29/25 30/9 109/15
ever [5]  11/3 12/14 17/2 17/4 94/9
every [5]  14/12 14/12 14/17 14/19 139/25
everybody [16]  5/24 6/17 7/12 12/23 13/1
15/22 20/19 25/2 34/5 56/24 57/1 60/25 64/9
70/2 136/14 136/23
Everybody was [1]  20/19
Everybody's [1]  24/13
everyone [2]  38/16 136/7
everything [4]  28/18 31/2 34/25 114/3
evidence [39]
evolution [1]  135/15
exact [6]  29/1 41/24 42/11 48/8 121/24
122/20
exactly [3]  13/25 41/25 60/22
EXAMINATION [4]  11/22 64/13 68/21
105/25
example [3]  10/17 60/2 94/2
except [3]  21/2 25/10 135/3
excuse [9]  45/1 50/2 51/6 52/1 52/1 56/12
57/9 112/4 112/10
excused [2]  62/11 134/7
exhibit [10]  20/17 33/21 34/10 70/19 78/21
79/20 80/25 86/14 92/5 139/4
exhibits [9]  42/15 69/16 70/10 72/14 103/22
127/15 128/3 139/1 139/12
exhibits – [1]  42/15
exist [1]  60/17
existence [2]  61/12 123/15
exists [1]  123/16
experienced [2]  53/11 53/14
expired [2]  122/14 122/15
explain [3]  29/20 30/6 59/17
explain his [1]  30/6
explaining [1]  57/23
explains [1]  46/4
expressed [1]  66/3
extent [1]  60/7
extra [3]  37/11 50/5 51/8

**F**

face-to-face [3]  14/8 14/14 14/25
facility [10]  69/12 71/3 73/5 78/14 78/24
79/4 79/21 80/9 80/18 81/13
fact [12]  7/4 10/21 46/12 54/20 54/23 56/5
70/15 77/10 82/11 91/4 91/15 111/5
fact that [1]  82/11
fact-finder [1]  40/6
factor [1]  65/24
facts [3]  47/6 47/23 130/23
factual [1]  46/14
fair [14]  6/3 7/6 7/7 8/14 9/7 9/12 9/25 10/9

10/12 10/12 10/19 10/24 11/8 11/14
fairly [7]  8/15 73/24 74/7 80/8 80/17 91/22
109/17
fall [1]  34/24
false [1]  84/13
familiar [1]  101/24
far [6]  21/25 50/24 58/10 58/25 105/6 137/4
fast [1]  85/15
fatal [1]  84/3
Fats [1]  30/1
February [4]  120/16 125/5 125/14 125/20
feel [1]  24/18
felon [5]  7/8 7/20 7/21 8/9 8/9
felony [8]  7/4 7/7 7/19 8/7 8/7 8/21 9/9 9/15
felt [1]  87/15
fence [1]  92/17
few [8]  9/6 11/21 64/2 66/9 90/13 106/6
121/25 128/11
few – [1]  128/11
Fifth [1]  1/19
fighting [1]  83/14
figure [4]  3/6 57/25 58/17 61/8
figured [1]  109/13
file [10]  41/12 75/17 76/7 77/22 78/2 82/23
82/25 83/1 103/8 112/12
files [4]  71/11 71/12 86/7 103/17
finally [10]  65/23 73/18 89/7 103/25 104/15
118/6 118/9 129/25 132/19 133/18
find [6]  13/1 16/1 26/13 32/22 123/25 124/2
fine [9]  8/24 27/7 47/16 59/13 63/20 90/16
101/9 112/8 113/16
finish [3]  44/22 97/5 105/10
finished [2]  3/13 18/25
firearm [6]  7/5 7/7 7/9 9/8 9/13 9/16
firearms [1]  64/20
first [37]
first – [3]  70/24 106/10 114/16
firsthand [3]  17/19 76/9 89/14
five [6]  3/23 41/4 47/18 99/1 136/23 136/25
flip-flop [1]  32/6
flip-flopping [1]  32/5
flip-floppy [1]  32/13
floor [7]  2/3 108/3 108/5 110/8 110/20
115/15 115/19
floor – [1]  110/8
flop [1]  19/13
flyer [1]  33/21
flyers [1]  61/1
focus [6]  65/12 65/18 67/6 67/11 107/7
109/14
focused [1]  65/14
folks [3]  24/1 24/2 114/18
follow-up [1]  60/2
followed [4]  107/12 108/2 110/24 114/17
following [3]  84/6 96/24 107/13
food [1]  93/7
food – [1]  93/7
fooled [1]  61/9
foregoing [1]  140/4
form [4]  117/5 118/11 118/22 119/3
formally [2]  65/3 65/9
forth [1]  34/25
found [12]  3/5 8/10 13/2 15/22 31/21 32/18
33/13 66/16 66/20 66/24 124/14 136/10
foundation [8]  63/16 69/21 71/7 72/7 76/3
76/11 123/17 131/8
four [7]  3/22 3/23 71/23 110/8 110/10
110/19 110/25
Fourteen [2]  49/19 50/17
Fourteen grams [2]  49/19 50/17
Fourth [1]  1/16
Francisco [1]  107/18

## C

comes [4]  61/4 63/13 109/17 133/13
coming [11]  31/9 60/25 61/1 62/14 93/3
 105/12 111/11 126/2 126/5 130/3 134/24
comment [1]  58/12
commercial [2]  69/7 124/1
committed [1]  67/13
committee [1]  41/12
communications [1]  128/15
company [11]  69/5 69/6 69/7 69/11 71/18
 74/18 76/1 80/2 94/8 96/9 124/1
company's [1]  71/12
compare [3]  47/14 123/8 132/17
compared [1]  123/4
comparing [1]  114/15
compatriots [1]  109/17
competed [1]  65/7
competent [1]  136/9
completed [2]  3/10 91/10
completely [1]  22/24
completing [1]  99/20
complex [3]  92/25 108/10 116/3
computer-aided [1]  2/24
Con [1]  92/20
Con't [1]  2/1
concern [1]  76/4
concerned [3]  58/24 62/21 105/6
concerning [1]  46/15
concludes [1]  40/8
conclusion [2]  65/16 123/19
conduct [2]  95/21 124/25
conducting [1]  94/15
conference [8]  7/1 16/4 20/18 31/7 44/11
 75/4 82/10 109/6
conferences [1]  85/13
confirm [2]  91/3 91/14
confused [4]  48/19 56/24 57/1 134/20
connect [1]  111/14
connected [1]  111/13
Connecticut [2]  2/6 2/9
connection [6]  65/3 101/17 101/24 108/7
 127/1 134/2
considered [1]  99/20
considering [1]  94/16
conspiracies [1]  65/15
conspiracy [1]  7/11
Constitution [1]  2/14
Cont'd [1]  139/12
contained [1]  132/11
containing [1]  66/20
contents [1]  109/2
context [3]  5/18 17/4 22/21
context of [1]  17/4
continue [2]  97/4 115/4
continued [2]  105/25 125/23
continuing [1]  118/21
conversation [42]
conversation — [1]  60/7
conversations [6]  12/15 15/7 21/11 55/13
 67/20 77/19
convicted [1]  9/9
conviction [2]  8/18 8/19
convince [1]  30/9
cooperate [2]  65/24 66/4
coordinating [1]  135/9
copies [4]  73/9 76/6 103/17 127/3
copy [6]  3/24 4/9 19/24 71/11 77/23 116/10
corporate [1]  124/1
corporation [1]  39/16
correct [40]
corroborates [1]  6/10

cost [3]  76/16 89/8 89/25
costs [2]  76/17 89/15
could [33]  5/16 6/22 7/8 7/25 8/11 8/25 9/14
 9/16 10/5 10/5 10/7 11/15 23/14 24/21 24/24
 28/25 29/12 35/6 35/18 38/15 38/15 43/11
 45/22 58/2 59/3 62/25 64/5 72/22 81/10
 83/22 84/8 95/25 99/8
couldn't [10]  5/8 8/2 21/1 24/16 25/20 35/16
 78/5 94/14 123/25 124/2
counsel [2]  134/16 136/23
counsel' [1]  28/14
couple [8]  3/11 9/22 18/1 24/19 37/25 38/4
 41/23 121/14
couple — [1]  37/25
course [18]  7/25 71/15 71/17 77/17 80/4
 82/23 86/1 103/8 106/11 115/25 119/7
 121/10 121/13 124/24 125/3 125/23 126/25
 132/10
court [27]  1/1 2/12 2/13 4/10 4/12 9/4 17/23
 26/11 27/8 32/25 39/2 39/11 46/20 48/2
 59/25 60/18 63/24 69/1 76/3 77/13 85/10
 112/9 117/15 131/12 134/20 140/2 140/10
court — [1]  39/2
Court's [5]  39/25 61/14 61/15 88/13 120/10
courtroom [5]  39/14 78/8 79/2 105/18
 136/18
cousins [1]  29/10
cover [2]  21/23 23/14
covered [2]  38/2 61/23
crack [2]  37/8 37/13
crazy [1]  45/21
create [2]  47/21 47/25
creates [1]  46/21
credit [3]  70/19 91/9 91/19
crime [1]  67/12
cross [7]  3/10 4/24 26/23 59/4 72/3 80/23
 138/3
cross — [1]  26/23
cross-examination [11]  3/7 17/11 28/15 30/7
 30/13 40/13 43/17 46/12 66/11 90/9 101/13
crosses [1]  26/24
Crystal [1]  96/5
cumulative [1]  6/14
curious [1]  110/20
current [1]  122/16
custodian [2]  75/24 76/2 117/20
custody [1]  65/10
customary [1]  99/7
customer [2]  37/14 52/24
customers [3]  29/4 29/7 37/4
Customs [1]  95/20
cut [1]  65/25

## D

D.C [19]  1/4 1/17 1/20 2/3 2/7 2/10 2/15
 27/12 42/1 106/14 106/19 107/2 116/19
 118/7 120/22 124/8 124/10 124/14 136/10
D.C — [1]  124/14
damage [1]  99/13
dash [2]  122/13 122/15
dashboard [1]  122/19
data [1]  124/1
databases [1]  124/1
date [10]  18/18 29/1 36/16 48/8 74/14 88/18
 90/17 117/4 117/8 140/8
dated [1]  36/5
dates [2]  35/19 75/16
day [25]  1/6 13/19 13/21 14/12 14/12 14/17
 14/19 34/13 34/15 36/21 38/8 38/12 38/14
 41/24 42/11 48/9 65/11 68/24 85/14 88/14
 115/2 119/12 125/15 130/18 131/5
days [10]  37/2 39/14 41/23 64/5 110/24

114/1 124/24 125/3 125/24 125/25
days — [2]  114/1 124/24
deal [5]  59/14 76/5 80/23 84/13 93/12
dealer [2]  53/11 53/14
dealing [1]  113/9
debris [1]  99/23
decide [1]  40/2
decided [2]  25/8 67/15
decision [13]  65/2 65/5 65/8 65/9 65/25
 66/15 67/18 67/24 67/25 68/1 68/2 68/5 68/8
Defendant [6]  1/18 2/2 2/5 2/9 13/23 28/8
defendant's [1]  28/5
Defendants [1]  1/8
defense [1]  69/18
defer [2]  101/5 101/7
Delaware [3]  119/23 121/23 122/2
delivered [2]  35/7 35/10
Denise [5]  73/7 101/19 104/7 128/10 129/22
depart [1]  119/17
departed [1]  114/24
Department [4]  124/8 127/2 127/18 127/21
departure [1]  99/6
depending [1]  49/5
deposit [3]  99/8 99/12 99/24
Derrick [14]  14/18 30/20 30/22 30/23 31/1
 31/24 37/15 38/9 38/10 38/12 51/7 51/10
 52/19 52/20
Derrick — [1]  51/7
describe [2]  31/20 121/4
described [1]  36/14
desolate [1]  92/23
detail [1]  107/9
details [3]  31/25 32/1 44/8
details — [1]  31/25
detection [1]  19/22
Detective [2]  64/10 114/5
determine [3]  39/22 40/18 41/15
determined [2]  39/11 72/1
developed [1]  109/10
diagram [1]  92/6
did [163]
Did — [1]  67/15
didn't [35]  10/2 20/21 23/7 24/14 25/10
 25/16 26/12 26/15 28/9 32/22 40/23 48/11
 53/19 55/19 56/3 56/18 58/4 58/13 59/1
 59/19 67/18 72/21 75/12 75/21 75/25 78/4
 78/6 83/24 85/2 85/3 97/12 110/22 111/22
 112/1 117/18
didn't — [1]  24/14
difference [1]  32/7
different [3]  22/24 105/20 122/6
digits [3]  119/25 121/25 122/5
direct [10]  5/3 5/4 25/24 62/18 63/1 64/13
 68/21 71/21 105/25 138/3
directed [2]  67/22 135/20
discuss [1]  105/2
discussed [5]  18/2 20/5 22/24 23/13 25/6
discussing [4]  20/13 21/7 21/8 27/19
discussion [18]  13/25 18/9 20/8 20/12 21/5
 22/8 23/2 23/16 23/19 24/4 26/11 26/13
 26/18 27/10 30/7 107/6 131/11 134/20
discussions [5]  20/22 22/4 25/17 25/18 59/8
distance [1]  130/21
district [7]  1/1 1/1 1/12 2/13 2/13 7/25 8/3
disturbing [1]  29/23
DMV [3]  110/5 132/15 132/17
do [127]
Docket [1]  1/3
document [10]  17/9 19/22 45/24 46/4 46/6
 47/25 85/25 117/6 117/9 122/9
documents [27]  3/18 24/17 45/3 70/12 70/13
 70/15 70/17 70/25 70/25 70/25 71/14 71/18

**B**

bad [1] 37/5
bag [2] 36/13 36/14
bags [2] 100/12 100/12
BALAREZO [18] 1/18 29/3 29/6 29/17
  33/20 34/17 35/18 38/16 78/16 84/12 90/12
  101/7 120/8 126/19 136/16 138/8 138/13
  138/16
Balarezo's [1] 30/13
balarezo.net [1] 1/20
barely [1] 4/14
barking [1] 57/16
based [9] 36/16 38/8 39/14 62/16 64/20
  110/6 115/10 115/14 123/14
bases [1] 124/1
basically [12] 10/1 21/13 22/14 23/21 53/5
  53/6 60/1 67/22 92/22 93/24 99/20 128/9
basically – [2] 21/13 92/22
basis [3] 45/18 47/22 81/16
bathroom [1] 111/25
be [84]
be – [2] 24/9 79/6
became [1] 88/9
because [45]
because – [1] 83/15
been [53]
been – [1] 125/8
before [44]
before – [1] 6/23
began [4] 119/12 120/17 120/21 122/4
begging [1] 135/4
begin [1] 12/6
beginning [1] 44/13
begun [1] 106/7
behalf [1] 53/22
behind [1] 87/22
being [12] 4/21 9/13 30/4 30/6 31/14 60/2
  64/7 74/9 84/4 93/18 108/21 131/2
believe [23] 11/4 13/11 18/19 21/4 22/20
  46/21 50/1 65/11 66/7 66/9 66/10 67/4 73/14
  91/6 92/20 101/17 101/18 112/13 125/14
  130/9 130/10 130/20 131/24
believed [1] 39/15
belongs [2] 109/7 110/3
bench [11] 7/1 16/4 20/18 25/21 31/7 44/11
  75/4 80/14 82/10 85/13 109/6
Bermea [1] 16/7
besides [1] 91/15
best [6] 14/7 16/14 26/5 29/12 97/11 97/17
bet [1] 113/13
better [2] 75/19 113/13
between [4] 26/5 51/24 90/1 134/1
Between – [1] 51/24
beyond [6] 22/4 42/22 43/23 54/6 61/12
  96/13
bicycle [2] 93/16 94/2
big [2] 32/7 98/9
bill [1] 89/21
birthday [2] 33/21 34/15
bit [6] 16/5 18/22 22/19 37/22 69/9 71/6
black [1] 109/22
block [5] 121/5 121/6 121/7 121/14 121/18–
Boom [4] 29/22 29/22 30/10 30/11
both [3] 9/23 55/12 113/9
bottom [2] 16/22 49/14
bought [1] 37/4
Boulevard [7] 69/13 70/19 71/3 73/23 79/23
  96/12 106/25
Bowie [5] 106/22 121/8 121/18 124/20
  124/22
box [8] 66/17 66/20 126/8 130/17 132/20

133/9 133/11 133/20
boy [1] 115/21
brain [1] 83/17
Brandywine [4] 129/20 129/20 129/24
  130/2
break [2] 12/6 93/19 112/5 130/3
break-ins [3] 93/15 94/17 95/3
breakfast [3] 38/23 39/4 134/9
BRIAN [7] 2/9 37/16 38/9 38/10 50/3 51/7
  52/17
briefly [3] 10/8 102/17 121/4
bring [7] 4/17 6/15 23/24 63/20 83/23
  112/12 113/20
brochure [1] 70/21
brochures [1] 95/6
broke [4] 34/23 94/3 107/6 125/13
broken [3] 93/17 93/18 94/2
brought [9] 22/10 22/17 31/3 31/17 33/3
  37/5 53/3 85/20 89/3
brown [9] 79/9 116/17 123/12 123/15
  123/21 123/23 123/24 123/25 124/5
building [15] 19/9 70/21 70/22 88/9 92/20
  94/25 95/24 96/11 97/1 114/18 115/8 123/22
  123/23 123/25 133/19
buildings [1] 69/7
bunch [2] 21/1 27/20
business [10] 70/20 71/15 71/18 82/24 83/13
  86/1 87/14 94/15 94/16 103/8
but – [3] 5/22 31/13 76/22
buy [2] 29/25 31/22
BWI [5] 109/18 111/3 119/11 119/14 119/17

**C**

Cadillac [5] 109/22 127/12 128/23 129/1
  129/17
call [22] 12/18 12/21 15/10 15/25 16/13
  16/15 18/16 30/18 35/21 36/7 36/16 36/18
  36/21 38/6 48/19 68/16 106/7 106/12 107/20
  107/22 135/11 136/17
call – [1] 30/18
called [1] 44/7
caller [1] 19/2
calling [1] 91/4
calls [12] 18/8 65/16 68/17 78/13 114/2
  134/22 135/1 135/10 135/16 135/16 135/19
  135/22
calls – [1] 135/22
came [14] 6/21 7/12 25/17 29/21 51/15 86/6
  89/3 89/4 89/5 91/5 91/5 91/9 91/10 117/19
can [94]
can – [2] 21/21 70/1
can't [27] 3/7 4/13 4/23 5/20 11/16 14/1 16/8
  16/15 16/20 16/23 20/24 38/13 44/16 44/18
  45/11 46/14 53/6 55/14 60/16 61/20 63/10
  66/7 75/15 82/11 82/19 128/18 134/25
can't – [2] 16/20 16/23
cans [1] 43/2
Capitol [3] 69/13 91/24 106/24
car [11] 109/7 109/17 109/18 110/11 111/17
  111/18 115/13 118/13 118/17 119/19 119/22
Caravan [1] 119/6
care [2] 53/15 110/16
cares [1] 5/13
Carlos [5] 29/18 29/25 29/25 30/7 30/9
Carolina [7] 30/15 30/21 30/24 31/18 31/19
  42/9 44/9
Carolina – [1] 30/21
cars [1] 108/23
case [10] 4/6 4/9 32/18 53/1 64/6 84/3 127/1
  134/12 136/10 136/11
cases [2] 67/3 136/8
catch [1] 61/3

CD [5] 13/5 18/20 18/24 36/8 36/25
cells [1] 83/17
Center [2] 19/11 96/7
certain [5] 14/5 67/3 67/3 109/11 135/19
certain – [1] 67/3
certainly [3] 84/23 95/13 110/18
CERTIFICATE [1] 140/2
certified [3] 127/3 127/18 127/21
certify [1] 140/4
champagne [1] 118/15
chance [2] 42/20 43/7
charge [3] 8/8 65/3 65/9
charged [9] 7/8 7/11 7/25 8/2 8/11 8/25 9/15
  9/16 9/20
charges [3] 7/5 67/15 67/23
Charlie [1] 123/2
chart [1] 113/22
check [6] 4/19 23/17 91/9 91/15 124/11
  136/2
checked [1] 124/10
Cherokee [3] 118/15 127/6 129/21
Chevy [2] 119/20 120/15
chimed [1] 26/6
choose [3] 20/24 44/16 45/12
chose [1] 46/17
Circle [13] 106/20 107/8 107/10 108/1
  108/10 108/13 110/7 114/14 114/17 115/19
  116/2 117/1 119/3
Circuit [2] 136/10 136/11
circumstances [1] 22/25
claim [2] 10/25 41/20
claimed [1] 54/20
claiming [2] 21/12 21/14
claims [1] 45/24
clarify [2] 59/3 96/23
cleanup [1] 99/21
clear [7] 11/7 11/12 46/5 68/25 113/8 135/2
  137/2
cleared [1] 99/15
clearly [1] 25/19
clerk [1] 68/20
client [15] 20/22 25/1 25/10 25/19 26/11
  26/13 39/9 75/7 75/9 75/11 79/13 84/14
  84/23 84/25 134/1
client's [1] 113/11
climb [1] 34/25
close-up [1] 133/10
closer [1] 69/9
closet [4] 34/18 34/23 66/16 66/20
clothes [1] 105/21
clothing [1] 100/2
club [11] 14/10 14/16 14/19 14/20 14/22
  29/18 29/23 48/11 107/2 107/4 133/19
clubs [2] 29/23 29/24
clubs – [1] 29/23
clue [1] 84/18
clued [1] 60/8
cocaine [7] 28/4 32/20 32/21 33/12 33/19
  49/24 64/20
cocaine – [1] 32/20
coconspirators [1] 31/16
cocounsel [1] 59/4
codefendants [1] 20/6
coke [1] 51/15
collaborative [1] 67/24
color [4] 118/15 129/1 129/3 129/5
COLUMBIA [2] 1/1 2/13
combined [1] 93/22
come [22] 5/12 7/15 22/2 26/17 26/25 42/18
  51/11 51/12 71/1 80/4 82/25 88/7 89/2 97/8
  107/13 112/16 112/20 114/1 114/18 119/13
  123/3 134/22

1

1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2

3    ------------------------------X

4    THE UNITED STATES OF AMERICA      Criminal Case No.

5         v.                                05-386

6    ANTOINE JONES, et al,

7                    Defendants,

8    ------------------------------X   Washington, D.C.
                                        Thurs., November 16, 2006
9                                       10:00 A.M.

10                  VOLUME 13 A.M. SESSION
                     TRANSCRIPT OF TRIAL
11        BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
           UNITED STATES DISTRICT JUDGE, and a jury
12

13   APPEARANCES:

14   For the Government:           JACK GEISE, ESQUIRE
                                    RACHEL LIEBER, ESQUIRE
15                                 Office of the U.S. Attorney
                                    555 4TH Street, N.W.
16                                 Washington, D.C.  20560
                                    (202) 616-9156
17

18   For Defendant Jones:         EDUARDO BALAREZO, ESQUIRE
                                    400 Fifth Street, N.W.
19                                 Suite 500
                                    Washington, D.C.  20001
20                                 (202) 639-0999

21
     Court Reporter:             Lisa Walker Griffith, RPR
22                                U.S. District Courthouse
                                   Room 6409
23                                Washington, D.C.  20001
                                   (202) 354-3247
24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25

**Page 1**

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

  ----------------------------X

  THE UNITED STATES OF AMERICA       Criminal Case No.

             v.                           05-386

  ANTOINE JONES, et al,

             Defendants,

  ----------------------------X    Washington, D.C.
                                   Thurs., November 16, 2006
                                   10:00 A.M.

                  VOLUME 13 A.M. SESSION
                   TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
           UNITED STATES DISTRICT JUDGE, and a jury

  APPEARANCES:

  For the Government:        JACK GEISE, ESQUIRE
                            RACHEL LIEBER, ESQUIRE
                            Office of the U.S. Attorney
                            555 4TH Street, N.W.
                            Washington, D.C.  20560
                            (202) 616-9156

  For Defendant Jones:       EDUARDO BALAREZO, ESQUIRE
                            400 Fifth Street, N.W.
                            Suite 500
                            Washington, D.C.  20001
                            (202) 639-0999

  Court Reporter:            Lisa Walker Griffith, RPR
                            U.S. District Courthouse
                            Room 6409
                            Washington, D.C.  20001
                            (202) 354-3247
  Proceedings recorded by mechanical stenography, transcript
  produced by computer.
```

**Page 2**

```
  APPEARANCES:  (Cont'd.)

  For Defendant Jackson:     JON NORRIS, ESQUIRE
                            641 Indiana Avenue, N.W.
                            2nd Floor
                            Washington, D.C.  20001
                            (202) 842-2695

  For Defendant Huggins:     RUDOLPH ACREE, ESQUIRE
                            1211 Connecticut Avenue, N.W.
                            Suite 303
                            Washington, D.C.  20036
                            (202) 331-0739

  For Defendant Holland:     BRIAN McDANIEL, ESQUIRE
                            1211 Connecticut Avenue, N.W.
                            Suite 506
                            Washington, D.C.  20036
                            (202) 331-0739
```

**Page 3**

                              P R O C E E D I N G S

1    THE DEPUTY CLERK:  Criminal Case Number 05-386,
2    United States versus Antoine Jones, et al.
3        MR. BALAREZO:  Your Honor, there is a preliminary
4    matter.  It may impact somehow I guess on Agent Gikas's
5    testimony.  I think either last week or late the week before,
6    the Government provided us with Agent Gikas's handwritten
7    notes from her investigation, and I perused them  Didn't
8    think there was much there, but yesterday I finally sat down
9    and looked at line by line.
10       And I noticed that one of her notations indicates
11   that they had a GPS tracker on Mr. Jones's car or box truck,
12   the white box truck we've heard about.  It looks from
13   March 6th to July 7th of '04.  Her notes indicate external
14   tracker installed in monitor on Jones's box truck and
15   removed.
16       And I immediately e-mailed Ms. Lieber and asked her
17   if she could provide me data and whatever other materials
18   regarding that.  And, frankly, she indicated that she wasn't
19   even aware of it.  So I'm making a request through the Court
20   now for that material to be turned over to me now that this
21   ICE investigation is part of the case.  I don't know what's
22   in it, but I think we should be entitled to at least review
23   it and see what might be there.
24       And, beyond that, I'm going to renew my motion in

**Page 4**

1    limine to exclude further testimony regarding this ICE
2    investigation as not being relevant to the issues in this
3    particular case.
4        Again, there is not going to be any testimony from
5    anybody that any drugs were ever recovered.  There's no
6    testimony that Mr. Jones ever did anything unlawful.  With
7    respect to that ICE investigation, it's just information that
8    tends to make him look bad.  And I don't think that's what is
9    appropriate here.  So, I renew that motion for the Court.
10       THE COURT:  The problem for you is they have put it
11   into the indictment as being in furtherance of the
12   conspiracy.  It doesn't have to be, each overt act doesn't
13   have to be a crime in and of itself.  The fact that they had,
14   they may not be able to stand on the ICE investigation
15   results --
16       Sorry, Mr. McDaniel.  I didn't realize you hadn't
17   come.
18       Well, first, Mr. Balarezo renewed his motion in
19   limine.  It's obvious that -- what other information is going
20   to come out other than either Maynard or Jones rented the
21   facilities where at least, in some instances, Javier went?
22       MS. LIEBER:  We have some search photos of those
23   locations.
24       THE COURT:  What does that show?
25       MS. LIEBER:  It just shows that there's shrink

1  wrap, there's air mattresses, there's devotional candles that
2  came to the stash house at 9508.
3      The only other thing I'll say, Your Honor, in terms
4  of not only did we indict the ICE investigation as part of
5  this conspiracy, but in fact we've been developing
6  information that in fact the car that picked up Javier at the
7  airport, was registered to Guadalupe Barrone.
8      We've get those records, the DMV records from
9  Delaware. And in fact Guadalupe Barrone is Pelos, who is the
10 person that Mr. Barma identified and testified about. So
11 that's an additional link, an obvious link between the ICE
12 investigation and this.
13     THE COURT: I think it's part and parcel of a
14 conspiracy. It's not standing on it as a substantive count
15 by itself. Certainly, there's a basis for the jury to infer
16 that it's part of the conspiracy given the connections here.
17     What about this other thing? First of all, just as
18 a matter of information, is the white box truck, the Isuzu,
19 is there any information regarding the GPS?
20     MS. LIEBER: Your Honor, as I told Mr. Balarezo
21 this morning, he sent an e-mail very late last night. Show
22 you how hard he's working, and I didn't get it until this
23 morning. And I saw this reference to a tracker. I know
24 nothing about it. I obviously couldn't talk to Special Agent
25 Gikas about it because she's on the stand.

1      THE COURT: Well, I'm going to ask you to talk to
2  her about that only. Does anyone have any objection to that?
3  I'd like to just clear the air a bit.
4      MR. BALAREZO: Could we just do it when she comes
5  in, Your Honor?
6      THE COURT: Well, I think she's entitled to ask her
7  ahead of time before we have it as part of the examination.
8  I just want to clear it that she, ask her whether there was
9  one on the truck and whether we're using any of the evidence
10 relating to it. So far, we haven't heard anything about it.
11 The truck was photographed, as far as I can tell, at Levels.
12     MS. LIEBER: That's right. And she will testify
13 that she saw Lawrence Maynard driving that truck on a number
14 of occasions to the Hampton Park storage facility as one of
15 the places she saw him frequently drive that truck.
16     THE COURT: Would you ask her whether there was a
17 GPS device put on the truck?
18     MS. LIEBER: Yes.
19     MR. BALAREZO: Could I be present there, Your
20 Honor, when she's questioned about that?
21     MS. LIEBER: Yes, I don't care.
22     And Your Honor, just one other thing, just I want
23 to confront this now. There are two other documents that I
24 don't have a custodian for yet. We're in the process of
25 getting a custodian for the Myrtle Avenue document.

1      There are two other documents, ICE 13 and 14, and
2  I'll just put them on the monitor. They are these two
3  letters that the Court has seen before. Two letters, the
4  Dear Mr. Kelly letter and the purportedly from Thomas Brown
5  letter, we're not offering those for the truth, Your Honor.
6  We're offering those for the non-truth actually, that these
7  are documents to cover illegal activity.
8      MR. BALAREZO: It's not that Lawrence Maynard
9  worked at Thomas Brown. I mean, that's not the truth. The
10 truth that they want it in for is that they're using made up
11 companies. So I mean it is hearsay. It's kind of like a
12 little reverse rabbit hole thing that Mr. Norris was talking
13 about.
14     THE COURT: You may or may not, but that still
15 doesn't get the document in. The business record, you don't,
16 you may be right about the second level of what you're doing
17 with it. But I think that you still have a problem of having
18 to show that they were kept in the ordinary course by
19 somebody, because otherwise, the document can come out of
20 thin air.
21     MS. LIEBER: Well, actually, Your Honor, first of
22 all, the documents themselves, I think, are in, the originals
23 of these, Lawrence Maynard retained or somebody retained at
24 Levels. And I think they're in as part of that search. And
25 now, I mean, I don't think it is a hearsay problem, Your

1  Honor. These documents, and Special Agent Gikas will testify
2  she received these from the rental company for the Myrtle
3  Avenue house. And so that's where they came from.
4      And everything contained therein is not being
5  offered for the truth. It's being offered to show that
6  they're making stuff up. I mean, it's sort of, to me it's
7  sort of glaring non-hearsay because it's not for the truth.
8  We think it's not true that he worked for Thomas Brown.
9      THE COURT: Can I see the two?
10     MS. LIEBER: Sure.
11     MR. BALAREZO: Your Honor, what is really the
12 relevance of whether or not they worked at Thomas Brown or
13 whether or not Thomas Brown existed to the drug conspiracy?
14     MS. LIEBER: The relevance is it didn't exist and
15 they created these false documents to rent stash locations
16 for Mexicans to come and sit and hold drugs and money and
17 distribute those.
18     MR. BALAREZO: I haven't heard any testimony about
19 drugs at the warehouse. I haven't heard any testimony about
20 drugs at Myrtle Avenue. I haven't heard any testimony about
21 drugs at Summit Circle. So, it's a big leap for me.
22     THE COURT: You may not but there's still an
23 inference out there that they weren't renting these things in
24 order to conduct legitimate business. Do you have other
25 things with Lawrence Maynard's signature?

9

1    MS. LIEBER:  I have his driver's license photo,
2  yes, that came in yesterday.
3    THE COURT:  May I see it for a minute?
4    MS. LIEBER:  Sure.
5    THE COURT:  The only three documents that are
6  attached to this Hampton -- I'm sorry.  Wasn't the man here?
7  Am I getting completely confused?  And what facility was
8  this?  Oh, he's not 400 Hampton Boulevard.  He's across the
9  street?
10    MS. LIEBER:  Your Honor, he's 400 Hampton.
11    THE COURT:  I see.  Okay.  These were not part of
12  his documents?
13    MS. LIEBER:  Right, these are not.  These are the
14  Myrtle Avenue documents.
15    THE COURT:  I see.  They're using the Hampton
16  Boulevard address.  Here is the white truck.  I get it.  I'm
17  sorry.
18    MS. LIEBER:  Your Honor, I have ICE 12, which is
19  the lease that contains the signature, and Photo 61, which is
20  a photocopy of his driver's license which also contains his
21  signature.
22    THE COURT:  I have much less difficulty putting in
23  13 as a statement of Mr. Maynard, written by Mr. Maynard.
24  Let me see his license a minute.  The Jury can compare the
25  signatures.

10

1    Mr. Norris, do you have some wisdom on this?
2    MR. NORRIS:  No, I don't, Your Honor, sorry.
3    THE COURT:  Anybody else?
4    MR. GEISE:  Not to butt in, Your Honor, but --
5    THE COURT:  I was leaning on that side of the
6  fence.
7    MR. GEISE:  Fine.
8    THE COURT:  All right.  I'll hear from you now.
9    MR. GEISE:  I was going to say, Your Honor, it was
10  a point we've discussed before.  There are two issues, one is
11  authentication, one is hearsay.  I mean I think Ms. Lieber is
12  correct that --
13    THE COURT:  I'm worried about the authentication.
14    MR. GEISE:  Yeah, I think the witness will testify
15  that she got them by subpoena from the actual --
16    MS. LIEBER:  She got them from the actual file of
17  the Remax people who rented the house.  That's one.  The
18  second layer of authentication, Your Honor, I think, is
19  that --
20    THE COURT:  Can I see what else she got from that?
21  We let in the lease.  Are there other documents or are these
22  the only two remaining that we're concerned with?
23    MS. LIEBER:  Your Honor, there are a few more.  I
24  have a rental application by Mr. Maynard.
25    THE COURT:  How are you getting those in?

11

1    MS. LIEBER:  We're getting the document custodian
2  to come in because, to the extent that I can use these now
3  with Agent Gikas --
4    THE COURT:  But they're coming any way, the
5  custodian.
6    MS. LIEBER:  Right.
7    THE COURT:  Subject to you bringing in the
8  custodian, I'm going to allow you to use them.  First of all,
9  I think that 13 is perfectly permissible.  It is not being
10  offered for the truth at all.  Rather, to show that
11  Mr. Maynard was involved in renting this and terminating the
12  rent.  So using the staging area itself is relevant.  So
13  they'll come in.  And you will connect it later on.
14    Why do I have to go through these mental gymnastics
15  unnecessarily?  They'll come in under business record, but 13
16  will come in no matter what.  And 14 I'm assuming you'll
17  manage.  You'll bring in your custodian.
18    Okay.  Anything else before we begin?  You are
19  going to talk to your -- the two counsel wanted to talk to
20  her just briefly.
21    (There was a pause in the proceedings.)
22    MR. BALAREZO:  Your Honor, just to complete that
23  earlier discussion, it appears that there was a GPS tracker
24  placed on that truck.
25    THE COURT:  On the white -- is any of the evidence

12

1  that we're talking about here related to that?
2    MS. LIEBER:  No.
3    THE COURT:  We're not talking about where that
4  truck went other than somebody saw it at Levels?
5    MS. LIEBER:  I'm only going to ask her where she
6  personally saw that truck.
7    MR. BALAREZO:  But, Your Honor, Ms. Lieber is going
8  to make that available to me, and I'll review it, and if
9  there's anything there, I will reserve the right to further
10  question.
11    THE COURT:  Fine.  I had to address the tracking
12  before, but it didn't cover this.
13    All right.  Are we ready to bring in the jury?
14    MS. LIEBER:  We are.
15    MR. BALAREZO:  Your Honor, can we approach for two
16  seconds?  I know there's no one here, but we'd like to
17  approach.  I would like the defense counsel to approach in an
18  ex parte manner for right now.
19    THE COURT:  All right.
20    (Bench conference.)
21    THE COURT:  This is under seal at the moment.
22    MR. BALAREZO:  Sure.  It's not a big secret.
23    THE COURT:  Your Honor, I just want to bring to the
24  Court's attention that there have been several people
25  throughout the trial who have come in to support my client to

13

1 just view the trial, that kind of thing.
2     I think on each occasion they have been approached
3 by either Agent Yanta or other law enforcement officers.
4 Basically they quickly have left because of them being
5 harassed by the law enforcement people here.
6     THE COURT: This is what your client thinks?
7     MR. BALAREZO: No, this is what I know. One of the
8 individuals left. I had given him my card so he could give
9 me a call, so I could get some information from him. I was
10 told that Agent Yanta, I think, I'm not going to say her, one
11 of the agents took my business card from him. They just
12 hassled him. It is an open courtroom. They have a right to
13 be here and I don't think that's appropriate.
14     THE COURT: I don't know why we're doing this ex
15 parte.
16     MR. ACREE: I had gotten the same information.
17     THE COURT: From people who were friends of your
18 client?
19     MR. ACREE: Yes.
20     THE COURT: I don't think this is appropriate to do
21 ex parte. They ought to be put on notice about what is going
22 on. There is case law that they can't interfere with your
23 defense.
24     Let's take this up quickly.
25     (Open Court.)

14

1     THE COURT: Go ahead, Mr. Balarezo.
2     MR. BALAREZO: Your Honor, as I was saying is,
3 during the course of this trial, there have been several
4 individuals who have appeared in the courtroom in support of
5 my client to view the trial and to basically see what's going
6 on.
7     And I believe, on each and every occasion, these
8 individuals have been approached by either Agent Yanta or
9 other law enforcement officers that are related to this case
10 and, for lack of a better word, have been harassed and have
11 had to leave the courtroom and the courthouse.
12     On one occasion, a piece of paper or a business
13 card that I gave one of the individuals, so he would be able
14 to call me later and perhaps help us with our defense,
15 informed me that the card was taken by one of the agents.
16 And that's why he wasn't able to call me, and I just think
17 that that's not proper and that these individuals should be
18 free to be here and support my client.
19     THE COURT: I actually think, to the extent that
20 anybody on behalf of the Government is approaching anybody in
21 the courtroom, they shouldn't, frankly.
22     Gwen can figure out whether somebody is a witness.
23 There is a rule on witnesses, so we should pay attention to
24 who's coming and going. But it's not the Government's
25 business to be interviewing public citizens whoever they are

15

1 who attend the trial.
2     MR. GEISE: Well, Your Honor, as the Court knows,
3 in any case like this but and this one as well, we do have
4 some concern about witness security and harassment of
5 witnesses while they're on the stand. So, obviously if we,
6 particularly if we have a cooperator on the stand,
7 particularly if it's one who has local connections, there is
8 a concern and it's not --
9     THE COURT: So what do you do about it? I mean we all
10 have concerns, but what are you doing about it is the
11 question?
12     MS. LIEBER: Your Honor, if I may, I think that
13 certainly law enforcement has the right to talk to anybody if
14 they have concerns. And the concerns are as follows. We
15 have witness issues in this case. We have witness security
16 concerns. We have calls to cooperating witness's mothers
17 saying their son better not testify. We have calls to the
18 wife of John Adams. We have kidnapping in Mexico.
19     We have a lot of serious security concerns in this
20 case. And to the extent that somebody comes into this
21 courtroom sits on one side, and then when the cooperator
22 takes the stand, moves all the way to the other and sits over
23 there to get a good eye ball on that person, I think we are
24 within our right, given our concerns based on things that are
25 happening in this case that we did not put on the record or

16

1 bring to the Court's attention, because at this point it
2 hasn't risen to the level of --
3     THE COURT: I don't think you can control where
4 people sit or who comes into this courtroom unless we have a
5 hearing about it. It's not up to the Government to control
6 the courtroom. It's up to me.
7     MS. LIEBER: Your Honor, and I appreciate that.
8 It's merely asking who these people are. I think that that
9 is, given -- Your Honor, given the calls to someone's mother,
10 the calls to someone's wife about your boy better not
11 testify, that gives us enough concern to at least inquire as
12 to who these people are. I think it's, it happens frequently
13 in cases like this to sort of get a sense of who is here.
14     THE COURT: Did anyone take his business card?
15     MS. LIEBER: This, I don't know anything about
16 that.
17     THE COURT: I think you have to be, if we want to
18 have a full-blown hearing and put the evidence so that we can
19 make sure that we're not getting people here who intimidate
20 or we can tell them to sit over there where the witness can't
21 see them. There are many ways to go about it.
22     I am not pleased with the idea that you're taking
23 responsibility for figuring out what people's purposes are
24 without anybody else knowing about it. That's why we have
25 marshals here. If we have some concerns, the marshal can

25

1  evidence that we were there. And we didn't have time to have
2  the window replaced. But we entered the house. We searched
3  it. We didn't remove anything. We just took photographs.
4  Q  Give the jury a sense of what did -- well, first of all,
5  was anyone home during the execution of the sneak and peek
6  warrant?
7  A  No, no one was home.
8  Q  And when you all went in, give the jury a sense of the
9  general interior of the house. What kind of stuff was in
10 there?
11 A  It was not furnished. There was maybe some furniture in
12 one of the bedrooms upstairs. But there were inflatable
13 mattresses. There were a lot of duffle bags. In the duffle
14 bags were a lot of heat sealing bags.
15       There were actually boxes, three or four boxes of
16 heat sealing bags. There were a lot of shopping bags like
17 someone had gone shopping with the clothes and stuff still in
18 them just kind of strewn around in the living room.
19       The kitchen had these patron saint devotional
20 candles, which we just thought was odd. But, you know,
21 looking around the kitchen, it didn't look like anyone lived
22 there. You know, the refrigerator was empty. There weren't
23 any dishes, things like that.
24 Q  How about the windows in the house? Were there windows,
25 first of all?

26

1  A  Yes. The house had typical windows. But the odd thing
2  was that every single window that didn't have like a normal
3  window covering, like blinds, was covered in some manner,
4  either by blankets, towels. The windows by the front door,
5  bordering the front door, were covered with aluminum foil.
6  It was obvious whoever was in the house didn't want anyone --
7       MR. BALAREZO:  Objection.
8       THE COURT:  Just tell us what you saw. I think
9  you're a little close to the mike and it's causing a little
10 static.
11      MR. BALAREZO:  I move to strike whatever response
12 she had.
13      THE COURT:  She didn't finish the sentence I don't
14 think. The last sentence will be stricken. It was only a
15 half a sentence. Okay.
16      THE WITNESS:  The window on the side of the door
17 were covered with aluminum foil. Every window was covered
18 with something, some make-shift item.
19 BY MS. LIEBER:
20 Q  Now, Agent Gikas, you've testified about bags that
21 contained boxes of heat sealing bags, duffle bags that
22 contained boxes of heat sealing bags. I'm going to show you,
23 I'll put up on the projector so everybody can see ICE 8?
24      THE COURT:  Any objection, Mr. Balarezo, to 8?
25      MR. BALAREZO:  I haven't seen the originals.

27

1       MS. LIEBER:  It's ICE 8 and 9 for identification.
2  BY MS. LIEBER:
3  Q  Agent Gikas, how many pictures do you all have from that
4  sneak and peek?
5  A  Three or four.
6  Q  Let me show you what has now been admitted, I think.
7       MS. LIEBER:  Your Honor, I'm seeking admission.
8  I'm sorry. Did you say yes?
9       THE COURT:  There was no objection?
10      MR. BALAREZO:  No.
11      MS. LIEBER:  ICE 8 and ICE 9.
12      (Government Exhibit Nos. ICE 8 and
13       ICE 9 were admitted into evidence.)
14 BY MS. LIEBER:
15 Q  What is ICE 8?
16 A  It is a duffle bag with a couple boxes of the vacuum
17 sealing bags and also tape.
18 Q  Is that how they were when you all found them?
19 A  Yes.
20 Q  I'm going to show you ICE 9, also. Is that just another
21 picture of the same cluster of bags?
22 A  Right, along with just a few more over to the side.
23 Q  After you took those pictures of the heat sealing bags,
24 did you all eventually leave the house on Myrtle Avenue?
25 A  Yes.

28

1  Q  Was this still in the evening of February 27th of 2004,
2  that Friday?
3  A  Yes.
4  Q  Now, at this point, do you know where Javier is? Say on
5  Friday, February 27th, did you know where he was?
6  A  Yes.
7  Q  How did you know where he was? Well, let me ask you
8  this. Did you have a pen register on his cellular phone?
9  A  Yes.
10 Q  Tell the jury a little bit about the particular aspects
11 of the pen register on Javier's phone. Did it tell you
12 certain information beyond the standard pen register?
13      MR. BALAREZO:  Your Honor, I object. None of this
14 evidence of this pen register has ever been turned over to
15 the defense.
16      THE COURT:  You want to approach?
17      MS. LIEBER:  Yes.
18      (Bench conference.)
19      MS. LIEBER:  Your Honor, the defense has had this
20 information for months, whenever we gave other Jencks that
21 they had a pen register on this phone. In terms of actual
22 printouts of pen register, I don't know that I have the
23 printouts of the pen register. In fact, I know I don't have
24 the pen register printouts. Nobody ever asked for it.
25      MR. BALAREZO:  She didn't know she had the GPS

29

1  either, but I requested and my client requested that almost
2  every document --
3      THE COURT:  She says you have it.
4      MR. BALAREZO:  I don't have it, Your Honor.
5      THE COURT:  She says you do.
6      MR. BALAREZO:  Are you saying that I have Javier's
7  pen register?
8      MS. LIEBER:  No, I'm saying they have the
9  information that we had a pen register on his phone.  Just
10  like we told you that we had a pen register on Lawrence
11  Maynard's phone.  No one has ever asked me for pen register
12  information on Francisco Javier.
13      THE COURT:  What's the information on that?
14      MS. LIEBER:  He had cell site information so they
15  know he was back in Mexico.  On February 27th they had an
16  analyst who was looking at the pen.  He placed a call to
17  Southwest Airlines.  So they knew that he called Southwest.
18  They found out that he bought a ticket and was coming back to
19  Baltimore on the 27th.
20      THE COURT:  That's it?  That's all that's coming
21  out of this?
22      MS. LIEBER:  They did certain things in relation to
23  this in terms of sales.
24      MR. BALAREZO:  They did the analysis and then told
25  her about it?

30

1      THE COURT:  It doesn't have to come in for the
2  truth of it.
3      MR. BALAREZO:  Don't we have a right to see it and
4  confront her with the information?
5      THE COURT:  If you want this information, you can
6  get it.  You can call her back.  I'm sure she'll make it
7  available.  She won't disappear on us if we need her back.
8      Okay.  Go ahead.
9      (Open Court.)
10  BY MS. LIEBER:
11  Q  Agent Gikas, the pen register that you had on Javier's
12  phone, did it have certain capabilities besides just telling
13  you phone numbers that he is calling?
14  A  Yes.  It also provided what's called cell tower
15  information.  It would identify which cellular towers the
16  phone was utilizing at any given moment.  So, at the time
17  Javier's phone was still in Texas.  It was showing that it
18  was pinging off of two or three different cell towers in
19  McAllen, Texas.
20  Q  Now, you said "pinging."  If you would just let the jury
21  know technically what does pinging mean?
22  A  That the cellular phone when it was being utilized was
23  sending signals to certain cell towers --
24      MR. BALAREZO:  Your Honor, I object.  Is she being
25  put forth as an expert now on this technology or what?

31

1      THE COURT:  No, but she can explain pinging.  Even
2  I understand that.  Overruled.
3      MR. BALAREZO:  Well, I don't, Your Honor.  I'm just
4  trying to --
5      THE COURT:  Well, do you have another word for
6  pinging?  Go ahead.
7      THE WITNESS:  Yes.  That cellular phone was sending
8  signals to the cell towers, to certain cell towers in the
9  McAllen, Texas area.
10  BY MS. LIEBER:
11  Q  Now, on February 27th, the same day as the sneak and
12  peek warrant, did you learn additional information about
13  Javier based on the pen register?
14  A  Yes.  It was made known to me that a call --
15      THE COURT:  Objection.
16      THE COURT:  This is not coming in for the truth of
17  the matter, ladies and gentlemen, about where the call was or
18  not, but explains what she did next.
19      MS. LIEBER:  And let me actually ask this.
20  BY MS. LIEBER:
21  Q  Based on information that you learned, did you take
22  certain action?
23  A  Yes.
24  Q  Okay.  What is the information that you learned?
25  A  The information we learned from the pen register was

32

1  that a call had been placed to Southwest Airlines.  So we
2  immediately contacted the airlines and found out that Javier
3  had booked a ticket and was flying back into Baltimore that
4  evening.
5  Q  So, based on the information, what did you do?
6  A  Went back to BWI.  This is straight from the Myrtle
7  Avenue house.  Went back to BWI and again awaited Javier's
8  arrival and followed him from the airport.
9  Q  Where did you follow him to?
10      THE COURT:  Were you following as opposed to other
11  people?
12      THE WITNESS:  Yes, Your Honor.
13  BY MS. LIEBER:
14  Q  Where did you follow him to?
15  A  The airport Comfort Inn.
16  Q  Did you actually yourself see him enter that building?
17  A  Yes.
18  Q  Now, about what time of day was it at this point?
19  A  It's almost midnight now, Friday night, midnight going
20  into Saturday.
21  Q  So, the night of February 27th into the morning of
22  February 28th of 2004, where did you hang out?
23  A  In the parking lot of the Comfort Inn.
24  Q  Did you personally see Javier again in the morning on
25  February 28th of 2004?

33

1  A  Yes.

2  Q  Was he with anyone else when he flew into BWI?

3  A  Yes, he was.

4  Q  Who was that?

5  A  Daniel Zintura.

6  Q  Is it Z-I-N-T-U-R-A?

7  A  Yes.

8  Q  And about what time did you see Javier the following

9  morning?

10  A  It was about 5:00, 5:30 in the morning.

11  Q  Was he with anyone else when you saw him that morning?

12  A  With Daniel Zintura.

13  Q  What did you see them do?

14  A  They checked out or they had gone to their counters and

15  they were checking out, and they --

16      MR. BALAREZO:  Objection.

17      THE COURT:  I supposed that's right.  They went to

18  the front desk and then what?

19  BY MS. LIEBER:

20  Q  What did they do after you saw them at the front desk?

21  A  Then they came out of the hotel, and I had observed

22  earlier a black Ford Excursion vehicle with Texas plates kind

23  of idling in the parking lot.  It was very early in the

24  morning.  There wasn't much activity.  So this car stood out

25  to me.  I ran the tag.

34

1  Q  And I'm not going to ask you who the tag came back to,

2  but did you investigate that particular Ford Excursion?

3  A  Yes.

4  Q  Did you learn certain information about that Ford

5  Excursion?

6  A  Yes.

7      MR. BALAREZO:  Objection.

8      THE COURT:  Overruled.  All right.  Go on.

9  BY MS. LIEBER:

10  Q  Was that Ford Excursion occupied by anybody?

11  A  Yes, at the time, I saw at least two individuals.  I

12  wasn't sure how many were in there but at least two.  But

13  Javier and Daniel Zintura entered the vehicle and left the

14  Comfort Inn in the vehicle.

15  Q  And where did the Excursion full of Javier and these

16  others go?

17  A  8550 Myrtle Avenue in Bowie.

18  Q  Did you actually see them go there?

19  A  Yes.

20  Q  Did you see anybody enter the house at 8550 Myrtle

21  Avenue?

22  A  Yes, Javier, Daniel Zintura, and three other

23  individuals.

24  Q  About how long -- well, did you see them eventually

25  leave 8550 Myrtle Avenue?

35

1  A  Yes.

2  Q  About how long were they inside that house?

3  A  Approximately 45 minutes.

4  Q  What was the manner in which they left 8550 Myrtle

5  Avenue?

6  A  They left --

7  Q  Actually, I'm sorry, Special Agent Gikas, can you hold

8  on one second?

9      I'm sorry.  Tell the jury, what was the manner in

10  which Javier and his crew, I'm sorry, and the people he was

11  with, left Myrtle Avenue?

12  A  Very hurriedly.  The car was parked outside in the

13  driveway.  They entered very quickly and took off at a higher

14  than normal rate of speed in that little neighborhood.

15      MR. BALAREZO:  Objection, Your Honor.

16      THE COURT:  Overruled.  She can say what the rate

17  of speed is.

18  BY MS. LIEBER:

19  Q  Higher than normal, is that what you said, rate of

20  speed?

21  A  Yes.

22  Q  What did you do when you observed the Ford Excursion

23  speed out of the neighborhood?

24  A  Began following it along with other members, with

25  several other cars, other members of my team.  In the end,

36

1  though, I cut off.  Three other cars continued following the

2  vehicle, but I stayed back to, I stayed back at the house.

3  Q  Okay.

4  A  I went back to the house.

5  Q  For a time, did you engage in that high speed chase?

6  A  Yes.

7      MR. BALAREZO:  Objection.

8      THE COURT:  Sustained.

9  BY MS. LIEBER:

10  Q  For a time, tell the jury what you did in the time after

11  the Excursion sped out of Myrtle Avenue?

12  A  Followed it but they got onto 495 heading south.  Then

13  when it was clear that they were going --

14      MR. BALAREZO:  Objection.

15      THE COURT:  What is the objection?

16      MR. BALAREZO:  Speculation I believe.

17      THE COURT:  I can't tell when you say it was clear.

18      Well did you see them, can you limit yourself to

19  what you saw and what you did as opposed to what you assumed?

20  BY MS. LIEBER:

21  Q  How far did you see the Excursion go before you broke

22  off?

23  A  I broke off at the 495-95 exchange in Virginia.

24  Q  Did you actually follow them on the Beltway on 495 for a

25  time?

37

```
1   A   Yes.
2   Q   How fast were you going when you followed them?
3   A   Probably 80 miles an hour or more.
4   Q   Were other members of your team in your line of sight
5   also following the Excursion?
6   A   Yes.
7   Q   How fast were they going?
8       MR. BALAREZO:  Objection.
9   BY MS. LIEBER:
10  Q   Were they going faster than you?
11  A   Since they were -- yes.
12  Q   Was the Excursion going faster than you?
13  A   At least, yes.
14  Q   And you said that you broke off at the, when 495 and 95
15  came together in Virginia, is that right?
16  A   Yes.
17  Q   Why?
18  A   Again, to go back to the house, just to keep an eye on
19  the house.  There was somebody else who had stayed back at
20  the house, but then I also went back to the house.
21  Q   Did you let your team handle the rest?
22  A   Yes.
23  Q   Now, I want to talk to you a little bit more about the
24  Myrtle Avenue house.  Did you do some investigation into who
25  rented that house?
```

38

```
1   A   Yes.
2   Q   In the course of your investigation, did you obtain
3   certain documents in support of a rental application for that
4   house?
5   A   Yes.
6   Q   I want to first show you what I think is in evidence,
7   ICE 12.
8       MS. LIEBER:  Ms. Franklin, can you correct me?
9   It's not, excuse me.
10      THE COURT:  This, we've discussed before.
11      MS. LIEBER:  Yes, Your Honor.
12      MR. BALAREZO:  Your Honor, I renew my objection.
13      THE COURT:  All right.  I believe we've discussed
14  that objection.  So it will be admitted over objection.
15  That's 12.
16      (Government Exhibit No. ICE 12
17        was admitted into evidence.)
18  BY MS. LIEBER:
19  Q   What I'm going to do, Special Agent Gikas, is I'm going
20  to show you a number of documents and ask if these were
21  documents you obtained in the course of your investigation.
22  Do you recognize ICE 12?
23  A   Yes, that's the actual lease.
24  Q   And I'm going to show you, for identification only at
25  this point, Agent Gikas, I'm showing you ICE 10.  Do you see
```

39

```
1   that at the bottom?
2   A   Yes, that's the rental application.
3   Q   Filled out by Lawrence Maynard?
4   A   Yes.
5   Q   Did you obtain that document in the course of your
6   investigation?
7   A   Yes.
8   Q   Who did you get all these documents from?
9   A   From the Remax 2000 rental agent, real estate agent.
10  Q   And I'm going to show you ICE 11 for identification at
11  this point.  Do you recognize what that is?
12  A   Yes, those are statements of earnings.
13  Q   Was that also part of the rental application?
14  A   Yes.
15  Q   I'm going to show you now ICE 13.  Do you recognize
16  that?
17  A   Yes.
18  Q   What is that?
19  A   It's a letter from Lawrence Maynard to the real estate
20  agent saying that he's going to vacate the premises, the
21  house early.  He's breaking his lease.
22  Q   Okay.  And I also show you ICE 14.  Do you recognize
23  what that is?
24  A   Yes.
25  Q   What is that?
```

40

```
1   A   A letter from Thomas Brown Agency explaining why
2   Mr. Maynard doesn't have employment any longer.
3       MS. LIEBER:  Your Honor, at this time, I'm going to
4   seek, and I think the court ruled this morning, I'm going to
5   seek to admit ICE 13 and 14 at this time, the two letters,
6   also.
7       THE COURT:  Right, 13 is admitted and 14 will be
8   admitted subject to your custodian coming.
9       MR. BALAREZO:  That's over objection.
10      THE COURT:  Yes.
11      (Government Exhibit No. ICE 13 was admitted into
12  evidence.)
13  BY MS. LIEBER:
14  Q   First of all, Agent Gikas, let me show you ICE 12, the
15  lease.  Just very briefly, this is the lease for Lawrence
16  Maynard; is that right?
17  A   Yes.
18  Q   What is the term of the lease?  How long was it supposed
19  to go?
20  A   One year.
21      MR. BALAREZO:  Objection, I think it speaks for
22  itself.
23      THE COURT:  It does but it's okay.  It's hard to
24  read any way.  Go ahead.
25
```

**41**

BY MS. LIEBER:

Q  To begin when?

A  January 2005, I'm sorry, January 2004 through January 2005.

Q  Now, you testified that ICE 13 is a letter from Lawrence Maynard to Mr. Kelly.  Who is Mr. Kelly, if you know?

A  Mr. Kelly, I think he's the real estate agent.

Q  And what does Mr. Maynard tell Mr. Kelly about his lease of that 8550 Myrtle Avenue?

A  Because he's lost his job basically with, just because he has lost his job, he's going to break the lease as of March 1, 2004.

Q  Is that letter dated?

A  No.  It doesn't appear to be.

Q  I'm going to show you now ICE 14, and what is that?

A  That's a letter from Thomas Brown Agency, who Mr. Maynard had listed as his employer, dated February 27, 2004, explaining that Mr. Maynard has been laid off effective March 1, 2004.

Q  Special Agent Gikas, how did that date, February 27, 2004, compare to your activities at the Myrtle Avenue house?

A  It's the day we executed the search warrant.

Q  Where you broke the window?

A  Yes.

Q  Now, you mentioned also that you observed this white

**42**

Isuzu box truck being driven by Lawrence Maynard and parked outside of a warehouse facility?

A  Yes.

Q  I want to talk to you a little bit about that warehouse facility.  First of all, what was the address of the warehouse?

A  It's 400 Hampton Park Boulevard, Capitol Heights.

Q  Did you conduct an investigation into who was renting that warehouse facility during the time of your investigation?

A  Yes.

Q  Why were you interested in that warehouse facility?

A  A couple of reasons, one, Lawrence Maynard had listed it as his place of employment, as one of his places of employment with Antoine Jones as a supervisor.  And two, the utilities at the warehouse came back to Antoine Jones.

Q  At that point in your investigation, what types of basic investigative steps were you taking?  What were you trying to identify?

A  Basically, identifying or focusing in on Mr. Antoine Jones and what was happening, you know, what type of business and what was happening at that warehouse.

Q  During the course of your investigation, did you identify that Mr. Jones was actually renting that warehouse?

A  Yes.

**43**

Q  Did you obtain a lease?

A  Yes.

Q  Just to be sure we're talking about the same thing, I'm showing you what's been admitted as ICE 15?

THE COURT:  This relates to the same property that Mr. Schaefer talked about yesterday?

MS. LIEBER:  That's correct, Your Honor.  ICE 15, it's in from yesterday.

BY MS. LIEBER:

Q  And just so we're talking about the same place, is this a copy of the lease that you obtained?

A  Yes.

Q  Rented by Antoine Jones?

A  Yes.

Q  Now, in support of that rental application, did you also obtain, or in support of that lease, did you also obtain a credit application filled out by Antoine Jones and Deniece Jones?

A  Yes.

Q  I'm going to show you what's in evidence as ICE 16.  First of all, what's the date of that credit application?

A  November 14, 2003.

Q  The front page, whose application is this, the front page?

A  Deniece Jones.

**44**

Q  What does Deniece Jones list as her current employment?

A  FTN Consultants.

Q  And who is her supervisor?

A  Antoine Jones.

Q  I'm going to show you the second page, the business information for FTN Consultants.  Who does it indicate that the owner or the principal is of that business?

A  Deniece Johnson.

Q  Did you come to learn --

MR. BALAREZO:  Objection.

MS. LIEBER:  Strike that.

BY MS. LIEBER:

Q  The third page of the credit application, who is personal applicant?  Whose application is this?

A  Antoine Jones.

Q  And who does he list as his employers?

A  FTN Consultants.

Q  And who's his supervisor?

A  Deniece Johnson.

Q  What's his second employment if you can see that?

A  D.C. Parks and Recreation.

Q  Just look at the date again.  What's the date on Mr. Jones's credit application?

A  November 14, 2003.

Q  I want to just compare that for a moment to what's

45

1  already in evidence as ICE 2, what we talked about a little
2  bit yesterday, the application for residency at Summit
3  Circle.  Can you see on the bottom here?  What was the date
4  that was filled out?
5      A   November 15, 2003.
6      Q   So a day after this other one?
7      A   Yes.
8      Q   Who did Mr. Jones list as his employers on that
9  application?
10     A   Thomas Brown Agency and D.C. Parks and Recreation.
11     Q   Do you see any reference to FTN Consultants as an
12 employer on that application?
13     A   No.
14     Q   Now, Agent Gikas, did there come a time that -- well,
15 did you obtain other documents indicating the status of Mr.
16 Jones's lease of that facility?
17         THE COURT:  Which one, Summit Circle now?
18         MS. LIEBER:  I'm sorry, the Hampton warehouse.
19         THE WITNESS:  Yes.
20 BY MS. LIEBER:
21     Q   I'm going to show you what was admitted yesterday as ICE
22 17.  What is ICE 17?
23     A   It's a letter from Antoine Jones to the management, or
24 to the owners of the warehouse indicating that he's going to
25 vacate or break the lease early, vacate the warehouse early.

46

1      Q   How long was the Hampton warehouse lease supposed to go
2  on after April, of 2004?
3      A   Another nine months.  It was a year lease.  So, I can't
4  remember exactly the start date, but eight or nine more
5  months.
6      Q   What's the date of this letter?
7      A   April 13, 2004.
8      Q   What does Antoine Jones, how does he refer to himself in
9  this letter, what's his title?
10     A   Business manager.
11     Q   What's the letterhead?
12     A   It says FTN Consultants.
13     Q   Okay.  Business manager of FTN Consultants?
14     A   Right.
15     Q   Now, Agent Gikas, in the course of your
16 investigation, did you eventually obtain permission to enter
17 the Hampton warehouse facility?
18     A   Yes.
19     Q   Who gave you permission to do that?
20     A   Mr. Schafer, Andrew Schafer.
21     Q   Was that before or after Mr. Jones had terminated his
22 lease on that property?
23     A   It was after he had vacated, terminated his lease and
24 vacated the property.
25     Q   Now, I want to show you, first of all, show it to

47

1  defense counsel.
2          MS. LIEBER:  Court's indulgence.  I'm going to show
3  to defense counsel ICE Exhibits 22 through 31, and actually,
4  I'm sorry, ICE 20 also.
5          THE COURT:  Twenty-two to thirty what?
6          MS. LIEBER:  I'm sorry.  ICE 20, and then ICE 22
7  through 31.  I'm going to show them to defense counsel.  They
8  have already seen.
9          THE COURT:  All right.  Nineteen and 21 are in.
10 Any objection?
11         MR. BALAREZO:  Probably not, Your Honor.  If I
12 could just briefly look at them.
13         THE COURT:  Okay.
14 BY MS. LIEBER:
15     Q   Agent Gikas, before I get to these photographs, did you
16 yourself go out and conduct in-person surveillance of that
17 warehouse facility from time to time?
18     A   Yes.
19     Q   Did you also, did you take any other surveillance steps
20 with respect to that warehouse?
21     A   Yes, not only, you know, was I passing by almost once a
22 day, I had a camera set up across the street that was
23 recording 24/7 video of the front of the warehouse area.
24     Q   Have you reviewed the video?
25     A   Yes, every night I would switch out the tapes and review

48

1  the tape of the previous day.
2      Q   Give the jury a sense of the commercial activity that
3  was going on, in specifically Mr. Jones's warehouse space,
4  400 Hampton Park?
5      A   Very little.  There was, I believe, the surveillance
6  lasted about 35 days, the recorded video surveillance.  And
7  apart from the comings and goings of Lawrence Maynard, he
8  would show up, not every day, but several times a week in the
9  box truck, stay a little while.  Mr. Jones would appear less
10 frequently.
11         But apart from those two, there were, in the 35
12 days, three or four other vehicles that the camera picked up
13 as arriving, going into the bay area, the garage area.
14 Unfortunately, you know, I couldn't see what was happening
15 behind because they went inside and closed the garage door.
16 But those three or four vehicles, that was the only activity
17 that was recorded, that was observed at the warehouse.
18     Q   Now, I want to show you what has been admitted as ICE 20
19 and --
20         THE COURT:  Are you offering them?
21         MS. LIEBER:  I'm sorry, yes.
22         THE COURT:  I don't think you formally admitted
23 them.  There was no objection, 20, 22 through 31.
24         (Government Exhibit Nos. ICE 20, ICE 22
25          through 31 were admitted into evidence.)

49

BY MS. LIEBER:

1  Q   First, Agent Gikas, I want to show you ICE 20, which is
2  a sketch.  Do you recognize that sketch?
3  A   Yes.
4  Q   What is that a sketch of?
5  A   It's a sketch of the, the inside of 400
6  Hampton Park Boulevard.
7  Q   Is this the day that you conducted your search?
8  A   Yes.
9  Q   Up here, do you see that?  Is that the front of the
10 space where it says overhead door?
11 A   Yes.
12 Q   What's this over here?
13 A   The 400 Hampton Park Boulevard had, it was basically a
14 big, like bay garage, big enough to hold a tractor
15 trailer-size truck, but then to the left was a small office.
16 Where it says door, that was the entrance to a small office
17 that led into the bay area.
18        Then there was your typical, a bathroom, another
19 smaller office.  There was just a room in the garage area and
20 a few tables and various items that they had left behind.
21        MR. BALAREZO:  Objection.
22        THE WITNESS:  That were there.
23        THE COURT:  Overruled.
24
25

50

BY MS. LIEBER:

1  Q   Agent Gikas, I'm going to show you a series of
2  photographs that have now been admitted.  First, I want to
3  show you ICE 22.  What is that?
4  A   That's the inside of the bay area of 400 Hampton Park
5  Boulevard.
6  Q   Now, I'm going to show you ICE 23.  What is that?
7  A   That's the actual garage door.  The picture was taken
8  from the inside, but we just wanted to show that the little
9  window is covered with a towel.
10 Q   Now, I'm going to show you ICE 24.  What is that a
11 picture of?
12 A   That same window.  We just lifted the towel that they
13 had covered the window with.
14 Q   I'm just going to show you some pictures of sort of
15 the --
16        MR. BALAREZO:  I object to the characterization.
17 She doesn't know who covered that.  So she can't testify to
18 that.
19        THE COURT:  I don't think she identified anybody.
20        MR. BALAREZO:  She said that they covered it up,
21 Your Honor?  What's the implication?
22        THE COURT:  I don't know.  Somebody covered it up.
23        MR. BALAREZO:  There is no evidence it was
24 Mr. Jones is all I'm saying.
25

51

1        THE COURT:  That's true.
2  BY MS. LIEBER:
3  Q   Agent Gikas, I'm showing you ICE 25.  What is ICE 25?
4  A   A jacket and some coveralls that was left there.  They
5  were hanging on the wall.
6  Q   What's ICE 26?
7  A   Moving blankets.
8        THE COURT:  What kind of blankets?
9        THE WITNESS:  The heavy moving blankets that you
10 use to wrap furniture with when you're moving.
11 BY MS. LIEBER:
12 Q   Is that the same thing in ICE 27?  Can you see that?
13 A   Yes.
14 Q   ICE 28, what is that a picture of?
15 A   That is an inflatable mattress, deflated, but it's one
16 of those inflatable mattresses.
17 Q   And I guess I should ask this general question.  Are all
18 these pictures, when you or someone took pictures of these
19 items within that warehouse space, were they in that original
20 condition or had you moved them in any way?
21 A   No, we hadn't moved them.
22 Q   Were they just as you found them?
23 A   Yes.
24 Q   I'm going to show you ICE 29.  What is ICE 29?
25 A   It's a box full of, almost like industrial type Saran

52

1  wrap or hand film as they call it.
2  Q   I'm going to now show you ICE 30 and 31.  Are these the
3  contents of that box?
4  A   Yes.
5  Q   What is that?
6  A   It's again just huge spools of Saran wrap, shrink wrap.
7  Q   Again, ICE 31?
8  A   More shrink wrap.
9        MS. LIEBER:  Your Honor, I'm going to show what is
10 not yet in evidence as ICE 32.
11       THE COURT:  Any objection to 32?
12       MR. BALAREZO:  I don't even know what it is, Your
13 Honor.  No.
14       MS. LIEBER:  ICE 32.
15       THE COURT:  It's admitted.
16       MS. LIEBER:  Thank you.
17       (Government Exhibit No. ICE 32
18         was admitted into evidence.)
19 BY MS. LIEBER:
20 Q   Agent Gikas, what is this little thing, can you see
21 that?
22 A   Yes.  It's like a little rolodex card.  It has Antoine
23 Jones's name with, that's actually Lawrence Maynard's
24 address, 7711 Greenleaf Road in Landover.
25 Q   Where did this card come from?

53

1    A   From the smaller office inside of the bay area in 400
2   Hampton Park Boulevard.
3    Q   Again, whose address is that?
4    A   Lawrence Maynard's.
5    Q   Agent Gikas, after you conducted this search, what
6   happened to you personally in your career?
7           MR. BALAREZO:   Objection.
8           THE COURT:   Yeah, I think it's relevant.  Is that
9   what you're saying?  Are you objecting on relevance grounds?
10          MR. BALAREZO:   That's one of them.
11          THE COURT:   Is there some other grounds?
12          MR. BALAREZO:   I don't think it's a legal ground.
13          THE COURT:   Overruled.  She changed jobs or
14  something.
15  BY MS. LIEBER:
16   Q   Let me ask this.  What happened to the ICE investigation
17  of Antoine Jones and Lawrence Maynard shortly after you did
18  this warehouse search?
19          THE COURT:   When was the search again if you can
20  remind me of the date?
21          THE WITNESS:   April 30, 2004.
22  BY MS. LIEBER:
23   Q   So, shortly after the end of April of 2004, say, some
24  time in May or June of 2004, give the jury a sense of what
25  happened to the ICE investigation of Antoine Jones and

54

1   Lawrence Maynard?
2    A   It was basically put on hold for various reasons.  The
3   office was reorganizing.  I was transferred to another
4   office, and the case was reassigned.  The agent to whom it
5   was reassigned went out on maternity leave for about a year.
6   And unfortunately, nothing much happened with the case
7   unfortunately after that.
8    Q   Did something happen in late October of 2005 that
9   brought this investigation back to the forefront?
10   A   Yes, the agent who had inherited the case from me, she
11  had come back from maternity leave, but she had been out for
12  almost a year.  But she picked it back up and started that
13  week doing surveillance.
14          THE COURT:   Wait a minute.  She can't testify about
15  what some other agent did.
16          MS. LIEBER:   I wasn't intending to elicit that.
17  BY MS. LIEBER:
18   Q   Agent Gikas, did you personally learn, towards the end
19  of October 2005, that something had happened to Antoine
20  Jones?
21   A   I heard that Antoine Jones had been arrested.
22   Q   So based on what you heard, what did you do?
23   A   I sought out the investigating agents and called them
24  and let them know that, you know, we were investigating the
25  same guy.

55

1    Q   Did you provide the information that you had to those
2   investigators?
3    A   Yes.
4           MS. LIEBER:   Court's indulgence.
5           THE COURT:   Can you remind me, and I'll just come
6   back to your testimony, but when did you first get a
7   telephone call from McAllen with ICE, the date?
8           THE WITNESS:   February the 6th, I believe, Your
9   Honor, 2004.
10          THE COURT:   You followed Javier three times
11  basically?  He came into Baltimore area?  The third time
12  being what you just talked about with the Myrtle Avenue?
13          THE WITNESS:   Right.
14          THE COURT:   You followed him to Summit Circle?
15          THE WITNESS:   Yes.
16          THE COURT:   Once to Myrtle and what was the
17  intervening one?
18          THE WITNESS:   He flew into Baltimore twice, only
19  twice.
20          THE COURT:   Only twice, the second time being when
21  he went to Myrtle Avenue in this Ford Excursion?
22          THE WITNESS:   Yes.  I didn't see him drive into the
23  town, but the presumption was that he drove in.
24          THE COURT:   You don't have to presum.
25          I'm just trying to, since we interrupted your

56

1   testimony, I know you got a call from McAllen and you
2   followed him and you went to Summit Circle back in February.
3   The next time you picked him up in the Baltimore area?
4           THE WITNESS:   From the airport, yes, we went to,
5   the hotel first then Myrtle Avenue the next morning.
6   BY MS. LIEBER:
7    Q   Let me just ask one clarifying question if I may.
8           We're talking, the very first time you ever heard
9   the name Francisco Javier Gonzalez-Ruan was that from the ICE
10  phone call in early February?
11   A   Yes.
12   Q   Where did that lead you?  What residence did that
13  ultimately led you to?
14   A   Summit Circle.
15   Q   Was there a second visit at least by the Javier phone?
16   A   Yes.
17   Q   Where did that lead you?
18   A   Myrtle Avenue.
19   Q   Was that sort of later in February of 2003?
20   A   Yes.
21   Q   Was there a third Javier visit where you personally saw
22  him?
23   A   Yes.
24   Q   Where did that lead you?
25   A   To Myrtle Avenue.

57

```
1    Q   Was that --
2          THE COURT:  From the pen register you identified
3    the Myrtle Avenue address.
4          THE WITNESS:  Originally?
5          THE COURT:  I think you said a cell.  That's what,
6    the cell identified the location of --
7          THE WITNESS:  Yes, yes, yes.
8    BY MS. LIEBER:
9    Q   When you first, so this is, basically three times; is
10   that correct?
11   A   Yes.
12         THE COURT:  Okay.
13   BY MS. LIEBER:
14   Q   When was the last time you saw Javier in the course of
15   this investigation in 2004?
16   A   When he left the Myrtle Avenue address on
17   February 28th.
18         MS. LIEBER:  That's all I have, thank you.
19         THE COURT:  So, it's fair to say that your
20   involvement in this investigation basically got kicked off on
21   February 6th and ended on February 28th.  Just trying to get
22   a timeframe, it's short.
23         THE WITNESS:  No, April, June, Your Honor, I mean,
24   April, May.
25         THE COURT:  All right.  But there was no more
```

58

```
1    Javier in this area?
2          THE WITNESS:  No, I had focused on the local
3    individual, Mr. Jones.
4          THE COURT:  Okay.
5          MS. LIEBER:  Thank you.
6          THE COURT:  Are you finished with this witness?  We
7    need a break.  Okay.  Ladies and gentlemen, we'll take a
8    ten-minute recess.
9          (Jury Out.)
10         THE COURT:  The agent shouldn't discuss her
11   testimony with anyone.  Okay.
12         (A brief recess was taken.)
13         THE COURT:  Are we ready?
14         MS. LIEBER:  Yes, Your Honor.  I would ask to ask
15   one more question of Agent Gikas before I tender the witness.
16         THE COURT:  Sure, that's fine.  All right.
17   Thirty-three didn't come in, right, ICE 33?  I just wanted to
18   make sure.  And I didn't have 10 or 11?  The rest of them
19   seem to be in.  Perhaps we should just double check before
20   you say one question.
21         MS. LIEBER:  It might be three now.
22         THE COURT:  That's what I figured.  Do you agree
23   that 10 and 11 have not been admitted?  Those are coming in
24   through some other person?
25         MS. LIEBER:  That's correct, Your Honor.
```

59

```
1          THE COURT:  And then 33 is about to come in, I
2    guess.
3          (Jury Present.)
4                DIRECT EXAMINATION resumed
5    BY MS. LIEBER:
6    Q   Agent Gikas, I think I promised three more questions.
7    First, I want to show you what is marked for identification
8    as ICE 33.
9          THE COURT:  Have you seen it, counsel?
10         MR. BALAREZO:  Yes, Your Honor, no objection.
11         THE COURT:  Thirty-three goes in.
12         (Government Exhibit No. ICE 33
13         was admitted into evidence.)
14   BY MS. LIEBER:
15   Q   What is that?
16   A   It's a little business card from Club Levels that we
17   found in the warehouse.
18         THE COURT:  The 400 Hampton Park Boulevard?
19         THE WITNESS:  Yes, Your Honor.
20         MS. LIEBER:  And finally, Your Honor, I'm going to
21   show to the witness what I've marked as ICE 39.
22         THE COURT:  Any objection?
23         MR. BALAREZO:  No, Your Honor.
24         THE COURT:  Okay.
25         (Government Exhibit No. ICE 39
```

60

```
1          was admitted into evidence.)
2          THE COURT:  It's admitted.  For my record, was
3    there anything, that 36, 37 or 38?  Okay, thank you.
4    BY MS. LIEBER:
5    Q   Agent Gikas, I'm showing you ICE 39.  Have you ever seen
6    this piece of paper before?
7    A   The piece of paper?
8    Q   Yes.
9    A   What's written on it.
10   Q   Okay, but have you seen the paper before?  Is this news
11   to you that I have this exhibit?
12         THE COURT:  No, that's not a good question.
13         MS. LIEBER:  I'm sorry.
14   BY MS. LIEBER:
15   Q   Did you write these numbers on this piece of paper?
16   A   I don't remember.
17   Q   Okay.
18         THE COURT:  I don't know what we're doing.  I'm
19   lost.
20   BY MS. LIEBER:
21   Q   Agent Gikas, do you know what this top number is, XA
22   9133167
23   A   Yes, that was the tag number on the silver Impala that
24   picked up Javier on his first trip into BW.
25   Q   Do you recognize these bottom numbers?
```

61

1    THE COURT:  The tag, just to remind me, was what, a
2  temporary Delaware tag?
3    THE WITNESS:  Yes, Your Honor.
4    THE COURT:  Okay.
5  BY MS. LIEBER:
6  Q   So this is the Impala, is that right?
7  A   Yes.
8  Q   What are these two bottom numbers?
9  A   The numbers from the tags that were in the Plymouth van
10  that was parked outside of Myrtle Avenue, 8550 Myrtle Avenue
11  in Bowie.  The one beginning with XA again is the Delaware
12  temporary tag.  The other one was a permanent tag that was
13  stuck on the dash but it was expired.
14    THE COURT:  What color is the Plymouth van?  I'm
15  having better luck with colors.  Do you remember?
16    THE WITNESS:  Blue.
17    MS. LIEBER:  Thank you very much, Agent Gikas.
18  That's all I have.
19    THE COURT:  Thirty-nine is in.  Cross?
20    MR. BALAREZO:  Yes, Your Honor, thank you.  Good
21  morning, ladies and gentlemen.
22    CROSS EXAMINATION
23  BY MR. BALAREZO:
24  Q   Good morning, Agent Gikas.
25  A   Good morning.

62

1  Q   You were on this, let's call it the ICE investigation,
2  that we've been talking about, since February '04 until about
3  May or so, you said?
4  A   Yes, sir.
5  Q   So for a period of about three months, three and a half
6  months or so?
7  A   About that, yes.
8  Q   Before I continue, let me just make sure you understand.
9  When I ask you a question, if you could just answer about
10  something that you know through personal knowledge, not about
11  what somebody else told you or what you read.  Do you
12  understand what I'm saying?
13  A   From personal observation.
14  Q   Right.
15  A   Okay.
16  Q   Now, so you conducted this investigation for about
17  three, three to four months, let's say, right?
18  A   Yes.
19  Q   During your conduct of this investigation, you employed
20  technology, like these pen registers that you talked about,
21  right?
22  A   Yes.
23  Q   And you employed technology like the cell tower pinging
24  thing that you talked about, right?
25  A   That's part of the pen register.

63

1  Q   You employed video surveillance of Mr. Jones, of the
2  warehouse, correct?
3  A   Yes.
4  Q   That was about 35 days' worth of video surveillance?
5  A   Yes.
6  Q   That was 24-7, you said.  Twenty-four hours a day, 7
7  days a week for 35 days; is that right?
8  A   Yes.
9  Q   And you've viewed all of those tapes?
10  A   Yes.
11  Q   Although Ms. Lieber didn't mention it, you also employed
12  a GPS tracker in this case, right, in your investigation?
13  A   Yes.
14  Q   And just so the jury is clear, that's a separate GPS
15  tracker than the one the FBI employed later, correct?
16  A   Yes.
17  Q   And you had that tracker in place for about three to
18  four months?
19  A   No, no, not that long.
20  Q   Do you recall how long it was?
21  A   Several weeks, I don't recall exactly.
22  Q   Let me show you what I'll mark as Jones Exhibit 26.
23  I'll show it to Ms. Lieber.
24    During the course of this case, you completed
25  what's called a case chronology and review form.  Do you

64

1  remember that?
2  A   Yes.
3  Q   Where you wrote down by hand observations, that kind of
4  thing?
5  A   Yes.
6  Q   Let me show you what I've marked as Jones Number 26.
7  I'll point your attention to the third line from the bottom
8  that's highlighted.  Does that refresh your recollection as
9  to how long you had the GPS tracker in place?
10  A   Yes.
11  Q   How long did you have that tracker in place?
12  A   It is several months.
13  Q   That's in fact from March 5th through July 7, 2004,
14  right?
15  A   Yes.
16  Q   So that's approximately four months that you had this
17  tracker in place?
18  A   Yes.
19  Q   Do you remember what vehicle in particular?
20  A   It was the Isuzu box truck.
21  Q   This is the white truck that you've mentioned several
22  times?
23  A   Yes, the one drove, driven by Lawrence Maynard.
24  Q   You didn't employ a wiretap in that investigation,
25  correct, at least with respect to Mr. Jones?

65

1    A  No.
2    Q  Did you employ a wiretap at all?
3         MS. LIEBER:  Objection.
4         THE COURT:  What's the relevance?  It doesn't
5    relate to any of these people here.
6         MR. BALAREZO:  I'm just trying to make sure it
7    doesn't relate to my client, Your Honor.
8         THE COURT:  Well then ask about Jones which she
9    said she didn't.
10   BY MR. BALAREZO:
11   Q  There was no wiretap on Mr. Jones, right?
12   A  On a telephone belonging to Mr. Jones, no.
13   Q  You also, related to this investigation, you received
14   information from informants, correct?
15   A  Yes.
16   Q  None of these informants gave you information relating
17   to Mr. Jones, correct?  I'm talking about the ICE
18   investigation when you conducted it back in 2004 that you
19   testified about.
20   A  Not identifying him by name but describing him, yes.
21   Q  Is that in any of the reports that you wrote, the
22   reports of incidents, I believe?  Let me reask that question.
23        You completed some reports, report of
24   investigations?  I'm sorry.
25   A  Yes.

66

1    Q  ROIs I think you call them?
2    A  Uh-huh.
3    Q  All right.  And in there, you do list things that you
4    have done, observations that you've made, investigative
5    techniques that you've employed, right?
6    A  Yes.
7    Q  You do mention informants in those reports, correct?
8    A  Yes.
9    Q  Not by name but by number?
10   A  Yes.
11   Q  Like informant number such and such?  All right.  At
12   least what I have before me, I have four reports that contain
13   your name, Report Number One, 001, from April 26, 2004.  Do
14   you remember completing one then?
15   A  Yes.
16   Q  There was a Report Number Two?
17   A  Yes.
18   Q  There is also a Report Number Four, and there was a
19   Report Number Five.
20   A  Correct.
21   Q  You're familiar with those, right?
22   A  Yes.  I wrote them.
23   Q  No where in those reports does it mention any informants
24   identifying Mr. Jones in any manner, does it?
25   A  Not directly, no.

67

1    Q  No, that's not my question.  No where in your reports,
2    which are very detailed and multiple pages in length, does it
3    indicate that any informant said anything about Mr. Jones,
4    correct?
5    A  Well, the information received from the informant was
6    that individuals from McAllen, Texas, were coming to meet
7    with and collect proceeds from individuals from Maryland.
8    That individual was Mr. Jones.  Again, it was not identified
9    by name but --
10   Q  Did any informant say Antoine Jones?
11   A  No.
12   Q  Did any informant say Levels Night Club?
13   A  No.
14   Q  Did any informant say Hampton Park?
15   A  No.
16   Q  Did any informant say Brandywine?
17   A  No.
18   Q  Did any informant say Summit Circle?
19   A  No.
20   Q  You didn't know it was Antoine Jones.  They said some
21   guy in Maryland.  It could be anybody, right?
22   A  Yes.
23   Q  Now, you said --
24   A  According to the informant, we identified on our own who
25   it was.

68

1    Q  I'm not asking what you did.  I'm asking what the
2    informant told you?
3    A  Yeah, not from the informant.
4    Q  As I said when I began this, you're an experienced
5    agent, correct?
6    A  Yes.
7    Q  This is not the first time you're testifying, right?
8    A  Yes.
9    Q  I asked you just to answer my question.  I don't want to
10   hear your opinion.  I don't want to hear anything else but
11   just the answer to my question.
12        THE COURT:  I instruct the witness, not you.  If
13   you need something from the witness, let me know.
14        MR. BALAREZO:  Well then I would ask the Court to
15   instruct the witness to answer the question.
16        THE COURT:  Yes, but when you asked the question
17   the way you did.  Overruled, go ahead.
18   BY MR. BALAREZO:
19   Q  Now, you said that, on the February the 6th is when you
20   first began your surveillance of this Javier guy, correct?
21   A  Yes.
22   Q  That was because you received a call from an Agent in
23   McAllen saying he was coming wearing the fancy ostrich boots
24   and all those things, correct?
25   A  Yes.

69

```
1    Q   That's when you went to the airport and made eye ball
2  surveillance, as Ms. Lieber likes to call it --
3         MS. LIEBER:   Objection.
4         THE COURT:   All right.
5  BY MR. BALAREZO:
6    Q   Did Ms. Lieber call it eye ball surveillance?
7         THE COURT:   Let's just go ahead.  She called it eye
8  ball.  Let's go ahead.
9  BY MR. BALAREZO:
10   Q   You made eye ball surveillance, right?
11   A   Yes.
12   Q   Of this Javier person, and you followed him from the
13 airport to Arundel Mills?
14   A   Yes.
15   Q   They had dinner then they went on to the Summit Circle
16 location, right?
17   A   Yes.
18   Q   And you yourself observed all of this?
19   A   Yes.
20   Q   Simple question, did you yourself, with your two eyes,
21 observe this Javier person from the airport to Summit Circle?
22   A   Yes.
23   Q   Mr. Jones was no where, at least that you could tell, at
24 Arundel Mills, was he?
25   A   No.
```

70

```
1    Q   When you got to Summit Circle, you indicated that you
2  saw the individual get out of the car, or three individuals
3  get out of the car, climb up the garden-style apartments to
4  the third floor.  At no point did you actually see what
5  apartment they went in; is that correct?
6    A   Correct.
7    Q   All you knew is that they went up to the third floor.
8  You never saw Mr. Jones up until that point, correct?
9    A   Correct.
10   Q   At some point thereafter, you indicated that the
11 individuals left the apartment; is that correct?
12   A   Correct.
13   Q   This was after you and your team were there I think over
14 night more than 24 hours conducting eye ball surveillance?
15   A   Yes.
16   Q   You guys didn't fall asleep, right?
17   A   I didn't.
18   Q   As far as you know, your agents didn't either.  I mean,
19 you're doing surveillance.  You're not falling asleep, right?
20   A   I would hope not.
21   Q   Well, you never saw Mr. Jones at Summit Circle, did you?
22 This is Mr. Jones.  You never saw this person at Summit
23 Circle?
24   A   No.
25   Q   While you were conducting your surveillance that night
```

71

```
1  or the next day, right?
2    A   No.
3    Q   You also mentioned that, the Javier guy left with one of
4  the other two individuals and took off, right?
5    A   Yes.
6    Q   And then the third individual from the apartment was
7  picked up and taken to an airport; is that correct?
8    A   Yes.
9    Q   You didn't see Mr. Jones driving up to pick up that
10 individual, correct?
11   A   No, I wasn't there at that time.
12   Q   Okay.  You've testified based -- when you testified on
13 direct examination about that particular incident, again,
14 that wasn't your direct knowledge.  That was what somebody
15 else told you?
16   A   Yes.
17   Q   Now, you've had access to all the technology that we've
18 discussed, the pen registers, all those things.  Did you have
19 a camera when you were conducting that surveillance?
20   A   That initial surveillance?
21   Q   Yes, on February 6th and 7th.
22   A   No, I didn't.
23   Q   Well, you just didn't happen into that location.  I mean
24 you went there for a purpose, right?
25   A   We were following, we followed Javier there, yes.
```

72

```
1    Q   Right.  When you went to the airport, you knew what you
2  were going to do.  It's not like it was serendipity.  It
3  wasn't coincidence, right?
4    A   Yes.
5    Q   So you didn't have a camera.  You didn't have a video
6  camera, right?
7    A   Right.
8    Q   You don't have a camera [sic] of this car picking up
9  this third person and going to the airport, right?  You don't
10 have a picture of Javier with his ostrich boots going up to
11 the third floor.  You don't have any of that?
12   A   No.
13   Q   Now, your team never went into Summit Circle, correct,
14 into the apartment itself?
15   A   Correct.
16   Q   That you subsequently identified Number Three -- what
17 was the number?  What was the apartment you later identified
18 as being rented by Antoine Jones?
19   A   3B.
20   Q   You never went into that apartment, right?
21   A   I didn't, no.
22   Q   Did any of your agents go into that apartment?
23   A   I think some did.
24   Q   Do you know when they went into that apartment?
25   A   I'm not exactly sure of the date.  It might have been
```

73

1  February 7th, the second day.
2  Q  Was that pursuant to a warrant?
3  A  No, sir.
4  Q  How did they get into there?
5  A  The maintenance man.
6  Q  So, you have an apartment that's rented presumably by
7  Mr. Jones, am I correct there?  You have some interest in
8  that apartment and your law enforcement capacity; is that
9  correct?
10  A  Yes.
11  Q  Did you understand the question?
12  A  Yes.
13  Q  Okay.  You want to see what's going on in the apartment,
14  right?  You're interested in what's going on in there, right?
15  You can't see from outside.
16  A  Yes.
17  Q  So you don't go to a court and get a search warrant; is
18  that correct?
19      MS. LIEBER:  Objection, Your Honor.
20      THE COURT:  Wait a second.  Let's approach.
21      (Bench conference.)
22      MR. BALAREZO:  You are objecting?
23      MS. LIEBER:  Just to, she can testify about what
24  she did.  Whether or not she got a search warrant, she didn't
25  do all of this.

74

1      THE COURT:  He's asking for all this hearsay.
2      MR. BALAREZO:  This is news to me, Your Honor.
3      THE COURT:  They didn't introduce anything that was
4  found there.  I suspect your guy is not going to stand up and
5  say.  If they don't introduce anything, so you have some kind
6  of possible, in a civil action, I don't know.  But what good
7  does it, where are we?
8      MR. BALAREZO:  Your Honor, it just shows the
9  conduct of these investigations of my client.  They're going
10  into an apartment without a warrant.
11      THE COURT:  I don't know that they are or not.
12      MR. BALAREZO:  She just said that they didn't have
13  one.
14      THE COURT:  It is not for the jury to pass on the
15  legality.
16      MR. BALAREZO:  I'm not asking that.  I think the
17  jury should be aware of the steps these people took to
18  investigate my client.
19      THE COURT:  That may be fine.  Maybe the Government
20  wants people to know, but they're not going to be told.  You
21  can't argue the legality of it.
22      MR. BALAREZO:  I'm not doing that.  I'm trying to
23  get the facts out.  I just found out about this.
24      THE COURT:  The more you ask, the more you learn.
25  Sometimes it doesn't actually turn out to be that helpful.

75

1      MS. LIEBER:  Your Honor, the reason I let it go
2  that far, now I'm going to ask her on redirect what did they
3  see.
4      THE COURT:  What did she see?
5      MS. LIEBER:  Air mattresses, shrink wrap and
6  devotional candles.  I didn't seek to put that in my case
7  because --
8      MR. BALAREZO:  Did she see it?  Was she there?
9  Your Honor, if the Government gave me this information from
10  the beginning, then I would know where I'm going.
11      THE COURT:  You are asking for hearsay.  Why are
12  you inviting it?  She doesn't have any first-hand knowledge.
13      MR. BALAREZO:  Your Honor, she was testifying about
14  not first-hand knowledge during the, this is not for the
15  truth of the matter.  This is to show why she did what she
16  did, to show her investigative technique.
17      MR. NORRIS:  If this line of questioning is opening
18  up the credibility, I don't see why that would open the door
19  to what they found from the illegality.
20      THE COURT:  You are suggesting that it is illegal.
21  We have not determined that.  We can't determine that here
22  because it can't be a motion to suppress unless they put the
23  stuff in.  But if you want to know --
24      MR. NORRIS:  They went into the requirements for
25  the search warrant for the sneak and peek investigation.  So,

76

1  it's already out there.  The fact that these agents follow
2  the letter of the law and get these warrants for sneak and
3  peeks, their credibility is at issue at that point, not what
4  they found illegally or not illegally inside.
5      THE COURT:  First of all, your guy doesn't have any
6  standing here.  But I think it's a terrible mistake to keep
7  on opening all these big fat doors over nothing.  She doesn't
8  have first-hand knowledge.  She isn't there.  So you can't
9  keep asking her what did she learn.  I don't want her to go
10  into what she saw.
11      MR. BALAREZO:  She was not there for a lot of what
12  she testified about.
13      THE COURT:  Why are you going backward?  As far as
14  I can tell, she saw what she saw.  And I don't have any
15  problem with the testimony to date.  If you keep talking
16  about this one, they'll be able to bring out what she found.
17  Otherwise we're stopping it.
18      MR. BALAREZO:  Can I at least confirm that they
19  didn't have a warrant and I'll move on then?
20      THE COURT:  She told you.
21      MR. BALAREZO:  Was she the lead agent?
22      THE COURT:  I don't know how much of this argument
23  about her credibility based on some people going into an
24  apartment without a warrant when, first of all, the legality
25  is not before the jury.  So what are you going to make of it?

77

1   MR. BALAREZO:  Your Honor, I would probably then
2   move to suppress whatever was found there.
3       THE COURT:  It has not been introduced.
4       MR. BALAREZO:  If I want to ask the question,
5   they're going to introduce it.
6       THE COURT:  I'm not going to let them  So you are
7   not going to have any argument about the legality of this
8   search warrant.  Somebody would have to, I'm the only one
9   that can pass on it.  I don't think you can make any argument
10  about this witness' credibility based on some allegation that
11  somebody on her team may or may not have entered with the
12  permission of the maintenance man.
13      MR. NORRIS:  There is all this testimony about what
14  she learned and how it affected the investigation.  I think
15  what is relevant is what she believes about the search, not
16  whether or not it is actually legal.
17      THE COURT:  I don't care what she thinks about the
18  legality of the search, unless you want to bring in
19  everything they found there.  You can't have it both ways.
20  Do you want everything to come in that they found?  Then we
21  can figure out what she believed.
22      MR. NORRIS:  I think just because someone is caught
23  with their hand in the cookie jar does not open the door to
24  what flavor the cookie was.
25      THE COURT:  I don't agree.  You are trying to

78

1   suggest something that is terribly illegal.  I have not ruled
2   on it.  Who can make that argument?  I don't even know except
3   for maybe your client.
4       But the only way you can argue the legality of what
5   they see is if we let in what they seize.  You can't have it
6   both ways.  You can't argue to this jury the legality.
7       MR. BALAREZO:  The problem I'm having with all
8   this, the paperwork that I got regarding the ICE
9   investigation, everything I saw about what was in that
10  apartment is written as if the, Summit Circle, the
11  maintenance man told us this, the maintenance man told us
12  that.
13      So based on what I've gleaned from this report, I
14  have no idea they're in there with the maintenance man.  Now
15  this witness said I'm there and they want to bring in all
16  these other things.
17      THE COURT:  She's not saying that, listen to her.
18  Do you want to voir dire her whether or not the maintenance
19  man told her, the agents told her?  But you are not going to
20  get it in before the jury.  It is completely inadmissible.
21  If you want it for truth, which you must be --
22      Sustained, move on.
23      (Open Court.)
24      THE COURT:  Go ahead.
25      MS. LIEBER:  Your Honor with respect to an

79

1   Instruction, perhaps?
2       THE COURT:  We can think about it later, thank you.
3   BY MR. BALAREZO:
4   Q   Now, with respect to this Summit Circle, which is the
5   only location we're talking about at this point, the
6   information that you had gotten up until this point was that
7   Javier was going to come to collect money, right?
8   A   Yes.
9   Q   Money for drugs in effect is what you understood?
10  A   Money from the proceeds of the sale of drugs, yes.
11  Q   At least to your knowledge, and let's get this out, were
12  you the lead agent, in a way, of this investigation?  Were
13  you in charge?
14  A   This was a phone call that came in --
15  Q   I'm not asking about the phone call.  I'm asking about
16  the ICE investigation from February until May or whenever it
17  was that you left, were you the lead agent?
18  A   Yes.
19  Q   You were in charge of the investigation?
20  A   Yes.
21  Q   You were familiar with all the details of the
22  Investigation, right?
23  A   Yes.
24  Q   Up until that point of February the 7th, let's say, when
25  Javier left the location at Summit Circle and the other two

80

1   Individuals left the location at Summit Circle, you never
2   placed Mr. Jones at that location physically, correct?
3   A   Correct.
4   Q   And as far as you know, no money was ever seized at that
5   location, correct?
6   A   Correct.
7   Q   As far as you know, no drugs were ever seized at that
8   location, correct?
9   A   Correct.
10  Q   Now, there were some items that were in that location,
11  is that true, when you went in?
12      THE COURT:  She didn't go in.
13      THE WITNESS:  I didn't go in.
14  BY MR. BALAREZO:
15  Q   Well, as case agent or lead agent, you are aware that --
16      THE COURT:  We discussed this, Mr. Balarezo.  If
17  you want to pursue that question, I've told you.  You'll
18  proceed at your risk.
19  BY MR. BALAREZO:
20  Q   So no money, no drugs, we're clear on that?
21  A   Correct.
22  Q   Now, after that, you began following up on tag numbers
23  and Mr. Jones.  I think you said you went to the apartment
24  and got the lease for the apartment, right?
25  A   Yes.

81

```
1    Q  And you found out that Mr. Jones, or at least someone by
2    the name of Jones, rented that apartment 3 B?
3    A  Yes.
4    Q  But you can't say that that's the apartment that Javier
5    and the other Mexicans, whoever they were, were in; is that
6    correct?
7    A  Correct.
8    Q  Either you can or you can't?
9    A  Well, I didn't physically see them go into that door.
10   Q  I don't want your belief?
11        THE COURT:  Let's approach.  Excuse us, ladies and
12   gentlemen.
13        (Bench conference.)
14        THE COURT:  You are trying to insinuate that they
15   have no good basis for fingering 3B.  But if they went in
16   there and found stuff in there, whether or not it is a good
17   or bad search, you are begging for it.
18        MR. BALAREZO:  She already said she didn't see any
19   of these guys go into apartment 3B.  All I, she got the
20   information on Jones.  She can't say it was the same
21   apartment.  She can say it on an assumption.
22        THE COURT:  Not on assumption.
23        MR. BALAREZO:  She never saw it.  No agent saw the
24   three Mexicans go into that apartment.  It's a stupid little
25   point.
```

82

```
1        THE COURT:  No, it's not stupid.  They didn't see
2    three people go into 3B.  But they went in there and saw the
3    remains of what people were doing.  It is clear.  So if you
4    want the inference to get in there, you can't keep going at
5    her as if she doesn't know things and then suggest that
6    they're doing something without a basis to connect this
7    apartment to him  He is clearly associated with your client
8    in this evidence.  It is not going to get any better.
9        MR. BALAREZO:  I don't dispute that.  I'm not
10   disputing that Jones is associated somehow with 3B or that
11   the Mexicans were seen going to the third floor.  All I'm
12   saying is she can't say they were going to 3B.
13        THE COURT:  I think the remains is consistent with
14   every other address, the warehouse, the Myrtle Avenue
15   apartment, the candles.
16        MR. BALAREZO:  The religious candles don't have to
17   be Mexicans.
18        THE COURT:  You can make that argument, the
19   Government can make these other arguments.  So keep
20   suggesting that 3B didn't have the Mexicans in there because
21   then she'll be able to put this stuff in.  Then you'll be
22   able to criticize the tactics but not the evidence that comes
23   in.
24        MR. BALAREZO:  So I can make my decision, can the
25   Government tell us what was found in 3B?
```

83

```
1        THE COURT:  Inflatable mattresses, candles, similar
2    to the candles found in two other locations.
3        MS. LIEBER:  Shrink wrap.  I think the bags of
4    clothes were still there just like Myrtle.
5        THE COURT:  It is a pretty similar course of
6    conduct is the problem
7        MR. NORRIS:  I think the argument is even stronger
8    now that she has testified that she was the lead agent.  If
9    she authorized this search, which is illegal.
10        THE COURT:  You are assuming something that I have
11   not ruled on.
12        MR. NORRIS:  I understand.  It might be worth the
13   hearing out of the presence of the jury.
14        THE COURT:  Wait.  Let me tell you.  How can we
15   have a hearing unless there is a motion to suppress?  Who has
16   the standing to suppress if they don't introduce the
17   evidence?  Since when do we get to have hearings about
18   evidence?
19        MR. NORRIS:  I think it effects her credibility.
20   If their decision is we're going to do something illegal, we
21   won't use the proceeds of it, but we're going to do it for
22   our own knowledge.
23        THE COURT:  They're saying, she authorized an
24   illegal search.  We'll have to take it up outside the
25   presence of the jury.
```

84

```
1        MS. LIEBER:  This is an area I never went into
2    because I was not intending to use this information.  She has
3    testified this was February 7th.  She got the call, the
4    triggering call late in the day on February 6th.  So, the
5    notion that she was the lead agent and she authorized this is
6    nonsense.  It does not go to her credibility.  That's the
7    issue.
8        THE COURT:  Mr. Norris' point is what if they said
9    to her, should we go in there without a search warrant.  I
10   don't know if it is illegal because I don't know enough about
11   facts.  Assuming that is, you can't hold her responsible if
12   nobody asked, just because she got the call and thereby
13   became the lead agent.  I don't buy that.  She has to have
14   some involvement.
15        We'll take it up outside the presence of the jury.
16   Her credibility in a sense is clearly at issue.  But I think
17   you are going to hear a lot of stuff about what is in this
18   apartment.  I'm not going to let you pick and choose these
19   arguments.
20        MR. GEISE:  Your Honor, I would just say this, if
21   the notion is that someone's credibility is at stake because
22   they authorized an illegal search.
23        THE COURT:  I don't know that it is.
24        MR. GEISE:  I'm just saying he begins to perhaps --
25        THE COURT:  You are assuming.
```

85

1  We'll let them go to lunch. We'll only take this
2 outside of the presence of the jury. If it gets in front of
3 the jury, there are consequences of what they found in there,
4 which is going to be remarkably similar. So I think you have
5 to figure out whether or not you care about this.
6  MR. BALAREZO: If I go into the warrant thing --
7  THE COURT: I'm not going to let you go into the
8 warrant anymore unless we have some basis for Mr. Norris'
9 argument. Then you have to decide whether you really want to
10 go into it in some fashion in front of the jury to insinuate
11 her people searched.
12  But once you get into her people's search being
13 good, bad or indifferent, the consequences of the search are
14 going to come out too. That's part of it. Okay.
15  (Open Court.)
16  THE COURT: Ladies and gentlemen, we're taking a
17 slightly long lunch. We have to take up a short legal issue.
18 We hope it's short. So I'm going to, instead of holding you
19 here, ask you to return please at 2:00. Have a good lunch.
20 Don't discuss the case and keep dry.
21  (Jury Out.)
22  THE COURT: Agent, would you take the stand again,
23 just a couple of quick questions.
24  Could you tell us, do you know from your, any of
25 the people on your investigation, did they report to you what

86

1 they found in the apartment at Summit Circle?
2  THE WITNESS: What they told me was that, the
3 candles were burning. They, I believe, saw a money counter
4 and ammunition boxes, cartridges, not cartridges, but empty
5 ammo boxes, ammunition boxes.
6  THE COURT: Anything else that you recall being
7 told that they saw in there?
8  THE WITNESS: Inflatable mattresses.
9  THE COURT: As far as you understand, the
10 maintenance man let them in?
11  THE WITNESS: Yes.
12  THE COURT: This was on the 7th?
13  THE WITNESS: Yes.
14  THE COURT: Okay. Mr. Norris, go ahead.
15  VOIR DIRE
16 BY MR. NORRIS:
17  Q  Good day, Agent Gikas. So you received a call the
18 previous day on the 6th; is that correct?
19  A  Yes.
20  Q  That's when all your surveillance work began was on the
21 6th, correct?
22  A  Yes.
23  Q  Is it fair to say that, because you received the call,
24 you were the agent that instigated the investigation that
25 followed, the surveillance that day and the surveillance that

87

1 led to Summit Circle?
2  A  The call -- let me back up -- actually my supervisor
3 received from the agent.
4  THE COURT: What's that person's name?
5  THE WITNESS: Bill Winter.
6 BY MR. NORRIS:
7  Q  What did Mr. Winter ask you to do in relation to the
8 call you received?
9  A  Well, he got the group together, to organize activity.
10 And it was, you know, informally, cat, you take the lead on
11 this, but the whole group was summoned.
12  Q  And that you take the lead on this, occurred before
13 Javier actually arrived at the airport. Is that fair to say?
14  A  I honestly don't remember. I honestly don't remember.
15 We were scrambling that evening just to get ready for the
16 arrival, but it was that day or shortly thereafter.
17  Q  That you took the lead on the investigation?
18  A  Yes.
19  Q  When did the maintenance man and the other agents go
20 into the apartment, if you know?
21  A  I don't know. I don't know what time. I was told, I
22 don't know if it was the next day or Monday, that some people
23 went into the apartment and observed those items.
24  Q  Okay.
25  THE COURT: Did you learn after the fact or before

88

1 the fact?
2  THE WITNESS: After the fact. After the fact.
3  THE COURT: Somebody told you what they saw in the
4 apartment and how they got in?
5  THE WITNESS: Yes, Your Honor.
6  THE COURT: Can I see the lease a minute, please,
7 for this apartment on Summit Circle and any other documents
8 that came in?
9  MS. LIEBER: The other documents also, Your Honor.
10  THE COURT: Two and three and I don't know what
11 else, two and three, please.
12 BY MR. NORRIS:
13  Q  Now, when you were conducting the surveillance at Summit
14 Circle before you left, that would have been up until the
15 morning of the 7th; is that correct?
16  A  Early, late morning, yes.
17  Q  You actually saw individuals go up to the third floor;
18 is that correct?
19  A  Yes.
20  Q  That's the point you didn't know which apartment, but
21 you knew it was third floor?
22  A  Correct.
23  Q  Was there a discussion amongst yourself and the agents
24 that were with you as to, you know, we wonder which
25 apartment. We want to know what's in the apartment. We're

89

1  curious what was in the apartment?
2      A   We want to know which apartment, yes.
3      Q   And did you also want to know what was going on in the
4  apartment?
5      A   Well, we pretty much, you know, we were thinking that
6  there was money in the apartment, yes.
7      Q   Okay.  And money, the proceeds of drug sales?
8      A   Yes.
9      Q   And were you also assuming that there could be drugs in
10  the apartment as well?
11     A   Possibly.
12     Q   Was there any discussion that you had as to ways in
13  which you could answer that question, how you could find out
14  what was in the apartment?
15     A   No.
16     Q   Any discussion about the need for a warrant or the way
17  to go in there without a warrant?
18     A   Did I have any discussions?
19     Q   Yes.
20     A   No, I wasn't part of that at all.  No.
21     Q   Do you know how it is the maintenance man came to let
22  the other agents in?
23         THE COURT:  That's hearsay.
24         MS. LIEBER:  I object to this point because if the
25  point is voir dire --

90

1          THE COURT:  I know.  Overruled.
2              What did they tell you after the fact regarding how
3  they got in there?
4          THE WITNESS:  That the maintenance guy had let them
5  in.  There was some discussion about immigration authority,
6  which I'm from the custom background, so I'm not extensively
7  knowledgeable on the immigration authorities we have, as far
8  as, you know, if there is a belief that there are illegal
9  aliens.
10         THE COURT:  This is all stuff that came to you some
11  time after the event?
12         THE WITNESS:  Yes, Your Honor.  I found out about
13  it after.
14         THE COURT:  I have one other question though.  So,
15  when did you piece together who was the lessee of this place?
16         THE WITNESS:  From the registrant of the Cadillac
17  matching one of the renters in that building.
18         THE COURT:  Cadillac?
19         THE WITNESS:  The black Cadillac that picked up the
20  third individual and took them to BW.
21         THE COURT:  I'm sorry, I'm having some difficulty
22  remembering that in prior testimony.  So a black Cadillac
23  picked up the third individual at BW?
24         THE WITNESS:  I'm sorry.  When the three
25  individuals fled that location on Saturday afternoon at some

91

1  time, Javier and one of the other individuals got into the
2  silver Impala and drove off.
3              The third individual was picked up by someone
4  driving a black Cadillac, and that black Cadillac was
5  registered to Antoine Jones.
6          THE COURT:  And that pick-up occurred at the Summit
7  Circle address?
8          THE WITNESS:  Yes, Your Honor.  And it went, the
9  black Cadillac went from the Summit Circle address to BW.
10         THE COURT:  Okay.  So, that's how you, when you ran
11  those tags on the black Cadillac, that's what got you to,
12  that revealed Jones's name?
13         THE WITNESS:  Yes, I mean the match.
14         THE COURT:  All right.  Go ahead, Mr. Norris,
15  finish it up.
16  BY MR. NORRIS:
17     Q   When did that occur in terms of running of the tags?
18     A   As soon as they saw the car.  Again, I wasn't there at
19  that point, but the agent who actually followed the car to
20  the airport or agents, they would have, we run tags by making
21  a phone call to our central communication.
22         THE COURT:  WALS, I take it.
23         THE WITNESS:  Sector, we call it.
24         THE COURT:  Okay.

92

1  BY MR. NORRIS:
2      Q   As to the maintenance man, I'm assuming that the
3  maintenance man going into the apartment with the agents was
4  done at the agent's request?
5          MS. LIEBER:  Objection.
6          MR. NORRIS:  It's hearsay but it's for the purposes
7  of the hearing?
8          THE COURT:  Only if somebody told her.
9  BY MR. NORRIS:
10     Q   You were told that the agents asked the maintenance man
11  to let them in?
12         THE COURT:  What were you told about this?
13         THE WITNESS:  I asked, you know, how did you guys
14  get in.  The maintenance man let us in.  I don't know what
15  was asked of the maintenance man.  I don't know, you know,
16  there was a candle burning, and, you know, the candles were
17  left burning.  I don't know.  I don't know.  You know, you
18  are going to have to ask the maintenance man.  I don't know.
19         MR. NORRIS:  Thank you.  Nothing further.
20         THE COURT:  Okay.  Mr. Norris.
21         Mr. Balarezo, anything further?
22         MR. BALAREZO:  Your Honor, number one, we may need
23  to continue this hearing because we have spoken to the
24  maintenance man and he indicated that he never let anybody
25  in.  I can tell you that.

93

1       THE COURT: All right. Do you have any more
2 questions for the witness? I am going to excuse the agent.
3       MR. BALAREZO: I think Mr. Norris covered it.
4       THE COURT: Fine. All right.
5       That's good. Thank you.
6       (Witness excused.)
7       THE COURT: Mr. Norris, I'll hear from you as soon
8 as the agent walks out.
9       I don't really know where we're going except
10 opening doors that I don't see in anyone's interest to open.
11 But that's your choice, not mine.
12       MR. NORRIS: Your Honor, I think any arguments to
13 be made are Mr. Balarezo's.
14       THE COURT: Okay.
15       MR. BALAREZO: Your Honor, I would like, number
16 one, to continue my examination with respect to the procedure
17 of this warrant, or warrantless search that they conducted
18 for various reasons. As Mr. Norris explained at the bench, I
19 think a lot of it has to do with the conduct of the
20 investigation, number one, the steps that they took, why they
21 did certain things that they did, and, quite frankly, how
22 they got to know certain things that they came to know.
23       I've consulted with my client with respect to the
24 Court's indication that if we continue down this road that
25 the things that were found are going to get before the jury.

94

1 I hope I'm not violating attorney/client, but we don't have a
2 problem with that. But I think it's important for us --
3       THE COURT: What is the relevance that some agents
4 may or may not have entered an apartment without proper
5 authority. I don't know whether they did or they didn't. So
6 you can't really argue it to the jury. It seems to me you're
7 asking some, you're trying to make an argument that somebody
8 has done something wrong without a Court ruling.
9       They're not in a position. She hasn't lied. She
10 didn't order it. There is no evidence before me that she
11 either authorized or ordered an unlawful search. There is
12 not going to be any evidence of the search coming in.
13       I don't see, based on the record in front of me,
14 that her credibility is affected one iota. So I don't
15 understand where we're going.
16       MR. BALAREZO: Your Honor, I think her credibility
17 is affected for this simple reason. She has written several
18 voluminous reports, these reports of investigation. She
19 testified in the Grand Jury. At no point, and I know the
20 Government is going to say, well, she wasn't asked, at no
21 point did she mention that they went into the house.
22       In the Grand Jury, she was specifically asked about
23 what was in the apartment. And basically, what she said is
24 that the maintenance man told us that there was -- and I'll
25 quote, this is Page 12 of the March 14, 2006, Grand Jury

95

1 testimony.
2       THE COURT: Do you have a copy that I can look at?
3       MR. BALAREZO: Do you want me to put it on the
4 Elmo?
5       THE COURT: That's fine.
6       MR. BALAREZO: I'll have this marked as Hearing
7 Exhibit 1?
8       THE COURT: Call it Jones, what's the next number?
9       MR. BALAREZO: 27.
10       THE COURT: Twenty-seven is the Grand Jury
11 testimony of the agent from what date? Okay.
12       MR. BALAREZO: March 14, '06, Your Honor.
13       THE COURT: Fine.
14       MR. BALAREZO: And here at Page 11, she's asked
15 questions about how -- I'll read it, When you went, when you
16 sort of began to conduct some further investigation of this
17 apartment and what was going on there, did you have a chance
18 to talk to the grounds keeper. Yes, I interviewed both the
19 property manager and one of the maintenance persons.
20 Question, and what specifically, first --
21       THE COURT: I'm sorry. I don't even know where you
22 are.
23       MR. BALAREZO: I'm right here, Your Honor. I'll
24 turn it back so the Court can read it.
25       THE COURT: Bring it up. I never saw the bottom.

96

1 Fine.
2       MR. BALAREZO: I'm sorry.
3       THE COURT: Could you make sure the agent is still
4 around out there in case I have a question for her?
5       All right. When you began conducting the
6 investigation -- go ahead.
7       MR. BALAREZO: Your Honor, if I could have this
8 admitted as an exhibit, or admitted into evidence for this
9 hearing, not just as an exhibit.
10       THE COURT: Well, it's an exhibit and it's for this
11 hearing, but I don't want to put it in evidence for the jury.
12 All right.
13       Would you remind me. The silver Impala is
14 registered to whom?
15       MR. BALAREZO: I think eventually it's going to be
16 shown that it was registered to Guadalupe Barrone.
17       THE COURT: Any more on that page?
18       MR. BALAREZO: That's it of that page, Your Honor,
19 but the gist of that is that --
20       THE COURT: She talks to maintenance?
21       MR. BALAREZO: You know, that she testified under
22 oath that they asked the maintenance man and the maintenance
23 man told them what happened, you know, which may have
24 happened. I don't know. But the fact is now we know that
25 they went in themselves to the apartment, and they're

97

1  claiming to have seen these things. So somewhere along the
2  line the truth lies.
3      THE COURT: Well, I don't know. You're insinuating
4  that what's in her Grand Jury in some fashion is not
5  accurate. I don't know whether she talked to the maintenance
6  man or she didn't.
7      MR. BALAREZO: Well, additionally, Your Honor, in
8  those reports, that's what I was getting at, there's at least
9  four that I have, and you saw the fifth, there's absolutely
10  no mention of them having gone into this apartment, which
11  would lead me to question, why are you hiding it? Why aren't
12  you putting it down? We went into the apartment and this is
13  what we found.
14      And I think that goes to credibility. Do they
15  think or does she think that her agents did something wrong?
16  Why are you not documenting the fact that you went into this
17  apartment that you're investigating? I think that's, and I
18  know the Court's making faces, Your Honor, but that's the
19  gist of it.
20      THE COURT: I know. I don't think it goes to her
21  credibility is the problem.
22      MS. LIEBER: Your Honor, if I may, with respect to
23  the Grand Jury, I purposely did not ask her about what the
24  other agents told her about that because I don't know whether
25  or not it was a legal search. We didn't sort of run, look at

98

1  all the immigration issues and other possible authority to do
2  so. In lieu of that, I just didn't ask about it.
3      THE COURT: Did she talk to a maintenance man?
4      MS. LIEBER: Yes.
5      THE COURT: So the, I mean, the problem of her
6  credibility in the Grand Jury, that may be fair game. But
7  you can ask her if she talked to a maintenance man and
8  learned these things. It's getting really cumulative whether
9  or not they learned anything from this search.
10      I find the issue of her credibility so attenuated,
11  not the question of her credibility but the relevance of a
12  search, which I'm not in the position to say whether it's
13  legal or not legal, whether it was improper or not improper,
14  as long as we don't have anybody offering the evidence to go
15  in.
16      If she talked to a maintenance man and learned
17  this, we can verify that because that's what goes to her
18  credibility, what she testified under oath. I don't think
19  that the absence of a discussion of what was seen in there in
20  her reports is sufficiently probative of her credibility
21  because the suggestion is there's something wrong with this
22  search.
23      And the search is really not before me as long as
24  they don't put in the evidence. So, if you want to ask her
25  whether she ever talked to a maintenance man and learned

99

1  these things, if she's telling the truth in the Grand Jury.
2  But I wouldn't do it -- you can do it out of the presence of
3  the jury. Otherwise, you just keep getting more information
4  you don't want.
5      MS. LIEBER: Your Honor, I would just, just so
6  we're clear, if Mr. Balarezo asks her in front of the jury
7  whether or not she spoke to the maintenance man about what
8  happened in that apartment, I just want to be sure I can then
9  ask her and what did she tell you? That he has opened --
10      THE COURT: Right. It's really a little bit of
11  thin ice here. If you want to know what the maintenance man
12  told her, if she in fact spoke to the maintenance man, I
13  don't see anything about this Grand Jury testimony that's
14  useful to go into.
15      MR. BALAREZO: Well, I think we should be able to
16  impeach her by omission, Your Honor. I mean, she's being
17  asked a specific question, and you know, she's, in effect,
18  saying one thing knowing that they got the information
19  another way.
20      THE COURT: No. The latter is if you had any basis
21  for that.
22      MR. BALAREZO: Well, I do because -- we spoke to
23  the maintenance man. My investigator spoke with him. He
24  said the guy who worked there as the maintenance man at that
25  time, he never let anybody in, never spoke to an agent.

100

1      THE COURT: Well, you can ask her if she ever
2  talked to a maintenance man and what she learned from the
3  maintenance man. All that might do is burn you. But you're
4  suggesting that something about her learning things from the
5  maintenance man is untrue.
6      I don't know what the maintenance man has to say
7  about what the information that she got from the maintenance
8  man. The impeachment by omission, the fact that she did not
9  include in her report that they had learned something from
10  looking in the apartment, I think is really attenuated. I'm
11  not going to let you go into it.
12      If you want to ask her out of the presence of the
13  jury, whether she in fact had a conversation with the
14  maintenance man to try to impeach her Grand Jury testimony,
15  that may go to credibility. That's the only thing I can see.
16      I'm not the least bit persuaded by the argument
17  that somebody, who was working with her, without her
18  authorization, may or may not have conducted a proper or
19  improper search. In some way or another it's going to go to
20  her credibility and that her failure to include something in
21  a report, that omission should be used to impeach her, I
22  don't see it.
23      MR. BALAREZO: Well, Your Honor, if I could get the
24  Government to give me the information of who went in the
25  apartment and make them available for me to talk to.

101

1  THE COURT:  You have a subpoena power.

2  MR. GEISE:  I'm going to say, not to be more petty

3  than my nature requires me to be, but I think it's fully

4  appropriate what we did here.  I don't think Mr. Balarezo was

5  entitled to ask this witness out of the presence of the jury

6  whether she talked to the maintenance man.

7  If he wants to ask that in front of the jury and

8  find out and live with the result, that's fine.  I think what

9  we did so far is absolutely appropriate.  But I don't think

10  he's entitled to free questions until he finds out what's

11  going to happen.

12  THE COURT:  I agree that, to the extent that she

13  could have given the Grand Jury false testimony, that's

14  certainly fair game.  But they're representing that she did

15  talk to a maintenance man.  And the problem with all that is,

16  once you open it up, you learn what she learned from the

17  maintenance man.

18  MR. BALAREZO:  I understand, but this is the

19  problem we get when they don't tell us things.  That's why we

20  have discovery.  I know they weren't seeking to introduce the

21  stuff --

22  THE COURT:  They don't have to tell you everything

23  the Government does.  Do they have to tell you everything the

24  Government's going to introduce and everything that is

25  material to the defense?  I don't see that this is --

102

1  MR. BALAREZO:  Well, Your Honor, in this case, I do

2  think it's something that they should have disclosed because,

3  if they saw something as a result of this search which may or

4  may not have been illegal, which caused them or gave them

5  information that they then subsequently used to conduct other

6  investigation, we could argue that it's the fruit of the

7  poisonous tree because of an illegal search initially.

8  So yes, we should have been told that.  Yes, I

9  would have filed a motion to suppress, and we would have had

10  this hearing before the trial.  For them now to say, I can't

11  get a free question because I can't get free discovery from

12  this witness, that's crazy.  Because they don't tell us these

13  things, so yes, I'm flying blind half the time because I

14  don't know.

15  THE COURT:  You can file any motion you want.

16  MR. BALAREZO:  Then I orally move to suppress.

17  I'll move, I'll file a oral motion asking the Judge to

18  disclose, to have the Government disclose this evidence to

19  us, tell me who these people are, when they went in, what

20  they saw, pictures, the whole thing.

21  I've requested all these things.  I haven't been

22  given them before.  Many times that I've asked the Government

23  give them to me.  So I'm asking for them in front of the

24  Court to provide me this information so I'm not flying blind

25  and heading somewhere that perhaps we don't want to go, or

103

1  maybe we do.  I don't know.

2  THE COURT:  You're assuming there are pictures and

3  that they seized things.  I am happy to ask the agent if

4  there are any pictures or have the Government ask that.  But

5  I don't have anything to suppress, sir.  I have no basis to

6  suppress evidence when there was none seized.

7  MR. BALAREZO:  Your Honor, just so I understand

8  again, I can't go into the warrant issue?  That's what I'm

9  being told?

10  THE COURT:  I'm telling you that it doesn't go to

11  her credibility.

12  Mr. Geise, what is it?

13  MR. BALAREZO:  Can I inquire -- I'm sorry.  Can I

14  inquire about, forget the warrant, inquire about what was

15  found in the apartment?  I'm just asking just so I know.

16  THE COURT:  You mean ask her what she learned that

17  they found?

18  MR. BALAREZO:  Yes, do you know that they found

19  mattresses and candles and all this nonsense.

20  THE COURT:  I'm not clear on what, otherwise, if

21  you want to elicit from her --

22  MR. BALAREZO:  I'm just saying, in case we're crazy

23  and we want to elicit, can I do that?  I just want to know

24  before I go there.

25  THE COURT:  Sure, the Government is dying to do it.

104

1  MR. BALAREZO:  That's fine.  They're dying to do a

2  lot.

3  THE COURT:  But I don't understand what you're

4  saying.  I don't even understand.  You mean you want to

5  elicit from her what she learned about what they saw in the

6  apartment?

7  MR. BALAREZO:  I'm saying, if we want to do that,

8  am I allowed to do that?

9  THE COURT:  Does the Government have any objection?

10  MR. GEISE:  No, Your Honor, but as long as it then

11  doesn't open up this whole was it an illegal search question.

12  THE COURT:  No, there's no evidence coming in.  I

13  mean if you bring it out, you can't complain that in some

14  fashion --

15  MR. BALAREZO:  I just want to know the parameters

16  I'm dealing with.

17  THE COURT:  You're welcome to elicit, but you're

18  not going to get, you can't argue in some fashion you should

19  be able to suppress what you elicited.  So, the legality of

20  it and her credibility with respect to what might or might

21  not have been a proper search is not going to be an argument

22  for you.  But you can elicit whatever you want regarding what

23  she learned that they saw there and that will be evidence

24  then.  You can think about it over the lunch.  I would like

25  you just to ask her though whether they took pictures.

105

1    Is there anything else for the Government?

2    MS. LIEBER: I don't think so.

3    THE COURT: You don't have any objection to him

4    asking the questions about what she saw, I mean, what the

5    other people saw?

6    MS. LIEBER: I have no problem with that at all.

7    THE COURT: I'm sure she doesn't.

8    MR. BALAREZO: And Your Honor, regarding, let's

9    move off that subject for one second, regarding the Myrtle

10    Avenue house where there are pictures, we've seen two from

11    the sneak and peek, the Government's telling me that that is

12    the universe of the pictures.

13    I don't want to ask questions and then we get an

14    answer like Agent O'Brien, saying, yeah, we have a clear

15    picture, you know, of your client and we've never seen it.

16    So they're telling me that --

17    THE COURT: We're going to have a stipulation about

18    that. You're going to look into it, Mr. Geise, whether there

19    was any better picture than the one of Berma that was

20    introduced.

21    MR. GEISE: I've asked her to look, Your Honor, and

22    if there is, everyone will see it. Of course, the jury will

23    eventually too, but I'm having her look into it.

24    MR. BALAREZO: Well, Your Honor, the problem I'm

25    having is I'm asking him things before I ask questions, and

---

106

1    they're telling me one thing, I'm relying on that and then

2    I'm getting burned. I asked is the picture that was shown to

3    O'Brien the picture, the best picture, whatever. Yes. And

4    now all of a sudden there's another picture somewhere else.

5    THE COURT: No, there isn't.

6    MS. LIEBER: I picked the picture. I picked the

7    one that I thought was the best. Everyone has the disk.

8    We'll deal with that. With respect to the pictures of Myrtle

9    Avenue, Mr. Balarezo and I had a conversation about this some

10    weeks ago about whether or not there were any more pictures.

11    I called Special Agent Gikas. I asked her. She said she

12    just wasn't sure. She then tracked down the photographer who

13    said no, these were the only ones.

14    THE COURT: That's the best we can say. That these

15    are the only ones of Myrtle. Okay. But you will find out

16    whether there were pictures taken at Summit.

17    MS. LIEBER: Yes.

18    THE COURT: Thank you. We'll resume at 2:00.

19    (A luncheon recess was taken.)

20

21

22

23

24

25

---

107

C O N T E N T S

WITNESS:        DIRECT CROSS REDIRECT RECROSS

KATERINA GIKAS

By Ms. Lieber        22

By Mr. Balarezo            61

VOIR DIRE -- Page 86

EXHIBITS

PAGE:

Government:

ICE 8 and 9                    27

ICE 12                         38

ICE 13                         40

ICE 20, 22 thru 31             48

ICE 32                         52

ICE 33                         59

ICE 39                         60

---

108

CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

Lisa Walker Griffith, RPR        11-17-06

**-**

— [63]      4/15 4/19 9/6 10/4
10/12 10/15 10/19 11/3
11/19 11/25 15/8 16/2 16/9
17/12 20/4 25/4 26/6 29/2
30/23 31/4 31/14 33/15
34/24 35/6 36/13 37/11
44/9 45/14 48/19 50/16
57/1 57/6 67/9 67/23 69/2
71/12 72/16 75/7 75/23
78/21 79/14 80/15 84/24
85/6 87/2 87/2 89/25 94/2
94/24 95/15 95/20 96/6
96/19 99/2 99/9 99/22
101/21 101/25 103/13
103/21 104/14 105/16 107/7
————————X [2]

1/3 1/8

**A**

A.M [2]      1/9 1/10
ability [2]      18/18 20/8
able [8]      4/14 14/13 14/16
76/16 82/21 82/22 99/15
104/19
about [120]
above-entitled [1]      108/6
absence [1]      98/19
absolutely [2]      97/9 101/9
access [1]      71/17
accommodate [1]      22/10
accomplish [1]      17/22
According [1]      67/24
accurate [1]      97/5
achieve [1]      21/2
ACREE [1]      2/6
across [2]      9/8 47/22
act [1]      4/12
action [2]      31/22 74/6
activities [1]      41/21
activity [6]      7/7 23/3
33/24 48/2 48/16 87/9
actual [6]      10/15 10/16
24/18 28/21 38/23 50/8
actual — [1]      10/15
actually [22]      7/6 7/21
14/19 17/2 24/13 24/20
25/16 31/19 32/16 34/18
35/7 36/24 42/24 47/3
52/23 70/4 74/4 77/16
87/2 87/13 88/17 91/19
Adams [1]      15/18
additional [2]      5/11 31/12
additionally [1]      97/7
address [10]      9/16 12/11
42/5 52/24 53/3 57/3 57/16
82/14 91/7 91/9
admission [1]      27/7
admit [1]      40/5
admitted [21]      27/6 27/13
38/14 38/17 40/7 40/8
40/11 43/4 45/21 48/18
48/22 48/25 50/3 52/15
52/18 58/23 59/13 60/1
60/2 96/8 96/8
affected [3]      77/14 94/14
94/17
after [19]      27/23 33/20
36/10 45/6 46/2 46/21
46/23 53/5 53/17 53/23
54/7 70/13 80/22 87/25

88/2 88/2 90/2 90/11 90/13
afternoon [1]      90/25
again [17]      4/4 18/24 20/13
32/7 32/24 37/18 44/22
52/6 52/7 53/3 53/19 61/11
67/8 71/13 85/22 91/18
103/8
Agency [3]      40/1 41/16
45/10
agent [64]      3/5 3/7 5/24
8/1 11/3 13/3 13/10 14/8
22/22 26/20 27/3 30/11
35/7 38/19 38/25 39/9 39/9
39/20 40/14 41/7 41/20
45/14 46/15 47/15 49/2
50/2 51/3 52/20 53/5 54/4
54/10 54/15 54/18 58/10
58/15 59/6 60/5 60/21
61/17 61/24 68/5 68/22
76/21 79/12 79/17 80/15
80/15 81/23 83/8 84/5
84/13 85/22 86/17 86/24
87/3 91/19 93/2 93/6 95/11
96/3 99/25 103/3 105/14
106/11
agent's [1]      92/4
agents [16]      13/11 14/15
54/23 70/18 72/22 76/1
78/19 87/19 88/23 89/2
91/20 92/3 92/10 94/3
97/15 97/24
ago [1]      106/10
agree [3]      58/22 77/25
101/12
ahead [12]      6/7 14/1 30/8
31/6 40/24 68/17 69/7 69/8
78/24 86/14 91/14 96/6
air [4]      5/1 6/3 7/20 75/5
airlines [3]      29/17 32/1
32/2
airport [12]      5/7 32/8
32/15 56/4 69/1 69/13
69/21 71/7 72/1 72/9 87/13
91/20
al [2]      1/6 3/3
alert [1]      24/11
aliens [1]      90/9
all [73]      5/17 7/22 10/8
11/8 11/10 12/13 12/19
15/9 15/22 17/12 19/18
20/18 21/8 22/4 22/12
23/23 25/4 25/8 25/25 27/3
27/18 27/24 29/20 34/8
38/13 39/8 40/14 42/5
43/21 46/25 47/9 50/25
51/17 57/18 57/25 58/16
61/18 63/9 65/2 66/3 66/11
68/24 69/4 69/18 70/7
71/17 71/18 73/25 74/1
76/5 76/7 76/24 77/13 78/7
78/15 79/21 81/19 82/11
86/20 89/20 90/10 91/14
93/1 93/4 96/5 96/12 98/1
100/3 101/15 102/21 103/19
105/6 106/4
allegation [1]      77/10
allow [1]      11/8
allowed [1]      104/8
allows [1]      24/3
almost [6]      23/14 29/1
32/19 47/21 51/25 54/12
along [3]      27/22 35/24 97/1

already [4]      45/1 47/8 76/1
81/18
also [26]      9/20 21/7 21/18
22/2 22/8 27/17 27/20
30/14 37/5 37/20 39/13
39/22 40/6 41/25 43/15
43/16 47/4 47/19 63/11
65/13 66/18 71/3 88/9 89/3
89/9
Although [1]      63/11
aluminum [2]      26/5 26/17
am [6]      9/7 16/22 73/7 93/2
103/3 104/8
AMERICA [1]      1/4
ammo [1]      86/5
ammunition [2]      86/4 86/5
amongst [1]      88/23
analysis [1]      29/24
analyst [1]      29/16
and — [1]      48/19
Andrew [1]      46/20
another [8]      27/20 31/5
46/3 49/19 54/3 99/19
100/19 106/4
answer [7]      17/7 62/9 68/9
68/11 68/15 89/13 105/14
ANTOINE [21]      1/6 3/3 23/10
42/15 42/16 42/20 43/13
43/17 44/4 44/15 45/23
46/8 52/22 53/17 53/25
54/19 54/21 67/10 67/20
72/18 91/5
any [64]      4/4 4/5 5/19 6/2
6/9 8/18 8/19 8/20 11/4
11/25 15/3 17/12 19/4
19/23 20/6 20/20 20/24
22/9 25/23 26/24 30/16
40/2 40/24 45/11 47/10
47/19 51/20 52/11 59/22
65/5 65/21 66/23 66/24
67/3 67/10 67/12 67/14
67/16 67/18 72/11 72/22
75/12 76/5 76/14 77/7 77/9
81/18 82/8 85/24 88/7
89/12 89/16 89/18 93/1
93/12 94/12 96/17 99/20
102/15 103/4 104/9 105/3
105/19 106/10
anybody [16]      4/5 10/3
14/20 14/20 15/13 16/24
18/2 20/19 21/6 34/10
34/20 50/20 67/21 92/24
98/14 99/25
anybody's [1]      20/13
anymore [1]      85/8
anyone [8]      6/2 16/14 25/5
25/21 26/6 33/2 33/11
58/11
anyone — [1]      26/6
anyone's [1]      93/10
anything [19]      4/6 6/10
11/18 12/9 16/15 17/14
19/17 25/3 60/3 67/3 68/10
74/3 74/5 86/6 92/21 98/9
99/13 103/5 105/1
apart [2]      48/7 48/11
apartment [51]      70/5 70/11
71/6 72/14 72/17 72/20
72/22 72/24 73/6 73/8
73/13 74/10 76/24 78/10
80/23 80/24 81/2 81/4
81/19 81/21 81/24 82/7

**A**

apartment... [29]          82/15
84/18 86/1 87/20 87/23
88/4 88/7 88/20 88/25
88/25 89/1 89/2 89/4 89/6
89/10 89/14 92/3 94/4
94/23 95/17 96/25 97/10
97/12 97/17 99/8 100/10
100/25 103/15 104/6
apartments [1]          70/3
apologize [1]          17/13
appear [3]          21/12 41/14
48/9
APPEARANCES [2]          1/13 2/1
appeared [1]          14/4
appears [1]          11/23
applicant [1]          44/14
application [14]          10/24
38/3 39/2 39/13 43/15
43/17 43/21 43/23 44/13
44/14 44/23 45/2 45/9
45/12
appreciate [1]          16/7
approach [6]          12/15 12/17
12/17 28/16 73/20 81/11
approached [1]          13/2 14/8
approaching [1]          14/20
appropriate [5]          4/9 13/13
13/20 101/4 101/9
approximately [2]          35/3
64/16
April [7]          46/2 46/7 53/21
53/23 57/23 57/24 66/13
April of [1]          46/2
arbitrarily [1]          19/16
are [79]          6/23 7/1 7/2 7/7
7/22 9/5 9/13 9/13 10/10
10/21 10/21 10/23 10/25
11/18 12/13 12/14 14/9
14/25 15/10 15/14 15/23
15/24 16/8 16/12 16/21
16/23 18/16 20/4 20/20
20/24 21/19 22/3 22/6
22/11 22/18 24/6 29/6
39/12 47/9 48/20 51/17
52/2 53/9 58/6 58/13 58/23
61/8 67/2 73/22 74/7 74/11
75/11 75/11 75/20 76/13
76/25 77/6 77/25 78/19
80/15 81/14 81/17 83/10
84/17 84/25 85/3 85/13
90/8 92/18 93/13 93/25
95/22 97/11 97/16 102/19
103/2 103/4 105/10 106/15
area [14]          11/12 23/3 31/9
47/23 48/13 48/13 49/18
49/20 50/5 53/1 55/11 56/3
58/1 84/1
aren't [1]          97/11
argue [6]          74/21 78/4 78/6
94/6 102/6 104/18
argument [10]          76/22 77/7
77/9 78/2 82/18 83/7 85/9
94/7 100/16 104/21
arguments [3]          82/19 84/19
93/12
around [4]          24/23 25/18
25/21 96/4
arrested [1]          54/21
arrival [2]          32/8 87/16
arrived [1]          87/13

arriving [1]          48/13
Arundel [2]          69/13 69/24
as [84]          4/2 4/11 5/4 5/14
5/17 5/20 6/7 6/11 6/11
6/14 7/24 9/23 14/2 15/2
15/3 15/14 16/11 22/11
22/12 30/25 31/11 32/10
36/19 41/11 41/17 42/14
42/14 42/15 43/4 43/20
44/1 44/16 45/1 45/8 45/11
45/21 48/13 48/18 51/22
52/1 52/10 59/8 59/21
63/22 64/8 64/8 68/4 69/2
70/18 70/18 72/18 76/13
76/13 78/10 80/4 80/4 80/7
80/7 80/15 82/5 86/9 86/9
88/24 89/10 89/12 90/7
90/8 91/18 91/18 92/2 93/7
93/8 93/18 95/6 96/8 96/9
98/14 98/14 98/23 98/23
99/24 102/3 104/10 104/10
ask [39]          6/1 6/6 6/8 6/16
12/5 21/16 28/7 31/19 34/1
38/20 51/17 53/16 56/7
58/14 58/14 62/9 65/8
68/14 74/24 75/2 77/4
85/19 87/7 92/18 97/23
98/2 98/7 98/24 99/9 100/1
100/1 100/5 101/7 103/3
103/4 103/16 104/25 105/13
105/25
asked [18]          3/17 28/24
29/11 68/9 68/16 84/12
92/10 92/13 92/15 94/20
94/22 95/14 96/22 99/17
102/22 105/21 106/2 106/11
asking [18]          16/8 20/21
21/13 21/14 68/1 68/1 74/1
74/16 75/11 76/9 79/15
79/15 94/7 102/17 102/23
103/15 105/4 105/25
asks [1]          99/6
asleep [2]          70/16 70/19
aspects [2]          23/10 28/10
associated [2]          82/7 82/10
assumed [1]          36/19
assuming [7]          11/16 83/10
84/11 84/25 89/9 92/2
103/2
assumption [2]          81/21 81/22
attached [1]          9/6
attend [1]          15/1
attention [4]          12/24 14/23
16/1 64/7
attenuated [2]          98/10
100/10
attorney [2]          1/15 94/1
authentication [3]          10/11
10/13 10/18
authorities [1]          90/7
authority [3]          90/5 94/5
98/1
authorization [1]          100/18
authorized [6]          17/14 83/9
83/23 84/5 84/22 94/11
available [3]          12/8 30/7
100/25
Avenue [33]          2/2 2/6 2/10
6/25 8/3 8/20 9/14 23/15
23/19 24/16 27/24 32/7
34/17 34/21 34/25 35/5
35/11 36/11 37/24 41/9

41/21 55/12 55/21 56/5
56/18 56/25 57/3 57/16
61/10 61/10 82/14 105/10
106/9
Avenue documents [1]          9/14
awaited [1]          32/7
aware [5]          3/20 19/18 21/18
74/17 80/15
away [1]          21/4

**B**

back [25]          24/10 24/23
29/15 29/18 30/6 30/7 32/3
32/6 32/7 34/1 36/2 36/2
36/4 37/18 37/19 37/20
42/16 54/9 54/11 54/12
55/6 56/2 65/18 87/2 95/24
back-door [1]          21/3
background [1]          90/6
backward [1]          76/13
bad [3]          4/8 81/17 85/13
bag [1]          27/16
bags [13]          25/13 25/14
25/14 25/16 25/16 26/20
26/21 26/21 26/22 27/17
27/21 27/23 83/3
BALAREZO [12]          1/18 4/18
5/20 14/1 18/5 26/24 80/16
92/21 99/6 101/4 106/9
107/5
Balarezo's [1]          93/13
ball [7]          15/23 23/9 69/1
69/6 69/8 69/10 70/14
Baltimore [5]          29/19 32/3
55/11 55/18 56/3
Barrone [3]          5/7 5/9 96/16
based [10]          15/24 31/13
31/21 32/5 64/22 71/12
76/23 77/10 78/13 94/13
based -- [1]          71/12
basement [1]          24/24
basic [1]          42/17
basically [10]          13/4 14/5
41/10 42/20 49/14 54/2
55/11 57/9 57/20 94/23
basis [6]          5/15 81/15 82/6
85/8 99/20 103/5
bathroom [1]          49/19
bay [5]          48/13 49/15 49/18
50/5 53/1
be [60]          3/21 3/23 3/24 4/4
4/12 4/13 4/14 6/19 7/16
13/13 13/21 14/13 14/17
14/18 14/25 16/17 17/9
17/10 17/20 19/17 19/18
19/19 19/24 21/13 21/18
22/2 22/10 26/14 38/14
40/7 41/14 43/3 58/19
58/21 67/21 74/17 74/19
74/20 74/25 75/22 76/16
78/21 82/17 82/21 82/21
83/12 85/4 89/9 93/13
94/12 96/15 98/6 99/8
99/15 100/21 101/2 101/3
104/19 104/21 104/23
be -- [1]          78/21
bear [1]          20/21
became [1]          84/13
because [42]          5/25 7/19 8/7
11/2 13/4 16/1 17/13 17/20
17/23 17/24 18/11 18/21
18/25 19/8 19/21 20/18

**B**

because... [26]                    24/10
24/25 41/10 41/10 48/15
68/22 75/7 75/22 77/22
82/20 84/2 84/10 84/12
84/21 86/23 89/24 92/23
97/24 98/17 98/21 99/22
102/2 102/7 102/11 102/12
102/13
because – [2]            75/7 99/22
bedrooms [1]          25/12
been [31]            5/5 12/24 13/2
14/3 14/8 14/10 17/4 17/5
23/4 23/9 23/18 24/5 24/12
27/6 28/14 32/1 41/18 43/4
48/18 50/3 54/11 54/21
58/23 62/2 72/25 77/3
88/14 102/4 102/8 102/21
104/21
before [29]         1/11 3/6 6/7
7/3 10/10 11/18 12/12
36/21 38/10 46/21 47/15
58/15 58/19 60/6 60/10
62/8 66/12 76/25 78/20
87/12 87/25 88/14 93/25
94/10 98/23 102/10 102/22
103/24 105/25
began [9]          35/24 68/4 68/20
80/22 86/20 95/16 96/5
81/17
begging [1]            81/17
begin [3]          11/18 21/15 41/2
beginning [2]         61/11 75/10
begins [1]           84/24
behalf [1]          14/20
behind [2]          48/15 49/21
being [18]          4/2 4/11 8/4
8/5 11/9 13/4 18/16 19/12
30/22 30/24 42/1 55/12
55/20 72/18 85/12 86/6
99/16 103/9
belief [2]          81/10 90/8
believe [8]          14/7 23/16
36/16 38/13 48/5 55/8
65/22 86/3
believed [1]         77/21
believes [1]         77/15
belonging [1]        65/12
Beltway [1]          36/24
bench [5]         12/20 28/18
73/21 81/13 93/18
Bermea [2]          5/10 105/19
besides [1]          30/12
best [3]          106/3 106/7
106/14
better [11]          14/10 15/17
16/10 17/16 17/16 18/1
18/2 18/2 61/15 82/8
105/19
between [1]          5/11
beyond [2]          3/25 28/12
big [5]          8/21 12/22 49/15
49/15 76/7
Bill [1]          87/5
bit [7]          6/3 28/10 37/23
42/4 45/2 99/10 100/16
black [7]          33/22 90/19
90/22 91/4 91/4 91/9 91/11
blankets [4]          26/4 51/7
51/8 51/9
blind [2]          102/13 102/24
blinds [1]          26/3

Blue [1]            61/16
booked [1]          32/3
boots [2]          68/23 72/10
bordering [1]        26/5
both [3]          77/19 78/6 95/18
bottom [7]          19/11 39/1 45/3
60/25 61/8 64/7 95/25
bought [1]          29/18
Boulevard [9]          9/8 9/16
23/16 42/7 49/7 49/14 50/6
53/2 59/18
Bowie [2]          34/17 61/11
box [12]          3/12 3/13 3/15
5/18 22/24 23/5 23/13 42/1
48/9 51/25 52/3 64/20
boxes [2]          25/15 25/15
26/21 26/22 27/16 86/4
86/5 86/5
boy [1]            16/10
Brandywine [1]          67/16
break [5]          18/23 24/23
41/11 45/25 58/7
breaking [1]          39/21
BRIAN [1]          2/10
brief [1]          58/12
briefly [3]          11/20 40/15
47/12
bring [9]          11/17 12/13
12/23 16/1 76/16 77/18
78/15 95/25 104/13
bringing [1]          11/7
broke [5]          22/24 36/21
36/23 37/14 41/23
brother [1]          20/15
brought [1]          54/9
Brown [8]          7/4 7/9 8/8 8/12
8/13 40/1 41/16 45/10
building [2]          32/16 90/17
burn [1]            100/3
burned [1]          106/2
burning [3]          86/3 92/16
92/17
business [13]          7/15 8/24
11/15 13/11 14/12 14/25
16/14 42/21 44/5 44/7
46/10 46/13 59/16
but – [2]            10/4 67/9
butt [1]            10/4
buy [1]            84/13
BWI [7]          32/6 32/7 33/2
60/24 90/20 90/23 91/9

**C**

Cadillac [8]          90/16 90/18
90/19 90/22 91/4 91/4 91/9
91/11
call [30]          13/9 14/14 14/16
17/16 29/16 30/6 31/14
31/17 32/1 52/1 55/7 56/1
56/10 62/1 66/1 68/22 69/2
69/6 79/14 79/15 84/3 84/4
84/12 86/17 86/23 87/2
87/8 91/21 91/23 95/8
call – [2]          31/14 87/2
called [6]          18/3 24/3 29/17
30/14 54/23 63/25 69/7
106/11
caller [1]          18/8
calling [2]          23/9 30/13
calls [4]          15/16 15/17 16/9
16/10
came [15]          5/2 8/3 9/2

17/19 18/7 33/21 34/1
37/15 42/16 55/11 79/14
88/8 89/21 90/10 93/22
camera [2]          47/22 48/12
71/19 72/5 72/6 72/8
can [62]          6/11 7/19 8/9
9/24 10/20 11/2 12/15
14/22 16/3 16/18 16/20
16/25 18/15 20/23 21/8
26/23 30/5 30/6 31/1 35/7
35/16 36/18 38/8 44/20
45/3 51/12 52/20 53/19
55/5 73/23 76/14 76/18
77/9 77/9 77/11 78/2 78/4
79/2 81/8 81/21 82/18
82/19 82/24 82/24 83/14
88/6 92/25 95/2 95/24 98/7
98/17 99/2 99/8 100/1
100/15 102/15 103/13
103/13 103/23 104/22
104/24 106/14
can't [37]          13/22 16/20
17/9 17/12 17/14 18/19
19/16 19/20 20/9 21/1 21/2
21/4 21/10 36/17 46/3
50/18 54/14 73/15 74/21
75/21 75/22 76/8 77/19
78/5 78/6 81/4 81/8 81/20
82/4 82/12 84/11 94/6
102/10 102/11 103/8 104/13
104/18
can't – [1]            17/12
candle [1]          92/16
candles [10]          5/1 25/20
75/6 82/15 82/16 83/1 83/2
86/3 92/16 103/19
capabilities [1]        30/12
capacity [1]          73/8
Capitol [1]          42/7
car [9]          3/12 5/6 33/24
35/12 70/2 70/3 72/8 91/18
91/19
card [8]          13/8 13/11 14/13
14/15 16/14 52/22 52/25
59/16
cards [1]          21/4
care [3]          6/21 77/17 85/5
career [1]          53/6
cars [2]          35/25 36/1
cartridges [2]          86/4 86/4
case [25]          1/4 3/2 3/22 4/3
13/22 14/9 15/3 15/15
15/20 15/25 20/2 21/4 21/7
54/4 54/6 54/10 63/12
63/24 63/25 75/6 80/15
85/20 96/4 102/1 103/22
cases [1]          16/13
cat [1]            87/10
caught [1]          77/22
caused [1]          102/4
causing [1]          26/9
cell [9]          29/14 30/14 30/18
30/23 31/8 31/8 57/5 57/6
62/23
cellular [4]          28/8 30/15
30/22 31/7
central [1]          91/21
certain [10]          28/12 29/22
30/12 30/23 31/8 31/22
34/4 38/5 93/21 93/22
certainly [4]          5/15 15/13
21/3 101/14

**C**

CERTIFICATE [1]     108/3
certify [1]     108/4
chance [1]     95/17
changed [1]     53/13
characterization [1]     50/17
charge [2]     79/13 79/19
chase [1]     36/5
check [1]     58/19
checked [1]     33/14
checking [1]     33/15
choice [1]     93/11
choose [1]     84/18
chronology [1]     63/25
Circle [23]     8/21 45/3
45/17 55/14 56/2 56/14
67/18 69/15 69/21 70/1
70/21 70/23 72/13 78/10
79/4 79/25 80/1 86/1 87/1
88/7 88/14 91/7 91/9
citizens [1]     14/25
civil [1]     74/6
claiming [1]     97/1
clarifying [1]     56/7
clear [12]     6/3 6/8 21/4
21/7 36/13 36/17 63/14
80/20 82/3 99/6 103/20
105/14
clearly [2]     82/7 84/16
client [14]     12/25 13/6
13/18 14/5 14/18 29/1 65/7
74/9 74/18 78/3 82/7 93/23
94/1 105/15
climb [1]     70/3
close [2]     21/1 26/9
closed [1]     48/15
closing [1]     17/8
clothes [2]     25/17 83/4
Club [3]     23/17 59/16 67/12
cluster [1]     27/21
cognizant [1]     22/2
coincidence [1]     72/3
collect [2]     67/7 79/7
color [1]     61/14
colors [1]     61/15
COLUMBIA [1]     1/1
come [26]     4/17 4/20 7/19
8/16 11/2 11/13 11/15
11/16 12/25 17/15 19/13
19/20 20/21 23/23 24/10
30/1 44/9 45/14 52/25
54/11 55/5 58/17 59/1
77/20 79/7 85/14
comes [4]     6/4 15/20 16/4
82/22
Comfort [3]     32/15 32/23
34/14
coming [12]     11/4 14/24
20/10 29/18 29/20 31/16
40/8 58/23 67/6 68/23
94/12 104/12
comings [1]     48/7
commercial [1]     48/2
commonly [1]     24/3
communication [1]     91/21
companies [1]     7/11
company [1]     8/2
compare [3]     9/24 41/21
44/25
competent [1]     21/20
complain [1]     104/13

complete [1]     11/22
completed [2]     63/24 65/23
completely [1]     9/7 78/20
completely confused [1]
9/7
completing [1]     66/14
computer [1]     1/24
concern [5]     15/4 15/8
16/11 19/12 21/21
concerned [2]     10/22 17/5
concerns [10]     15/10 15/14
15/14 15/16 15/19 15/24
16/25 17/24 21/17 22/10
condition [1]     51/20
conduct [8]     24/24 42/8
47/16 62/19 74/9 83/6
93/19 95/16 102/5
conducted [7]     23/3 49/8
53/5 62/16 65/18 93/17
100/18
conducting [5]     70/14 70/25
71/19 88/13 96/5
conference [4]     12/20 28/18
73/21 81/13
confirm [1]     76/18
confront [2]     6/23 30/4
confused [1]     9/7
connect [2]     11/13 82/6
Connecticut [2]     2/6 2/10
connections [2]     5/16 15/7
consequences [2]     85/3
85/13
consistent [1]     82/13
conspiracy [5]     4/12 5/5
5/14 5/16 8/13
Consultants [6]     44/2 44/6
44/17 45/11 46/12 46/13
consulted [1]     93/23
Cont'd [1]     2/1
contacted [1]     32/2
contain [1]     66/12
contained [3]     8/4 26/21
26/22
contains [1]     9/19 9/20
contents [1]     52/3
continue [4]     62/8 92/23
93/16 93/24
continued [1]     36/1
control [2]     16/3 16/5
conversation [2]     100/13
106/9
cookie [2]     77/23 77/24
cooperating [2]     15/16
19/23
cooperator [3]     15/6 15/21
20/10
cooperators [1]     18/16
cops [1]     22/4
copy [2]     43/11 95/2
correct [44]     10/12 38/8
43/7 57/10 58/25 63/2
63/15 64/25 65/14 65/17
66/7 66/20 67/4 68/5 68/20
68/24 70/5 70/6 70/8 70/9
70/11 70/12 71/7 71/10
72/13 72/15 73/7 73/9
73/18 80/2 80/3 80/5 80/6
80/8 80/9 80/21 81/6 81/7
86/18 86/21 88/15 88/18
88/22 108/5
correct that [1]     10/12
could [19]     3/18 6/4 6/19

13/8 13/9 24/22 47/12 62/9
67/21 69/23 85/24 89/9
89/13 89/13 96/3 96/7
100/23 101/13 102/6
couldn't [2]     5/24 48/14
counsel [6]     11/19 12/17
47/1 47/3 47/7 59/9
count [1]     5/14
counter [1]     86/3
counters [1]     33/14
County [1]     23/15
couple [4]     22/19 27/16
42/13 85/23
course [13]     7/18 14/3 19/8
23/2 38/2 38/21 39/5 42/23
46/15 57/14 63/24 83/5
105/22
court [23]     1/1 1/21 3/20
4/9 7/3 13/25 15/2 17/23
20/23 21/17 21/24 22/2
22/2 22/3 30/9 40/4 68/14
73/17 78/23 85/15 94/8
95/24 102/24
Court's [7]     12/24 16/1
21/10 47/2 55/4 93/24
97/18
courthouse [2]     1/22 14/11
courtroom [18]     13/12 14/4
14/11 14/21 15/21 16/4
16/6 17/10 17/15 17/18
17/20 18/8 18/12 18/14
18/15 19/13 21/2 21/25
cover [2]     7/7 12/12
coveralls [1]     51/4
covered [10]     26/3 26/5
26/17 26/17 50/10 50/14
50/18 50/21 50/23 93/3
covering [1]     26/3
crazy [2]     102/12 103/22
created [1]     8/15
credibility [21]     75/18
76/3 76/23 77/10 83/19
84/6 84/16 84/21 94/14
94/16 97/14 97/21 98/6
98/10 98/11 98/18 98/20
100/15 100/20 103/11
104/20
credit [4]     43/17 43/21
44/13 44/23
crew [1]     35/10
crime [1]     4/13
Criminal [2]     1/4 3/2
criticize [1]     82/22
cross [4]     19/6 61/19 61/22
107/1
cumulative [1]     98/8
curious [1]     89/1
current [1]     44/1
custodian [7]     6/24 6/25
11/1 11/5 11/8 11/17 40/8
customs [1]     90/6
cut [1]     36/1

**D**

D.C [9]     1/8 1/16 1/19 1/23
2/3 2/7 2/11 44/21 45/10
Daniel [4]     33/5 33/12
34/13 34/22
dash [1]     61/13
data [1]     3/18
date [12]     41/20 43/21
44/22 44/22 45/3 46/4 46/6

**D**

date... [5]          53/20 55/7
72/25 76/15 95/11
dated [2]          41/13 41/17
day [18]          17/17 31/11 32/18
41/22 45/6 47/22 48/1 48/8
49/8 63/6 71/1 73/1 84/4
86/17 86/18 86/25 87/16
87/22
days [6]          23/20 24/5 48/6
48/12 63/7 63/7
days' [1]          63/4
deal [1]          106/6
dealing [1]          104/16
Dear [1]          7/4
decide [1]          85/9
decision [3]          23/24 82/24
83/20
Defendant [4]          1/18 2/2 2/6
2/10
defendants [2]          1/7 18/3
defense [13]          12/17 13/23
14/14 18/18 20/8 21/5 21/9
28/15 28/19 47/1 47/3 47/7
101/25
deflated [1]          51/15
Delaware [3]          5/9 61/2
61/11
delay [1]          22/18
Denelce [1]          44/19
Deniece [4]          43/17 43/25
44/1 44/8
describing [1]          65/20
desk [2]          33/18 33/20
detailed [1]          67/2
details [1]          79/21
determine [1]          75/21
determined [1]          75/21
developing [1]          5/5
device [1]          6/17
devotional [3]          5/1 25/19
75/6
did [128]
did – [1]          25/4
didn't [47]          3/8 4/16 5/22
8/14 12/12 20/17 24/11
25/1 25/3 25/21 26/2 26/6
26/13 28/25 55/22 58/17
58/18 63/11 64/24 65/9
67/20 70/16 70/17 70/18
71/9 71/22 71/23 72/5 72/5
75/6 76/19 80/12 80/13
81/9 81/18 82/1 82/20
88/20 94/5 94/10 97/6
97/25 98/2
different [2]          24/7 30/18
difficulty [2]          9/22 90/21
dinner [1]          69/15
dire [4]          78/18 86/15 89/25
107/7
direct [6]          19/1 22/20 59/4
71/13 71/14 107/1
directly [1]          66/25
disappear [1]          30/7
disclose [2]          102/18 102/18
disclosed [1]          102/2
discovery [2]          101/20
102/11
discuss [2]          58/10 85/20
discussed [5]          10/10 38/10

38/13 71/18 80/16
discussion [6]          11/23 88/23
89/12 89/16 90/5 98/19
discussions [1]          89/18
dishes [1]          25/23
disingenuous [1]          19/25
disk [1]          106/7
dispute [1]          82/9
disputing [1]          82/10
distribute [1]          82/10
DISTRICT [4]          1/1 1/1 1/11
1/22
DMV [1]          5/8
do [81]          6/4 8/24 10/1
11/14 13/20 16/3 16/9 16/9
18/15 18/19 19/5 19/17
20/21 20/23 21/10 21/21
21/22 22/25 23/9 23/24
27/3 28/4 29/5 31/5 32/5
33/13 33/20 35/22 37/24
38/19 38/22 38/25 39/11
39/15 39/22 45/11 46/19
49/3 49/10 54/22 58/22
60/21 60/25 61/15 62/11
63/20 63/25 64/19 66/3
66/7 66/13 72/2 72/24
73/25 77/20 78/18 83/17
83/20 83/21 85/24 87/7
89/21 93/1 93/19 95/2 95/3
97/14 98/1 99/2 99/2 99/22
100/3 101/23 102/1 103/1
103/18 103/23 103/25 104/1
104/7 104/8
doable [1]          20/4
document [6]          6/25 7/15
7/19 11/1 29/2 39/5
document – [1]          29/2
documenting [1]          97/16
documents [17]          6/23 7/1
7/7 7/22 8/1 8/15 9/5 9/12
9/14 10/21 38/1 38/3 38/20
38/21 39/8 45/15 88/7 88/9
does [21]          4/24 6/2 21/17
30/21 40/23 41/8 44/1 44/6
44/16 46/8 46/8 64/8 66/23
66/24 67/2 74/7 77/23 84/6
97/15 101/23 104/9
doesn't [17]          4/12 4/12
7/15 30/1 40/2 41/14 50/18
65/4 65/7 74/25 75/12 76/5
76/7 82/5 103/10 104/11
105/7
doing [9]          7/16 13/14 15/10
54/13 60/18 70/19 74/22
82/3 82/6
don't [115]
done [3]          66/4 92/4 94/8
door [12]          24/21 24/22 26/4
26/5 26/16 48/15 49/11
49/17 50/8 75/18 77/23
81/9
doors [2]          76/7 93/10
double [1]          58/19
down [7]          3/9 17/9 24/19
64/3 93/24 97/12 106/12
drive [2]          6/15 55/22
driven [2]          42/1 64/23
driver's [2]          9/1 9/20
driveway [1]          35/13
driving [3]          6/13 71/9 91/4
drove [3]          55/23 64/23 91/2
drug [2]          8/13 89/7

drugs [10]          4/5 8/16 8/19
8/20 8/21 79/9 79/10 80/7
80/20 80/9
dry [1]          85/20
due [1]          21/8
duffie [4]          25/13 25/13
26/21 27/16
during [10]          14/3 18/22
19/8 23/2 25/5 42/9 42/23
62/19 63/24 75/14
dying [2]          103/25 104/1

**E**

e-mail [1]          5/21
e-mailed [1]          3/17
each [3]          4/12 13/2 14/7
earlier [2]          11/23 33/22
early [5]          33/23 39/21
45/25 45/25 56/10 88/16
earnings [1]          39/12
EDUARDO [1]          1/18
effect [4]          21/5 22/5 79/9
99/17
effective [1]          41/18
effects [1]          83/19
eight [1]          46/4
either [9]          3/6 4/20 13/3
14/8 26/4 29/1 70/18 81/8
94/11
elicit [6]          54/16 103/21
103/23 104/5 104/17 104/22
elicited [1]          104/19
ELLEN [1]          1/11
Elmo [1]          95/4
else [16]          10/3 10/20 11/18
16/24 17/6 33/2 33/11
37/19 62/11 68/10 71/15
86/6 88/11 105/1 106/4
employ [1]          64/24 65/2
employed [6]          62/19 62/23
63/1 63/11 63/15 66/5
employer [2]          41/17 45/12
employers [2]          44/16 45/8
employment [5]          40/2 42/14
42/15 44/1 44/20
empty [2]          25/22 86/4
end [3]          35/25 53/23 54/18
ended [1]          57/21
enforcement [5]          13/3 13/5
14/9 15/13 73/8
engage [1]          36/5
enough [3]          16/11 49/15
84/10
enter [2]          24/2 24/4 32/16
34/20 46/16
entered [1]          25/2 34/13
35/13 77/11 94/4
entitled [1]          3/23 6/6
101/5 101/10
entrance [1]          49/17
ESQUIRE [6]          1/14 1/14 1/18
2/2 2/6 2/10
estate [3]          39/9 39/19 41/7
et [2]          1/6 3/3
even [10]          3/20 19/4 19/7
20/8 31/1 52/12 78/2 83/7
95/21 104/4
evening [4]          24/17 28/1
32/4 87/15
event [1]          90/11
eventually [6]          17/20 27/24
34/24 46/16 96/15 105/23

## E

ever [11]    4/5 4/6 28/14
28/24 29/11 56/8 60/5 80/4
80/7 98/25 100/1
every [8]    14/7 23/14 26/2
26/17 29/2 47/25 48/8
82/14
everybody [1]    26/23
everyone [2]    105/22 106/7
everything [8]    8/4 17/22
77/19 77/20 78/9 101/22
101/23 101/24
evidence [33]    6/9 11/25
16/18 18/7 24/21 25/1
27/13 28/14 38/6 38/17
40/12 43/20 45/1 48/25
50/24 52/10 52/18 59/13
60/1 82/8 82/22 83/17
83/18 94/10 94/12 96/8
96/11 98/14 98/24 102/18
103/6 104/12 104/23
ex [3]    12/18 13/14 13/21
exactly [3]    46/4 63/21
72/25
examination [7]    6/7 19/6
22/20 59/4 61/22 71/13
93/16
example [1]    20/14
except [2]    78/2 93/9
exchange [1]    36/23
exclude [1]    4/1
Excursion [11]    33/22 34/2
34/5 34/10 34/15 35/22
36/11 36/21 37/5 37/12
55/21
excuse [3]    38/9 81/11 93/2
excused [1]    93/6
execute [1]    24/13
executed [1]    41/22
execution [2]    24/18 25/5
exhibit [13]    27/12 38/16
40/11 48/24 52/17 59/12
59/25 60/11 63/22 97/7
96/8 96/9 96/10
Exhibits [2]    47/3 107/9
exist [1]    8/14
existed [1]    8/13
expect [1]    24/10
experienced [1]    68/4
expert [1]    30/25
expired [1]    61/13
explain [1]    31/1
explained [1]    93/18
explaining [2]    40/1 41/18
explains [1]    31/18
extensively [1]    90/6
extent [5]    11/2 14/19
15/20 17/21 101/12
external [1]    3/14
eye [8]    15/23 23/9 37/18
69/1 69/6 69/7 69/10 70/14
eyes [1]    69/20

## F

faces [1]    97/18
facilities [1]    4/21
facility [9]    6/14 9/7 42/2
42/5 42/9 42/12 45/16
46/17 47/17
fact [19]    4/13 5/5 5/6 5/9
22/2 24/11 28/23 64/13

76/1 87/25 88/1 88/2 88/2
90/2 96/24 97/16 99/12
100/8 100/13
facts [2]    74/23 84/11
failure [1]    100/20
fair [5]    57/19 86/23 87/13
98/6 101/14
fall [1]    70/16
falling [1]    70/19
false [2]    8/15 101/13
familiar [2]    66/21 79/21
families [1]    18/17
fancy [1]    68/23
far [12]    6/10 6/11 21/12
36/21 70/18 75/2 76/13
80/4 80/7 86/9 90/7 101/9
fashion [5]    85/10 97/4
104/14 104/18
fashion -- [1]    104/14
fast [2]    37/2 37/7
faster [2]    37/10 37/12
fat [1]    76/7
FBI [1]    63/15
February [26]    23/21 24/14
28/1 28/5 29/15 31/11
32/21 32/22 32/25 41/17
41/20 55/8 56/2 56/10
56/19 57/17 57/21 57/21
62/2 68/19 71/21 73/1
79/16 79/24 84/3 84/4
February the [2]    55/8
79/24
feel [2]    19/16 19/19
fence [1]    10/6
few [4]    10/23 20/11 27/22
49/21
fifth [2]    1/18 97/9
figure [4]    14/22 21/22
77/21 85/5
figured [1]    58/22
figuring [1]    16/23
file [3]    10/16 102/15
102/17
filed [1]    102/9
filled [3]    39/3 43/17 45/4
film [1]    52/1
finally [2]    3/9 59/20
find [6]    20/24 22/11 89/13
98/10 101/8 106/15
finds [1]    101/10
fine [12]    10/7 12/11 19/6
21/10 58/16 74/19 93/4
95/5 95/13 96/1 101/8
104/1
fingering [1]    81/15
finish [2]    26/13 91/15
finished [1]    58/6
first [24]    4/18 5/17 7/21
11/8 25/4 25/25 38/6 40/14
42/5 43/21 46/25 49/2 50/3
55/6 56/5 56/8 57/9 59/7
60/24 68/7 68/20 76/5
76/24 95/20
first -- [1]    95/20
first-hand [3]    75/12 75/14
76/8
Five [1]    66/19
flavor [1]    77/24
fled [1]    90/25
flew [2]    33/2 55/18
floor [7]    2/3 70/4 70/7
72/11 82/11 88/17 88/21

flying [3]    32/3 102/13
102/24
focus [1]    17/5
focused [1]    58/2
focusing [1]    42/20
foil [2]    26/5 26/17
follow [4]    32/9 32/14
36/24 76/1
followed [10]    32/8 36/12
37/2 55/10 55/14 56/2
69/12 71/25 86/25 91/19
following [7]    32/10 33/8
35/24 36/1 37/5 71/25
80/22
follows [1]    15/14
forced [1]    24/23
Ford [5]    33/22 34/2 34/4
34/10 35/22 55/21
forefront [1]    54/9
foregoing [1]    108/5
forget [1]    103/14
form [1]    63/25
formally [1]    48/22
forth [1]    30/25
found [25]    27/18 29/18
32/2 51/22 59/17 74/4
74/23 75/19 76/4 76/16
77/2 77/19 77/20 81/1
81/16 82/25 83/2 85/3 86/1
90/12 93/25 97/13 103/15
103/17 103/18
four [11]    23/20 25/15 27/5
48/12 48/16 62/17 63/18
64/16 66/12 66/18 97/9
Francisco [1]    29/12 56/9
Franklin [1]    38/8
frankly [4]    3/19 14/21
17/22 93/21
free [4]    14/18 101/10
102/11 102/11
frequently [5]    6/15 16/12
21/14 23/7 48/10
Friday [5]    24/14 24/17
28/2 28/5 32/19
friends [1]    13/17
front [16]    23/16 23/17
26/4 26/5 33/18 33/20
43/23 43/23 47/23 49/10
85/2 85/10 94/13 99/6
101/7 102/23
fruit [1]    102/6
FTN [6]    44/2 44/6 44/17
45/11 46/12 46/13
full [2]    34/15 51/25
full-blown [2]    16/18 17/8
fully [1]    101/3
furnished [1]    25/11
furniture [2]    25/11 51/10
further [6]    4/1 12/9 92/19
92/21 95/16
furtherance [1]    4/11

## G

game [2]    98/6 101/14
garage [5]    48/13 48/15
49/15 49/20 50/8
garden-style [1]    70/3
gave [6]    14/13 28/20 46/19
65/16 75/9 102/4
GEISE [3]    1/14 103/12
105/18
general [2]    25/9 51/17

## G

gentlemen [6]          22/17 31/17
58/7 61/21 81/12 85/16
George's [1]          23/15
get [36]          5/8 5/22 7/15
9/16 13/9 15/23 16/13
18/25 22/14 24/24 30/6
39/8 47/15 55/6 57/21 70/2
70/3 73/4 73/17 74/23 76/2
78/20 79/11 82/4 82/8
83/17 85/12 87/15 92/14
93/25 100/23 101/19 102/11
102/11 104/18 105/13
gets [2]          17/15 85/2
getting [9]          6/25 9/7 10/25
11/1 16/19 97/8 98/8 99/3
106/2
Gikas [31]          5/25 8/1 11/3
22/15 22/22 26/20 27/3
30/11 35/7 38/19 38/25
40/14 41/20 45/14 46/15
47/15 49/2 50/2 51/3 52/20
53/5 54/18 58/15 59/6 60/5
60/21 61/17 61/24 86/17
106/11 107/3
Gikas – [1]          11/3
Gikas's [2]          3/5 3/7
gist [2]          96/19 97/19
give [8]          13/8 20/14 25/4
25/8 48/2 53/24 100/24
102/23
given [8]          5/16 13/8 15/24
16/9 16/9 30/16 101/13
102/22
given – [1]          16/9
gives [1]          16/11
glaring [1]          8/7
gleaned [1]          78/13
go [51]          11/14 14/1 16/21
22/14 24/23 30/8 31/6 34/8
34/16 34/18 36/21 37/18
40/19 40/24 46/1 47/16
68/17 69/7 69/8 72/22
73/17 75/1 76/9 78/24
80/12 80/13 81/9 81/19
81/24 82/2 84/6 84/9 85/1
85/6 85/7 85/10 86/14
87/19 88/17 89/17 91/14
96/6 98/14 99/14 100/11
100/15 100/19 102/25 103/8
103/10 103/24
goes [4]          59/11 97/14 97/20
98/17
going [98]          3/25 4/4 4/19
6/1 10/9 11/8 11/19 12/5
12/7 13/10 13/21 14/5
14/24 26/22 27/20 32/19
34/1 36/13 37/2 37/7 37/10
37/12 38/19 38/19 38/24
39/10 39/15 39/20 40/3
40/4 41/11 41/15 43/20
44/5 45/21 45/24 47/2 47/7
48/3 48/13 50/2 50/7 50/11
50/15 51/24 52/2 52/9
59/20 72/2 72/9 72/10
73/13 73/14 74/4 74/9
74/20 75/2 75/10 76/13
76/23 76/25 77/5 77/6 77/7
78/19 79/7 82/4 82/8 82/11
82/12 83/20 83/21 84/17
84/18 85/4 85/7 85/14

85/18 89/3 92/3 92/18 93/2
93/9 93/25 94/12 94/15
94/20 95/17 96/15 100/11
100/19 101/2 101/11 101/24
104/18 104/21 105/17
105/18
going – [1]          36/13
goings [1]          4/8
gone [4]          18/23 25/17 33/14
97/10
Gonzalez-Ruan [1]          56/9
good [15]          15/23 22/17
22/22 22/23 60/12 61/20
61/24 61/25 74/6 81/15
81/16 85/13 85/19 86/17
93/5
got [21]          10/15 10/16 10/20
36/12 56/1 57/20 70/1
73/24 78/8 80/24 81/19
84/3 84/12 87/9 88/4 90/3
91/1 91/11 93/22 99/18
100/7
gotten [2]          13/16 79/6
Government [29]          1/14 3/7
14/20 16/5 18/7 20/7 21/16
22/15 27/12 38/16 40/11
48/24 52/17 59/12 59/25
74/19 75/9 82/19 82/25
94/20 100/24 101/23 102/18
102/22 103/4 103/25 104/9
105/1 107/12
Government's [4]          14/24
19/12 101/24 105/11
GPS [8]          3/12 5/19 6/17
11/23 28/25 63/12 63/14
64/9
Grand [11]          94/19 94/22
94/25 95/10 97/4 97/23
98/6 99/1 99/13 100/14
101/13
Greenleaf [2]          23/15 52/24
Griffith [3]          1/21 108/4
108/12
ground [1]          53/12
grounds [3]          53/9 53/11
95/18
group [2]          87/9 87/11
Guadalupe [3]          5/7 5/9
96/16
guess [3]          3/5 51/17 59/2
guy [8]          54/25 67/21 68/20
71/3 74/4 76/5 90/4 99/24
guys [3]          70/16 81/19 92/13
Gwen [1]          14/22
gymnastics [1]          11/14

## H

had [60]          3/12 4/13 12/11
13/8 13/16 14/11 19/3 19/4
19/17 22/18 23/20 24/11
24/20 24/23 25/17 25/19
26/1 26/12 28/19 28/21
28/25 29/9 29/10 29/14
29/15 30/11 32/1 32/3
33/14 33/21 37/19 41/17
42/13 46/21 46/23 47/22
49/14 49/21 50/14 51/20
54/10 54/11 54/11 54/19
54/21 55/1 58/2 63/17 64/9
64/16 69/15 71/17 79/6
89/12 90/4 99/20 100/9
100/13 102/9 106/9

hadn't [3]          4/16 19/4 51/21
half [3]          26/15 62/5 102/13
Hampton [17]          6/14 9/6 9/8
9/10 9/15 23/16 42/7 45/18
46/1 46/17 48/4 49/7 49/14
50/5 53/2 59/18 67/14
Hampton – [1]          9/6
hand [3]          52/1 64/3 77/23
handle [1]          37/21
handwritten [1]          3/7
hang [1]          32/22
hanging [1]          51/5
happen [4]          20/9 54/8 71/23
101/11
happened [10]          17/12 17/13
53/6 53/16 53/25 54/6
54/19 96/23 96/24 99/8
happening [5]          15/25 18/20
42/21 42/22 48/14
happens [1]          16/12
happy [3]          22/10 24/25
103/3
harassed [2]          13/5 14/10
harassment [1]          15/4
hard [2]          5/22 40/23
has [24]          7/3 15/7 15/13
17/4 18/7 27/6 28/14 28/19
29/11 41/11 41/18 48/18
52/22 77/3 83/8 83/15 84/2
84/13 93/19 94/8 94/17
99/9 100/6 106/7
hasn't [2]          16/2 94/9
hassled [2]          13/12 18/23
have [174]
haven't [6]          6/10 8/18 8/19
8/20 26/25 102/21
having [9]          7/17 17/8 18/24
61/15 78/7 90/21 97/10
105/23 105/25
he [42]          5/21 8/8 13/8
14/13 14/16 20/16 28/5
28/7 29/14 29/15 29/16
29/17 29/18 30/13 33/2
33/2 33/3 33/11 35/10
41/11 44/16 46/8 46/23
48/7 55/11 55/18 55/21
55/23 57/16 68/23 69/24
82/7 84/24 87/9 92/24
92/24 99/9 99/9 99/23
99/25 101/7 101/10
he's [12]          5/22 9/8 9/8
9/10 39/20 39/21 41/7
41/10 41/11 45/24 74/1
101/10
heading [2]          36/12 102/25
hear [5]          10/8 68/10 68/10
84/17 93/7
hear anything [1]          68/10
heard [8]          3/13 6/10 8/18
8/19 8/20 54/21 54/22 56/8
hearing [10]          16/5 16/18
83/13 83/15 92/7 92/23
95/6 96/9 96/11 102/10
hearings [2]          17/8 83/17
hearsay [7]          7/11 7/25
10/11 74/1 75/11 89/23
92/6
heat [5]          25/14 25/16 26/21
26/22 27/23
heavy [1]          51/9
heck [1]          18/24
Heights [1]          42/7

# H

help [1]         14/14
helpful [1]         74/25
her [77]         3/8 3/11 3/14
3/17 6/2 6/6 6/8 6/16
11/20 12/5 13/10 17/16
29/25 30/4 30/6 30/7 44/1
44/3 58/10 75/2 75/16 76/9
76/9 76/23 77/11 78/17
78/18 78/19 78/19 82/5
83/19 84/6 84/9 84/11
84/16 85/11 85/12 92/8
94/14 94/16 96/4 97/4
97/15 97/20 97/23 97/24
98/5 98/7 98/10 98/11
98/17 98/20 98/20 98/24
99/6 99/9 99/12 99/16
100/1 100/4 100/9 100/12
100/14 100/17 100/17
100/20 100/20 100/21
103/11 103/16 103/21 104/5
104/20 104/25 105/21
105/23 106/11
her -- [1]         103/21
here [32]         4/9 5/16 9/6
9/16 12/1 12/16 13/5 13/13
14/18 16/13 16/19 16/25
18/21 18/21 18/22 20/4
20/15 20/16 22/9 22/11
22/14 45/3 49/10 49/13
65/5 75/21 76/6 85/19
95/14 95/23 99/11 101/4
here -- [1]         20/4
hiding [1]         97/11
high [1]         36/5
higher [2]         35/13 35/19
highlighted [1]         64/8
him [25]         4/8 6/15 13/8
13/9 13/11 13/12 20/17
20/17 32/8 32/9 32/14
32/16 33/11 55/14 55/22
56/2 56/3 56/22 65/20
65/20 69/12 82/7 99/23
105/3 105/25
himself [1]         46/8
his [26]         4/18 9/1 9/12
9/20 9/20 9/24 16/14 28/8
29/9 35/10 39/21 41/8
41/10 41/11 41/17 42/14
42/14 44/16 44/18 44/20
45/8 46/9 46/21 46/23
60/24 72/10
hold [5]         8/16 35/7 49/15
54/2 84/11
holding [1]         85/18
hole [1]         7/12
Holland [1]         2/10
home [3]         23/15 25/5 25/7
honestly [2]         87/14 87/14
Honor [95]         3/4 5/3 5/20
6/5 6/20 6/22 7/5 7/21 8/1
8/11 9/10 9/18 10/2 10/4
10/9 10/18 10/23 11/22
12/7 12/15 12/23 14/2 15/2
15/12 16/7 16/9 17/2 17/11
17/22 18/6 18/11 19/2
20/12 21/8 22/1 27/7 28/13
28/19 29/4 30/24 31/3
32/12 35/15 38/11 38/12
40/3 43/7 47/11 50/22 52/9
52/13 55/9 57/23 58/14

58/25 59/10 59/19 59/20
59/23 61/3 61/20 65/7
73/19 74/2 74/8 75/1 75/9
75/13 77/1 78/25 84/20
88/5 88/9 90/12 91/8 92/22
93/12 93/15 94/16 95/12
95/23 96/7 96/18 97/7
97/18 97/22 99/5 99/16
100/23 102/1 103/7 104/10
105/8 105/21 105/24
HONORABLE [1]         1/11
hope [3]         70/20 85/18 94/1
hotel [2]         33/21 56/5
hour [1]         37/3
hours [2]         63/6 70/14
house [33]         5/2 8/3 10/17
23/18 23/20 23/24 24/2
24/4 24/9 24/12 24/24 25/2
25/9 25/24 26/1 26/6 27/24
32/7 34/20 35/2 36/2 36/4
37/18 37/19 37/20 37/20
37/24 37/25 38/4 39/21
41/21 94/21 105/10
how [33]         5/22 10/25 23/7
24/18 25/24 27/3 27/18
28/7 34/12 34/24 35/2
36/21 37/2 37/7 40/18
41/20 46/1 46/8 63/20 64/9
64/11 73/4 76/22 77/14
83/14 88/4 89/13 89/21
90/2 91/10 92/13 93/21
95/15
how -- [1]         95/15
huge [1]         52/6
Huggins [1]         2/6
hurriedly [1]         35/12
husband [1]         17/16
HUVELLE [1]         1/11

# I

I'd [1]         6/3
I'll [17]         5/3 7/2 10/8
12/8 26/23 55/5 63/22
63/23 64/7 76/19 93/7
94/24 95/6 95/15 95/23
102/17 102/17
I'm [113]
I've [9]         23/9 59/21 64/6
78/13 80/17 93/23 102/21
102/22 105/21
i.e [1]         18/18
ice [79]         3/22 4/1 4/7 4/14
5/4 5/11 7/1 9/18 26/23
27/1 27/11 27/11 27/12
27/13 27/15 27/20 38/7
38/16 38/22 38/25 39/10
39/15 39/22 40/5 40/11
40/14 41/5 41/15 43/4 43/7
43/20 45/1 45/21 45/22
47/3 47/4 47/6 47/6 48/18
48/24 48/24 49/2 50/4 50/7
50/11 51/3 51/3 51/6 51/12
51/14 51/24 51/24 52/2
52/7 52/10 52/14 52/17
53/16 53/25 55/7 56/9
58/17 59/8 59/12 59/21
59/25 60/5 62/1 65/17 78/8
79/16 99/11 107/13 107/14
107/16 107/16 107/17
107/18 107/19
idea [2]         16/22 78/14
identification [4]         27/1

38/24 39/10 59/7
identified [8]         5/10 50/20
57/2 57/6 67/8 67/24 72/16
72/17
identify [3]         30/15 42/19
42/24
identifying [3]         42/20
65/20 66/24
identity [3]         20/4 20/17
20/22
idling [1]         33/23
illegal [12]         7/7 75/20
78/1 83/9 83/20 83/24
84/10 84/22 90/8 102/4
102/7 104/11
illegality [1]         75/19
illegally [2]         76/4 76/4
immediately [2]         3/17 32/2
immigration [3]         90/5 90/7
98/1
impact [1]         3/5
Impala [4]         60/23 61/6 91/2
96/13
impeach [3]         99/16 100/14
100/21
impeachment [1]         100/8
implication [1]         50/22
important [1]         94/2
improper [3]         98/13 98/13
100/19
in -- [1]         79/14
in-person [1]         47/16
inadmissible [1]         78/20
incident [1]         71/13
incidents [1]         65/22
include [2]         100/9 100/20
increased [1]         23/24
incredible [1]         20/7
Indiana [1]         2/2
indicate [3]         3/14 44/6
67/3
indicated [4]         3/19 70/1
70/10 92/24
indicates [1]         3/11
indicating [2]         45/15 45/24
indication [1]         93/24
indict [1]         5/4
indictment [1]         4/11
indifferent [1]         85/13
individual [1]         58/3 67/8
70/2 71/6 71/10 90/20
90/23 91/3
individuals [19]         13/8 14/4
14/8 14/13 14/17 18/7
18/21 24/10 34/11 34/23
67/6 67/7 70/2 70/11 71/4
80/1 88/17 90/25 91/1
indulgence [2]         47/2 55/4
industrial [1]         51/25
infer [1]         5/15
inference [2]         8/23 82/4
inflatable [5]         25/12 51/15
51/16 83/1 86/8
inform [1]         21/17
informally [1]         87/10
informant [11]         66/11 67/3
67/5 67/10 67/12 67/14
67/16 67/18 67/24 68/2
68/3
informants [4]         65/14 65/16
66/7 66/23
information [37]         4/7 4/19

**I**

information... [35]                    5/6
5/18 5/19 13/9 13/16 28/12
28/20 29/9 29/12 29/13
29/14 30/4 30/5 30/15
31/12 31/21 31/24 31/25
32/5 34/4 44/6 55/1 65/14
65/16 67/5 75/9 79/6 81/20
84/2 99/3 99/18 100/7
100/24 102/5 102/24
informed [1]                      14/15
inherited [1]                     54/10
initial [1]                       71/20
initially [1]                     102/7
Inn [3]            32/15 32/23 34/14
inquire [8]            16/11 17/7
20/3 20/20 21/20 103/13
103/14 103/14
inquire -- [1]                   103/13
inquiring [2]            21/25 22/6
inquiry [2]              17/1 17/4
inside [3]         35/2 48/15 49/6
49/6 50/5 50/9 53/1 76/4
insinuate [2]        81/14 85/10
insinuating [1]                  97/3
installed [1]                    3/15
instances [1]                    4/21
instead [1]                      85/18
instigated [1]                   86/24
instruct [2]            68/12 68/15
instruction [1]                  79/1
intending [2]           54/16 84/2
interest [2]            73/7 93/10
interested [4]             17/19 24/6
42/12 73/14
interesting [1]                  20/16
interfere [5]          13/22 18/18
20/8 20/13 21/5
interior [1]                     25/9
interrupted [1]                  55/25
intervening [1]                  55/17
interview [3]              21/8 21/13
21/15
interviewed [1]                  95/18
interviewing [1]                 14/25
intimidate [1]                   16/19
intimidated [2]                  18/17
19/16
intimidating [1]                 21/3
introduce [6]           74/3 74/5
77/5 83/16 101/20 101/24
introduced [2]        77/3 105/20
investigate [3]          17/21 34/2
74/18
investigating [3]                54/23
54/24 97/17
investigation [45]               3/8
3/22 4/2 4/7 4/14 5/4 5/12
23/2 23/24 37/24 38/2
38/21 39/6 42/8 42/10
42/17 42/23 46/16 53/16
53/25 54/9 57/15 57/20
62/1 62/16 62/19 63/12
64/24 65/13 65/18 75/25
77/14 78/9 79/12 79/16
79/19 79/22 85/25 86/24
87/17 93/20 94/18 95/16
96/6 102/6
investigation -- [1]             96/6
investigations [2]               65/24
74/9

**I (continued)**

investigative [3]                42/18
66/4 75/16
investigator [1]                 99/23
investigators [1]                55/2
inviting [1]                     75/12
involved [2]           11/11 18/25
involvement [2]                  57/12
84/14
iota [1]                         94/14
is [239]
is -- [1]                        101/25
is voir [1]                      89/25
isn't [3]         18/10 76/8 106/5
issue [7]         84/16 85/17 98/10 103/8
84/16 85/17 98/10 103/8
issues [4]         4/2 10/10 15/15
98/1
isuzu [4]         5/18 22/24 42/1
64/20
it [232]
it -- [2]                  69/2 99/2
it's [68]          4/7 4/19 5/13
5/14 5/16 7/8 7/11 8/5 8/6
8/6 8/7 8/8 8/21 12/22
14/24 15/7 15/8 16/5 16/6
16/8 16/12 17/14 18/13
18/14 18/15 19/18 26/9
27/1 32/19 38/9 39/19
40/23 40/23 41/22 42/7
43/8 45/23 49/6 51/15
51/25 52/6 52/15 52/22
53/8 53/12 57/19 57/22
59/16 60/2 72/2 76/1 76/6
81/24 82/1 85/18 92/6 92/6
94/2 96/10 96/10 96/15
98/8 98/12 99/10 100/19
101/3 102/2 102/6
item [1]                   26/18
items [4]         49/21 51/19
80/10 87/23
itself [5]         4/13 5/15 11/12
40/22 72/14

**J**

JACK [1]                   1/14
jacket [1]                 51/4
Jackson [1]                2/2
January [3]       41/3 41/3 41/4
jar [1]                    77/23
Javier [30]       4/21 5/6 28/4
29/12 31/13 32/2 32/24
33/8 34/13 34/15 34/22
35/10 55/10 56/9 56/15
56/21 57/14 58/1 60/24
68/20 69/12 69/21 71/3
71/25 72/10 79/7 79/25
81/4 87/13 91/1
Javier's [5]       28/11 29/6
30/11 30/17 32/7
Jencks [1]                 28/20
job [2]         41/10 41/11
jobs [1]                   53/13
John [1]                   15/18
Johnson [1]       44/8 44/19
JON [1]                    2/2
JONES [57]       1/6 1/18 3/3
4/6 4/20 20/15 23/10 42/15
42/16 42/21 42/24 43/13
43/17 43/18 43/25 44/1
44/4 44/15 45/8 45/23 46/8
46/21 48/9 50/25 53/17
53/25 54/20 54/21 58/3

**J (continued)**

63/1 63/22 64/6 64/25 65/8
65/11 65/12 65/17 66/24
67/3 67/8 67/10 67/20
69/23 70/8 70/21 70/22
71/9 72/18 73/7 80/2 80/23
81/1 81/2 81/20 82/10 91/5
95/8
Jones's [8]       3/12 3/15
20/15 44/23 45/16 48/3
52/23 91/12
JUDGE [2]         1/11 102/17
July [2]         3/14 64/13
June [2]         53/24 57/23
jury [51]         1/11 15/9 9/24
12/13 22/14 22/16 24/1
24/18 25/4 25/8 28/10
30/20 35/9 36/10 48/2
53/24 58/9 59/3 63/14
74/14 74/17 76/25 78/6
78/20 83/13 83/25 84/15
85/2 85/3 85/10 85/21
93/25 94/6 94/19 94/22
94/25 95/10 96/11 97/4
97/23 98/6 99/1 99/3 99/6
99/13 100/13 100/14 101/5
101/7 101/13 105/22
Just [91]         4/7 4/25 5/17
6/3 6/4 6/8 6/22 6/22 7/2
11/20 11/22 12/23 13/1
13/11 14/16 17/9 18/8 19/2
19/9 19/9 19/10 19/16
19/18 20/12 20/12 22/7
25/3 25/18 25/20 26/8
27/20 27/22 29/9 30/12
30/20 31/3 37/18 40/15
41/10 43/3 43/10 44/22
44/25 47/12 49/20 50/9
50/13 50/15 51/22 52/6
55/5 55/12 55/25 56/7
57/21 58/17 58/19 61/1
62/8 62/9 63/14 65/6 68/9
68/11 69/7 71/23 73/23
74/8 74/12 74/23 77/22
83/4 84/12 84/20 84/24
85/23 87/15 96/9 98/2 99/3
99/5 99/5 99/8 103/7
103/15 103/15 103/22
103/23 104/15 104/25
106/12

**K**

KATERINA [2]      22/15 107/3
keep [9]         19/5 37/18 76/6
76/9 76/15 82/4 82/19
85/20 99/3
keeper [1]                 95/18
Kelly [5]         7/4 41/6 41/6
41/7 41/8
kept [1]                   7/18
kicked [1]                 57/20
kidnapping [1]             15/18
kind [8]         7/11 13/1 25/9
25/18 33/22 51/8 64/3 74/5
kitchen [2]       25/19 25/21
knew [6]         17/6 29/15 29/17
70/7 72/1 88/21
know [108]       3/22 5/23 12/16
13/7 13/14 16/15 17/3
17/15 17/19 18/4 18/4
19/10 19/15 20/9 20/16
20/18 20/24 24/1 25/20
25/22 28/4 28/5 28/7 28/22

**K**

know... [84]                28/23 28/25
30/21 41/6 42/21 47/21
48/14 50/18 50/23 52/12
54/24 54/24 56/1 60/18
60/21 62/10 67/20 68/13
70/18 72/24 74/6 74/11
74/20 75/10 75/23 76/22
78/2 80/4 80/7 82/5 84/10
84/10 84/23 85/24 87/10
87/20 87/21 87/21 87/22
88/10 88/20 88/24 88/25
89/2 89/3 89/5 89/21 90/1
90/8 92/13 92/14 92/15
92/15 92/16 92/17 92/17
92/17 92/18 93/9 93/22
93/22 94/5 94/19 95/21
96/21 96/23 96/24 96/24
97/3 97/5 97/18 97/20
97/24 99/11 99/17 100/6
101/20 102/14 103/1 103/15
103/18 103/23 104/15
105/15
know -- [1]              75/23
knowing [3]          16/24 20/8
99/18
knowledge [7]          62/10 71/14
75/12 75/14 76/8 79/11
83/22
knowledgeable [1]          90/7
known [1]          31/14
knows [1]          15/2

**L**

lack [1]          14/10
ladies [6]          22/17 31/17
58/7 61/21 81/11 85/16
laid [1]          41/18
Landover [2]          23/16 52/24
last [4]          3/6 5/21 26/14
57/14
lasted [1]          48/6
late [6]          3/6 5/21 23/21
54/8 84/4 88/16
later [6]          11/13 14/14
56/19 63/15 72/17 79/2
latter [1]          99/20
law [9]          13/3 13/5 13/22
14/9 15/13 21/4 21/7 73/8
76/2
Lawrence [19]          6/13 7/8
7/23 8/25 23/10 23/14
29/10 39/3 39/19 40/15
41/5 42/1 42/13 48/7 52/23
53/4 53/17 54/1 64/23
layer [1]          10/18
lead [14]          56/12 56/17
56/24 76/21 79/12 79/17
80/15 83/8 84/5 84/13
87/10 87/12 87/17 97/11
leaning [1]          10/5
leap [2]          8/21
learn [8]          31/12 34/4 44/9
54/18 74/24 76/9 87/25
101/16
learn -- [1]          44/9
learned [14]          31/21 31/24
31/25 77/14 98/8 98/9
98/16 98/25 100/2 100/9
101/16 103/16 104/5 104/23
learning [1]          100/4

lease [20]          9/19 10/21
38/23 39/21 40/15 40/15
40/18 41/8 41/11 43/1
43/11 43/16 45/16 45/25
46/1 46/3 46/22 46/23
80/24 88/6
least [17]          3/23 4/21 16/11
17/3 21/17 34/11 34/12
37/13 56/15 64/25 66/12
69/23 76/18 79/11 81/1
97/8 100/16
leave [7]          14/11 24/4 24/9
27/24 34/25 54/5 54/11
led [3]          49/18 56/13 87/1
left [18]          13/4 13/8 24/25
34/13 35/4 35/6 35/11
49/16 49/21 51/4 57/16
70/11 71/3 79/17 79/25
80/1 88/14 92/17
left -- [1]          35/6
legal [6]          53/12 77/16
85/17 97/25 98/13 98/13
legality [8]          74/15 74/21
76/24 77/7 77/18 78/4 78/6
104/19
legitimate [1]          8/24
length [1]          67/2
less [2]          9/22 48/9
lessee [1]          90/15
let [33]          9/24 10/21 20/24
27/6 28/7 30/20 31/19
37/21 40/14 53/16 54/24
56/7 62/8 63/22 64/6 65/22
68/13 75/1 77/6 78/3 83/6
84/18 85/1 85/7 86/10 87/2
89/21 90/4 92/11 92/14
92/24 99/25 100/11
let's [12]          13/24 22/14
22/14 62/1 62/17 69/7 69/8
73/20 79/11 79/24 81/11
105/8
letter [10]          7/4 7/5 39/19
40/1 41/5 41/13 41/16
45/23 46/6 46/9 76/2
letterhead [1]          46/11
letters [3]          7/3 7/3 40/5
level [2]          7/16 16/2
Levels [6]          6/11 7/24 12/4
23/17 59/16 67/12
license [3]          9/1 9/20 9/24
LIEBER [9]          1/14 3/17 10/11
12/7 63/11 63/23 69/2 69/6
107/4
lied [1]          94/9
lies [1]          97/2
lieu [1]          98/2
lifted [1]          50/13
like [27]          6/3 7/11 12/16
12/17 15/3 16/13 17/7
17/14 19/8 19/20 25/16
25/21 25/23 26/2 26/3
29/10 49/15 51/25 52/22
62/20 62/23 66/11 72/2
83/4 93/15 104/24 105/14
likes [1]          69/2
limine [2]          4/1 4/19
limit [1]          36/18
limits [1]          18/14
line [7]          3/10 3/10 19/11
37/4 64/7 75/17 88/2
link [2]          5/11 5/11
Lisa [3]          1/21 108/4 108/12

list [4]          44/1 44/16 45/8
66/3
listed [2]          41/17 42/13
listen [1]          78/17
little [17]          7/12 24/25
26/9 26/9 28/10 35/14
37/23 42/4 45/1 48/5 48/9
50/9 52/20 52/22 59/16
81/24 99/10
live [1]          101/8
lived [1]          25/21
living [1]          25/18
local [2]          15/7 58/2
location [11]          57/6 69/16
71/23 79/5 79/25 80/1 80/2
80/5 80/8 80/10 90/25
locations [3]          4/23 8/15
83/2
locksmith [1]          24/20 24/22
long [12]          34/24 35/2 40/18
46/1 63/19 63/20 64/9
64/11 85/17 98/14 98/23
104/10
long -- [1]          34/24
longer [1]          40/2
look [9]          4/8 25/21 44/22
47/12 95/2 97/25 105/18
105/21 105/23
looked [1]          3/10
looking [3]          25/21 29/16
100/10
looks [1]          3/13
lost [3]          41/10 41/11 60/19
lot [10]          15/19 25/13 25/14
25/16 32/23 33/23 76/11
84/17 93/19 104/2
luck [1]          61/15
lunch [4]          85/1 85/17 85/19
104/24
luncheon [1]          106/19

**M**

Ma'am [1]          20/5
made [9]          7/10 17/4 21/18
23/23 31/14 66/4 69/1
69/10 93/13
maintenance [41]          73/5
77/12 78/11 78/11 78/14
78/18 86/10 87/19 89/21
90/4 92/2 92/3 92/10 92/14
92/15 92/18 92/24 94/24
95/19 96/20 96/22 96/22
97/5 98/3 98/7 98/16 98/25
99/7 99/11 99/12 99/23
99/24 100/2 100/3 100/5
100/6 100/7 100/1 4 101/6
101/15 101/17
make [19]          4/8 12/8 16/19
17/1 19/16 22/8 30/6 58/18
62/8 65/6 76/25 77/9 78/2
82/18 82/19 82/24 94/7
96/3 100/25
make-shift [1]          26/18
making [4]          3/20 8/6 91/20
97/18
man [38]          9/6 77/12 78/11
78/11 78/14 78/19 86/10
87/19 89/21 92/2 92/3
92/10 92/14 92/15 92/18
92/24 94/24 96/22 96/23
97/6 98/3 98/7 98/16 98/25
99/7 99/11 99/12 99/23

## M

man... [10]            99/24 100/2
100/3 100/5 100/6 100/8
100/14 101/6 101/15 101/17
manage [1]        11/17
management [1]        45/23
manager [3]        46/10 46/13
95/19
manner [5]        12/18 26/3 35/4
35/9 66/24
many [4]        16/21 27/3 34/12
102/22
March [6]        3/14 41/12 41/19
64/13 94/25 95/12
mark [1]        63/22
marked [4]        59/7 59/21 64/6
95/6
marshal [1]        16/25
marshals [7]        16/25 20/3
20/21 21/19 22/3 22/3
22/10
Maryland [3]        23/3 67/7
67/21
match [1]        91/13
matching [1]        90/17
material [2]        3/21 101/25
materials [1]        3/18
maternity [2]        54/5 54/11
matter [6]        3/5 5/18 11/16
31/17 75/15 108/6
matters [1]        22/19
mattress [1]        51/15
mattresses [7]        5/1 25/13
51/16 75/5 83/1 86/8
103/19
may [33]        3/5 4/14 7/14
7/14 7/16 8/22 9/3 15/12
17/3 17/20 19/17 19/17
20/12 22/4 53/24 56/7
57/24 62/3 74/19 77/11
77/11 79/16 92/22 94/4
94/4 96/23 97/22 98/6
100/15 100/18 100/18 102/3
102/4
maybe [4]        25/11 74/19 78/3
103/1
Maynard [23]        4/20 6/13 7/8
7/23 9/23 9/23 10/24 11/11
23/11 39/3 39/19 40/2
40/16 41/6 41/8 41/17
41/18 42/1 42/13 48/7
53/17 54/1 64/23
Maynard's [5]        8/25 23/15
29/11 52/23 53/4
McAllen [6]        30/19 31/9
55/7 56/1 67/6 68/23
McDANIEL [3]        2/10 4/16
19/6
me [55]        3/18 3/21 8/6 8/21
9/24 12/8 13/9 14/14 14/15
14/16 16/6 18/21 19/22
27/6 28/7 29/11 31/14
31/19 33/25 38/8 38/9
40/14 53/16 53/20 54/10
55/5 56/7 61/1 62/6 63/22
64/6 65/22 66/12 68/13
74/2 75/9 83/14 86/2 87/2
94/6 94/10 94/13 95/3
96/13 97/11 98/23 100/24
100/25 101/3 102/19 102/23
102/24 105/11 105/16 106/1

mean [21]        7/9 7/11 7/25
8/6 10/11 15/9 17/13 18/8
18/13 20/13 30/21 57/23
70/18 71/23 91/13 98/5
99/16 103/16 104/4 104/13
105/4
mechanical [1]        1/24
meet [1]        67/6
members [4]        23/19 35/24
35/25 37/4
men [1]        73/5
mental [1]        11/14
mention [5]        63/11 66/7
66/23 94/21 97/10
mentioned [3]        41/25 64/21
71/3
merely [1]        16/8
Mexicans [6]        8/16 81/5
81/24 82/11 82/17 82/20
Mexico [2]        15/18 29/15
midnight [2]        32/19 32/19
might [8]        3/24 24/10 58/21
72/25 83/12 100/3 104/20
104/20
mike [1]        26/9
miles [1]        37/3
Mills [2]        69/13 69/24
mine [1]        93/11
minimize [1]        24/21
minute [4]        9/3 9/24 54/14
88/6
minutes [1]        35/3
mistake [1]        76/6
moment [3]        12/21 30/16
44/25
Monday [1]        87/22
money [9]        8/16 79/7 79/9
79/10 80/4 80/20 86/3 89/6
89/7
monitor [2]        3/15 7/2
months [9]        28/20 46/3 46/5
62/5 62/6 62/17 63/18
64/12 64/16
more [20]        10/23 20/10
20/11 21/20 27/22 37/3
37/23 46/4 52/8 57/25
58/15 59/6 70/14 74/24
74/24 93/1 96/17 99/3
101/2 106/10
morning [19]        5/21 5/23
18/22 22/17 22/22 22/23
32/21 32/24 33/9 33/10
33/11 33/24 40/4 56/5
61/21 61/24 61/25 88/15
88/16
mother [1]        16/9
mothers [1]        15/16
motion [8]        3/25 4/9 4/18
75/22 83/15 102/9 102/15
102/17
move [7]        26/11 76/19 77/2
78/22 102/16 102/17 105/9
moved [2]        51/20 51/21
moves [1]        15/22
moving [5]        51/7 51/9 51/10
Mr [27]        4/16 4/18 5/10
5/20 7/12 10/1 14/1 18/5
19/6 26/24 41/7 45/15
80/16 84/8 85/8 86/14
91/14 92/20 92/21 93/3
93/7 93/13 93/18 101/4
105/18 106/9 107/5

Mr. [46]        3/12 4/6 7/4 9/23
9/23 10/24 11/11 20/15
40/2 41/6 41/6 41/8 41/8
41/17 41/18 42/20 42/24
43/6 44/23 45/8 46/20
46/21 48/3 48/9 50/25 58/3
63/1 64/25 65/11 65/12
65/17 66/24 67/3 67/8
69/23 70/8 70/21 70/22
71/9 73/7 80/2 80/23 81/1
87/7 99/6 103/12
Mr. Antoine [1]        42/20
Mr. Balarezo [1]        99/6
Mr. Geise [1]        103/12
Mr. Jones [24]        4/6 42/24
45/8 46/21 48/9 50/25 58/3
63/1 64/25 65/11 65/12
65/17 66/24 67/3 67/8
69/23 70/8 70/21 70/22
71/9 73/7 80/2 80/23 81/1
Mr. Jones's [4]        3/12 20/15
44/23 48/3
Mr. Kelly [2]        7/4 41/6
41/6 41/8
Mr. Maynard [8]        9/23 9/23
10/24 11/11 40/2 41/8
41/17 41/18
Mr. Schaefer [1]        43/6
Mr. Schafer [1]        46/20
Mr. Winter [1]        87/7
Ms [8]        3/17 10/11 12/7
63/11 63/23 69/2 69/6
107/4
Ms. [1]        38/8
Ms. Franklin [1]        38/8
much [7]        3/9 9/22 33/24
54/6 61/17 76/22 89/5
multiple [1]        67/2
must [1]        78/21
my [25]        3/25 12/25 13/8
13/11 14/5 14/18 17/4 20/1
29/1 35/25 38/12 60/2 65/7
67/1 68/9 68/11 74/9 74/18
75/6 82/24 87/2 93/16
93/23 99/23 101/3
Myrtle [32]        6/25 8/2 8/20
9/14 23/18 24/16 27/24
32/6 34/17 34/20 34/25
35/4 35/11 36/11 37/24
41/9 41/21 55/12 55/16
55/21 56/5 56/18 56/25
57/3 57/16 61/10 61/10
82/14 83/4 105/9 106/8
106/15
myself [1]        19/7

## N

N.W [5]        1/15 1/18 2/2 2/6
2/10
name [11]        21/15 22/7 52/23
56/9 65/20 66/9 66/13 67/9
81/2 87/4 91/12
nature [1]        101/3
necessarily [1]        18/3
need [8]        17/20 18/3 19/18
30/7 58/7 68/13 89/16
92/22
neighborhood [2]        35/14
35/23
never [15]        17/13 19/10
70/8 70/21 70/22 72/13
72/20 80/1 81/23 84/1

**N**

never... [5]                92/24 95/25
99/25 99/25 105/15
news [2]        60/10 74/2
next [7]        17/17 31/18 56/3
56/5 71/1 87/22 95/8
night [8]        5/21 23/14 32/19
32/21 47/25 67/12 70/14
70/25
nine [2]        46/3 46/4
Nineteen [1]        47/9
no [84]        1/4 4/5 10/2 11/16
12/2 12/16 13/7 18/10
18/11 18/13 21/12 21/12
21/19 25/7 25/7 27/9 27/10
29/8 29/11 31/1 38/16
40/11 41/14 45/13 48/23
50/24 51/21 52/13 52/17
57/23 57/25 58/2 59/10
59/12 59/23 59/25 60/12
63/19 63/19 65/1 65/11
65/12 66/23 66/25 67/1
67/1 67/11 67/13 67/15
67/17 67/19 69/23 69/25
70/4 70/24 71/2 71/11
71/22 72/12 72/21 73/3
78/14 80/4 80/7 80/20
80/20 81/15 81/23 82/1
89/15 89/20 89/20 94/10
94/19 94/20 97/10 99/20
103/5 104/10 104/12 104/12
105/6 106/5 106/13
nobody [3]        17/6 28/24
84/12
non-hearsay [1]        8/7
non-truth [1]        7/6
none [3]        28/13 65/16 103/6
nonsense [2]        84/6 103/19
normal [3]        26/2 35/14
35/19
NORRIS [9]        2/2 7/12 10/1
86/14 91/14 92/20 93/3
93/7 93/18
Norris' [2]        84/8 85/8
Nos [2]        27/12 48/24
not [144]
not – [1]        15/8
notations [1]        3/11
notes [2]        3/8 3/14
nothing [5]        5/24 21/24
54/6 76/7 92/19
notice [2]        13/21 24/9
noticed [1]        3/11
notification [1]        24/5
notion [2]        84/5 84/21
November [4]        1/8 43/22
44/24 45/5
now [49]        3/21 3/21 6/23
7/25 10/8 11/2 12/18 18/23
23/18 24/13 26/20 27/6
28/4 30/20 30/25 31/11
32/18 32/19 37/23 39/15
41/5 41/15 41/25 43/15
45/14 45/17 46/15 46/25
48/18 50/3 50/7 50/11 52/2
58/21 62/16 67/23 68/19
71/17 72/13 75/2 78/14
79/4 80/10 80/22 83/8
88/13 96/24 102/10 106/4
number [18]        3/2 6/13 38/20
60/21 60/23 64/6 66/9

66/11 66/13 66/16 66/18
66/19 72/16 72/17 92/22
93/15 93/20 95/8
numbers [2]        30/13 60/15
60/25 61/8 61/9 80/22

**O**

O'Brien [2]        105/14 106/3
oath [2]        96/22 98/18
object [4]        28/13 30/24
50/17 89/24
objecting [2]        53/9 73/22
objection [32]        6/2 20/20
26/7 26/24 27/9 31/15
33/16 34/7 35/15 36/7
36/14 36/15 37/8 38/12
38/14 38/14 40/9 40/21
44/10 47/10 48/23 49/22
52/11 53/7 59/10 62/12
65/3 69/3 73/19 92/5 104/9
105/3
observation [1]        62/13
observations [2]        64/3 66/4
observe [2]        23/4 69/21
observed [6]        33/21 35/22
41/25 48/17 69/18 87/23
observer [1]        22/12
obtain [8]        24/7 38/2 39/5
43/1 43/16 43/16 45/15
46/16
obtained [2]        24/2 24/8
38/21 43/11
obvious [3]        4/19 5/11 26/6
obviously [3]        5/24 15/5
24/25
occasion [4]        13/2 14/7
14/12 17/4
occasions [1]        6/14
occupied [1]        34/10
occur [1]        91/17
occurred [3]        19/3 87/12
91/6
October [2]        54/8 54/19
odd [2]        25/20 26/1
of – [2]        16/2 57/6
off [11]        30/18 35/13 36/1
36/22 36/23 37/14 41/18
57/20 71/4 91/2 105/9
offered [3]        8/5 8/5 11/10
offering [4]        7/5 7/6 48/20
98/14
office [7]        1/15 49/16
49/17 49/20 53/1 54/3 54/4
officers [2]        13/3 14/9
Oh [2]        9/8 19/7
okay [36]        9/11 11/18 18/3
23/2 23/23 26/15 30/8
31/24 36/3 39/22 40/23
46/13 46/15 47/13 57/12
58/4 58/7 58/11 59/24 60/3
60/10 60/17 61/4 62/15
71/12 73/13 85/14 86/14
87/24 89/7 91/10 91/24
92/20 93/14 95/11 106/15
omission [3]        99/16 100/8
100/21
once [6]        20/24 47/21 55/16
85/12 101/16
one [60]        3/11 6/9 6/14
6/22 10/10 10/11 10/17
12/16 13/7 13/10 14/12
14/13 14/15 15/3 15/7

15/21 17/3 19/2 19/21 20/9
20/12 20/21 25/7 25/12
29/11 35/8 40/20 42/13
42/14 45/6 45/17 51/15
53/10 55/17 56/7 58/15
58/20 61/11 61/12 63/15
64/23 66/13 66/14 71/3
74/13 76/16 77/8 90/14
90/17 91/1 92/22 93/16
93/20 94/14 95/19 99/18
105/9 105/19 106/1 106/7
ones [2]        106/13 106/15
only [23]        5/3 5/4 6/2 9/5
10/22 12/5 20/9 20/14 22/6
26/14 38/24 47/21 48/16
55/18 55/20 77/8 78/4 79/5
85/1 92/8 100/15 106/13
106/15
open [16]        13/12 13/25
17/23 18/12 18/14 20/14
24/20 24/22 30/9 75/18
77/23 78/23 85/15 93/10
101/16 104/11
opened [1]        99/9
opened – [1]        99/9
opening [3]        75/17 76/7
93/10
opinion [1]        68/10
opposed [2]        32/10 36/19
oral [1]        102/17
orally [1]        102/16
order [2]        8/24 94/10
ordered [1]        94/11
ordinary [1]        7/18
organize [1]        87/9
original [1]        51/19
Originally [1]        57/4
originals [2]        7/22 26/25
ostrich [2]        68/23 72/10
other [49]        3/18 4/19 4/20
5/3 5/17 6/22 6/23 7/1
8/24 10/21 12/4 13/3 14/9
15/22 20/12 20/14 28/20
32/10 34/22 35/24 35/25
35/25 36/1 37/4 45/6 45/15
47/19 48/12 53/11 54/15
58/24 61/12 71/4 78/16
79/25 81/5 82/14 82/19
83/2 87/19 88/7 88/9 89/22
90/14 91/1 97/24 98/1
102/5 105/5
others [1]        34/16
otherwise [4]        7/19 76/17
99/3 103/20
ought [1]        13/21
our [8]        14/14 15/24 15/24
20/21 21/19 67/24 83/22
91/21
out [53]        4/20 7/19 8/23
14/22 16/23 18/22 20/24
21/22 22/11 29/18 29/21
32/2 32/22 33/14 33/15
33/21 33/24 35/23 36/11
39/3 43/17 45/4 47/16
47/25 54/5 54/11 54/23
58/9 70/2 70/3 74/23 74/23
74/25 76/1 76/16 77/21
79/11 81/1 83/13 85/5
85/14 85/21 89/13 90/12
93/8 96/4 99/2 100/12
101/5 101/8 101/10 104/13
106/15

**O**

outside [8]          23/14 35/12
42/2 61/10 73/15 83/24
84/15 85/2
over [11]          3/21 15/22 16/20
27/22 28/14 38/14 40/9
49/13 70/13 76/7 104/24
overhead [1]          49/11
Overruled [7]          31/2 34/8
35/16 49/24 53/13 68/17
90/1
overt [1]          4/12
own [2]          67/24 83/22
owner [1]          44/7
owners [1]          45/24

**P**

page [10]          43/23 43/24 44/5
44/13 94/25 95/14 96/17
96/18 107/7 107/10
pages [1]          67/2
paper [5]          14/12 60/6 60/7
60/10 60/15
paperwork [1]          78/8
parameters [1]          104/15
parcel [1]          5/13
Park [10]          6/14 23/16 42/7
48/4 49/7 49/14 50/5 53/2
59/18 67/14
parked [4]          23/14 35/12
42/1 61/10
parking [2]          32/23 33/23
Parks [2]          44/21 45/10
part [11]          3/22 5/4 5/13
5/16 6/7 7/24 9/11 39/13
62/25 85/14 89/20
parte [3]          12/18 13/15
13/21
particular [6]          4/3 20/1
28/10 34/2 64/19 71/13
particularly [2]          15/6 15/7
pass [2]          74/14 77/9
passing [1]          47/21
patron [1]          25/19
pause [1]          11/21
pay [1]          14/23
peek [6]          24/3 25/5 27/4
31/12 75/25 105/11
peeks [1]          76/3
Pelos [1]          5/9
pen [20]          28/8 28/11 28/12
28/14 28/21 28/22 28/23
28/24 29/7 29/9 29/10
29/11 29/16 30/11 31/13
31/25 57/2 62/20 62/25
71/18
people [31]          10/17 12/24
13/5 13/17 16/4 16/8 16/12
16/19 17/7 17/9 18/19
19/13 19/16 19/19 20/22
21/3 21/13 22/3 32/11
35/10 65/5 74/17 74/20
76/23 82/2 82/3 85/11
85/25 87/22 102/19 105/5
people's [3]          16/23 20/4
85/12
perfectly [1]          11/9
perhaps [5]          14/14 58/19
79/1 84/24 102/25
perhaps – [1]          84/24
period [1]          62/5

permanent [1]          61/12
permissible [1]          11/9
permission [3]          46/16 46/19
77/12
person [9]          5/10 15/23
19/21 20/18 58/24 69/12
69/21 70/22 72/9
person's [1]          87/4
personal [3]          44/14 62/10
62/13
personally [7]          12/6 23/4
23/7 32/24 53/6 54/18
56/21
persons [2]          19/3 95/19
persuaded [1]          100/16
perused [1]          3/8
petty [1]          101/2
phone [16]          28/8 28/11
28/21 29/9 29/11 30/12
30/13 30/16 30/17 30/22
31/7 56/10 56/15 79/14
79/15 91/21
photo [2]          9/1 9/19
photocopy [1]          9/20
photographed [1]          6/11
photographer [1]          106/12
photographs [3]          25/3 47/15
50/3
photos [1]          4/22
physically [2]          80/2 81/9
pick [2]          71/9 84/18
pick-up [1]          91/6
picked [11]          5/6 48/12
54/12 56/3 60/24 71/7
90/19 90/23 91/3 106/6
106/6
picking [1]          72/8
picture [12]          27/21 50/8
50/12 51/14 72/10 105/15
105/19 106/2 106/3 106/3
106/4 106/6
pictures [14]          27/3 27/23
50/15 51/18 51/18 102/20
103/2 103/4 104/25 105/10
105/12 106/8 106/10 106/16
piece [5]          14/12 60/6 60/7
60/15 90/15
pinging [6]          30/18 30/20
30/21 31/1 31/6 62/23
place [7]          42/14 43/10
63/17 64/9 64/11 64/17
90/15
placed [4]          11/24 29/16
32/1 80/2
places [2]          6/15 42/14
plates [1]          33/22
please [5]          85/19 88/6
88/11
pleased [1]          16/22
Plymouth [2]          61/9 61/14
point [24]          10/10 16/1
19/12 28/4 32/18 38/25
39/11 42/17 64/7 70/4 70/8
70/10 76/3 79/5 79/6 79/24
81/25 84/8 88/20 89/24
89/25 91/19 94/19 94/21
poisonous [1]          102/7
position [3]          19/19 94/9
98/12
possible [2]          74/6 98/1
Possibly [1]          89/11
potential [2]          21/9 22/9

power [1]          101/1
preliminary [1]          3/4
premises [1]          39/20
preposterous [3]          18/9
18/13 18/15
presence [7]          83/13 83/25
84/15 85/2 99/2 100/12
101/5
present [3]          6/19 22/16
59/3
presumably [1]          73/6
presume [1]          55/24
presumption [1]          55/23
pretty [2]          83/5 89/5
previous [2]          48/1 86/18
PREVIOUSLY [1]          22/15
Prince [1]          23/15
principal [1]          44/7
printouts [3]          28/22 28/23
28/24
prior [1]          90/22
probably [3]          37/3 47/11
77/1
probative [1]          98/20
problem [15]          4/10 7/17
7/25 20/6 20/24 76/15 78/7
83/6 94/2 97/21 98/5
101/15 101/19 105/6 105/24
procedure [1]          93/16
proceed [1]          80/18
proceeding [1]          20/14
proceedings [3]          1/24 11/21
108/6
proceeds [4]          67/7 79/10
83/21 89/7
process [1]          6/24
produced [1]          1/24
projector [1]          26/23
promised [1]          59/6
proper [4]          14/17 94/4
100/18 104/21
property [3]          43/5 46/22
46/24 95/19
protect [1]          21/6
provide [3]          3/18 55/1
102/24
provided [2]          3/7 30/14
public [1]          14/25
purportedly [1]          7/4
purpose [1]          71/24
purposely [1]          97/23
purposes [3]          16/23 20/23
92/6
pursuant [1]          73/2
pursue [1]          80/17
put [18]          4/10 6/17 7/2
13/21 15/25 16/18 17/23
18/14 19/19 26/23 30/25
54/2 75/6 75/22 82/21 95/3
96/11 98/24
putting [2]          9/22 97/12

**Q**

question [27]          12/10 15/11
51/17 56/7 58/15 58/20
60/12 62/9 65/22 67/1 68/9
68/11 68/15 68/16 69/20
73/11 77/4 80/17 89/13
90/14 95/20 96/4 97/11
98/11 99/17 102/11 104/11
questioned [1]          6/20
questioning [1]          75/17

**Q**

questions [8]          59/6 85/23
93/2 95/15 101/10 105/4
105/13 105/25
quick [1]          85/23
quickly [3]          13/4 13/24
35/13
quite [1]          93/21
quote [1]          94/25

**R**

rabbit [1]          7/12
RACHEL [1]          1/14
ran [2]          33/25 91/10
rate [3]          35/14 35/16 35/19
Rather [1]          11/10
reach [1]          18/24
read [4]          40/24 62/11 95/15
95/24
ready [4]          12/13 22/18
58/13 87/15
real [3]          39/9 39/19 41/7
realize [1]          4/16
really [8]          8/11 85/9 93/9
94/6 98/8 98/23 99/10
100/10
reask [1]          65/22
reason [2]          75/1 94/17
reasons [3]          42/13 54/2
93/18
reassigned [2]          54/4 54/5
recall [3]          63/20 63/21
86/6
received [8]          8/2 65/13
67/5 68/22 86/17 86/23
87/3 87/8
recess [3]          58/8 58/12
106/19
recognize [6]          38/22 39/11
39/15 39/22 49/3 60/25
recollection [1]          64/8
record [7]          7/15 11/15
15/25 17/23 60/2 94/13
108/5
recorded [3]          1/24 48/6
48/17
recording [1]          47/23
records [2]          5/8 5/8
recovered [1]          4/5
Recreation [2]          44/21 45/10
RECROSS [1]          107/1
redirect [2]          75/2 107/1
refer [1]          46/8
reference [2]          5/23 45/11
refresh [1]          64/8
refrigerator [1]          25/22
regarding [8]          3/19 4/1
5/19 78/6 90/2 104/22
105/8 105/9
register [17]          28/8 28/11
28/12 28/14 28/21 28/22
28/23 28/24 29/7 29/9
29/10 29/11 30/11 31/13
31/25 57/2 62/25
registered [4]          5/7 91/5
96/14 96/16
registers [2]          62/20 71/18
registrant [1]          90/16
relate [2]          65/5 65/7
related [3]          12/1 14/9
65/13

relates [1]          43/5
relating [2]          6/10 65/16
relation [2]          29/22 87/7
relevance [6]          8/12 8/14
53/9 65/4 94/3 98/11
relevant [4]          4/2 11/12
53/8 77/15
religious [1]          82/16
relying [1]          106/1
remaining [1]          10/22
remains [2]          82/3 82/13
remarkably [1]          85/4
Remax [2]          10/17 39/9
remember [9]          22/25 46/4
60/16 61/15 64/1 64/19
66/14 87/14 87/14
remembering [1]          90/22
remind [4]          53/20 55/5 61/1
96/13
remove [2]          24/8 25/3
removed [1]          3/16
renew [3]          3/25 4/9 38/12
renewed [1]          4/18
rent [2]          8/15 11/12
rental [7]          8/2 10/24 38/3
39/2 39/9 39/13 43/15
rented [7]          4/20 10/17
37/25 43/13 72/18 73/6
81/2
renters [1]          90/17
renting [4]          8/23 11/11
42/8 42/24
reorganizing [1]          54/3
replaced [1]          25/2
report [9]          65/23 66/13
66/16 66/18 66/19 78/13
85/25 100/9 100/21
Reporter [2]          1/21 108/3
reports [2]          65/21 65/22
65/23 66/7 66/12 66/23
67/1 94/18 94/18 97/8
98/20
representing [1]          101/14
request [2]          3/20 92/4
requested [3]          29/1 29/1
102/21
requirements [1]          75/24
requires [1]          101/3
reserve [1]          12/9
residence [1]          56/12
residency [1]          45/2
respect [11]          4/7 21/8
47/20 64/25 78/25 79/4
93/16 93/23 97/22 104/20
106/8
response [1]          26/11
responsibility [1]          16/23
responsible [1]          84/11
rest [2]          37/21 58/18
result [4]          19/1 21/2 101/8
102/3
results [1]          4/15
results – [1]          4/15
resume [2]          22/18 106/18
resumed [2]          22/20 59/4
retained [3]          7/23 7/23
24/20
return [1]          85/19
revealed [1]          91/12
reverse [1]          7/12
review [4]          3/23 12/8 47/25
63/25

reviewed [1]          47/24
right [73]          6/12 7/16 9/13
10/8 11/6 12/9 12/13 12/18
12/19 13/12 15/13 15/24
19/13 19/14 20/10 20/13
22/12 23/21 27/22 30/3
33/17 34/8 37/15 38/13
40/7 40/16 46/14 47/9
55/13 57/25 58/16 58/17
61/6 62/14 62/17 62/21
62/24 63/7 63/12 64/14
65/11 66/3 66/5 66/11
66/21 67/21 68/7 69/4
69/10 69/16 70/16 70/19
71/1 71/4 71/24 72/1 72/3
72/6 72/7 72/9 72/20 73/14
73/14 79/7 79/22 80/24
91/14 93/1 93/4 95/23 96/5
96/12 99/10
risen [1]          16/2
risk [1]          80/18
road [2]          52/24 93/24
ROIs [1]          66/1
rolodex [1]          52/22
room [3]          1/22 25/18 49/20
RPR [2]          1/21 108/12
RUDOLPH [1]          2/6
rule [1]          14/23
ruled [3]          40/4 78/1 83/11
ruling [1]          94/8
run [2]          91/20 97/25
running [1]          91/17

**S**

said [22]          30/20 35/19
37/14 50/21 57/5 62/3 63/6
65/9 67/3 67/20 67/23 68/4
68/19 74/12 78/15 80/23
81/18 84/8 94/23 99/24
106/11 106/13
said – [1]          67/23
saint [1]          25/19
sale [1]          79/10
sales [2]          29/23 89/7
same [14]          13/16 17/23
18/17 21/2 22/4 27/21
31/11 43/3 43/5 43/10
50/13 51/12 54/25 81/20
Saran [2]          51/25 52/6
sat [1]          3/9
Saturday [2]          32/20 90/25
saw [36]          5/23 6/13 6/15
12/4 12/6 26/8 33/11 33/20
34/11 36/19 56/21 57/14
70/2 70/8 70/21 70/22
76/10 76/14 76/14 78/9
81/23 81/23 82/2 86/3 86/7
88/3 88/17 91/18 95/25
97/9 102/3 102/20 104/5
104/23 105/4 105/5
say [34]          5/3 10/9 13/10
19/2 19/21 19/25 27/8 28/4
35/16 36/17 53/23 57/19
58/20 62/17 67/10 67/12
67/14 67/16 67/18 74/5
79/24 81/4 81/20 81/21
82/12 84/20 86/23 87/13
94/20 98/12 100/6 101/2
102/10 106/14
saying [20]          14/2 15/17
19/5 19/9 29/6 29/8 39/20
50/25 53/9 62/12 68/23

**S**

saying... [9]                78/17 82/12
83/23 84/24 99/18 103/22
104/4 104/7 105/14
says [5]           29/3 29/5 46/12
49/11 49/17
Schaefer [1]         43/6
Schafer [2]      46/20 46/20
scrambling [1]         87/15
seal [1]        12/21
sealing [6]         25/14 25/16
26/21 26/22 27/17 27/23
search [39]        4/22 7/24 24/2
24/4 24/7 24/8 24/13 24/19
41/22 49/8 53/5 53/18
53/19 73/17 73/24 75/25
77/8 77/15 77/18 81/17
83/9 83/24 84/9 84/22
85/12 85/13 93/17 94/11
94/12 97/25 98/9 98/12
98/22 98/23 100/19 102/3
102/7 104/11 104/21
searched [2]         25/2 85/11
second [10]        7/16 10/18
35/8 44/5 44/20 55/20
56/15 73/1 73/20 105/9
seconds [1]         12/16
secret [1]        12/22
Sector [1]        91/23
security [4]         15/4 15/15
15/19 17/24
see [53]      3/24 8/9 9/3 9/11
9/15 9/24 10/20 14/5 16/21
18/21 23/7 23/13 24/6
26/23 30/3 32/16 32/24
33/8 33/13 34/18 34/20
34/24 36/18 36/21 38/25
44/20 45/3 45/11 48/14
49/10 51/12 52/20 55/22
70/4 71/9 73/13 73/15 75/3
75/4 75/8 75/18 78/5 81/9
81/18 82/1 88/6 93/10
94/13 99/13 100/15 100/22
101/25 105/22
seek [4]       20/17 40/4 40/5
75/6
seeking [2]         27/7 101/20
seem [1]         58/19
seems [1]         94/6
seen [11]       7/3 26/25 47/8
59/9 60/5 60/10 82/11 97/1
98/19 105/10 105/15
SEGAL [1]         1/11
selze [1]         78/5
seized [4]       80/4 80/7 103/3
103/6
sending [2]         30/23 31/7
sense [6]       16/13 25/4 25/8
48/2 53/24 84/16
sent [1]         5/21
sentence [3]         26/13 26/14
26/15
separate [1]         63/14
serendipity [1]         72/2
series [1]         50/2
serious [1]         15/19
SESSION [1]         1/10
set [1]        47/22
several [9]         12/24 14/3
23/8 35/25 48/8 63/21
64/12 64/21 94/17

she [120]
she'll [2]         30/6 82/21
she's [8]       5/25 6/6 6/20
78/17 95/14 99/1 99/16
99/17
shopping [2]         25/16 25/17
short [3]       57/22 85/17
85/18
shortly [3]         53/17 53/23
87/16
should [15]        3/23 14/17
14/23 19/19 20/22 22/2
51/17 58/19 74/17 84/9
99/15 100/21 102/2 102/8
104/18
shouldn't [2]         14/21 58/10
show [42]       4/24 5/21 7/18
8/5 11/10 26/22 27/6 27/20
38/6 38/20 38/24 39/10
39/15 39/22 40/14 41/15
43/20 44/5 45/21 46/25
46/25 47/2 47/7 48/8 48/18
49/2 50/2 50/4 50/7 50/9
50/11 50/15 51/24 52/2
52/9 59/7 59/21 63/22
63/23 64/6 75/15 75/16
showing [5]        30/17 38/25
43/4 51/3 60/5
shown [2]       96/16 106/2
shows [3]       4/25 17/14 74/8
shrink [5]       4/25 52/6 52/8
75/5 83/5
sic [1]         72/8
side [4]       10/5 15/21 26/16
27/22
sight [1]        37/4
signals [2]         30/23 31/8
signature [3]         8/25 9/19
9/21
signatures [1]         9/25
silver [3]       60/23 91/2
96/13
similar [3]       83/1 83/5 85/4
simple [2]       69/20 94/17
since [4]       37/11 55/25 62/2
83/17
sincerely [1]         17/13
single [1]        26/2
sir [3]       62/4 73/3 103/5
sit [4]       8/16 16/4 16/20
17/19
site [1]        29/14
sits [3]       15/21 15/22 17/12
sitting [1]        21/25
situation [1]        20/1
sketch [4]       49/3 49/3 49/5
49/6
slightly [1]        85/17
small [1]        24/23 49/16
49/17
smaller [2]       49/20 53/1
sneak [7]       24/3 25/5 27/4
31/11 75/25 76/2 105/11
snitch [3]       17/16 18/1 18/2
snitches [1]        19/4
so [90]      3/20 4/9 5/10 6/10
7/11 8/3 8/21 11/12 11/12
13/8 13/9 14/13 14/23 15/5
15/9 16/18 17/6 19/10
19/18 19/24 20/9 20/21
21/12 22/9 23/21 24/11
26/23 29/14 29/17 30/16

32/1 32/5 32/21 33/24
38/14 43/10 45/6 46/3
50/18 53/23 54/22 57/9
57/19 61/6 62/3 62/5 62/6
62/16 63/14 64/16 72/5
73/6 73/17 74/5 75/25 76/8
76/25 77/6 78/13 80/20
82/3 82/19 82/24 84/4 85/4
85/18 86/17 90/6 90/14
90/22 91/10 94/5 94/14
95/24 97/1 98/2 98/5 98/10
98/24 99/5 101/9 102/8
102/13 102/23 102/24 103/7
103/15 104/19 105/2 105/16
some [48]       4/21 4/22 10/1
13/9 15/4 16/25 18/7 18/16
18/16 20/16 21/2 21/17
23/3 25/11 26/3 26/18
37/24 50/15 51/4 53/11
53/23 54/15 58/24 65/23
67/20 70/10 72/23 73/7
74/5 76/23 77/10 80/10
84/14 85/8 85/10 87/22
90/5 90/10 90/21 90/25
94/3 94/7 95/16 97/4
100/19 104/13 104/18 106/9
somebody [18]         7/19 7/23
12/4 14/22 15/20 17/17
19/25 21/20 37/19 50/23
62/11 71/14 77/8 77/11
88/3 92/8 94/7 100/17
somehow [2]         3/5 82/10
someone [5]         25/17 51/18
77/22 81/1 91/3
someone's [3]         16/9 16/10
84/21
something [21]        17/20 19/18
24/6 26/18 53/14 54/8
54/19 62/10 68/13 78/1
82/6 83/10 83/20 94/8
97/15 98/21 100/4 100/9
100/20 102/2 102/3
Sometimes [1]         74/25
somewhat [1]         19/25
somewhere [3]         97/1 102/25
104/4
son [2]       15/17 18/1
soon [2]       91/18 93/7
sorry [21]       4/16 9/6 9/17
10/2 22/18 27/8 35/7 35/9
35/10 41/3 45/18 47/4 47/6
48/21 60/13 65/24 90/21
90/24 95/21 96/2 103/13
sort [9]       8/6 8/7 16/13
17/9 23/9 50/15 56/19
95/16 97/25
sought [1]        54/23
sounds [1]        19/8
south [1]        36/12
Southwest [3]         29/17 29/17
32/1
space [3]       48/3 49/11 51/19
speaks [1]        40/21
Special [6]       5/24 8/1 35/7
38/19 41/20 106/11
specific [1]        99/17
specifically [3]         48/3
94/22 95/20
Speculation [1]        36/16
sped [1]        36/11
speed [5]        35/14 35/17
35/20 35/23 36/5

**S**

spoke [6]    19/22 99/7 99/12 99/22 99/23 99/25
spoken [2]    19/3 92/23
spools [1]    52/6
staging [1]    11/12
stake [1]    84/21
stand [6]    4/14 5/25 15/5 15/6 15/22 19/23 74/4 85/22
standard [1]    28/12
standing [3]    5/14 76/6 83/16
start [2]    17/8 46/4
started [1]    54/12
stash [2]    5/2 8/15
statement [1]    9/23
statements [1]    39/12
STATES [4]    1/1 1/4 1/11 3/3
static [1]    26/10
status [1]    45/15
stay [1]    48/9
stayed [3]    36/2 36/2 37/19
stenography [1]    1/24
stepped [1]    18/22
steps [4]    42/18 47/19 74/17 93/20
still [8]    7/14 7/17 8/22 25/17 28/1 30/17 83/4 96/3
stipulation [1]    105/17
stood [1]    33/24
stopping [1]    76/17
storage [1]    6/14
straight [1]    32/6
street [6]    1/15 1/18 9/9 22/4 23/5 47/22
strewn [1]    25/18
stricken [1]    26/14
strike [2]    26/11 44/11
stronger [1]    83/7
stuck [1]    61/13
stuff [9]    8/6 25/9 25/17 75/23 81/16 82/21 84/17 90/10 101/21
stuff -- [1]    101/21
stupid [2]    81/24 82/1
subject [3]    11/7 40/8 105/9
subpoena [2]    10/15 101/1
subsequently [2]    72/16 102/5
substantial [1]    21/21
substantive [1]    5/14
such [2]    66/11 66/11
sudden [1]    106/4
sufficiently [1]    98/20
suggest [2]    78/1 82/5
suggesting [6]    17/9 20/22 21/10 75/20 82/20 100/4
suggestion [3]    17/12 18/16 98/21
Suite [3]    1/19 2/7 2/11
Summit [24]    8/21 45/2 45/17 55/14 56/2 56/14 67/18 69/15 69/21 70/1 70/21 70/22 72/13 78/10 79/4 79/25 80/1 86/1 87/1 88/7 88/13 91/6 91/9 106/16
summoned [1]    87/11

supervisor [4]    42/15 44/3 44/18 87/2
support [6]    12/25 14/4 14/18 38/3 43/15 43/16
supposed [2]    33/17 40/18 46/1
suppress [9]    75/22 77/2 83/15 83/16 102/9 102/16 103/5 103/6 104/19
sure [19]    8/10 9/4 12/22 16/19 17/3 22/8 30/6 34/12 43/3 58/16 58/18 62/8 65/6 72/25 96/3 99/8 103/25 105/7 106/12
surveillance [22]    23/10 23/20 47/16 47/19 48/5 48/6 54/13 63/1 63/4 68/20 69/2 69/6 69/10 70/14 70/19 70/25 71/19 71/20 86/20 86/25 86/25 88/13
suspect [1]    74/4
Sustained [2]    36/8 78/22
switch [1]    47/25
SWORN [1]    22/15

**T**

tables [1]    49/21
tactics [1]    82/22
tag [8]    33/25 34/1 60/23 61/1 61/2 61/12 61/12 80/22
tags [4]    61/9 91/11 91/17 91/20
take [16]    13/24 16/14 21/4 21/10 22/19 31/21 47/19 58/7 83/24 84/15 85/1 85/17 85/22 87/10 87/12 91/22
taken [6]    14/15 50/8 58/12 71/7 106/16 106/19
takes [1]    15/22
taking [3]    16/22 42/18 85/14
talk [14]    5/24 6/1 11/19 11/19 15/13 18/18 20/17 21/9 37/23 42/4 95/18 98/3 100/25 101/15
talked [11]    43/6 45/1 55/12 62/20 62/24 97/5 98/7 98/16 98/25 100/2 101/6
talking [14]    7/12 12/1 12/3 19/11 22/24 23/4 23/18 43/3 43/10 56/8 62/2 65/17 78/15 79/5
talks [1]    96/20
tape [2]    27/17 48/1
tapes [2]    47/25 63/9
team [7]    23/20 36/25 37/4 37/21 70/13 72/13 77/11
technically [1]    30/21
technique [1]    75/16
techniques [1]    66/5
technology [4]    30/25 62/20 62/23 71/17
telephone [1]    55/7 65/12
tell [25]    6/11 16/20 18/2 24/1 24/18 26/8 28/10 28/11 35/9 36/10 36/17 41/8 69/23 76/14 82/25 83/14 85/24 90/2 92/25 99/9 101/19 101/22 101/23

102/12 102/19
telling [7]    19/9 30/12 99/1 103/10 105/11 105/16 106/1
temporary [2]    61/2 61/12
ten-minute [1]    58/8
tender [1]    58/15
tends [1]    4/8
term [2]    19/10 40/18
terminated [2]    46/21 46/23
terminating [1]    11/11
terms [5]    5/3 20/7 28/21 29/23 91/17
terrible [1]    76/6
terribly [1]    78/1
testified [13]    5/10 23/19 26/20 41/5 65/19 71/12 71/12 76/12 83/8 84/3 94/19 96/21 98/18
testify [9]    6/12 8/1 10/14 15/17 16/11 17/16 50/18 54/14 73/23
testifying [3]    20/1 68/7 75/13
testimony [19]    3/6 4/1 4/4 4/6 8/18 8/19 8/20 20/17 55/6 56/1 58/11 76/15 77/13 90/22 95/1 96/11 99/13 100/14 101/13
Texas [5]    30/17 30/19 31/9 33/22 67/6
than [11]    4/20 12/4 21/20 35/14 35/19 37/10 37/12 63/15 70/14 101/3 105/19
thank [11]    20/25 52/16 57/18 58/5 60/3 61/17 61/20 79/2 92/19 93/5 106/18
that [547]
that -- [5]    4/19 10/19 45/14 57/1 105/16
that's [70]    4/8 5/11 6/12 7/9 8/3 10/17 13/13 14/16 14/17 16/24 17/21 18/8 19/6 19/10 24/8 29/20 29/20 29/23 33/17 38/15 38/23 39/2 40/9 41/16 43/7 50/5 50/8 51/1 52/23 53/10 57/5 57/18 58/16 58/22 58/25 60/12 61/18 62/25 63/14 64/8 64/13 64/16 67/1 69/1 73/6 81/4 84/6 85/14 86/20 88/20 89/23 91/10 91/11 93/5 93/11 95/5 96/18 97/8 97/17 97/18 98/17 99/13 100/15 101/8 101/13 101/19 102/12 103/8 104/1 106/14
the -- [1]    50/16
their [6]    15/17 18/17 33/14 76/3 77/23 83/20
them [48]    3/8 7/2 10/15 10/16 11/8 13/4 16/20 16/21 18/24 24/11 25/18 27/18 33/13 33/20 34/18 34/24 36/18 36/24 37/2 47/7 47/12 48/20 48/23 51/20 51/21 51/22 53/10 54/23 54/24 58/18 66/11 66/22 77/6 81/9 85/1 86/10 90/4 90/20 92/11 96/23 97/10 100/25 102/4 102/4

**T**

them... [4]    102/10 102/22
102/23 102/23
themselves [3]    7/22 20/22
96/25
then [36]    15/21 17/17
18/23 21/21 24/7 29/24
33/18 33/21 36/12 37/20
47/6 49/16 49/19 56/5 59/1
65/8 66/14 68/14 69/15
71/6 75/10 76/19 77/1
77/20 82/5 82/21 82/21
85/9 99/8 102/5 102/16
104/10 104/24 105/13 106/1
106/12
there [125]
there's [14]    4/5 4/25 5/1
5/1 5/15 8/22 12/9 12/16
21/24 97/8 97/9 98/21
104/12 106/4
thereafter [2]    70/10 87/16
thereby [1]    84/12
therein [1]    8/4
these [51]    7/2 7/6 7/23
8/1 8/2 8/15 8/23 9/11
9/13 9/13 10/21 11/2 11/14
14/7 14/17 16/8 16/12 18/7
20/22 25/19 34/15 38/20
39/8 47/15 51/18 51/18
52/2 60/15 60/25 61/8
62/20 65/5 65/16 74/9
74/17 76/1 76/2 76/7 78/16
81/19 82/19 84/18 94/18
97/1 98/8 99/1 102/12
102/19 102/21 106/13
106/14
they [152]
they -- [1]    33/15
they'll [4]    11/13 11/15
21/21 76/16
they're [21]    7/10 7/24 8/6
9/15 11/4 15/5 22/4 22/6
22/11 74/9 74/20 77/5
78/14 82/6 83/23 94/9
96/25 101/14 104/1 105/16
106/1
thin [2]    7/20 99/11
thing [19]    5/3 5/17 6/22
7/12 13/1 17/23 19/21
20/13 26/1 43/3 51/12
52/20 62/24 64/4 85/6
99/18 100/15 102/20 106/1
thing -- [1]    85/6
things [23]    8/23 8/25
15/24 17/8 25/23 29/22
66/3 68/24 71/18 78/16
82/5 93/21 93/22 93/25
97/1 98/8 99/1 100/4
101/19 102/13 102/21 103/3
105/25
think [85]    3/6 3/9 3/23
4/8 5/13 6/2 7/17 7/22
7/24 7/25 8/8 10/11 10/14
10/18 11/9 13/2 13/10
13/13 13/20 14/16 14/19
15/12 15/23 16/3 16/8
16/12 16/17 17/2 17/3 17/4
17/11 19/11 19/12 19/18
19/24 26/8 26/14 27/6 38/6
40/4 40/21 41/7 48/22
50/20 53/8 53/12 57/5 59/6

66/1 70/13 72/23 74/16
76/6 77/9 77/14 77/22 79/2
80/23 82/13 83/3 83/7
83/19 84/16 85/4 93/3
93/12 93/19 94/2 94/16
96/15 97/14 97/15 97/15
97/17 97/20 98/18 99/15
100/10 101/3 101/4 101/8
101/9 102/2 104/24 105/2
thinking [1]    89/5
thinks [2]    13/6 77/17
third [15]    44/13 55/11
56/21 64/7 70/4 70/7 71/6
72/9 72/11 82/11 88/17
88/21 90/20 90/23 91/3
thirty [1]    47/5
Thirty-nine [1]    61/19
Thirty-three [2]    58/17
59/11
this [186]
Thomas [8]    7/4 7/9 8/8
8/12 8/13 40/1 41/16 45/10
those [22]    4/22 5/8 7/5
7/6 8/17 10/25 27/23 39/12
48/11 48/16 51/16 55/1
58/23 63/9 66/7 66/21
66/23 68/24 71/18 87/23
91/11 97/8
though [4]    19/13 36/1
90/14 104/25
thought [2]    25/20 106/7
three [24]    9/5 25/15 27/5
30/18 34/22 36/1 48/12
48/16 55/10 57/9 58/21
59/6 62/5 62/5 62/17 62/17
63/17 70/2 72/16 81/24
82/2 88/10 88/11 90/24
Three -- [1]    72/16
through [11]    3/20 11/14
24/24 41/3 47/3 47/7 48/23
48/25 58/24 62/10 64/13
throughout [1]    12/25
thru [1]    107/16
Thurs [1]    1/8
ticket [2]    29/18 32/3
time [35]    6/7 18/17 18/24
19/22 19/24 20/1 23/23
25/1 30/16 32/18 33/8
34/11 36/5 36/10 36/10
36/25 40/3 40/5 42/9 45/14
47/17 47/17 53/24 55/11
55/20 56/3 56/8 57/14 68/7
71/11 87/21 90/11 91/1
99/25 102/13
timeframe [1]    57/22
times [6]    23/8 48/8 55/10
57/9 64/22 102/22
title [1]    46/9
to -- [1]    31/4
together [3]    37/15 87/9
90/15
told [27]    5/20 13/10 29/10
29/24 62/11 68/2 71/15
74/20 76/20 78/11 78/11
78/19 78/19 80/17 86/2
86/7 87/21 88/3 92/8 92/10
92/12 94/24 96/23 97/24
99/12 102/8 103/9
too [3]    24/25 85/14 105/23
took [11]    13/11 25/3 27/23
35/13 51/18 71/4 74/17
87/17 90/20 93/20 104/25

top [1]    60/21
towards [1]    54/18
towel [2]    50/10 50/13
towels [1]    26/4
tower [2]    30/14 62/23
towers [5]    30/15 30/18
30/23 31/8 31/8
towers -- [1]    30/23
town [1]    55/23
tracked [1]    106/12
tracker [10]    3/12 3/15
5/23 11/23 63/12 63/15
63/17 64/9 64/11 64/17
tracking [1]    12/11
tractor [1]    49/15
trailer-size [1]    49/16
transcript [3]    1/10 1/24
108/5
transferred [1]    54/3
tree [1]    102/7
trial [8]    1/10 12/25 13/1
14/3 14/5 15/1 19/8 102/10
triggering [1]    84/4
trip [1]    60/24
trouble [1]    21/6
truck [22]    3/12 3/13 3/15
5/18 6/9 6/11 6/13 6/15
6/17 9/16 11/24 12/4 12/6
22/25 23/5 23/7 23/13 42/1
48/9 49/16 64/20 64/21
true [4]    8/8 17/25 51/1
80/11
truth [13]    7/5 7/9 7/10
8/5 8/7 11/10 19/9 30/2
31/16 75/15 78/21 97/2
99/1
try [1]    100/14
trying [11]    17/21 18/24
31/4 42/18 55/25 57/21
65/6 74/22 77/25 81/14
94/7
turn [2]    74/25 95/24
turned [2]    3/21 28/14
Twenty-four [1]    63/6
Twenty-seven [1]    95/10
Twenty-two [1]    47/5
twice [3]    55/18 55/19
55/20
two [25]    6/23 7/1 7/2 7/3
8/9 10/10 10/22 11/19
12/15 18/21 30/18 34/11
34/12 40/5 42/15 48/11
61/8 66/18 69/20 71/4
79/25 83/2 88/10 88/11
105/10
type [4]    24/7 24/8 42/21
51/25
types [1]    42/17
typical [2]    26/1 49/19
Tyrone [1]    20/15

**U**

U.S [2]    1/15 1/22
Uh-huh [1]    66/2
ultimately [1]    56/13
under [5]    11/15 12/21
23/20 96/21 98/18
understand [14]    19/11
21/23 22/1 31/2 62/8 62/12
73/11 83/12 86/9 94/15
101/18 103/7 104/3 104/4
understood [2]    22/13 79/9

**U**

unfortunately [4]          24/22
48/14 54/6 54/7
UNITED [4]      1/1 1/4 1/11
3/3
universe [1]          105/12
unlawful [2]         4/6 94/11
unless [8]      16/4 17/8 18/6
19/15 75/22 77/18 83/15
85/8
unnecessarily [1]        11/15
until [8]      5/22 62/2 70/8
79/6 79/16 79/24 88/14
101/10
untrue [1]          100/5
up [44]      5/6 7/10 8/6 13/24
16/5 16/6 17/17 22/19
26/23 47/22 48/8 48/12
49/10 50/21 50/23 54/12
56/3 60/24 70/3 70/7 70/8
71/7 71/9 71/9 72/8 72/10
74/4 75/18 79/6 79/24
80/22 83/24 84/15 85/17
87/2 88/14 88/17 90/19
90/23 91/3 91/15 95/25
101/16 104/11
up -- [1]          87/2
upstairs [1]          25/12
us [20]      3/7 14/14 16/11
20/24 21/10 22/10 24/3
26/8 30/7 78/11 78/11
81/11 82/25 85/24 92/14
94/2 94/24 101/19 102/12
102/19
us -- [1]          94/2
use [7]      11/2 11/8 19/7
19/10 51/10 83/21 84/2
used [2]      100/21 102/5
useful [1]          99/14
using [4]      6/9 7/10 9/15
11/12
utilities [1]          42/16
utilized [1]          30/22
utilizing [1]          30/16

**V**

vacate [3]      39/20 45/25
45/25
vacated [2]      46/23 46/24
vacuum [1]          27/16
van [2]      61/9 61/14
various [4]      23/10 49/21
54/2 93/18
vehicle [5]      33/22 34/13
34/14 36/2 64/19
vehicles [2]      48/12 48/16
verify [1]          98/17
versus [1]          3/3
very [9]      5/21 33/23 35/12
35/13 40/15 48/5 56/8
61/17 67/2
video [6]      47/23 47/24 48/6
63/1 63/4 72/5
view [2]      13/1 14/5
viewed [1]          63/9
violating [1]          94/1
Virginia [2]      36/23 37/15
visit [2]      56/15 56/21
voir [4]      78/18 86/15 89/25
107/7
VOLUME [1]          1/10

voluminous [1]          94/18

**W**

WAILS [1]          91/22
Walt [3]      54/14 73/20 83/14
Walker [3]      1/21 108/4
108/12
walks [1]          93/8
wall [1]          51/5
want [61]      6/8 6/22 7/10
12/23 16/17 18/18 18/25
19/2 20/3 20/19 21/9 21/19
24/9 24/11 26/6 28/16 30/5
37/23 38/6 42/4 44/25
46/25 48/18 49/2 50/3 59/7
68/9 68/10 73/13 75/23
76/9 77/4 77/18 77/20
78/15 78/18 78/21 80/17
81/10 82/4 85/9 88/25 89/2
89/3 95/3 96/11 98/24 99/4
99/8 99/11 100/12 102/15
102/25 103/21 103/23
103/23 104/4 104/7 104/15
104/22 105/13
wanted [3]      11/19 50/9
58/17
wants [2]      74/20 101/7
warehouse [25]      8/19 23/17
42/2 42/4 42/6 42/9 42/12
42/16 42/22 42/24 45/18
45/24 45/25 46/1 46/17
47/17 47/20 47/23 48/3
48/17 51/19 53/18 59/17
63/2 82/14
warrant [25]      24/2 24/3
24/7 24/8 24/13 24/19 25/6
31/12 41/22 73/2 73/17
73/24 74/10 75/25 76/19
76/24 77/8 84/9 85/6 85/8
89/16 89/17 93/17 103/8
103/14
warrantless [1]          93/17
warrants [1]          76/2
was [214]
was -- [1]          94/24
Washington [7]      1/8 1/16
1/19 1/23 2/3 2/7 2/11
wasn't [14]      3/19 9/6 14/16
20/2 33/24 34/12 54/16
71/11 71/14 72/3 89/20
91/18 94/20 106/12
way [11]      11/4 15/22 21/3
40/24 51/20 48/17 78/4
79/12 89/16 99/19 100/19
ways [4]      16/21 77/19 78/6
89/12
we [158]
we'd [1]          12/16
we'll [8]      21/21 58/7 83/24
84/15 85/1 85/1 106/8
106/18
we're [31]      5/8 6/9 6/24
7/5 7/6 10/22 11/1 12/1
12/3 13/14 16/19 17/21
19/11 21/6 21/14 43/3
43/10 56/8 60/18 76/17
79/5 80/20 83/20 83/21
85/16 88/25 93/9 94/15
99/6 103/22 105/17
we've [11]      3/13 5/5 10/10
23/18 24/5 38/10 38/13
62/2 71/17 105/10 105/15

wearing [1]          68/23
week [6]      3/6 3/6 23/8 48/8
54/13 63/7
weeks [2]      63/21 106/10
welcome [1]          104/17
well [42]      4/18 6/1 6/6
7/21 15/2 15/3 17/6 18/6
18/11 18/20 21/7 21/14
21/14 24/10 24/20 25/4
28/7 31/3 31/5 34/24 36/18
45/14 65/8 67/5 68/14
70/21 71/23 80/15 81/9
87/9 89/5 89/10 94/20
96/10 97/3 97/7 99/15
99/22 100/1 100/23 102/1
105/24
went [39]      4/21 12/4 24/19
25/8 32/6 32/7 33/17 36/4
37/20 48/15 54/5 55/21
56/2 56/4 69/1 69/15 70/5
70/7 71/24 72/1 72/13
72/20 72/24 75/24 80/11
80/23 81/15 82/2 84/1
87/23 91/8 91/9 94/21
95/15 96/25 97/12 97/16
100/24 102/19
were [81]      4/5 7/18 9/11
13/17 18/8 18/21 18/21
18/22 18/23 18/23 22/24
24/21 24/23 25/1 25/12
25/13 25/14 25/15 25/16
25/24 26/5 26/17 27/13
27/18 32/10 33/15 34/12
35/2 36/13 37/2 37/4 37/7
37/10 37/11 38/20 42/12
42/18 42/18 48/11 48/25
49/23 51/5 51/19 51/22
54/24 61/9 62/1 67/6 70/13
70/25 71/19 71/25 72/2
79/11 79/12 79/17 79/19
79/21 80/7 80/10 80/10
81/5 81/5 82/3 82/11 82/12
83/4 86/3 86/24 87/15
88/13 88/24 89/5 89/9
92/10 92/12 92/16 93/25
106/10 106/13 106/16
were -- [1]          37/11
weren't [4]      8/23 24/25
25/22 101/20
what [194]
what's [29]      3/22 14/5
18/20 21/15 24/2 29/13
30/14 43/4 43/20 43/21
44/20 44/22 44/25 46/6
46/9 46/11 49/13 50/22
51/6 60/9 63/25 65/4 73/13
73/14 87/14 88/25 95/8 97/4
101/10
whatever [6]      3/18 19/17
26/11 77/2 104/22 106/3
when [56]      6/4 6/20 15/21
19/3 19/22 19/25 20/15
20/21 22/24 25/8 27/18
30/22 33/2 33/11 35/22
36/13 36/17 37/2 37/14
41/2 51/10 51/18 53/19
55/6 55/20 57/9 57/14
57/16 62/9 65/18 68/4
68/16 68/19 69/1 70/1
71/12 71/19 72/1 72/24
76/24 79/24 80/11 83/17
86/20 87/19 88/13 90/15

**W**

when... [9]                90/24 91/10
91/17 95/15 95/15 96/5
101/19 102/19 103/6
whenever [2]           28/20 79/16
where [34]        4/21 8/3 12/3
12/5 16/3 16/20 19/19
23/13 28/4 28/5 28/7 31/17
32/9 32/14 32/22 34/15
41/23 49/11 49/17 52/25
56/12 56/17 56/21 56/24
64/3 66/23 67/1 69/23 74/7
75/10 93/9 94/15 95/21
105/10
whether [27]        6/8 6/9 6/16
8/12 8/13 14/22 22/11
73/24 77/16 78/18 81/16
85/5 85/9 94/5 97/5 97/24
98/8 98/12 98/13 98/25
99/7 100/13 101/6 104/25
105/18 106/10 106/16
which [27]        9/18 9/19 9/20
24/3 24/24 25/20 30/15
35/4 35/10 45/17 49/2 65/8
67/2 78/21 79/4 83/9 85/4
88/20 88/24 89/2 89/13
90/6 96/23 97/10 98/12
102/3 102/4
while [3]          15/5 48/9 70/25
white [9]            3/13 5/18 9/16
11/25 22/24 23/5 23/13
41/25 64/21
white -- [1]            11/25
who [51]       5/9 10/17 12/25
13/17 14/4 15/1 15/7 16/4
16/8 16/12 16/13 16/19
17/19 17/19 18/7 20/4
20/16 20/18 20/20 20/24
21/20 21/25 22/6 22/11
29/16 33/4 34/1 37/19
37/24 39/8 41/6 41/16 42/8
44/3 44/6 44/13 44/16 45/8
46/19 50/18 54/10 67/24
78/2 83/15 90/15 91/19
99/24 100/17 100/24 102/19
106/12
who's [2]            14/24 44/18
whoever [3]        14/25 26/6
81/5
whole [3]         87/11 102/20
104/11
whom [2]          54/4 96/14
whose [3]        43/23 44/14 53/3
why [19]        11/14 13/14 14/16
16/24 19/5 19/10 24/9
37/17 40/1 42/12 75/11
75/15 75/18 76/13 93/20
97/11 97/11 97/16 101/19
wife [3]          15/18 16/10 17/15
will [15]         6/12 8/1 10/14
11/13 11/16 12/9 20/25
22/10 26/14 38/14 40/7
104/23 105/22 105/22
106/15
window [9]        24/24 25/2 26/2
26/3 26/17 41/23 50/10
50/13 50/14
windows [5]        25/24 25/24
26/1 26/4 26/16
Winter [2]          87/5 87/7
wiretap [3]          64/24 65/2

65/11
wisdom [1]          10/1
within [2]        15/24 51/19
without [10]          16/24 20/8
74/10 76/24 82/6 84/9
89/17 94/4 94/8 100/17
witness [20]          10/14 14/22
15/4 15/15 15/15 16/20
22/11 22/15 58/6 58/15
59/21 68/12 68/13 68/15
78/15 93/2 93/6 101/5
102/12 107/1
witness' [1]          77/10
witness's [2]        15/16 17/15
witnesses [5]        14/23 15/5
19/23 21/9 22/9
won't [2]          30/7 83/21
wonder [1]          88/24
word [3]        14/10 19/5 31/5
work [1]          86/20
worked [4]          7/9 8/8 8/12
99/24
working [2]        5/22 100/17
worried [1]          10/13
worth [2]          63/4 83/12
would [33]          6/16 12/17
14/13 17/7 17/14 19/21
19/24 20/14 21/16 24/7
30/15 30/20 47/25 48/8
48/9 58/14 68/14 70/20
75/10 75/18 77/1 77/8
84/20 85/22 88/14 91/20
93/15 96/13 97/11 99/5
102/9 102/9 104/24
wouldn't [1]          99/2
wrap [8]          5/1 51/10 52/1
52/6 52/6 52/8 75/5 83/3
write [1]          60/15
written [4]          9/23 60/9
78/10 94/17
wrong [5]          19/9 21/24 94/8
97/15 98/21
wrote [3]          64/3 65/21 66/22

**X**

XA [2]          60/21 61/11

**Y**

Yanta [3]          13/3 13/10 14/8
yeah [5]          10/14 19/7 53/8
68/3 105/14
year [4]          40/20 46/3 54/5
54/12
yes [176]
yesterday [7]          3/9 9/2
23/19 43/6 43/8 45/2 45/21
yet [3]          6/24 19/4 52/10
you [536]
you'll [4]          11/16 11/17
80/17 82/21
you're [23]          7/16 16/22
19/8 19/9 26/9 51/10 53/9
66/21 68/4 68/7 70/19
70/19 73/14 94/6 94/7 97/3
97/17 100/3 103/2 104/3
104/17 104/17 105/18
you've [8]          23/4 26/20 63/9
64/21 66/4 66/5 71/12
71/17
your [151]
your -- [1]          11/19
yourself [6]          32/16 36/18

47/16 69/18 69/20 88/23

**Z**

Z-I-N-T-U-R-A [1]          33/6
Zintura [4]          33/5 33/12
34/13 34/22

1

```
 1                 UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2     ----------------------------X

 3     THE UNITED STATES OF AMERICA      Criminal Case No.

 4               v.                      05-386

 5     ANTOINE JONES, et al,

 6               Defendants,

 7     ----------------------------X   Washington, D.C.
                                       Monday, November 27, 2006
 8                                     10:00 A.M.

 9                 VOLUME 16 -  A.M. SESSION

10                 TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11          UNITED STATES DISTRICT JUDGE, and a jury

12     APPEARANCES:

13     For the Government:          JACK GEISE, ESQUIRE
                                    RACHEL LIEBER, ESQUIRE
14                                  Office of the U.S. Attorney
                                    555 4TH Street, N.W.
15                                  Washington, D.C.  20560
                                    (202) 616-9156
16

17     For Defendant Jones:         EDUARDO BALAREZO, ESQUIRE
                                    400 Fifth Street, N.W.
18                                  Suite 500
                                    Washington, D.C.  20001
19                                  (202) 639-0999

20

21     Court Reporter:              Lisa Walker Griffith, RPR
                                    U.S. District Courthouse
22                                  Room 6409
                                    Washington, D.C.  20001
23                                  (202) 354-3247

24     Proceedings recorded by mechanical stenography, transcript

25     produced by computer.
```

1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2    - - - - - - - - - - - - - - - - - -X

 3    THE UNITED STATES OF AMERICA      Criminal Case No.

 4                      v.                   05-386

 5    ANTOINE JONES, et al,

 6                    Defendants,

 7    - - - - - - - - - - - - - - - - - -X    Washington, D.C.
                                              Monday, November 27, 2006
 8                                            10:00 A.M.

 9              VOLUME 16 - A.M. SESSION

10              TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11         UNITED STATES DISTRICT JUDGE, and a jury

12    APPEARANCES:

13    For the Government:      JACK GEISE, ESQUIRE
                               RACHEL LIEBER, ESQUIRE
14                             Office of the U.S. Attorney
                               555 4TH Street, N.W.
15                             Washington, D.C.  20560
                               (202) 616-9156
16
17    For Defendant Jones:     EDUARDO BALAREZO, ESQUIRE
                               400 Fifth Street, N.W.
18                             Suite 500
                               Washington, D.C.  20001
19                             (202) 639-0999

20
21    Court Reporter:          Lisa Walker Griffith, RPR
                               U.S. District Courthouse
22                             Room 6409
                               Washington, D.C.  20001
23                             (202) 354-3247

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer.
```

2

```
 1    APPEARANCES: (Cont'd.)

 2    For Defendant Jackson:    JON NORRIS, ESQUIRE
                                641 Indiana Avenue, N.W.
 3                              2nd Floor
                                Washington, D.C.  20001
 4                              (202) 842-2695

 5
 6    For Defendant Huggins:    RUDOLPH ACREE, ESQUIRE
                                1211 Connecticut Avenue, N.W.
 7                              Suite 303
                                Washington, D.C.  20036
 8                              (202) 331-0739

 9
10    For Defendant Holland:    BRIAN McDANIEL, ESQUIRE
                                1211 Connecticut Avenue, N.W.
11                              Suite 506
                                Washington, D.C.  20036
12                              (202) 331-0739

13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                  P R O C E E D I N G S

 2         THE DEPUTY CLERK:  Criminal Case Number 05-386,

 3    United States versus Antoine Jones, et al.

 4         MR. GEISE:  Your Honor, I have one minor thing

 5    before we begin.  Just I've supplied this to counsel, Your

 6    Honor.  It's the question of transcripts being used during

 7    deliberations.  We discussed it.  There is a D.C. Circuit

 8    case on the issue.  It's United States versus Holton, 116

 9    F.3d 1536.

10         THE COURT:  Say it again?

11         MR. GEISE:  United States versus Holton, 116 F.3d

12    1536.  I've supplied a copy to counsel, and I have a copy for

13    the Court.  At some point we may want to address the issue.

14    I've indicated the pages that are relevant, Your Honor.

15         THE COURT:  Is this the most recent statement on

16    the issue?

17         MR. GEISE:  Most recent from the D.C. Circuit, Your

18    Honor.

19         THE COURT:  Right.  Also, Mr. Jones has filed

20    additional objections.  I got additional objections to the

21    timeline.  So perhaps Ms. Lieber will look at these in terms

22    of getting rid of disputes that we don't have to rule on if

23    we don't have to.

24         MS. LIEBER:  Your Honor, let me say this.  I saw

25    that Mr. Balarezo was working this morning until 2:00 in the
```

4

```
 1    morning and filed that at that time last night, this morning

 2    and took a look at what he filed.  And I dispute some of

 3    them, and agree with one or two of them.  I made those

 4    changes on the timeline.

 5         What I have now is for everybody, including the

 6    Court, copies of what I sort of see as the Government's final

 7    version subject to any rulings the Court makes.  I changed

 8    all the meetings to agrees to meet and put jeep at a certain

 9    location instead of Jones at a certain location consistent

10    with the Court's suggestions last week.

11         There were times, and I included this in this

12    e-mail to counsel yesterday, everybody, there were times that

13    I actually left meets with Kevin Holland or meets with so and

14    so, because, from the calls themselves, they say things like,

15    yeah, do you see me?  I'm right behind you, things like that.

16    So it's clearly a meeting in the absence of surveillance.

17    Based on the language on the call, I left it as meets, but

18    there were only a handful of those.

19         THE COURT:  I don't know what's left here in terms

20    of -- I'm sure you're able to tell me at some point.  Then,

21    if you can show counsel what you come up with, then Mr.

22    Balarezo can go through this and figure out exactly which

23    things you want a ruling on.  I can't tell from whether some

24    she's probably responded to, otherwise not.

25         But what concerns me is that, I'm assuming that a
```

**5**

1  lot of these quotes are what the transcripts say. It's a
2  little late to be objecting to the transcript, especially
3  since the jury may have even heard it with the use of the
4  transcript. I don't know, some of these.
5       MR. BALAREZO: Well, Your Honor, my understanding
6  of what the summary would be, is basically a, not verbatim,
7  but an accurate representation or compilation of what the
8  calls are. A lot of what was in the summary that I discussed
9  are interpretations by Ms. Lieber. It's not an
10 interpretation by, at least from what I can tell, from the
11 officers. Things like -- I mean they're there. Let me get
12 my copy.
13      THE COURT: I don't think we can do that just yet.
14      MR. BALAREZO: There are several quotes that are
15 inaccurate, Your Honor. There's a call where Mr. Holland
16 says, I'm behind you. It doesn't necessarily mean that he's
17 right behind him. It could be he's a mile behind him going
18 somewhere.
19      THE COURT: I want you to take a look at what she's
20 redone.
21      MR. BALAREZO: Okay.
22      THE COURT: And then highlight what specific things
23 you need rulings on. That's the only thing I can do. I mean
24 there's sort of general discussion. You're going to have to
25 hold up a lit bit putting it in evidence.

**6**

1       MS. LIEBER: Let me say this, Your Honor. As I
2  told, I think I told counsel last week, Detective Horne,
3  while I am the principal drafter, I will admit, of this
4  document, Detective Horne is in the process of and, in fact,
5  is almost finished going through each of these items in here.
6       So that, while I know I don't need a witness to put
7  it in, I am going to put it in through her and talk about
8  some of the entries therein instead of playing all of these
9  calls. And she's going to testify that she checked the
10 accuracy. And to the extent that there might be a, quote,
11 interpretation in the I'm right behind you, that's going to
12 be her interpretation of what that means. So there's going
13 to be testimony that flushes out what actually is contained
14 herein. To the extent that there are --
15      THE COURT: Wait. Let me just say, on the summary
16 chart, it would be very ill advised to start giving
17 interpretations. The summary chart is a summary of the
18 evidence, not the interpretation by somebody you're offering
19 to explain various calls.
20      MS. LIEBER: I guess I should say then, It's not, I
21 took out references to dropped off the cocaine with
22 Mrs. Huggins. I said dropped something off with
23 Mrs. Huggins. Because the call said I left it with your
24 wife. A call, for instance, between Mr. Jones and Mr.
25 Huggins is I left it with your wife. So I took out the

**7**

1  supposition that it would be cocaine and just left something.
2       THE COURT: What I'm concerned with here, because I
3  have not sat and gone line by line, I was assuming counsel
4  would. Maybe it's now very late in the game, but they've
5  done it. I don't know, are you intending to put it in this
6  morning?
7       MS. LIEBER: No, no, no.
8       THE COURT: The key here is, I'm not interested in
9  suppositions.
10      MS. LIEBER: Right.
11      THE COURT: This is a summary exhibit of certain
12 calls and certain GPS.
13      MS. LIEBER: Right.
14      THE COURT: So that you can have them coordinate
15 it. That's what I understood. It's not anything having to
16 do with assumptions or interpretations, that's for argument.
17      MS. LIEBER: Right. And, Your Honor, the only
18 thing I would say is there are certain times that we've
19 included actual quotes. For instance, on the first page on
20 September 3rd at 9:36 A.M., Mr. Jones calls John Adams, who
21 says he is, quote, about to get rid of those tickets.
22      When there are quotes, it's because they're quotes.
23 But there are other times, 9:18 -- this is an objection by
24 Mr. Balarezo -- 9:18 on September 3rd, leaves a message for
25 Demetrius Johnson to call him. I mean I think the message

**8**

1  was, hey, man, give me a call. I didn't put in actual
2  quotes, hey, man, give me a call. I can go back and do that.
3  But --
4       THE COURT: One second. I don't see the --
5       MR. BALAREZO: Your Honor, if I could just point to
6  one in particular that kind of encapsulizes this, it's a
7  September 5th at 3:28 call where the Government has, Agrees
8  to meet with Pauline Spence at her house in a few minutes,
9  Call 573.
10      All it is is the caller, presumably Antoine Jones,
11 whomever, caller says I'm outside. So from somebody saying
12 I'm outside, how do you get agrees to meet with Pauline
13 Spence at her house in a few minutes? And that's what I'm
14 objecting to.
15      MS. LIEBER: There is a previous call between the
16 two of them where they talk about going --
17      THE COURT: Can I just look at one of yours?
18      MS. LIEBER: Yes.
19      THE COURT: One or two?
20      MS. LIEBER: Pauline Spence is in Volume Two, Your
21 Honor.
22      THE COURT: Let's just look at 9-5 for one second,
23 if we may.
24      MS. LIEBER: I will say that, there are a handful
25 of calls that actually weren't ever transcribed because

9

1  they're just a sampling. What we did was a lot of the
2  transcripts. So, to that extent, this is maybe not a good
3  example of one to look at, but I know --
4       THE COURT: Well, the one problem I have is that I
5  can't rule on an objection unless I sit and listen to the
6  tape. So --
7       MS. LIEBER: Your Honor, I will say, I'm happy to
8  sit down with Mr. Balarezo and have him tell me what he
9  thinks it should say versus what I have. And maybe it's a
10  matter of semantics.
11       THE COURT: Fine. I'm happy to rule on it. The
12  closer you stay to the transcript -- she doesn't have to
13  summarize everything verbatim.
14       MR. BALAREZO: I'm not saying that, Your Honor. I
15  just think it should be accurate. And as that call -- I can
16  play you the call if you like.
17       THE COURT: I may have to. First, you're going to
18  have to sit with Ms. Lieber and see what you can, I'll have
19  to rule on whatever is left.
20       MS. LIEBER: Your Honor, obviously I want these to
21  be, I want the timelines to be an accurate representation of
22  the calls. And, to the extent that there are words here or
23  there, for instance, I will say an objection that Mr.
24  Balarezo included was -- calls on the first day,
25  September 2nd, there is an issue of meets at the Wendy's

10

1  nearby. I struck nearby because he didn't actually say
2  nearby and okay. Fine.
3       I think it's obvious from the call, the timing of
4  the call and the map of Branch Avenue, that he's talking
5  about the Wendy's across the street. But he doesn't say the
6  word nearby so I took it out. And, to the extent that Mr.
7  Balarezo wants to give me his challenges, the only thing I'll
8  say is, for everyone's information, we are running out of the
9  Government's case.
10       And I intended to make the timeline to be sort of
11  the final piece that I use with Detective Horne. It may be
12  that Mr. Balarezo and I need a little time, that would be
13  trial time, to sort of hash this stuff out to get it right.
14       THE COURT: We're going to stop tomorrow, the
15  28th. There is a portrait hanging, which I have to attend,
16  so we have to stop before quarter of 4:00. That's one
17  possibility. If you can give me a better idea, we could try
18  to do something. I mean a lot of these things are petty and
19  they can be resolved without -- well, they are.
20       I mean the difference between words and the
21  inference are not so great. But Ms. Lieber is willing to,
22  you know, the speaker says Club instead of Levels. You can
23  always argue Levels when the time comes. That's simple. So
24  half of this is going to wash out before we finish.
25       Then I'll have to spend an hour going through and

11

1  resolve the ones that are important. But I think you need to
2  spend a little time figuring out what's important, what's
3  wrong and what I need to rule on.
4       MS. LIEBER: And I think that's just fine. I'm
5  happy to do that.
6       MR. BALAREZO: Your Honor, we disagree that some of
7  these things are petty because quite frankly --
8       THE COURT: We don't have to debate this.
9       MR. BALAREZO: If I could just get my record
10  complete, Your Honor, on this.
11       THE COURT: First, there is nothing for me to do
12  until you and Ms. Lieber have the opportunity to see what's
13  left. Then I'll decide whether something is worthy of either
14  changing or telling them or sustaining the objection or, if
15  it's not an important objection, then I'll overrule it.
16       MR. BALAREZO: Your Honor, what I want to say is
17  this. Probably the overwhelming majority of not all of these
18  calls I have heard at some point or another. For the purpose
19  of this timeline, I started sitting and I went through each
20  of the calls that I put in there. Unfortunately, it was 2:00
21  in the morning, and I'm sitting there and I'm saying, this is
22  ridiculous because in reading the entire document, you know
23  that there is a lot of interpretation and supposition.
24       Now, whether or not there's a Wendy's nearby or
25  whether or not somebody says the word nearby, it doesn't

12

1  matter perhaps in the long run, but it does matter because,
2  if this document becomes an exhibit and the jury takes it
3  back, human nature would be to read this and not go through
4  the calls. And I don't want the Government's interpretation
5  of what it says. I want it just to be accurate.
6       THE COURT: Right, I agree.
7       MR. BALAREZO: That's all I'm saying. So I think
8  that, given what we're discussing here, I think it's going to
9  take more than just, you know, 4:15 tomorrow afternoon
10  because I think we're going to have to go through each and
11  every one of these.
12       THE COURT: Well, the number of objections are
13  not as -- she's made some changes already. So that's going
14  to eliminate. The way I see this, it's two and a half pages.
15  I really don't see it so --
16       MR. BALAREZO: But I only went through the first
17  few days because, Your Honor, I wasn't going to go through
18  each and every one for the next two months. But if that's
19  what we have to do, fine.
20       THE COURT: Well, I know what you're saying. Now,
21  it's getting too late for that. You've had this now for a
22  long time. The Government gave you a draft. What I have is
23  a draft. I haven't seen it. So I will end early today,
24  we'll end early tomorrow.
25       And the Government's case is finishing this week.

13

1  So, to the extent that you feel that this is important, if
2  one had to have been done before. I realize that you
3  obviously, it's been a long time, but they've presented it.
4  They're entitled to use it in summary. You've had more than
5  an ample opportunity to look at it.
6          So all I can say is, by the end of their case, we
7  will have done what we have to do to allow them to clean it
8  up. And I'm urging them to keep as close as possible to the
9  actual words. But if there isn't, if I can't find the
10 inaccuracies, I can't do anything about it. That's all I can
11 say.
12         MS. LIEBER: I'm sorry to just belabor this, but
13 because I anticipate this might be an issue eventually some
14 day, so to complete the record, I gave out a draft of the
15 timeline to all of defense counsel during the first week of
16 jury selection, so whenever that was, the week of
17 October 16th.
18         And to the extent that there are additions, there
19 are no deletions from the timeline. The only additions have
20 been, as I noted a week or two ago, certain calls that we
21 ended up playing in court, I added those in as well. So
22 there have only been additions, but those additions are the
23 calls themselves that I played in court. There might be a
24 half a dozen of those that I added.
25         MR. BALAREZO: Your Honor, if I remember correctly,

14

1  when we got this thing in the jury selection, it wasn't meant
2  to be an exhibit. It was meant for us to follow it. And it
3  was only until very recently that it was going to become an
4  exhibit. So that's when I started paying attention to it.
5  Because if it's going to come in, I need to look at it.
6          THE COURT: Well, it is going to come in because I
7  know that I asked for any objections to be filed over a week
8  ago. So, do you have an estimate now of where you stand? Is
9  this going to substitute what you've just handed up?
10         MS. LIEBER: I'm sorry. Did I already hand you
11 this one?
12         THE COURT: No.
13         MS. LIEBER: Okay. That's your copy, I'm sorry.
14 That's one that I made, that's for everybody that includes
15 the agrees to meet versus meets and jeep.
16         THE COURT: Right.
17         MS. LIEBER: In terms of timing, Your Honor, if I
18 may speak for the Government, we have a very short document
19 concerning witness this morning, Anthony Givens, Detective
20 Horne, who's going to play a series of various chunks of
21 calls for very specific purposes, and then I'm going to ask
22 her about some aspects of the timeline. And I'll certainly
23 hold off on that. That wouldn't be today. That will be
24 tomorrow or Wednesday or whenever we get it in final form
25         We have, Special Agent O'Brien to talk a little bit

15

1  more about the phones that were recovered from 9508, some
2  analysis that she did of that. We may have the maintenance
3  man from the Summit Circle apartments and a few other
4  documents that are going to come in, self authenticating DMV
5  records from Delaware and Texas showing Guadalupe Barrone and
6  Pelos, just little odds and ends, but that's really --
7          THE COURT: And you don't expect Demetrius Johnson?
8  Is that what you're saying?
9          MS. LIEBER: We don't.
10         THE COURT: All I can say, Mr. Balarezo, I don't
11 think that, it's not sufficient at this point in time to say
12 well you've gone through three days or whatever, five days,
13 and her timeline goes a lot longer. We can't hold up the
14 case to go through everything. This goes to the 24th, and I
15 know that this has been, the timeline has been out there.
16         MR. BALAREZO: If I could have until tomorrow
17 morning, I will give you all my objections.
18         THE COURT: Well, that's fine. I mean, for the
19 purposes of the record, he's got to file whatever objections
20 he had. They were due over a week ago, and if I were the,
21 Ms. Lieber, I will make myself available for a half a day on
22 Wednesday if need be to rule on the objections. I don't see
23 any other way around it after you delete what I don't need to
24 rule on.
25         MS. LIEBER: Your Honor, I'm going to be as

16

1  expansive as possible. There are just certain ones that I
2  think they're just, Mr. Balarezo with all due respect, wrong.
3          THE COURT: That's fine.
4          MS. LIEBER: And so we'll just have to hammer those
5  out.
6          THE COURT: That's why I'm here.
7          MS. LIEBER: But I will do everything I can.
8          THE COURT: All right. Mr. Balarezo, any further
9  objections, not that they're timely, have to be filed by
10 tomorrow morning. And then, if you can just hold off on
11 introducing it until we get any objections resolved.
12         There are going to be various things that we're
13 going to have to take up at the end of the Government's case.
14 One is obviously Mr. Norris is going to have something to say
15 on the one offense. So there is going to be a point this
16 week, when you come very close to finishing, that we're going
17 to be taking up some legal issues.
18         The only one that I'm aware of, other than now we
19 have these objections to the timeline. And for purposes of
20 any appeal, the Government obviously understands that they
21 don't want to make any errors on this timeline. So whatever
22 you figure out, Mr. Balarezo, tell them it's really late in
23 the game to be doing this.
24         You're going to offer me some case law on the issue
25 of what is brandishing?

17

1   MR. GEISE:  I hope to have that for you tomorrow,
2   Your Honor.  What I've got, what I'm working on now, I was
3   just going to say, a couple of minor things.  One, just for
4   the record, we've given Mr. Balarezo, which I hope that he
5   has to look at, but we have given him the first few entries
6   of that GPS information on Moore Street on October 24th.
7       If you recall, Mr. Balarezo was concerned about
8   whether it would show that the search began before 6:00 A.M.
9   Our concern was that we not disclose this location.  I
10  believe we've given him the first several entries.  I'm sure
11  he'll let us know if it's inadequate for his purposes, but,
12  to the extent it was just when it was reactivated, I believe
13  it was around 7:00 in the morning.  Just so the record is
14  clear, we have supplied him with that.
15      THE COURT:  So reactivation means it was seized
16  around 7:00?
17      MR. GEISE:  Something got it moving again.  If you
18  recall, it falls asleep when it's not moving.  Something got
19  it moving again at 7:00 in the morning.
20      THE COURT:  And, Mr. Norris, if you have any case
21  law you want to bring to my attention, tomorrow is the
22  latest.
23      MR. NORRIS:  Yes, Your Honor.
24      MR. GEISE:  The other thing, Your Honor, is I have
25  talked with Special Agent Yanta.  Mr. Balarezo was concerned

18

1   about whether there might have been any searches, given the
2   ICE search that was an issue without a warrant, whether we
3   were aware of any other searches that were not otherwise
4   disclosed, warrants, et cetera.
5       I told Mr. Balarezo, until now, as far as we know,
6   I talked with the agents, there were no other searches of
7   that kind.  It's a little difficult to state a negative for
8   sure because I can't read people's minds, but as far as I'm
9   able to find from inquiring, there are no other searches of
10  the kind he's describing.
11      The other thing, Your Honor, is at some point,
12  maybe either this week or early next week, I think, as the
13  Court points out, we're well on schedule, we will get to the
14  defense case.  It would make our lives considerably easier in
15  doing criminal history checks if the defense counsel could
16  let us know some greater descriptive of their witnesses than
17  their names, date of birth, a physical description, an
18  address, something like that.
19      Some of the names are quite general.  It's very
20  difficult to do a criminal history check on John Smith or
21  something like that.  That would make our job much easier and
22  I think make it much more efficient when their case is on.
23      THE COURT:  I've asked the defendants to give them
24  dates of birth.  I'm going to say Wednesday.  They have to
25  start doing this.  So, defense counsel, if you're going to

19

1   call witnesses, they ought to have the dates of birth and
2   names or a social security number, whichever you have, you've
3   got to do it on Wednesday.  We're going to be rolling into
4   the defense case, either this week or early next.
5       MR. GEISE:  And the last thing, Your Honor, again,
6   I know it's a sensitive question for defense counsel.  But at
7   some point, if we could be advised whether their clients will
8   be taking the stand as well.
9       THE COURT:  Okay.  I suspect you'll have to wait
10  until the end of Government's case.
11      MR. GEISE:  That's fair enough.
12      THE COURT:  You'll have time because whatever we're
13  doing here, we have to take a break for one week there.
14      MR. GEISE:  And so the Court knows, Your Honor, if
15  we break early this afternoon, I'm still working on jury
16  instructions.  I believe I will make my goal for tomorrow for
17  the general jury instructions, probably the forfeiture
18  instruction, as well, although that, even if it is relevant,
19  doesn't come until after the jury considers the other counts.
20  The forfeiture is separate.  And it may take me a day or so
21  more for the form of verdict sheet, but I should have it all
22  to the Court by Wednesday.
23      THE COURT:  On the verdict sheets, you're going to
24  do one per defendant.
25      MR. GEISE:  Okay.  That's good to know, Judge.

20

1   THE COURT:  I think that's the only way to do it.
2       MR. GEISE:  Because otherwise I would have done
3   one -- I haven't done it yet, so you've saved me considerable
4   time.
5       THE COURT:  Because it's clearly for the jury's
6   point of view.
7       Are we ready to bring in the jury?
8       MS. LIEBER:  Your Honor, we have Bill Kelly from
9   Remax to authenticate some documents and then we move into
10  Anthony Givens, the next cooperator.
11      THE COURT:  Okay.  Anything else before we proceed?
12      MS. LIEBER:  Your Honor, if I may just have a word
13  with Mr. McDaniel while you bring in the jury?
14      (Jury Present.)
15      THE COURT:  Good morning, ladies and gentlemen.  I
16  hope you all had a nice Thanksgiving.  You all ready to work
17  again?
18      All right.  We're ready to begin.  Ms. Lieber, you
19  want to call your next witness?
20      MS. LIEBER:  I do, Your Honor.  Thank you.  The
21  Government calls Bill Kelly.
22      WILLIAM KELLY, GOVERNMENT WITNESS, SWORN
23      DIRECT EXAMINATION
24  BY MS. LIEBER:
25  Q   Good morning, sir.

21

```
1    A   Good morning.
2    Q   In a nice, clear voice will you please introduce
3  yourself to our jury?
4    A   My name is William Kelly.  I'm a rental manager and
5  leasing agent for Remax 2000 real estate company in Silver
6  Spring, Maryland.
7    Q   Sir, how long have you been an agent with Remax 2000?
8    A   About ten years.
9    Q   Mr. Kelly, I want to direct your attention specifically
10  to some documents pertaining to a lease of 8550 Myrtle Avenue
11  in Bowie, Maryland, these documents from January of 2004.
12       MS. LIEBER:  And, Your Honor, if I may approach the
13  witness, I'm going to approach with documents labeled ICE 10
14  through ICE 14.
15       THE COURT:  Okay.  Go ahead.
16       MS. LIEBER:  Counsel has seen these but I will show
17  him again.
18  BY MS. LIEBER:
19    Q   Mr. Kelly, I'm showing you what I've marked as
20  Government's Exhibit ICE 10 through ICE 14.  I'm going to ask
21  you to take a look at those documents.
22    A   Okay.
23    Q   Are those lease documents pertaining to 8550 Myrtle
24  Avenue in Bowie, Maryland?
25    A   Yes, they are.
```

22

```
1    Q   Who is the applicant for that lease?
2    A   Lawrence Maynard.
3    Q   Okay.  Mr. Kelly, having reviewed those documents here
4  this morning, are those documents items that you keep in the
5  ordinary course of your business as a rental manager at Remax
6  2000?
7    A   Yes.
8        MS. LIEBER:  And, Your Honor, at this time, some of
9  those are actually in evidence but I wanted to put them all
10  together.  At this time I would move ICE 10 through 14 into
11  evidence.
12       THE COURT:  Well, 12, 13 and 14 are in evidence I
13  think.  Were these all kept in the ordinary course of
14  business in your files?
15       THE WITNESS:  Yes, Ma'am.
16       THE COURT:  It's your ordinary business to keep
17  these kinds of records?
18       THE WITNESS:  Yes.  We're supposed to keep these
19  records on file for at least three years.
20       THE COURT:  Any objection?
21       MR. BALAREZO:  No, Your Honor.
22       THE COURT:  Then 10 through, 10 and 11 are in.  The
23  others are already in.
24       (Government Exhibit Nos. ICE 10 and ICE 11
25        were admitted into evidence.)
```

23

```
1        MS. LIEBER:  Thank you.  I have nothing else, sir.
2  Thank you.
3        THE COURT:  Any questions for Mr. Kelly?
4        MR. BALAREZO:  May I speak with Ms. Lieber for one
5  second?
6        THE COURT:  Are we going to put them on the screen
7  so we know what's in evidence at least briefly?
8        MS. LIEBER:  Sure.
9        THE COURT:  Okay.  Let's put them on the Elmo so
10  everybody can see them.
11       MS. LIEBER:  Since it's just 10 and 11, thank you,
12  Your Honor.  And just for everyone's information, this is ICE
13  10.
14  BY MS. LIEBER:
15    Q   Sir, is that a copy of the rental application for 8550
16  Myrtle Avenue filled out by Lawrence Maynard?  Do you see
17  that up here, Mr. Kelly?
18    A   Yes.
19    Q   Just so we're clear, this is a copy of the rental
20  application for Mr. Maynard?
21    A   Yes, it is.
22       THE COURT:  What is the date of the rental
23  application please?
24       MS. LIEBER:  Court's indulgence.  There does not
25  appear to be a date on the actual application.  The date on
```

24

```
1  the lease is January 10th.
2        THE WITNESS:  There may be a fax date on the top of
3  it though.  I'm not sure.
4        THE COURT:  January 6th or 8th?  I can't tell.
5        MS. LIEBER:  The first fax line is January 7th of
6  '04, I'm sorry, the top, January 6th of '04.  And the actual
7  lease, ICE 12, that lease is to commence January 10, 2004.
8  BY MS. LIEBER:
9    Q   Sir, if I might, ICE 11, this document here, are these
10  earnings statements that Mr. Maynard submitted to you all?
11    A   Yes, this is proof of income.
12       MS. LIEBER:  Thank you.
13       THE COURT:  Okay.  Mr. Balarezo?
14       MR. BALAREZO:  Good morning, ladies and gentlemen.
15                  CROSS EXAMINATION
16  BY MR. BALAREZO:
17    Q   Mr. Kelly, how long have you been with Remax?
18    A   About ten years.
19    Q   Were you, then does that mean that you were working
20  there back in February of 2004?
21    A   Yes.
22    Q   The documents that Ms. Lieber just asked you about, did
23  you provide those to an agent by the name of Katerina Gikas?
24    A   I did provide to an agent.  I can't recall what her name
25  was.
```

MR Kelly

25

```
 1   Q   Kind of tall, slender female, looks like Joe Hennessy
 2   from what I've been told?
 3   A   Okay.
 4   Q   Does that ring a bell?
 5   A   Yes.
 6   Q   Are you aware that there was a search warrant executed
 7   at the 8550 Myrtle street address?
 8        MS. LIEBER:   Objection, beyond the scope.
 9        THE COURT:   I think so.
10        MR. BALAREZO:   Then, Your Honor, I'm just trying to
11   save time.  Then I ask that he be put on call.
12        THE COURT:   Let's approach please.
13        (Bench conference.)
14        THE COURT:   First of all, was there one?
15        MR. BALAREZO:   All I want to ask him is if he let
16   in Agent Gikas after the search warrant is all I want to ask.
17   If he testified, she testified after the sneak and peek was
18   done, that the rental office let the agents into the property
19   once again.  I could call this guy back for that question or
20   I could do it now.
21        THE COURT:   I don't want to inconvenience him and
22   have him back in even though I don't know what difference
23   does it make.
24        MS. LIEBER:   That's my next question.  What
25   difference does it make that he let him in?
```

26

```
 1        THE COURT:   We continually spend a lot of time on
 2   these things.  There was nothing seized and introduced here.
 3        MS. LIEBER:   That is correct.  And nobody in this
 4   courtroom would have standing to object to any search.
 5        MR. BALAREZO:   Your Honor, there was testimony
 6   about the candles and that kind of thing at that house.  I
 7   just want to know, if he went in the house, did he see any.
 8        THE COURT:   You can ask him if he ever went in the
 9   house after it was vacated, if that's what your purpose is.
10        MR. BALAREZO:   I can't ask whether or not he let
11   the agent in?
12        THE COURT:   I thought your reason was you wanted to
13   know whether or not he saw anything.  So you can ask him
14   She didn't identify this gentleman by name.  So if your point
15   is you want to know what he saw in there after it was
16   vacated, you can do that.
17        MR. BALAREZO:   I also want to know whether or not
18   he let the agents in.  Agent Gikas testified after the search
19   warrant, the sneak and peek, they were let in by somebody
20   from the rental office.  But Your Honor, the reason it
21   matters is because she already indicated that she did a
22   warrantless search, if you will, of the apartment at Summit
23   Circle.
24        THE COURT:   Yeah, but you are misstating the
25   transcript dramatically.  She wasn't there for any
```

27

```
 1   warrantless search so to speak.
 2        MR. BALAREZO:   But she knows that it happened.  The
 3   Government is prosecuting my client.  I need to establish
 4   whether or not there is a pattern of the Government doing,
 5   perhaps, things that they shouldn't be doing.
 6        THE COURT:   Never mind, Ms. Lieber.
 7        We already had an exploration of that.  I will let
 8   you ask your questions but I think the Government is right.
 9        Go ahead, ask your questions.  Let's get it over
10   with.
11        (Open Court.)
12   BY MR. BALAREZO:
13   Q   Have you ever been inside of 8550 Myrtle Avenue?
14   A   Many times.
15   Q   Were you there inside the location at around the time
16   February or so of 2004?
17   A   Yes.
18   Q   Do you know who was living there at the time?
19   A   Yes.
20   Q   Who was that?
21   A   The tenant, Lawrence Maynard.
22   Q   Lawrence Maynard.  And do you know whether or not
23   Mr. Maynard kept any candles, any of those religious-type
24   candles in that, did you ever notice any of those?
25   A   No, I didn't.
```

28

```
 1   Q   Did you ever notice any inflatable mattresses?
 2   A   Not that I recall.
 3   Q   Did you notice whether or not the windows were covered
 4   up, each and every window was covered up in some fashion?
 5   A   I'm not sure.  I think it was, but I can't be certain
 6   that every one was.
 7   Q   Well, the windows did have window coverings, right,
 8   shades, blinds, that kind of thing?
 9   A   I believe they have mini blinds.
10   Q   Do you remember any aluminum foil covering any windows?
11   A   Not specifically, no.
12   Q   Do you remember seeing any narcotics in that house?
13   A   No.
14   Q   Do you remember seeing any large amounts of money in
15   that house?
16   A   No.
17        MR. BALAREZO:   I have nothing else.
18        THE COURT:   Anything else?
19        MR. NORRIS:   No questions, Your Honor -
20        MR. McDANIEL:   No questions.
21        MS. LIEBER:   Your Honor, just for clarification.
22              RE-DIRECT EXAMINATION
23   BY MS. LIEBER:
24   Q   Mr. Kelly, when exactly did you go into the house?
25        THE COURT:   Can you remind me when the house was
```

29

1 vacated, too, so I get the dates correct? When was the
2 tenant vacated?
3          MS. LIEBER: Your Honor, if I may, I can actually
4 put on information that's in evidence, put ICE 13 onto the
5 machine.
6 BY MS. LIEBER:
7 Q   Mr. Kelly, does this -- there is no date on it.
8          Do you see though, first of all, the Dear Mr. Kelly
9 letter?
10 A   Yes.
11 Q   Is that you?
12 A   It is me.
13 Q   And the termination of his lease would be as of what
14 date, do you see that?
15 A   March 1, '04.
16 Q   Okay. So, the lease ran from June 10th to --
17          THE COURT: January, January.
18 BY MS. LIEBER:
19 Q   I'm sorry. January 10th to March 1st of 2004; is that
20 right?
21 A   That's right. It was a year lease, but he asked to be
22 let out early and the landlord conceded to his request.
23 Q   So you had to check with the landlord?
24 A   Yes.
25 Q   When, within that timeframe, did you actually go into

30

1 that house?
2 A   It was before that date, but I'm not certain what the
3 date of that was, but I did go into the house.
4 Q   Was this before he had vacated or after? Do you know?
5 A   Before.
6 Q   Any sense of when within that timeframe?
7 A   It was about a month before, maybe less.
8          MS. LIEBER: Thank you.
9          THE COURT: Thank you.
10          (Witness excused.)
11          THE COURT: Should we take a short break?
12          MS. LIEBER: Yes.
13          THE COURT: All right. Ladies and gentlemen. I am
14 going to excuse you for five minutes. It won't be long,
15 I promise.
16          (Jury Out.)
17          MS. LIEBER: Your Honor, if I may, just as they're
18 bringing the witness in, I need to have one brief word with
19 him. I'm happy to have any defense counsel that wants to be
20 there with me come with me. Mr. McDaniel and I had discussed
21 an issue that I wanted to clarify with the witness.
22          THE COURT: Mr. McDaniel will come with you then,
23 that's fine. I don't know what that means but at a minimum.
24          Can we bring him in?
25          MS. LIEBER: Sure, yes.

31

1          (There was a pause in the proceedings.)
2          THE COURT: Are we ready to proceed?
3          MS. LIEBER: We are.
4          (Jury Present.)
5          THE COURT: All right. Ladies and gentlemen, we're
6 ready to proceed.
7          ANTHONY GIVENS, GOVERNMENT WITNESS, SWORN
8                    DIRECT EXAMINATION
9 BY MS. LIEBER:
10 Q   Good morning, sir. In a nice, clear voice, can you
11 please introduce yourself to our jury.
12 A   My name is Anthony Givens.
13 Q   How do you spell Givens?
14 A   G-I-V-E-N-S.
15 Q   Sir, do you have a nickname?
16 A   Pig, P-I-G.
17 Q   How did you get that nickname?
18 A   My grandmother.
19 Q   Your grandmother?
20 A   Yes, ma'am.
21 Q   How old are you?
22 A   Thirty-four.
23 Q   And are you presently incarcerated?
24 A   Yes.
25 Q   Where are you currently incarcerated?

32

1 A   CTF or CTA.
2 Q   And what is CTF or CTA?
3 A   D.C. Jail.
4 Q   It's sort of a component of the D.C. Jail?
5 A   Yes, ma'am.
6          THE COURT: You're going to have to speak up a bit
7 so everybody all the way down can hear you. All right, sir?
8          THE WITNESS: Okay.
9 BY MS. LIEBER:
10 Q   Mr. Givens, prior to your time that you're spending now
11 incarcerated, where did you live generally?
12 A   In Northeast, Washington, D.C.
13 Q   Where were you born and raised?
14 A   In the Capitol Hill, Eastern High School area.
15 Q   Is that in Northeast here in Washington?
16 A   That's Southeast, just a bit over.
17 Q   Okay. Where did you go to elementary school?
18 A   I went to Payne Elementary.
19 Q   Is that Payne, P-A-Y-N-E?
20 A   Yes, ma'am.
21 Q   Where did you go to school beyond that?
22 A   I went to Elliott and then I went to McKinley.
23 Q   Elliott Jr. High School?
24 A   Yes, ma'am.
25 Q   And McKinley Tech High School?

---

33

1  A  Yes, ma'am

2  Q  How long have you been incarcerated?

3  A  About 31 months now.

4  Q  When were you first locked up?

5  A  '04, May 11th.

6  Q  When you were arrested, tell the jury why were you

7  arrested?

8  A  When I was arrested, I was carrying 500 grams of crack

9  cocaine.  I was arrested for that.

10  Q  When you say you were carrying it, did you intend to

11  actually sell that crack cocaine?

12  A  Yes.

13  Q  Because you had close to 500 grams of crack cocaine,

14  were you indicted for that offense?

15  A  Yes.

16  Q  After you were indicted for that offense, were you

17  indicted for possession with intent to distribute 50 grams or

18  more of cocaine base?

19  A  Yes.

20  Q  Is cocaine base known as crack on the street?

21  A  Yes.

22  Q  Were you indicted for that offense?

23  A  Yes, I was.

24  Q  Did you ultimately make a decision about what to do

25  about that indictment?

---

34

1  A  Yes.

2  Q  What was your decision?

3  A  To cooperate with the Government as far as the case, as

4  far as my case was.

5  Q  When you say "cooperate with the Government," did you

6  actually enter a plea of guilty to the indictment?

7  A  Yes.

8      MS. LIEBER:  Your Honor, at this time I'm going to

9  show Mr. Balarezo, all counsel, what I've marked, going to

10  mark as Miscellaneous 12.

11      THE DEPUTY CLERK:  Miscellaneous 11 was a

12  stipulation.

13      MS. LIEBER:  Your Honor, if we can just approach on

14  one matter.  I'm sorry about that.

15      (Bench conference.)

16      THE COURT:  We have something that needs to come

17  out?

18      MS. LIEBER:  I'll do that too.  Your Honor, with

19  respect to this, I asked my secretary to pull a signed copy

20  of his plea letter, which this is not a signed copy.  She is

21  out this morning.  So I couldn't actually get that from her.

22  I'm going to use this with Mr. Givens because it is

23  identical.  It's just not signed.  So I'm just going to

24  substitute, Mr. Balarezo has already given me permission to

25  substitute a signed copy when it goes back.

---

35

1      MR. BALAREZO:  I just don't want to have any issue

2  when I'm crossing saying I have not signed it.

3      MS. LIEBER:  I am going to actually say to him this

4  is an unsigned version of your plea agreement.

5      THE COURT:  Fine, for the record, we'll substitute

6  it, this one for the other one.  Any problems?

7      MR. BALAREZO:  No.

8      THE COURT:  Okay.  Go ahead.

9      (Open Court.)

10      THE COURT:  Any objection to its admission,

11  Miscellaneous 12?

12      MR. BALAREZO:  No, subject to our discussion, Your

13  Honor.

14      THE COURT:  Let's make it clear, this is an

15  unsigned copy, and we'll just put in the signed copy as soon

16  as it's available, when your secretary gets back.

17      MS. LIEBER:  Thank you.

18      (Government Exhibit No. Miscellaneous 12

19      was admitted into evidence.)

20  BY MS. LIEBER:

21  Q  Mr. Givens, I'm going to show you what I've marked at

22  the bottom as Miscellaneous 12 here, and I want to ask you to

23  take a look at this.  First of all, is this, just so

24  everybody knows, is this an unsigned copy of your plea

25  letter?

---

36

1  A  Yes.

2  Q  Actually, why don't I have you take a look at it?

3      Mr. Givens, if you would take a look at that and

4  see if you recognize what that document is.

5  A  This is my plea letter.

6  Q  Except for the fact that this actual copy doesn't have

7  your signature on it, is this the plea letter that you agreed

8  to when you pled guilty?

9  A  Yes.

10  Q  Okay.  And I'm going to just spend a few minutes talking

11  about the letter itself.  In this plea letter, first of all,

12  who is Pleasant Broadnax.

13  A  That's my lawyer.

14  Q  In this plea letter, what have you agreed to plead

15  guilty to here in Paragraph 1?

16  A  I agreed to plead to 21 USC 841, dash (a)(1).

17  Q  Now, do you know about 21 USC 841(a)(1).  In other

18  words, are you familiar with the U.S. Code?

19  A  No, I'm not familiar with the U.S. Code.  But I'm quite

20  sure it's distributing crack cocaine above 50 grams.

21  Q  In fact, is it, above here, possession with intent to

22  distribute 50 grams or more of cocaine base?

23  A  Yes.

24  Q  How much time, are you aware that you're facing a

25  mandatory minimum amount of time?

**37**

```
 1   A   Yes.
 2   Q   How much time are you facing as a mandatory minimum?
 3   A   Ten years.
 4   Q   What's the maximum that you are facing?
 5   A   I believe life.
 6   Q   Mr. Givens, did you have an opportunity to go over this
 7   plea letter with your attorney?
 8   A   Yes.
 9   Q   Did he explain to you various aspects of the plea
10   letter?
11   A   Yes.
12   Q   In terms of the sentencing, well first of all, are you
13   the same Anthony Givens that was convicted in 1999 of
14   distribution of PCP in Superior Court?
15   A   Yes.
16   Q   What is your understanding of how the sentencing would
17   take place in your case?
18         THE COURT:  Let me just remind the jury, we've had
19   this before, but you've just heard evidence regarding the
20   prior conviction of this witness, and you may use it in
21   considering his credibility.  I instructed you on this
22   before.  I will instruct you again I'm sure in the future.
23   Okay.
24         MS. LIEBER:  Thank you, Your Honor.
25
```

**38**

```
 1   BY MS. LIEBER:
 2   Q   Mr. Givens, what is your understanding about the
 3   sentencing guidelines?  Are you familiar that there are
 4   sentencing guidelines?
 5   A   Yes.
 6   Q   In terms of your plea letter, who ultimately decides
 7   what sentence you get?
 8   A   The judge.
 9   Q   Do I have any say in the sentence that you get?
10   A   I don't believe so.
11   Q   Is there anything I can do for you?  Under the plea that
12   you agreed to, is there anything I can do --
13         THE COURT:  You mean the Government.
14         MS. LIEBER:  I'm sorry.  I mean, the Government.
15   Thank you.
16   BY MS. LIEBER:
17   Q   Is there anything the Government can do to assist you in
18   your sentencing?
19   A   No, I think my plea is a mandatory ten years.  I think
20   that's what I pled to.  So in this that's about it.
21   Q   What is your understanding of what you get, the benefit
22   of cooperating with the Government?
23   A   They could take my cooperation into consideration.  I
24   think that's, I could still be sentenced to ten years or to
25   life.  There is no guarantee.
```

**39**

```
 1   Q   Have I promised you what sentence you'll get?
 2   A   No.
 3   Q   What promises have I made to you?
 4   A   None.
 5   Q   Are you aware of something called a 5K motion?
 6   A   Yes.
 7   Q   Tell the jury what your understanding is of a 5K motion.
 8   A   My understanding of a 5K motion is that, if I cooperate
 9   and testify to the truth, that a 5K motion is a motion that
10   would be filed in my behalf saying that my cooperation is
11   helpful.  That would be another considering factor for the
12   judge for my sentencing.
13   Q   Now, Mr. Givens, you said that you were arrested in May
14   of 2004 in possession of almost half a kilogram of crack
15   cocaine?
16   A   Yes.
17   Q   Have you sold drugs in the past?
18   A   Yes.
19   Q   What kinds of drugs have you sold in the past?
20   A   PCP, marijuana and crack cocaine.
21   Q   Now, have you ever had any legitimate employment?
22   A   Yes.
23   Q   Tell the jury about that.
24   A   I have a CDL.  I work for BFI.  I did trash removal.
25   Q   When you say CDL is that a commercial driver's license?
```

**40**

```
 1   A   Yes, ma'am.
 2   Q   Do you have to take extra steps to obtain a CDL beyond a
 3   typical driver's license?
 4         MR. BALAREZO:  Objection.
 5         THE COURT:  What's the basis?
 6         MR. BALAREZO:  It's irrelevant.
 7         THE COURT:  Overruled.  Go ahead.
 8   BY MS. LIEBER:
 9   Q   You can answer.
10   A   It's a couple of classes you have to take as far as
11   safety, as far as learning the vehicle, the trucks; 30,000
12   pounds is very dangerous.  If I'm in an accident with a truck
13   of that size, most likely somebody else is going to get
14   killed.
15         So it's important for you to know how to operate
16   the vehicle in the public, things like that.  Also, your
17   medical record is important because they don't want you to
18   drive and you have a heart attack or anything like that.  So
19   it's a lot of key components to having a CDL.
20   Q   And when you had your CDL, you said you worked for BFI.
21   Is that a trash removal company?
22   A   Yes.
23   Q   I'm going to talk to you now about drug dealing,
24   specifically cocaine.
25   A   Okay.
```

**41**

1  Q  Do you know someone named Antoine Jones?

2  A  Yes.

3  Q  How do you know Antoine Jones?

4  A  Through a acquaintance of mine.

5  Q  What's the name of your acquaintance?

6  A  Beanie.

7  Q  Is that Beanie?

8  A  Yes.

9  Q  Do you know Beanie's real name?

10 A  Not offhand.

11 Q  How did you come to meet Mr. Jones?

12 A  We grew up in the neighborhood that I was associated

13 with and we became friends.

14 Q  How did you become friends, through Beanie?

15 A  You mean Antoine?

16 Q  Yes. I'm sorry, were you telling us you grew up with

17 Beanie?

18 A  Yes. Yes, me and him became friends.

19 Q  I'm sorry. I misunderstood. Let's backtrack to Beanie.

20 You say you grew up in the same neighborhood as Beanie?

21 A  Yes.

22 Q  And became friends?

23 A  Yes.

24 Q  How is it that Beanie introduced you to Antoine Jones?

25 A  He came to me and he was telling me about --

---

**42**

1  MR. BALAREZO:  Objection.

2  THE COURT:  We're not talking about Beanie? Who

3  came to you? Who's the person?

4  THE WITNESS:  Beanie, he came to me, my friend. He

5  came to me and we had a discussion.

6  MR. BALAREZO:  Objection.

7  MS. LIEBER:  Your Honor, can we approach?

8  THE COURT:  Yes. Let's approach.

9  (Bench conference.)

10 THE COURT:  I don't know what he is about to say.

11 Is it being offered for the truth? Where are we in time

12 please?

13 MS. LIEBER:  I was about, I was -- we're going to

14 talk about the fall of 2003. Your Honor, these are clearly

15 co-conspirator statements in furtherance of a drug

16 conspiracy.

17 THE COURT:  Because?

18 MS. LIEBER:  Because the statements are going to be

19 that Beanie came to Givens and wanted to talk to him about

20 getting cocaine from Antoine Jones. That Beanie had a source

21 of cocaine who was Antoine Jones. So while Beanie is

22 certainly not charged, this is -- he can be an unindicted

23 co-conspirator. These are statements. Doesn't have to be an

24 indicted co-conspirator for a 801(D)(2)(e) co-conspirator

25 statement to come in.

---

**43**

1  THE COURT:  Where is he going with this? In '03,

2  Beanie says to him I have a source, Antoine Jones?

3  MS. LIEBER:  Yes, basically Beanie was brokering

4  cocaine transactions between Mr. Jones and Mr. Givens for a

5  time. And then Mr. Givens started buying cocaine directly

6  from Mr. Jones. So it is all part and parcel.

7  MR. BALAREZO:  This is the problem we're having

8  before. They're throwing names out that are part of

9  conspiracy and we're supposed to lay down. We don't know

10 anything about Beanie. We don't know whether he was part of

11 this conspiracy or another conspiracy. That's the problem

12 we're having. They're throwing all these things out for the

13 truth. It is compounding the problem

14 THE COURT:  They're entitled to introduce

15 co-conspirators' statements in furtherance of. This guy

16 became a co-conspirator through Beanie. So, and Beanie

17 apparently was dealing directly with Givens. I have not

18 allowed them to go off in another circle beyond the people

19 who dealt directly with Jones. So, it is part and parcel.

20 These were his distributors. So, it's overruled. It comes

21 in as a co-conspirator statement.

22 (Open Court.)

23 BY MS. LIEBER:

24 Q  Mr. Givens, tell the jury how is it that Beanie came to

---

**44**

1  THE COURT:  How is it, what does that mean?

2  BY MS. LIEBER:

3  Q  Tell the jury about the first time you heard the name

4  Antoine Jones, how that came up.

5  A  He wanted to finance a drug buy.

6  Q  Who wanted to finance a drug buy?

7  A  Beanie.

8  Q  How do you know that?

9  A  Because we talked on several occasions about him buying

10 cocaine from Antoine.

11 Q  Let's start with the timeframe. About when was this,

12 when you had your first conversation with Beanie about

13 financing a drug buy with Antoine?

14 A  I believe around October of '03.

15 Q  When you say Antoine, do you see Antoine Jones here in

16 court today?

17 A  Yes.

18 Q  Can you identify him by where he's seated and something

19 that he's wearing?

20 A  I think the fourth seat, blue sweater.

21 MS. LIEBER:  Your Honor, I'm sorry.

22 MR. BALAREZO:  Objection.

23 THE COURT:  Is that the person that just stood up

24 that you say is Antoine Jones?

25 THE WITNESS:  Maybe I'm not correct. Maybe it's

45

1  the last guy. Maybe it's the last guy, I'm sorry, in the tan
2  sweater. I don't know how many seats that will be.
3      MS. LIEBER: Okay.
4      THE COURT: The one that just stood up? I just
5  want to know.
6      THE WITNESS: I'm trying to see. I'm having a hard
7  time seeing that far.
8      MS. LIEBER: Okay. Why don't you do this, Mr.
9  Givens. Why don't you stand up and take a look around the
10 courtroom and see if you see Mr. Jones. I will get out of
11 the way.  *Lieber is leading the witness*
12     THE WITNESS: Can I move closer?
13     THE COURT: Yes, you can.
14 BY MS. LIEBER:
15 Q   Mr. Givens, do you see Mr. Jones here in court?
16 A   Seat number one.
17 Q   Just so we're clear, from where you were seated where
18 you are seated now in that witness chair, you had a hard time
19 seeing the person --
20 A   I have difficulty seeing period.
21 Q   Okay. Tell the jury about that, first of all, your
22 difficulty seeing.
23     THE COURT: Can we find out who he has identified
24 for the record so it's clear to me. Who did you describe
25 again? Would you tell us where he's seated.

*He didn't know what I look like.*

46

1      THE WITNESS: Number one seat, got a green shirt,
2  black jacket.
3      MS. LIEBER: Your Honor, may the record reflect an
4  identification of Mr. Jones.
5      MR. BALAREZO: The record reflects his third
6  identification of Mr. Jones.
7      THE COURT: Well, all right, the record will
8  reflect that on this occasion the gentleman in the green
9  shirt is Mr. Jones.
10 BY MS. LIEBER:
11 Q   Mr. Givens, you had to come down from the witness stand
12 to make that identification; is that right?
13 A   Yes.
14 Q   Now, sitting here, having come down from the witness
15 stand, are you sure that the person you have just identified,
16 the man in the green shirt, is Antoine Jones?
17 A   Yes.
18 Q   Why is it, tell the jury, that you had to actually come
19 down and move closer?
20 A   I was supposed to have prescription glasses filled from
21 CCA, but the block that I'm on, I'm having a hard time
22 receiving them.
23 Q   So you're supposed to actually have visional correction?
24 A   Yes.
25 Q   Do you have contact lenses in or anything like that

47

1  right now?
2  A   They won't allow me to have contacts, only glasses which
3  were not provided for me before I got here.
4  Q   Now, when Beanie came to you in October of 2003 and said
5  he wanted to finance a drug transaction, what specifically
6  did he tell you he wanted to buy?
7  A   500 grams of crack cocaine, he wanted to buy.
8  Q   Did he tell you how, was he looking for money from you
9  or why is it that he came, why did he tell you he wanted to
10 involve you in this process?
11 A   He was telling me that he wanted to purchase the cocaine
12 from Antoine. And that he didn't have the money to. I guess
13 he negotiated a 500-gram --
14     MR. BALAREZO: Objection.
15     THE COURT: I'm sorry. We don't want to you guess.
16 You can tell us what he told you.
17     THE WITNESS: He said that he negotiated a deal for
18 500 grams of crack cocaine, but he didn't have the money.
19     THE COURT: He said he negotiated what?
20     THE WITNESS: A deal for 500 grams of crack
21 cocaine.
22 BY MS. LIEBER:
23 Q   But he didn't have the money; is that right?
24 A   But he didn't have the money.
25 Q   Did he identify, in this first occasion, the name of his

48

1  source of who he wanted to buy the drugs from?
2  A   Yes.
3  Q   What did he tell you about Antoine Jones?
4  A   In the beginning, he didn't tell me much. He just was
5  telling me that basically he wanted me to give him, loan him
6  the money. That he would pay me a percentage of my money
7  back with interest and things like that. But he didn't tell
8  me too much about him other than his name and that's about
9  it.
10 Q   Did you, at that point, try to start a drug relationship
11 with Mr. Jones on your own, separate from Beanie?
12 A   Down the line, yes.
13 Q   But at the very beginning, did you?
14 A   No.
15 Q   Did you ultimately start buying wholesale quantities of
16 cocaine yourself through Beanie from somebody, from a source?
17 A   Yes.
18 Q   When did it start that you actually started buying
19 wholesale quantities of cocaine yourself through Beanie?
20     MR. BALAREZO: Objection to wholesale, Your Honor.
21     THE COURT: Overruled.
22 BY MS. LIEBER:
23 Q   What kind of quantities were you buying? Why kind of
24 quantities of cocaine were you buying through Beanie?
25 A   Started out buying 500 grams of crack cocaine, it

49

1  started out because I was really skeptical about the whole
2  situation.
3  Q   Who was skeptical?  I'm sorry.
4  A   I was.
5  Q   Why were you skeptical?  You were skeptical about the
6  whole situation.  What does what mean?
7  A   I don't know him  It's my money.
8          THE COURT:  You didn't know who?
9          THE WITNESS:  I don't know Antoine at all.  You
10  know what I'm saying?  I feel like I have everything to lose
11  in this situation.  I'm giving them my money.  If something
12  happens, something bad goes wrong, anything, I think my money
13  is going to be in the balance, going to be in limbo, so I'm
14  really skeptical about it in the beginning.
15  BY MS. LIEBER:
16  Q   Okay.  So is that why you started buying smaller
17  quantities?
18  A   I felt like 500 grams was real small.
19  Q   You feel like 500 grams is small?
20  A   That's how I felt.
21  Q   Did you ultimately start buying larger quantities of
22  cocaine?
23  A   Yes.
24  Q   Okay.  Tell the jury how it was that you went from 500
25  grams to larger quantities.

50

1  A   Well, the first purchase, the 500 grams, it was really
2  good.  It was better than expected.  It was cheaper than I
3  expected.  And so, I think my greed put me in this situation.
4  So, after 500 grams, after the 500 grams, I started taking it
5  around, letting other people see it, and everybody seemed to
6  love it.
7  Q   I'm going to stop you there.  You said you started
8  taking it around and letting other people see it.  Tell the
9  jury what specifically you did when you say you let other
10  people see it.
11  A   Well, the quality of the cocaine was really good.
12  Q   How do you know that?
13  A   Through mixing it, putting the base on it, through
14  cooking it and through the texture and things like that,
15  through the oil.  It was really good.
16  Q   When you say "cooking it and putting a base on it," just
17  tell the jury, when you got 500 grams was it powder or was it
18  crack?
19  A   It was powder.
20  Q   When you got 500 grams, half a kilogram of powder
21  cocaine from Mr. Jones, what did you do to that, what did you
22  personally do to it so you could tell?  When you say "put a
23  base on it," what's that mean?
24  A   Basically, what you do is you take it, you moisturize it
25  with water and you heat it slowly.  And through that process,

51

1  it slowly melts down from a powder to an oil substance.  It's
2  hard to tell what you have in a powdery substance.  But once
3  you get it down to an oil, you get a sense of what you have,
4  the quality of it and everything.  Based on the quality of
5  it, it depend on how much base you can put to it.  The more
6  base you can put to it, basically the more money you can get.
7  Q   Why is it that you get more money the more base you can
8  put on powder cocaine?
9  A   Because if the oil is good, it absorbed more baking
10  soda, which is base.  So, for example, if you had 250 grams,
11  you put it in there, if you can add a hundred grams of baking
12  soda, when it all come back together it's 350 grams.
13          So at the price you sell cocaine and you have a box
14  of baking soda, which is basically fifty-cents, you put a
15  hundred grams of that in there, come out with 350.  That's
16  how you make your money.  But if the oil is not good, it
17  won't hold.  It won't be right.
18  Q   So when you said that you started showing it around to
19  people, did you show them the cocaine already cooked up into
20  crack or did you show them the powder and the process that
21  you used?
22  A   Some I showed them the process because everything is in
23  the process.  And once people, once I knew, once people saw
24  it, they, you know what I'm saying, I felt they would love
25  it.

52

1  Q   And did they?  Did you get a good response?
2  A   Yes.
3  Q   To the cocaine that you had from Mr. Jones?
4  A   I had a wonderful response.  It was almost unbelievable
5  to be honest with you.
6  Q   How did that affect your willingness to buy bigger
7  quantities from Mr. Jones?
8  A   I was willing to pay in the background and not really
9  get involved, just to loan my money.
10  Q   I'm sorry, just to what your money?
11  A   Loan it.
12  Q   Okay.  Who did you loan your money to?
13  A   Beanie.
14  Q   If you're just loaning money to Beanie, how is it that
15  you made money?
16  A   We would do like percentages, like, if I gave him
17  $12,000, he'll say, I'll give you 15 back.  And that's how
18  the agreement was worked out.  It was either you could do
19  money or you can do, you know, the cocaine per se.  But you
20  work out the agreement in the beginning as far as how they
21  would pay your money back.
22  Q   So, in the beginning, you just made your money by
23  basically charging high interest rates?
24  A   Exactly.
25  Q   And when you ultimately started buying cocaine for

53

```
 1   yourself to sell, how much cocaine were you buying at a time?
 2   A   It went from, I think, after the half a kilo we
 3   purchased two kilos of cocaine.
 4            THE COURT:  We?
 5   BY MS. LIEBER:
 6   Q   Who is we?
 7   A   Me and Beanie.
 8   Q   How did that shake out, you and Beanie?  How much of
 9   that two kilos was yours and how much of that was Beanie's?
10   A   All of it was mine basically.
11   Q   Did you pay for all of it?
12   A   Yes.
13   Q   What did you do with the cocaine, that next quantity
14   that you bought, the two kilograms, what did you do with
15   that?
16   A   We took one, and we put it in our own neighborhood
17   through Beanie.  That's how Beanie basically got his money.
18   Q   When you say "put it in your own neighborhood," what
19   does that mean?
20   A   We sold it in our neighborhood, where we came from.
21   Q   What neighborhood is that?
22   A   Capers, Arthur Capers.
23   Q   Okay.  Is Arthur Capers, is that an apartment complex?
24   A   It's an apartment complex.
25   Q   When you sold it, what quantities did you sell it in?
```

54

```
 1   A   Me?
 2   Q   First of all, did you actually sell hand-to-hand?
 3   A   No, I didn't sell hand-to-hand.
 4   Q   How is it that that first kilogram went into your
 5   neighborhood, in what quantities?
 6   A   Eighth, 62s and basically that was how it went in my
 7   neighborhood.
 8   Q   When you say an eighth, is that an eighth of a kilogram?
 9   A   That's an eighth of a kilogram of crack cocaine.
10   Q   Okay.  When you all sold it, had you already converted
11   it to crack?
12   A   Yes.
13   Q   When you say a 62, how much?
14   A   62 grams of crack cocaine.
15   Q   And you say that you didn't actually sell it
16   hand-to-hand; is that right?
17   A   Right.
18   Q   How did the crack actually get sold as eighths and 62s?
19   A   I would cook it up and wrap it up, weigh it out, wrap it
20   up and give it to Beanie.  And basically, he would distribute
21   it lower to whatever people wanted it in the neighborhood in
22   various ways.
23   Q   When you say you weighed it, how did you weigh it?
24   A   On a scale.
25   Q   What kind of scale?
```

55

```
 1   A   A digital scale.
 2   Q   About how big was the digital scale?
 3   A   When you have kilos of cocaine, you need two scales
 4   actually.  You need one that weighs at least 500 grams or
 5   more.  You need another one that weighs approximately
 6   100 grams or less.  The hundred grams or less is a more
 7   accurate scale.  So it is best to have both of them
 8   Q   Now, did there come a time that you collected money from
 9   other people interested in buying cocaine from Mr. Jones?
10   A   Yes.
11   Q   First of all, about when did you start collecting money
12   from other people to buy cocaine from Mr. Jones?
13   A   Well, we bought the two kilos of cocaine.  Like I said,
14   I gave Beanie one and to add the base to it.  That's how we
15   basically got our money, Beanie and I, because of the base,
16   like I said, you add it to the cocaine and it stretches, so
17   it enhances the weight.  So, more weight, more money.  So
18   that's how we did that.  That's like our day-to-day money.
19   That was our gram money.
20   Q   Let me ask you this.  How much were you paying for a
21   kilogram of cocaine from Mr. Jones, again, this is the
22   beginning?
23   A   We started out paying like 23, I believe.
24   Q   Twenty-three what?
25   A   Twenty-three thousand dollars for a kilo of cocaine.
```

56

```
 1   Q   Of powder cocaine?
 2   A   Yes, which, at the time, was still a beautiful price.
 3   Q   If you weren't getting from Mr. Jones, how much were you
 4   typically paying for a kilogram of cocaine in the fall of
 5   2003, prior to dealing with Mr. Jones?
 6   A   Twenty-six thousand and 28,000.
 7   Q   So the first time was about 23,000?
 8   A   From Antoine?
 9   Q   Yes.
10   A   Yes.
11   Q   Now, again, tell the jury, there came a time when you
12   started collecting money from other folks?
13   A   Right.  What I did with the other kilo of cocaine is,
14   every kilo of cocaine is a thousand grams.  So I cut it down
15   into 250 grams, which is a quarter.  Then what I started
16   doing was I took them quarters out to different neighborhoods
17   to guys that I knew and sold them
18            Sold the cocaine in quarters, in powder, in powder
19   because I needed the, because Antoine sold the cocaine so
20   cheap, I realized that it was easier for me, I could sell it
21   at 25, 26 and make money just straight off the top of the
22   cocaine, without cooking it, without really having to do too
23   much to it.
24   Q   I'm sorry.  Just so we're clear, when you say 25 or 26,
25   is that thousand dollars?
```

57

A    Thousand dollars. Twenty-six thousand dollars. So,
what my plan was, was to have Beanie in the neighborhood
doing the day-to-day thing, the day-to-day grind, every day.
Then I would go out to other neighborhoods and solicit other
people that I knew had money, but so I started out purchasing
the cocaine myself just to let them know, like, it's cool.
It's perfect. It's not going to change, building confidence,
building, you know, relationships with other people.

Q    These were neighborhoods different from the Capers?

A    Right.

Q    After you sold those four quarter kilograms in different
neighborhoods, did that increase interest in your business?

A    Yes.

Q    Tell the jury what you did based on the increased
interest in the cocaine?

A    Well, our money grew definitely. Our money grew, me and
Beanie's money grew. So we had more people in the
neighborhood that were interested in doing business with us.
So that grew. So, it was like we went from a kilo of cocaine
in the neighborhood to two. And from the 250 grams I sold to
like four people, they basically wanted to buy a kilo of
cocaine themselves.

Q    Did you help them do that? Did you help get kilograms
of cocaine from Antoine Jones to these other interested
customers?

58

A    Yes.

Q    About when did you start brokering cocaine transactions
in kilogram quantities?

A    I would say December of '03, just before the New Year.

Q    Just so we're clear, in terms of the total length of
your cocaine relationship with Antoine Jones, you say you
started in October of 2003. And when was the last time you
purchased cocaine from Antoine Jones?

A    I think in April, probably about the last time I got
cocaine from Antoine.

      THE COURT:    April of what year?

      THE WITNESS:    '04.

BY MS. LIEBER:

Q    Then you were locked up in May of '04; is that right?

A    May of '04, the 11th.

Q    Okay. And from May 11th to the present, have you been
incarcerated the whole time?

A    Yes.

Q    We're talking about you brokering cocaine transactions,
you know, kilogram quantities of cocaine transactions between
Mr. Jones and other customers.

      THE COURT:    Can I have a date when you actually met
Mr. Jones? I'm a little confused.

      THE WITNESS:    When I met him?

      THE COURT:    Yes.

59

      THE WITNESS:    I met him in --

      THE COURT:    When is the first time you saw him face
to face?

      THE WITNESS:    Face to face I saw him, I would say,
in December, when the quantities went up.

BY MS. LIEBER:

Q    That was my next series of questions. I'm sorry. In
the first few months that you were getting cocaine from
Antoine Jones, did you actually receive it from his hands or
did you receive it from somebody else?

A    We would drive and meet him, me and Beanie would drive
and meet him at various locations.

Q    Who would actually go and have a face-to-face meeting
with Mr. Jones, you or Beanie?

A    Beanie.

Q    Did there come a time that Beanie actually introduced
you in person to Mr. Jones?

A    Yes.

Q    When was that?

A    I think in December we met, in December.

Q    When you said you and Beanie --

      THE COURT:    I'm sorry, in December you what?

      THE WITNESS:    We met in December.

BY MS. LIEBER:

Q    Had you accompanied Beanie in October or November to

60

meet with Mr. Jones but not actually -- that's a terrible
question. Strike that.

      In October or November, tell the jury, you say that
you accompanied Beanie. What does that mean?

A    Well, the money started getting, it started to be more
money. It wasn't $12,000 any more with the half. It started
being more, so like around a hundred. So I started going
with him.

Q    You say "12,000 for a half." What does that mean?

A    Twelve thousand dollars for a half, that's what I was
told it was being charged for the half on the loan.

Q    Just so we're clear, half is what is a half?

A    500 grams.

Q    Of powder cocaine?

A    Powder cocaine.

Q    You say that it then got up to a hundred and you started
going with Beanie?

A    Right, the money.

Q    A hundred is what, a hundred thousand dollars?

A    A hundred thousand dollars or better.

Q    Whose money was that hundred thousand dollars?

A    I would say like half of it was ours and the other half
was people who put in to buy up front. So, I would go get,
solicit, get their money and take it with me.

      That was more so the reason why I started to ride

61

1  along to go and to make sure that other people's money was,
2  you know, I was responsible for other people's money and not
3  Beanie because I felt like he wasn't the best type of person
4  being in that type of situation. So I went to make sure that
5  the money, you know, got where it was supposed to get to him
6  and that the cocaine was in my possession.
7  Q  Okay. Did you ultimately then start meeting without
8  Beanie even being there?
9  A  No.
10  Q  Tell the jury how it is that you first met in person,
11  face to face Mr. Jones?
12  A  Well we had a lot of little meetings first. We would
13  meet at various locations around Maryland. My first
14  encounter was when we went to a Sam's Club. So, like I say,
15  we met a couple times before. We met at the Sam's Club. We
16  was there early. He was there late. He didn't arrive at the
17  time he said he was. So we was sitting, waiting on him.
18  Q  How is it that you all decided to meet at Sam's Club?
19  A  He would pick the spots, and we would just meet. I
20  would be with Beanie. He would call. So we would tell him,
21  basically what we wanted, how much money we had. When we
22  would, he would meet, he would decide where we met at.
23  Q  You said various spots in Maryland. Give the jury a
24  sense of some of the places that you met with Mr. Jones
25  during that six-month or so period.

62

1  A  Central Avenue, we met by the Home Depot. We met --
2      THE COURT:  Central Avenue where, in Maryland or
3  D.C.?
4      THE WITNESS:  In Maryland, Home Depot in Maryland.
5  We met off Central Avenue at Home Depot. There's a 7-Eleven,
6  we met at the 7-Eleven. The Crown gas station, we met there.
7  We met at the Wendy's, which is all in the same area.
8  BY MS. LIEBER:
9  Q  Okay. All in the same area off of Central Avenue?
10  A  Right. Then we met at the Sam's, which is not far.
11  It's by FedEx Field. We met there a couple of times as well.
12  Q  When you say you met at Sam's Club or the Home Depot,
13  where specifically did you meet with Mr. Jones, like where,
14  was it in the parking lot, in the building, behind the
15  building?
16  A  At Sam's.
17  Q  Yes, for instance Sam's, where would you meet?
18  A  At Sam's, like I said, he was late. So we were sitting
19  in the parking lot. So when he arrived, I let Beanie do most
20  of the talking. So as I got out, he was like, he wanted to
21  introduce us and things like that, my first time, so he
22  introduced. I went into the Sam's Club, went in. They did
23  the transaction. I came out. And they was in there talking
24  for a little bit, in the cars for a little bit. He got out,
25  got in his truck and he left.

63

1      THE COURT:  Who left?
2      THE WITNESS:  Antoine got out the car, got in his
3  truck and he left.
4      THE COURT:  Was this the first time that you were
5  introduced to him?
6      THE WITNESS:  Yes, Ma'am.
7  BY MS. LIEBER:
8  Q  You say he got into his truck, what kind of truck? What
9  kind of vehicle did Mr. Jones drive?
10  A  He drove a Cherokee, gold in color, Maryland tags.
11  Q  Now, are you also familiar with a fitness center near
12  FedEx Field?
13  A  Yes.
14  Q  Okay. Do you know the name of the fitness center?
15  A  I'm not sure. I think it's Sports Complex or something
16  like that.
17  Q  Did you ever meet with Mr. Jones there?
18  A  Yes.
19  Q  What kinds of things did you do when you met with
20  Mr. Jones at the Sports Complex by FedEx Field?
21  A  They would work out, him and Beanie.
22      MR. BALAREZO:  Objection, foundation, basis.
23      THE COURT:  Tell us, you were there at the Sports
24  Complex?
25      THE WITNESS:  Yes.

64

1      THE COURT:  What did you see?
2      THE WITNESS:  Them working out. They was going to
3  work out.
4  BY MS. LIEBER:
5  Q  Did you actually see them lifting weights inside the
6  Sports Complex?
7  A  Yes.
8  Q  Did you yourself go in and work out with Mr. Jones and
9  Beanie?
10  A  No.
11  Q  What did you do when they were working out?
12  A  I really didn't do anything. I didn't work out. I
13  didn't -- I looked around. I walked around the facility. It
14  was my first time there. I heard a lot about it. So I
15  basically was just looking at the sights. I watched people
16  do aerobics. It was more so about business for me, not about
17  working out.
18  Q  Okay. When you say it was about business to you, what
19  does that mean?
20  A  I looked at every opportunity as an opportunity to do
21  better business. And the thing about it was, I had to do
22  things kind of like through Beanie in a sense. Like we
23  didn't have a relationship whereas though I felt like I could
24  voice my opinion. So I had to kind of, we was out there to
25  do business. I wasn't out there to work out. Or I wasn't

65

```
1   there to go to stores or anything like that. I was there to
2   do business. And the sooner my business was done, I was
3   ready to go.
4   Q   So, for instance, when you all met at the Sam's Club
5   with Mr. Jones, what type of business were you out there to
6   conduct?
7   A   I was out there to conduct more cocaine. I wanted him
8   to, I wanted us to buy. We had a hundred thousand dollars.
9   He felt like we were spending a lot of money with him. I
10  wanted him to give us some, honestly, to trust us more, to
11  build, I wanted, it's called fronting, which is like
12  consignment.
13        It's like we'd give him a hundred thousand dollars.
14  Then he'd give us 50 thousand and we'll just owe him the
15  rest. That's what I wanted. So I looked at these meetings
16  as an opportunity to try to get him to give us more leeway as
17  far as more cocaine so that we can stretch out a little more.
18  Q   So did there come a time that Mr. Jones fronted you
19  cocaine?
20  A   Yes.
21  Q   Okay. You've been talking about you doing these things
22  for business purposes. Did you have a social relationship
23  with Mr. Jones?
24  A   No.
25  Q   Did you go out with Mr. Jones?
```

66

```
1   A   No.
2   Q   And we talked about the sports, the FedEx Field gym, the
3   Sports Complex. Did you conduct cocaine transactions with
4   Mr. Jones there?
5   A   No.
6   Q   Why then did you go to the Sports Complex?
7   A   Like I say, I felt it was an opportunity to do business.
8   Even when you're not, because, say like when you, when you at
9   FedEx Field, I mean, when we're at Sam's Club, it's not an
10  opportunity to do business because I have a hundred thousand
11  dollars in money. He has several kilos of cocaine. I wanted
12  to make the transaction as fast as possible, and I wanted to
13  get on my way.
14        So, it's hard to talk. It's hard to do business
15  that way. I never had a conversation with him on the phone.
16  So, these opportunities at FedEx, at the Complex were good
17  opportunities for us to try to do better business, to do more
18  cocaine, for him to trust us more. And that's the object of
19  us, me going, anyway.
20  Q   When you met with Mr. Jones at the gym, at that Sports
21  Complex, did you talk to Mr. Jones about cocaine?
22  A   No, not really. I didn't talk to him. I would tell
23  Beanie what I desired, what I felt like he should do, what I
24  felt like we were doing for him.
25  Q   When you say we were doing for him, you and Beanie were
```

67

```
1   doing for whom?
2   A   For Antoine.
3   Q   What did you think you and Beanie were doing for
4   Antoine?
5   A   We were putting a hundred thousand dollars in his pocket
6   with ease.
7   Q   With ease?
8   A   Yes, with ease, like we were on time. We owned up to
9   every word that we had. I felt like we had been in a solid
10  relationship. I felt like we should take it to the next
11  level. I felt like the opportunity was now. And that we had
12  to try to acquire as much cocaine as possible because I
13  started noticing it was more so a pattern of when he would
14  have it and then when he would run out.
15        So my thing was to try to acquire as much, as many
16  kilos as he had from his possession to our possession. But
17  the money wasn't moving as fast as I would have liked it to,
18  to have been. So I felt like if he trusted us more, we would
19  have more leeway. And that's what I felt like them
20  conversations was about.
21  Q   Did there come a time that you did start getting more
22  cocaine from him, that your relationship developed with
23  Mr. Jones?
24  A   Yes.
25  Q   Were you satisfied with the way that your relationship
```

68

```
1   was going?
2   A   Yes.
3   Q   When you met at these places on Central Avenue, and the
4   Home Depot and the like, how is it that you transferred money
5   to Mr. Jones and Mr. Jones transferred cocaine to you?
6   A   Through bags.
7   Q   What kind of bags?
8   A   Backpacks, shopping bags. We would buy backpacks and
9   buy bags because we didn't want the same looking bags all the
10  time, so basically, bags.
11  Q   What was the most amount of cocaine that you ever got at
12  one time from Mr. Jones?
13  A   I think in New Year in January I think we acquired ten
14  kilos of cocaine from him at one time, I believe.
15  Q   Did you pay for all those ten kilograms in cash or was
16  some of that fronted to you by Mr. Jones?
17  A   Some of it was fronted.
18  Q   First of all, did you pay Mr. Jones back for the cocaine
19  that was fronted to you?
20  A   Definitely.
21        THE COURT:  Ms. Lieber, may I ask how long your
22  direct is?
23        MS. LIEBER:  I probably have maybe ten minutes.
24        THE COURT:  Is everybody okay? Go ahead, Ms.
25  Lieber.
```

69

BY MS. LIEBER:

Q  Now, you said the most you ever got was ten kilograms of cocaine.  When you obtained kilogram quantities at a time from Mr. Jones, what generally did that cocaine look like when you first got it?

A  It was in clear plastic.  It was two in a stack, two in a wrap.

THE COURT:  Two kilos?

THE WITNESS:  Two kilos of cocaine in one bubble wrap.  When you took the two kilos out, you had various wrappings.  You had, say Saran wrap, aluminum foil.  You had, some had balloon type of wrap.  It would be wrapped layers and layers and layers.  You might have a gooey substance in there.

BY MS. LIEBER:

Q  A gooey substance?

A  Yes.  It is dark in color, real sticky, greasy.  It's, the odor is, the odor is like no other.  I can't even base it on anything.

Q  Was it a powerful odor?

A  Yes.  Yes, that's basically how it was wrapped.

Q  What did the powder itself look like after you got off all the layers?

A  When you peel off all the layers, it most likely has a imprint printed in it.  It's different.  It varies from time

---

70

to time, but sometimes it has like a crosses or it could have numbers or letters or faces of Jesus, it varies.

Q  These are imprinted actually in the powder itself?

A  In the powder itself.

THE COURT:  I don't understand what that means.  Can you explain what you mean?  There is a picture of Jesus in the powder meaning that somebody's drawn a picture in the powder?

THE WITNESS:  It's like, cocaine, in its process it is liquid.  When it's heated, that's when it becomes powder.  So they take it and they suppress it.  It's like coffee.  You know what I'm saying?  You go to the grocery store and you see a hard thing of coffee.  It's like they compress it.  Take all the air out and compress it really hard so it makes the powder really hard.  But in the compression they put a stamp on it to let you, most time they let you know, that it's the same product.  It's consistent, things like that.  So it is an engraving sort of.

Q  An engraving?

A  Yeah, it's like an imprint when they press it together.

Q  Give me a sense of this.  You know, you talk about, this is an example with sort of the coffee, they can squeeze all the air out.  When you unwrapped all the wrappings and you had a kilogram there in front of you, was it fine powder like sugar or was it harder?

---

71

A  It's very hard until you grind it.  You have to grind it back down to a very fine powder.

Q  Now, we talked a little bit about your arrest on May 11th of 2004.  Where did you get the powder that you used to make into the crack cocaine that you were arrested with?

A  From Antoine.

Q  About when did you purchase that powder?

A  In April, I believe in April.

Q  April 2004?

A  Yes.

MS. LIEBER:  Court's indulgence.

BY MS. LIEBER:

Q  I'm sorry, just a few more questions about the money.  You said that you gave Mr. Jones money in plastic bags and backpacks.

A  Yes.

Q  When you gave it to Mr. Jones, did he ever count that money in front of you?

A  Never.

Q  You're smiling a little bit.  Tell the jury why, why is it that is of note to you?

A  Well, when I would talk to Beanie about Antoine, he used to tell me things about Antoine.  He would do certain things that I felt like, you know, he could do more.  Like, he was capable of more but he was only spoon feeding us.

---

72

Q  Who is he?

A  Antoine.  Antoine was only spoon feeding us.  But I felt like he was capable of much more.  The quality of the cocaine was an indication.  And the pricing of the cocaine was definitely an indication.  We went from paying, like I say, almost $23,000 for a ki' of cocaine to almost 21.  Which was I felt like was unheard of for the quality of it.

Q  Now, let me stop you there.  Did the price that you paid per kilo actually go down over the course of your relationship with Mr. Jones?

A  Yes.

Q  From 23 to 21?

A  Yes.

Q  What is it about the money, the fact that he didn't count the money that you find, how did you feel about that?

A  I felt like a person who don't really have a lot of money, who is grinding every day, they need every penny of their money.  So they count it to make sure it's right, to make sure the deal was, you know, everything was straight, things like that.

MR. BALAREZO:  Your Honor, I object to what I think is coming next.

THE COURT:  I don't know.  I don't have a opinion of what is coming next.  I don't care what he thinks.

MS. LIEBER:  I'm sorry.  I can ask the next

73

1  question.
2  BY MS. LIEBER:
3  Q  You said he never counted it. Did Mr. Jones ever ask
4  you if it was all there or if the money was straight or
5  anything like that?
6  A  Never.
7  Q  In your experience is that common or uncommon?
8  A  It is very uncommon because some --
9  THE COURT:  That's all right.  We're getting far
10 afield here.  Approximately how many times are we talking
11 about that you were present when you exchanged money for
12 drugs with Mr. Jones?
13 THE WITNESS:  Every time, I wasn't the first
14 500 grams of crack cocaine, but, after that, every time I was
15 there.
16 THE COURT:  What would that be per month?
17 THE WITNESS:  It would vary per month, but I think
18 four times a month, twice a month, whenever we could get up
19 the money to see him, we would.
20 BY MS. LIEBER:
21 Q  You said that you began to notice a pattern that certain
22 times of the month that Mr. Jones would have more cocaine; is
23 that right?
24 A  That's right.
25 MR. BALAREZO:  Objection.  I don't believe I heard

74

1  him say --
2  THE COURT:  I don't think so either.
3  MR. BALAREZO:  So I move to strike that, Your
4  Honor.
5  THE COURT:  Yes, that's true.  Stricken.
6  BY MS. LIEBER:
7  Q  Mr. Givens, did you tell the jury that you noticed a
8  pattern?
9  A  Yes.
10 Q  What was that pattern?
11 A  The pattern was that, when he first would call, it was
12 pretty much whatever you could buy.  Then, that might be the
13 first week of the month.  So, we try to gather up as much
14 money as we can to go back as fast as we can.  The second
15 week, it's like the pickings get slim.  We might want five.
16 He may not have nothing but three.  The last two weeks it was
17 definitely like, couldn't get it.  We always had to wait
18 until probably like the next month or so.
19 MS. LIEBER:  Court's indulgence.
20 BY MS. LIEBER:
21 Q  Were there times that you conducted transactions with
22 Mr. Jones while Mr. Jones was in his jeep?
23 MR. BALAREZO:  Objection, Your Honor, it's leading,
24 putting words in his mouth.
25 THE COURT:  Overruled.

75

1  MR. BALAREZO:  There's no testimony to the jeep.
2  THE COURT:  He mentioned the jeep, overruled.  Go
3  ahead.
4  BY MS. LIEBER:
5  Q  Were there times that you conducted transactions with
6  Mr. Jones when he was in his jeep?
7  A  Yes.
8  Q  Did you ever have any other contact with the jeep when
9  Mr. Jones was not actually physically in the jeep?
10 A  I don't understand.
11 Q  Okay.  Have you yourself ever been inside that jeep?
12 A  No.
13 Q  Were you ever with Beanie and observed Beanie inside the
14 jeep?
15 A  Yes.
16 Q  You said that sometimes you used shopping bags and
17 sometimes you used backpacks?
18 A  Yes.
19 Q  Why would you use backpacks instead of shopping bags?
20 A  I started to feel like shopping bags looked tacky.
21 Money started to weigh it down.  It was heavy.  It just, it
22 looked, it just didn't look good to me.  I think backpacks
23 concealed more.  It was more sturdy.  You could hold more
24 money.  It was better all around.
25 MS. LIEBER:  Court's indulgence.

76

1  BY MS. LIEBER:
2  Q  Sorry to jump back to one other thing, but briefly, Mr.
3  Givens, you said that you met with Mr. Jones at various
4  commercial places on Central Avenue?
5  A  Right.
6  Q  Did you observe Mr. Jones with your own eyes, prior to
7  meeting with you, did you see where he was coming from?
8  A  Yes.
9  Q  Tell the jury, did you have any concerns about that?
10 A  He would meet, we started out meeting at Home Depot a
11 lot.  So I was really concerned about the Home Depot thing.
12 Q  Why were you concerned about meeting at Home Depot?
13 A  We always met at the same spot.  I felt like we should
14 change location.  We keep meeting at the same location.  I
15 was like me and Beanie, I'm like, why we keep meeting in the
16 same location?  Why we can't move around a little bit?
17 Beanie was telling me that he was, he had a, was going to
18 open a club and the reason that he met at the Home Depot is
19 because he would buy supplies and basically --
20 MR. BALAREZO:  Objection, Your Honor.
21 THE COURT:  We need to take a short recess any way,
22 ladies and gentlemen.  So we'll break now for about ten
23 minutes here.  Thank you.
24 (Jury Out.)
25 THE COURT:  We'll resume in ten minutes.

77

```
1        (A brief recess was taken.)
2        Q    Mr. Geise, did you resolve the exhibit,
3   Miscellaneous 7?  It was a Lockhart report.
4        MR. GEISE:  If it was admitted, it should not have
5   been.  It was just for ID.  It was to refresh recollection.
6   I talked with Gwen, we agreed.
7        THE COURT:  All right.  The rest of the
8   Miscellaneous, my record shows are in.
9        MR. GEISE:  I believe that's correct.  I'll double
10  check, Judge.
11       (Jury Present.)
12  BY MS. LIEBER:
13       Q    Good morning, again, Mr. Givens.  You said that you were
14  arrested on May 11, 2004.  Where were you arrested?
15       A    Nannie Helen Burroughs, Northeast, Washington, D.C.
16       Q    Do you remember what block?
17       A    The 5200 block, I believe.
18       Q    That's here in Washington, D.C.?
19       A    Yes.
20       Q    When you were arrested, did you give any information
21  that day, the day that you were arrested?
22       A    No, the day that I was arrested, no.
23       THE COURT:  I'm having a little trouble hearing
24  you, sir.  Could you speak a little louder?
25       THE WITNESS:  No.
```

78

```
1   BY MS. LIEBER:
2        Q    Do you remember talking to detectives shortly after your
3   arrest?
4        A    Yes.
5        Q    Did you give some information to them after your arrest?
6        A    Yes.
7        Q    When you met with Mr. Jones at various places, did you
8   have concerns about other people?
9        MR. BALAREZO:  Objection, vague, Your Honor.
10       THE COURT:  A little bit.  Do you understand what
11  she is asking you?
12       THE WITNESS:  No.
13  BY MS. LIEBER:
14       Q    For instance, say you met at say Wendy's with Mr. Jones,
15  did you have a concern about other people seeing you and
16  Mr. Jones?
17       A    Definitely.
18       Q    Okay.  Tell the jury about that.
19       A    We'd be driving the same two cars every time.  I'm
20  driving a white Ford Expedition.  He is driving a gold
21  Cherokee.  It was like we were meeting up at the same place
22  at the same time.  I had concerns about it because people
23  work in the gas stations, people work at Wendy's and things
24  of that sort.  So I had concern about it.
25       Q    Did you have a concern about other customers possibly
```

79

```
1   seeing you?
2        A    Yes.
3        Q    Tell the jury about that.
4        A    We met at the Crown gas station.  He is at a pump, we at
5   a pump.  When he had somebody else put up at another pump, I
6   just felt like that just wasn't a good thing for me.
7        Q    What were you concerned that this other person, these
8   other customers might do or say?
9        A    I was concerned that they might tell actually.
10       Q    Finally, we talked a lot about this person, Beanie, did
11  you ever cut him out of your relationship between you and
12  Mr. Jones?
13       A    Money wise, yeah, but as far as the contact with
14  Antoine, no.
15       Q    Why not?
16       A    Because I needed him.
17       Q    I'm sorry?
18       A    I needed him.  I felt like I needed him.  I felt like I
19  was safer with him in the middle.  I felt like it was a safer
20  arrangement with him being in the middle, than me being on
21  the one hand and him being on the other hand because, you
22  know, we never had no direct contact.  I felt like anything
23  he do it wasn't going to directly fall on me.  That was my
24  thought.
25       MS. LIEBER:  That's all I have, sir, thank you.
```

80

```
1        THE WITNESS:  You're welcome.
2        THE COURT:  Mr. Balarezo.
3        MR. BALAREZO:  Thank you.
4               CROSS EXAMINATION
5   BY MR. BALAREZO:
6        Q    Mr. Givens, good morning.
7        A    Good morning.
8        Q    You are wearing the blue uniform of C.C.A. you
9   indicated, right?
10       A    Yes.
11       Q    That is the correctional treatment facility?
12       A    Yes.
13       Q    That's actually not the D.C. jail.  That's another jail
14  that's next to the Correctional Treatment Facility, right?
15       A    It's all considered D.C. jail.
16       Q    Listen to my question.  It's not the actual D.C. jail at
17  1900 D Street, Southeast.  It is Correctional Treatment
18  Facility at 1901 E Street, Southeast, correct?
19       A    Correct.
20       Q    It's got a different address, right?
21       A    Yes.
22       Q    You know this because you get your little money orders
23  from family, that kind of thing, right?
24       A    Yes.
25       Q    So it's not the D.C. jail.  Either it is or it isn't?
```

MR BALAREZO CROSS-

81

1       MS. LIEBER:  Objection.

2       THE COURT:  Do you know whether it's part of the

3   D.C. jail or a separate facility?  I think that's what he's

4   asking.

5       THE WITNESS:  I feel like it's the same facility.

6   BY MR. BALAREZO:

7   Q   Well you've been at the D.C. jail itself, right?

8   A   Yes.

9   Q   You know at the D.C. jail they wear orange, correct?

10  A   Yes.

11  Q   You know that when your family visits there, you have to

12  see them through those plate glass windows.

13      MS. LIEBER:  Objection.

14      THE COURT:  Overruled.

15  BY MR. BALAREZO:

16  Q   You said you got arrested 30 months ago about, right?

17  A   Yes.

18  Q   You didn't go to C.C.A. right away, correct?

19  A   No.

20  Q   You went to C.C.A. after you cut the deal with the

21  Government, right?

22  A   No.

23  Q   When did you go to C.C.A.?

24  A   I stayed in the 1901 D Street for I think 45 days or so.

25  Q   Where is that, at the jail?

82

1   A   Yes.

2   Q   And then you went to C.C.A.?

3   A   Yes.

4   Q   Wasn't that the result of the Government asking that you

5   be placed over there?

6   A   No.

7   Q   They just happened to put you over there?

8   A   No, I had an injury to my Achilles' tendon in the jail

9   playing basketball, which they further found out that I

10  ruptured my Achilles' tendon.  So they sent me to C.C.A. to

11  get an operation.

12  Q   And that injury is fine now, correct?

13  A   No.

14  Q   Is that why you're still at C.C.A.?

15      MS. LIEBER:  Objection.

16      THE COURT:  If he knows.  Do you know why you

17  didn't go back to the jail at D Street?

18      THE WITNESS:  No.  After I did the surgery, I

19  remained in C.C.A. even before I made the, cooperated with

20  the Government.

21  BY MR. BALAREZO:

22  Q   Now, now you're at C.C.A.  You're at the Unit C4A, which

23  is the snitch block, right?

24      MS. LIEBER:  Objection.

25      THE COURT:  Sustained.

83

1       MR. BALAREZO:  Isn't that the unit that --

2       THE COURT:  Sustained.  It was sustained.  So

3   don't --

4       MR. BALAREZO:  I asked a separate question, Your

5   Honor.

6       THE COURT:  You can strike the last question,

7   ladies and gentlemen.

8       MR. BALAREZO:  Very well.

9   BY MR. BALAREZO:

10  Q   Now, Mr. Givens, you've indicated that, when you were

11  arrested back in May 11 of 2004, you had in your possession

12  500 grams of crack cocaine, correct?

13  A   Nearly close.

14  Q   And that wasn't the first transaction you've ever done

15  in your life, correct?

16  A   I don't understand your question, transaction with who?

17  Q   You're a drug dealer, right?

18  A   Yes.

19  Q   You've dealt drugs before.  You said you've dealt

20  marijuana?

21  A   Yes.

22  Q   You've dealt PCP?

23  A   Yes.

24  Q   And you've dealt crack?

25  A   Yes.

84

1   Q   So you know what crack is, right?

2   A   Yes.

3   Q   And you know what cocaine is, right?

4   A   Yes.

5   Q   One's a powder, cocaine, right?

6   A   Right.

7   Q   And crack is a rock.  That's how they sell it, correct?

8   A   Yes.

9   Q   So you know exactly what cocaine powder is, and you know

10  exactly what crack cocaine is, right?

11  A   Yes.

12  Q   And what you've said is that, when you were arrested on

13  May 11, 2004, you were arrested with 500 grams, thereabouts,

14  of crack cocaine, correct?

15  A   Yes.

16  Q   There's no mistake that it was crack cocaine.  It wasn't

17  powder, correct?

18  A   Yes.

19  Q   Now, when you were arrested, you were in your car; is

20  that right?

21  A   No.

22  Q   You were walking to your car?

23  A   Yes.

24  Q   And the police approached you to talk to you and they

25  noticed that your tags were expired or something along those

85

1  lines, right?
2      MS. LIEBER:  Objection.
3      THE COURT:  What did the police tell you?  Did they
4  say anything about your tags?
5      THE WITNESS:  No.
6  BY MR. BALAREZO:
7  Q  Did you know that your tags were expired at that time?
8  A  Yes.
9  Q  When you pled guilty in your case, you agreed to what's
10  called a factual proffer, correct?
11  A  Yes.
12  Q  Do you know what a factual proffer is?  It tells you
13  what the facts that you're agreeing to are?
14  A  Yes.
15  Q  Did it not include in that factual proffer that you had,
16  that the police saw the expired tags and the expired
17  inspection sticker?
18  A  They did see the expired tags and the expired inspection
19  sticker, but that wasn't the reason why he stopped me.
20  Q  The reason he stopped you is because they thought
21  somebody was putting up posters in the neighborhood, correct?
22  A  Yes.
23  Q  You were walking back to your car at the time and the
24  officer noticed that there was crack cocaine in the car,
25  right?

86

1  A  No.
2  Q  He didn't notice the crack cocaine?
3  A  No.
4  Q  Well, he didn't stop you because of the posters, right?
5  A  Yes.
6  Q  That's why he stopped you, and that's why he arrested
7  you?
8  A  No, that's why he stopped me.  He stopped me to ask me
9  about the posters.  He said that the posters were illegally
10  posted on the trees and things like that.  He wanted to ask
11  me a couple of questions about the posters.
12  Q  Right.  And when they had you in your car and they
13  looked around in your car, that's when they saw the crack
14  cocaine in plain view, and you were arrested for the crack
15  cocaine, right?
16  A  No.
17  Q  Well, sir, do you have the plea agreement up there?
18      THE COURT:  You're saying no to what?  There is a
19  compound question here.  No what?
20      THE WITNESS:  No, that's not the sequence of
21  events.  He asked me questions about the poster board.  I
22  declined to answer his questions.  He continued to follow me
23  to the car.  He asked me about the registration and the
24  inspection sticker, which were dead.  Therefore, I tried to
25  get into the car and get the tags, I was going to reregister

87

1  the tags.  Then he seen the crack cocaine.
2  BY MR. BALAREZO:
3  Q  All that being said, the crack cocaine was in plain view
4  in your car, right?
5  A  Yes.
6  Q  So, you're this drug dealer with experience and you have
7  the crack cocaine just sitting there in plain view, right,
8  when the police came?
9      MS. LIEBER:  Objection, argumentative.
10      THE COURT:  Sustained.
11  BY MR. BALAREZO:
12  Q  You've had experience previous to that selling crack
13  cocaine, correct?
14  A  Yes.
15  Q  When you were arrested, you were interviewed by the
16  police.  Is that true?
17  A  Yes.
18  Q  When you were arrested and interviewed by the police,
19  you immediately agreed to make a statement, right?
20  A  Yes.
21  Q  They read you your rights, your right to remain silent,
22  all those things, and you said I want to go ahead and make a
23  statement, correct?
24  A  Yes.
25  Q  When you talked to them, they asked you about the drugs

88

1  that you had on you at the time that you were arrested; is
2  that right?
3  A  Yes.
4  Q  At that time, what you told them is that you had gotten
5  the crack cocaine three days before.  Do you remember that?
6  A  Yes.
7  Q  Now, the reason you wanted to talk to the police is you
8  were trying to get out of trouble, correct?
9  A  Yes.
10  Q  I mean that's the only reason, correct?
11  A  Yes.
12  Q  So, you wanted to tell them the truth to help yourself
13  out, right?
14  A  Yes.
15  Q  So what you told them then that you had gotten the crack
16  three days before, that wasn't the truth, right?
17  A  No.
18  Q  Because now, today, you're telling the jury that you got
19  it about a month before?
20  A  That's correct.  *PERJURY*
21  Q  Also, when you, you told the jury today that you were
22  going to sell that crack cocaine, correct?
23  A  Yes.  *PERJURY*
24  Q  The 500 grams that you got arrested with?
25  A  Yes.  *PERJURY*

*IMPEACH-Givens*

89

```
1    Q   But did you not tell the police, when you were arrested
2  and you gave that statement, that you were merely going to
3  deliver that drug?
4    A   For money, yeah, I was going to deliver it.
5    Q   So you were saying you were just going to deliver it,
6  right?
7            THE COURT:  I don't understand what the question
8  is.  Are you asking him what did he say to the police?
9            MR. BALAREZO:  Let me clarify.
10 BY MR. BALAREZO:
11   Q   Did you not tell the police that you were merely a
12 courier for the 500 grams?
13   A   Courier?
14   Q   A courier.
15   A   No.     PERJURY
16   Q   Did you not tell the police that you were going to get
17 paid $500 for being a courier for the 500 grams?
18   A   I told the police officer that I was going to get paid a
19 hundred dollars for carrying an eighth of cocaine.  That's
20 what I said.
21           THE COURT:  You told police what?
22           THE WITNESS:  An eighth.
23           THE COURT:  You were going to be paid how much?
24           THE WITNESS:  They were asking me about the eighth
25 of cocaine.  I told them that I was going to courier it,
```

His story is fabricated and perjury

90

```
1  deliver it.  I planned on doing that that particular morning.
2  He asked me roughly what would that cost.  I roughly told him
3  that it was $3500.  So he asked me various questions about
4  prices and things like that.  I gave him exactly what he
5  asked me.
6  BY MR. BALAREZO:
7    Q   The eighth of a kilo, it that what we're talking about?
8    A   Yes.
9    Q   You said that you were going to get thirty-some hundred
10 dollars, but that wasn't the 500 grams that you got arrested
11 for.
12   A   It was within there.
13   Q   It was part of that?
14   A   Yes.
15   Q   So you never told them that you were going to get $500
16 for delivering the 500 gram to somebody else?
17   A   Not the eighth, no.
18   Q   I'm talking about the 500 grams here, half a kilo, not
19 an eighth.
20   A   No.
21   Q   Did you not tell them that this was actually the third
22 time that you've done this?  Being a courier, in case you
23 didn't get that.
24   A   No.
25   Q   You never told them that?
```

91

```
1            MR. BALAREZO:  Your Honor, I would like to --
2  BY MR. BALAREZO:
3    Q   And as far as you know, were you aware that that
4  interview was being videotaped by the police?
5    A   Yes.
6            MR. BALAREZO:  Your Honor, I'd like to introduce
7  what I've marked as Defendant's Jones Number 33.  It's
8  obtained from the Government.  I don't think the Government
9  has any objection.  It is about a two-minute --
10           THE COURT:  Do you know what it is?  Are you about
11 to admit into evidence?  Before you play it, it's got to be
12 admitted into evidence.  Is it an actual video or is it just
13 an audio?
14           MR. BALAREZO:  It's a video.
15           THE COURT:  Okay.  Any objection to the admission
16 of 33?
17           MS. LIEBER:  No, Your Honor.
18           THE COURT:  Okay.
19           MR. ACREE:  I guess, Your Honor, are we admitting
20 it for impeachment?
21           THE COURT:  It doesn't make any difference.  If
22 we're going to use it, it's going to be admitted for whatever
23 purpose.  It's his prior statement and the purpose for it
24 could be talked about later.
25           Do you want to approach?  Does it impact you?
```

92

```
1            MR. ACREE:  Yes, Your Honor.
2            (Bench conference.)
3            THE COURT:  Are you asking for an instruction?
4  This is not under oath.  It probably does go for impeachment
5  but it is going into evidence.
6            MR. ACREE:  Well I guess the only place I'm coming
7  from to be honest with you, I have not seen it.  So I guess
8  my concerns -- I'll just make my point.
9            THE COURT:  I assume it is how much he was going to
10 be paid for how much he was going to deliver.
11           MR. ACREE:  If I make my points then everybody can
12 answer whatever question there is.  My only concern is that I
13 don't know whether I should have a concern or not because I
14 don't know what is in it.  So I thought that it was just
15 coming in to impeach that particular point.
16           I guess my position is that, for purposes of
17 impeachment, the entire tape doesn't have to be admitted.  I
18 thought only that particular portion of the tape that deals
19 with the question on which he was impeaching it was coming
20 in.  So my only concern is that, if we're saying we're
21 admitting it, are we just playing it for that impeachment or
22 are we admitting the whole thing?  Not that I necessarily
23 have an objection to it being admitted.
24           MR. BALAREZO:  Your Honor, it is probably two
25 minutes.
```

93

```
1        THE COURT:  I assume that the two minutes went to
2   what he was testifying to.  Is it more than that?
3        MR. BALAREZO:  I can probably ask him a couple of
4   questions that I can impeach him with any way.
5        THE COURT:  That's not the point.
6        MR. ACREE:  I guess my point is I'm not saying I
7   don't want it to be played.  I'm concerned because I have not
8   seen it.
9        MR. BALAREZO:  There is no mention of Mr. Huggins,
10  Mr. Jackson or Mr. Holland.  There is no mention of my client
11  for that matter.
12       THE COURT:  He is trying to show a prior
13  inconsistent statement.  And it has something to do with his
14  credibility.  Ultimately, I can instruct them now.  It is not
15  coming in for the truth because it is not under oath.
16  Generally, I instruct later but I don't have any problem
17  You've seen it, is it way beyond?  Is there lots of
18  it that is beyond what's going on here now?  Or is it just
19  sort of --
20       MR. ACREE:  Let me just say, because I didn't know
21  until we got up here that it doesn't have anything to do with
22  Mr. Huggins on that regard, I don't necessarily have an
23  objection.  But I didn't know that until I got up here.
24       THE COURT:  Now you know that.
25       Does the Government have any objection?  Does
```

94

```
1   anybody want, let's see.
2        It's not coming in for the truth.  I actually never
3   specifically instructed, at this point in time, but I don't
4   have any problem with it.
5        MR. ACREE:  I'm not requesting the instruction.  I
6   just wanted to make sure that it was --
7        THE COURT:  Generally what happens at the end of
8   the day, this is probably the first time we had it when it
9   wasn't under oath.  Do you want an instruction?  No?  Do you
10  have any objection to its admission?  Then let's play it.  I
11  think the representation is it has nothing specific --
12       MR. ACREE:  Sure.  I just didn't know that.
13       THE COURT:  It's what he was talking about when he
14  first got arrested.  Okay.
15       (Open Court.)
16       THE COURT:  Thirty-three is admitted
17       (Defendant Jones Exhibit No. 33
18         was admitted into evidence.)
19  BY MR. BALAREZO:
20  Q   That interview back in May 11 of 2004, when you were
21  arrested, Ms. Lieber asked you, you've had a prior drug
22  conviction, correct?
23  A   Yes.
24  Q   In 1999, I believe, you had a drug conviction for
25  distribution of PCP?
```

95

```
1   A   Yes.
2   Q   That's a felony conviction in Superior Court, right?
3   A   Yes.
4   Q   At that time, you pled guilty and you cut a deal with
5   the government back then also, correct?
6   A   No.
7   Q   No?
8   A   I pled guilty and received two years of probation.
9   Q   Well, you are aware that you were indicted on two counts
10  back then, correct?
11  A   Two counts?
12  Q   Unlawful distribution of a controlled substance --
13  excuse me.  Unlawful distribution of a controlled substance,
14  PCP, and unlawful distribution of a controlled substance in a
15  drug-free zone, marijuana.  You don't remember that?
16  A   Yes.
17  Q   You do remember it now?
18  A   I remember.
19  Q   Well, I'll mark this Jones Number 33?
20       THE COURT:  It's already in evidence?
21       MR. BALAREZO:  This is something else.
22       THE COURT:  We already used 33.
23       MR. BALAREZO:  Thirty-four, Your Honor.
24       THE COURT:  I think he's misunderstanding you cut a
25  deal.  What happened to the two counts that you were charged
```

96

```
1   with back in '99?
2        THE WITNESS:  They asked me if I'll plead to the
3   PCP, that they would drop the marijuana and the drug.  So
4   that's what I agreed to.
5   BY MR. BALAREZO:
6   Q   Right.  You had a plea agreement with the Government
7   back in 1999, right?  You were indicted on two counts.  They
8   dropped one, you plead to the other, right?
9   A   Yes.
10  Q   Because otherwise you would have gone to trial and
11  possibly been convicted of both counts, right?
12  A   Right.
13  Q   And you know that the PCP count that you got, that you
14  pled guilty to, carried up to a 30-year penalty over there,
15  correct?
16  A   Yes.
17  Q   The agreement that you got from the Government was to a
18  possible three-year sentence, correct?
19  A   They didn't say what I would get.  But they said that
20  they would drop one for the other if I pled to it.
21  Q   And you never discussed with your attorney at the time,
22  Mr. Iverson, what the penalties were?
23       MS. LIEBER:  Objection.
24       THE COURT:  Sustained.
25       MR. BALAREZO:  Were you aware what the --
```

97

```
 1          THE COURT:  Sustained, sustained.
 2   BY MR. BALAREZO:
 3      Q   Were you aware what the penalty was for distribution of
 4   PCP?
 5          MS. LIEBER:  Objection.
 6          THE COURT:  He said it would carry the 30-year
 7   penalty.  If you have any other questions about this, I guess
 8   we have to approach.  I'm lost, 1999?
 9          MR. BALAREZO:  Yes, Your Honor.
10          THE COURT:  Let's approach.
11          (Bench conference.)
12          THE COURT:  I'm sorry.  What are we doing?  This is
13   unrelated to this case.
14          MR. BALAREZO:  I understand.  This is the same
15   thing that I did with, I think, John Adams.  This guy has
16   prior convictions.  He cut a deal with the Government.
17          THE COURT:  You are confusing him.  We now know he
18   dropped one count.  He pled.  That's a plea agreement.
19   You've been talking about cutting deals as if it were
20   cooperation.  So go on.  Where are we?
21          MR. BALAREZO:  That's all I am going to ask him
22   about that.
23          THE COURT:  Why is it relevant?
24          MR. BALAREZO:  Because it goes to the credibility
25   in the sense that he has cut a deal, pled guilty, cooperating
```

98

```
 1   now, cut a deal back then, got a deal back in.
 2          THE COURT:  It's in.  He cut a deal insofar as he
 3   got probation apparently.  They dropped the counts and --
 4          MR. BALAREZO:  Your Honor, the whole thing is in
 5   1999 they agreed to cap their allocution.  Now they're
 6   agreeing to file a 5K letter.
 7          MS. LIEBER:  It is completely different.  And Mr.
 8   Balarezo knows that.
 9          THE COURT:  This is totally complicating.  What
10   they do over in Superior Court doesn't have to do with
11   cooperation.
12          MR. BALAREZO:  It has to do is he keeps getting
13   benefits from the same U.S. Attorney's Office?
14          THE COURT:  The benefits in '99 have nothing to do
15   with the benefits here.  They're completely divorced.  You've
16   gotten in his prior conviction.  It goes to credibility.
17   Benefits?  He pled guilty.
18          MR. BALAREZO:  It is a benefit that the Government
19   agreed to cap one to three.
20          THE COURT:  It is not relevant to what he is doing
21   here.
22          Are you going to add anything new?  I've already
23   ruled in your favor.
24          MR. GEISE:  Let me add a couple of things.  Mr.
25   Balarezo has already gone beyond impeachment, more than that.
```

99

```
 1   They're now left with the impression that this guy had some
 2   other kind of cooperation when the Court has pointed out,
 3   this is the usual deal to get people to plea.  And it's very
 4   hard to clarify that.
 5          THE COURT:  You can ask him on redirect if he had
 6   cooperated before but this line of questioning is over, Mr.
 7   Balarezo.  It is nothing probative.  Thank you.
 8          (Open Court.)
 9          THE COURT:  Are we moving to the tape please?
10          MR. BALAREZO:  Sure, I'll play it now, Your Honor.
11          (There was a pause in the proceedings.)
12          MR. BALAREZO:  Your Honor, I can move on to another
13   line and come back to the tape.
14          THE COURT:  Okay.
15   BY MR. BALAREZO:
16      Q   Now, we'll come back to the video, Mr. Givens.  When you
17   were arrested for the 500 gram of crack back in May of 2004,
18   you decided to cooperate with the Government; is that right?
19      A   At some point, yeah.
20      Q   You signed that plea agreement that Ms. Lieber showed
21   you, Miscellaneous 12, which is the unsigned document that is
22   in evidence.  Do you remember that?
23      A   Uh-huh.
24          THE COURT:  Can I see the date please?
25
```

100

```
 1   BY MR. BALAREZO:
 2      Q   You did that on September 29, 2005; is that right?
 3      A   Uh-huh.
 4      Q   That was about four months after, excuse me, over a year
 5   after you were arrested, right?
 6          THE COURT:  Just shy of a year, I think.
 7          THE WITNESS:  Yes.
 8   BY MR. BALAREZO:
 9      Q   Well, you were arrested in May of 2004?
10      A   Yes.
11      Q   So September of 2005 would be about 16 months later?
12      A   Right.
13      Q   When you decided to cooperate with the Government, you
14   decided to give them information about Antoine Jones; is that
15   right?
16      A   I decided to tell them the truth about whatever they
17   asked me about.
18      Q   Now, on May 11th, when you made that tape that we'll see
19   in a little bit, you never mentioned Antoine Jones, correct?
20      A   Right.
21      Q   According to you, the crack you had was his, or that you
22   had gotten it from him?
23      A   In the tape?
24      Q   No.  I'm just asking you generally.  The crack that you
25   had in your car that you were arrested for, you told this
```

101

```
1   jury that you had gotten from Antoine Jones, right?
2   A   Yes.   PERJURY
3   Q   So, the day, on May 11th, the day you got arrested with
4   that crack, Antoine Jones never crosses your lips, correct?
5   A   In the tape?
6   Q   In the tape.
7   A   They asked me about, about a particular question and I
8   told them that prior to the tape.  That I didn't feel
9   comfortable about discussing everything.  The officer asked
10  me to accept what was in my possession.  I felt that the tape
11  was about me confessing about what was in my possession.
12  Q   And confessing about what was in your possession.  But
13  they asked you specifically where did you get the drugs from
14  and you didn't tell them Antoine Jones.  Is that right?
15  A   I didn't make a statement.  I chose not to make a
16  statement at that point because I felt like I --
17  Q   Yes or no?
18          THE COURT:  Did you tell them about Antoine Jones
19  at the time?
20          THE WITNESS:  No.
21  BY MR. BALAREZO:
22  Q   Now, the plea agreement that you signed with the
23  Government you pled guilty to one count of possession with
24  intent to distribute 50 grams or more, correct?
25  A   Yes.
```

102

```
1   Q   Even though you had 500 grams on you, right?
2   A   Yes.
3   Q   You do know that, because you had that prior felony drug
4   conviction from Superior Court, Ms. Lieber asked you what's
5   the mandatory jail time, you told her ten years; is that
6   right?
7   A   Under my plea agreement, ten years.
8   Q   Well you are aware that, because you have that prior
9   drug conviction, that you could have been facing, if the
10  Government had filed papers, repeat papers against you, 20
11  year mandatory, correct?
12  A   Yes.
13  Q   And they didn't file the repeat papers, right?
14  A   No.
15  Q   That was basically part of the agreement, correct?
16  A   No.
17  Q   Well, it's not written in here, right?
18  A   That they were going to sentence me to 20 years?
19  Q   No, no, listen to me.  It's not written in the agreement
20  that they were not going to file the repeat papers.  That
21  would have subjected you to a 20-year mandatory sentence,
22  right?
23  A   I don't understand what you're saying.
24  Q   You just agreed with me that, because of your prior
25  felony drug conviction from Superior Court, if the Government
```

103

```
1   had filed repeat papers -- do you know what repeat papers
2   are?
3   A   Yes.
4   Q   Basically repeat offender status?
5   A   Yes.
6   Q   That you would have been facing a 20-year mandatory
7   minimum sentence, not ten?
8   A   Yes.
9   Q   You were aware of that?
10  A   Yes.
11  Q   No where in the agreement does it say we're not going to
12  file repeat papers, right?
13  A   Right.
14  Q   But they didn't file repeat papers, and they could have,
15  right?
16  A   I don't know.
17  Q   Well, you just said that they could have and you said
18  that --
19  A   And then you asked me about something that they could
20  have done.  I don't know what they would have done.
21  Q   Did you read this?
22  A   I read it.
23  Q   Did you understand it?
24  A   I understand it.
25  Q   Did you have a lawyer when you went through with it?
```

104

```
1   A   Yes, I did.
2   Q   When you pled guilty before Judge Walton, you didn't
3   question any of that, did you?
4          MS. LIEBER:  Objection.
5          THE COURT:  I don't know what that means.
6   BY MR. BALAREZO:
7   Q   When you pled guilty in front of Judge Walton, did you
8   question the fact of what mandatory sentence you were looking
9   at?
10  A   I felt that --
11  Q   Listen to my question.
12          THE COURT:  Wait, no.  You are asking him if he
13  asked Judge Walton anything about the mandatory he faced.  At
14  the time he entered the plea, he faced a ten-year mandatory.
15  That's critical because he was only pleading.  There were no
16  repeat papers filed.  So, I don't know what you're asking him
17  about Judge Walton.
18  BY MR. BALAREZO:
19  Q   When you were in front of Judge Walton to plead guilty,
20  you were under oath, right?
21  A   Yes.
22  Q   And the Judge asked a lot of questions about the plea
23  agreement, right?
24  A   Yes.
25  Q   And you said you understood everything?
```

1   A   Yes.

2   Q   All I'm asking you simply is, no where in the agreement

3   does it say that the Government will not file repeat papers?

4   You read it?

5   A   Right.

6   Q   And it's not in here, right?

7   A   Right.

8   Q   But you are aware that that is part of the agreement,

9   right?  You agreed to cooperate.  They're not going to file

10  repeat papers?

11  A   No, that's not part of the agreement.  My lawyer advised

12  me that a ten-year mandatory was in my best interest.

13  Knowing that they could file repeat papers, why wouldn't I

14  take the ten year versus 20-year mandatory?  That was advised

15  me by my own lawyer.

16  Q   So that's part of the agreement?  That's what I'm

17  asking.

18  A   No, it's not part of the agreement.  They didn't file

19  repeat papers.

20  Q   Now, the life, the maximum that you're looking at is

21  life, correct?

22  A   Yes.

23  Q   And you're pretty sure you're not going to get life in

24  prison, correct?

25  A   I'm not pretty sure.

---

106

1   Q   Well, the reason you cooperated is, if you're facing

2   this ten-year as you say, if you had gone to trial and lost,

3   that would have been the minimum that you would have been

4   facing, right?

5   A   Right.

6   Q   And you told Ms. Lieber that you were aware of what the

7   sentencing guidelines were, right?

8   A   I'm aware of what the sentencing guidelines are.

9   Q   And you're aware that the sentencing guidelines take

10  into account your prior criminal history, right?

11  A   Yes.

12  Q   Take into account the weight of the drugs that you were

13  carrying, correct?

14  A   Yes.

15  Q   They give a sentencing range, right?

16  A   Yes.

17  Q   And you are aware that, given your criminal history and

18  the amount of drugs that you were carrying, you would have

19  been looking at a 14 to 17-and-a-half year sentence possibly

20  under the guidelines.  Right?

21  A   Something like that.

22  Q   Which is more than the mandatory minimum?

23          THE COURT:  Of ten years, yes.

24          THE WITNESS:  Yes.

25

---

107

BY MR. BALAREZO:

2   Q   Of ten years, all right.  And you do know that, if the

3   Government does not file the 5K letter that Ms. Lieber talked

4   about, you know that the Judge has to sentence you to at

5   least ten years mandatory?

6   A   Yes.

7   Q   Now, you didn't cooperate in order to get ten years,

8   right?

9   A   Actually, yes.

10  Q   So you'd be happy with ten years?  Is that what you're

11  telling us?

12  A   Versus 20, yes.

13  Q   I'm not talking about 20.  I'm just talking about 10?

14  A   Versus 20 to life, I think, however, I would take the

15  ten.

16  Q   You'd be happy with probation, perhaps, right?

17  A   But I have a mandatory sentence so.

18  Q   That's not what I asked.  Just try to answer my

19  question.  You would be happier with probation.  Is that fair

20  to say?

21  A   Of course.

22  Q   All right.  And you know that the only way that you

23  could possibly get probation and less than ten years is if

24  the Government files that 5K letter with Judge Walton, right?

25  A   It's a possibility.

---

108

1   Q   That's not what I asked, sir.  I said, the only way that

2   the Judge can sentence you to less than ten years is if they

3   file that 5K with the Judge, right?

4   A   Yes, my understanding, yes.

5   Q   And they're the ones that determine whether or not

6   they're going to file the 5K, right?

7   A   Yes.

8   Q   The Judge, if they don't file it, has to give you ten

9   years?

10  A   Yes.

11  Q   The Judge can't make them file a 5K, correct?

12  A   Yes.

13  Q   And who determines whether or not the 5K is going to be

14  filed is the Government, right?

15  A   Yes.

16  Q   Because that depends on the extent of your cooperation,

17  right?

18  A   Yes.

19  Q   They determine when your cooperation begins and when it

20  ends, correct?

21  A   Yes.

22  Q   And they also determine if your cooperation is truthful,

23  complete and accurate, correct?

24  A   Yes.

25  Q   They determine everything about that?

1    A  Yes.
2    Q  And if you don't satisfy them to whatever extent, you
3 may not get that 5K letter, right?
4         MS. LIEBER:  Objection of satisfying them.
5         THE COURT:  Well, unless they file a motion under
6 5K, you -- I don't understand the objection.  Go ahead and
7 answer it.  If you don't satisfy them, you don't get a 5K.
8         THE WITNESS:  I'm telling the truth.  So, I don't
9 know if that will satisfy them or not.  I can only tell the
10 events that happened.
11 BY MR. BALAREZO:
12    Q  And telling the truth is something that they want you to
13 do, right?
14    A  It's something I want to do.
15    Q  Besides what you want to do, in order to satisfy them
16 and get that 5K, you have to tell the truth.  That's in your
17 agreement, right?
18    A  No, that's not in my agreement.  To satisfy them, that's
19 not in my agreement.
20    Q  How about to tell the truth as you were saying?
21    A  That's in my agreement, to tell the truth.
22    Q  And the ones who determine that you're telling the truth
23 for the purposes of filing that 5K motion is the prosecutor,
24 correct?
25    A  Yeah.

---

1    Q  It's not the Judge, right?  And it's not the jury?
2    A  No, the Judge, he going to look at it the same way.
3    Q  Sir, the Judge cannot --
4         THE COURT:  Careful.  The Judge gets to determine.
5         THE WITNESS:  He get to determine, not them.
6         THE COURT:  Judge Walton will determine.
7         MR. BALAREZO:  Your Honor, did Judge Walton not
8 determine whether or not the Government files a 5K.
9 BY MR. BALAREZO:
10    Q  Is that correct, sir?
11    A  It's their job to file the 5K, but it's still Judge
12 Walton's decision.  He still can give me anything.  He still
13 can give me life.  He still can give me ten years.  He still
14 can give me anything he wants.  So I think it's more about if
15 he thinks that I'm telling the truth than they feel like I'm
16 telling the truth.
17    Q  Sir, is Judge Walton in the room right now?
18         MS. LIEBER:  Objection.
19         THE COURT:  Sustained.
20 BY MR. BALAREZO:
21    Q  Does he know what you're testifying to?
22         THE COURT:  The Government has, the only ones to
23 file the 5K.  After that, it's up to the Judge what to do.
24 Judge Walton is a different Judge in this courthouse but not
25 in this trial.  Okay.  Go ahead.

---

1 BY MR. BALAREZO:
2    Q  Now, when you were arrested -- strike that.
3         You began, as you say, dealing with Mr. Jones some
4 time in 2003, right?
5    A  Yes.
6    Q  When exactly did you begin that business?
7    A  Around October.
8    Q  October 2003.  And you went until the time you got
9 arrested, right?
10    A  Somewhere around April.
11    Q  So April was the last time you had any transactions, if
12 you will, with Mr. Jones?
13    A  Some where around there, yes.
14    Q  So that would be about six months you dealt with him,
15 right?
16    A  Yes.
17    Q  And you testified to the jury that you would deal
18 approximately four times a month; is that correct?
19    A  It depends.
20    Q  On what?
21    A  If I had the money, like I said, if I had other people
22 who was interested, they could call me and say that they
23 wanted something.  And then I would have to try to get in
24 touch with him the best way.  You know what I'm saying.  So
25 that really determined how much running back and forth we

---

1 did.
2    Q  When you answered that question for Ms. Lieber, you said
3 four times a month.  You didn't have all of this explanation,
4 right?  And that was on average basically?
5    A  I said two to four times actually.
6    Q  All right.  Well, two to four times, six months times
7 two, that's 12 times.  Six time four, that's 24 times, right?
8 Do you agree?
9    A  Do I agree that's how many times I went to see him?
10    Q  Based on your testimony, yes?
11    A  I'm not going to agree to that.
12    Q  Well you said two to four times?
13    A  I said it varied.
14    Q  So what does it vary to now?
15         MS. LIEBER:  Objection, what does it vary to now.
16         THE COURT:  Sustained.  Ask a different question.
17 He said before, two to four times a month.  So what do you
18 want him to answer?
19         MR. BALAREZO:  I just asked him.  I'm trying to get
20 an answer, Your Honor.
21 BY MR. BALAREZO:
22    Q  Two to four times over six months, that's either 12 to
23 24 times that you've dealt with Mr. Jones, right?
24    A  What I'm saying is that --
25         MR. BALAREZO:  Your Honor, if I could get the

**114**

1  witness just to answer the question.

2       THE COURT:  Let him explain it.  Go ahead.

3       THE WITNESS:  What I'm saying is two to four times,

4  every month is different.  It wasn't like, it wasn't like we

5  made a point to say we would meet every Monday.  That's not

6  how it goes.  You're trying to make me say that we met four

7  times every week.  That's not what I'm trying to say.

8       What I'm trying to say is that, when the money was

9  there, I went back to him.  If I had money, then I bought

10  something.  If I did not have any money or didn't have any

11  business with him, I did not go back.  That's what I'm trying

12  to say.  And it varied from month to month.  It didn't start

13  off.

14  BY MR. BALAREZO:

15  Q  Sir, it was your testimony two to four times a month.

16  Is that correct?  *PeR JURY*

17  A  Yes.

18  Q  You testified that you dealt with him for about six

19  months, correct?

20  A  Yes.

21  Q  So, based on the six-month period and the two to four

22  times a month, it comes out, doing simple math, to 12 to 24

23  times that you claim you dealt with Mr. Jones.  That's all

24  I'm asking you based on your testimony.

25  A  That's a good estimate I would say.

*ImpeAcH*

---

**114**

1  Q  Twelve to 24 times, right?

2  A  That's a good estimate.

3  Q  The first time you dealt with him, you didn't deal with

4  him directly, correct?

5  A  No.

6  Q  You dealt, you said, through this guy Beanie?

7  A  Yes.

8  Q  This guy Beanie who grew up with you in the

9  neighborhood, right?

10  A  Yes.

11  Q  How old are you?

12  A  I'm 34 years old.

13  Q  You've known him most of your life, correct?  When you

14  grew up with him, you grew up with him when you were young?

15  A  More than half.

16  Q  You came up with him, right?

17  A  More than half.

18  Q  You don't know Beanie's name, right?

19  A  No.

20  Q  All that time, more than half of your life, you never

21  found out Beanie's name?

22  A  No.

23  Q  Okay.  And regarding the transactions, these 12 to 24

24  transactions that you claim to have done with Mr. Jones,

25  you're really the only witness to those, correct?

*FAbRicAting StoRie*

---

**115**

1       MS. LIEBER:  Objection.

2       THE COURT:  He wouldn't know.  I don't understand

3  the question, sustained.

4  BY MR. BALAREZO:

5  Q  Are you aware if your phones were being tapped?

6  A  No.

7  Q  Do you know if Mr. Jones's phones were being tapped back

8  in 2004?

9  A  No, I don't know.

10  Q  Did the Government ever play you any calls between you

11  and Mr. Jones?

12  A  No.

13  Q  Did the Government ever show you any videotapes between

14  you and Mr. Jones doing anything?

15  A  No.

16  Q  Do you have any pictures with you and Mr. Jones?

17  A  No.

18  Q  So, based on those things, really the only evidence of

19  that is your testimony, correct, of the transactions with

20  Antoine Jones involving you and him?

21       MS. LIEBER:  Objection.

22       THE COURT:  Could you ask him if he is aware of any

23  other evidence regarding these?  I frankly don't understand

24  the question.

25       MR. BALAREZO:  Maybe I should sit down, Your Honor.

---

**116**

1       THE COURT:  Okay.  Do you have any other questions?

2       MR. BALAREZO:  Yes, Your Honor.  I do.

3       THE COURT:  Well, sustain that one.

4  BY MR. BALAREZO:

5  Q  To your knowledge, has Beanie been arrested?

6       MS. LIEBER:  Objection.  May we approach, Your

7  Honor?  Other evidence.  It is a simple answer.

8       THE COURT:  All right.  Excuse us, ladies and

9  gentlemen.

10       (Bench conference.)

11       MS. LIEBER:  Your Honor, there is the other

12  evidence if we have to get into it.  I'm just going to ask if

13  I can have leeway on cross to say would it surprise you that

14  Mr. Jones were meeting with all these other people doing the

15  same thing, same place, the same modus operandi.

16       THE COURT:  No.  I don't care whether it would

17  surprise him or not.  You can argue it to the jury.  But you

18  don't ask him --

19       MR. BALAREZO:  I was prevented from doing this with

20  the other witnesses.  They have nothing but this guy's

21  testimony.  That's all I'm getting at.  I'm not talking about

22  the inferences you can draw from Mr. Berman or anybody else.

23  All they have --

24       THE COURT:  They can argue to the jury.  You don't

25  use these argumentative questions with the witness.

1   MR. BALAREZO:  But Your Honor, I can because it
2  goes to his credibility.
3   THE COURT:  You argue the credibility to the jury
4  not to what does he know about the other evidence.  There is
5  all kinds of different evidence out there.
6   MR. BALAREZO:  Not of this, Your Honor.  That's why
7  it is specifically limited to his transactions.
8   THE COURT:  It is argumentative.
9   And I don't want you bringing up whether he is
10  surprised.
11   MS. LIEBER:  Of course, I can't say this.  He can't
12  say this either.
13   THE COURT:  Do you have any questions?
14   MR. BALAREZO:  Yes, Your Honor, I do.
15   THE COURT:  We'll take a break now.
16   (Open Court.)
17   THE COURT:  All right, ladies and gentlemen.  This
18  is a good time to break for lunch.  We'll resume at quarter
19  to 2:00.  Have a good lunch.
20   (Jury Out.)
21   THE COURT:  If the Government has handed me a case
22  on transcripts, what is it that you're planning to ask so we
23  don't have a big delay for defense counsel?  We have played
24  many, many tapes.  Some are coming in now in terms of just
25  summary.  There has been no question, I mean, any rulings

Anthony Given Step-BREAK

1  about the authenticity or the accuracy.  These tapes are
2  pretty clear.
3   We had no specific objections for me to rule on.
4  So all these tapes, to the extent some of them have been
5  played, all of this stuff is not going to be dumped on the
6  jury at the end of the day anyway, is it?  I wasn't sure
7  where you want to go.  You better let counsel know so I can
8  specifically rule.
9   MR. GEISE:  It isn't my intent, Your Honor, to send
10  back all 6,000 calls.  We've marked the total universe of the
11  wire for identification.
12   THE COURT:  1, 2, 3 went in only for
13  identification.
14   MR. GEISE:  Exactly, but it would be our intention
15  to send back to the jury the disks that contain the calls
16  that are reflected in the transcripts.
17   THE COURT:  Well, do you really, there are a lot
18  that have never been played.  You don't want the jury --
19   MR. GEISE:  Well, Your Honor, they're either going
20  to be played or going to be as part of the summary of
21  Detective Horne.  So, they're entitled to have, it seems to
22  me, if they want to verify that.  There are two different
23  questions, one is --
24   THE COURT:  Wait.  I thought the whole point of the
25  summary was to eliminate that very problem.  Otherwise, if

119

1  you don't want the summary to stand as a summary of these
2  calls, then Mr. Balarezo and I don't have to go through this.
3  We'll play them all and we'll sit here and listen to them
4   You can't have it every which way.  You can't have
5  a summary and have the jury spend their time picking those
6  calls that they want to listen to, and we don't know what
7  they are.  I'm very troubled by that.  So some way or
8  another, we have to decide what specifically either whether
9  they get tapes sent back or whether they get transcripts sent
10  back, whether they make requests.  They hear what they're
11  going to hear.  I'm in favor of knowing what's going on and
12  not just having them perusing through things without us
13  knowing what.
14   MS. LIEBER:  May I consult with Mr. Geise?
15   THE COURT:  I think I decided this one clearly.
16   (There was a pause in the proceedings.)
17   MR. GEISE:  Your Honor, Ms. Lieber makes the point
18  to me that, when we are done playing all calls, we can have a
19  disk burned that contains just the calls that were played.
20   THE COURT:  Fine.
21   MR. GEISE:  That can go back.  The jury has to be
22  told that obviously by the Court.
23   THE COURT:  I would suggest that, if you're going
24  to do such a thing, you do it fairly early.  I don't know
25  what the defense case consists of here.

120

1   Mr. Norris, do you intend to call witnesses?
2   MR. NORRIS:  Yes, Your Honor.
3   THE COURT:  How many?
4   MR. NORRIS:  Not many, half a dozen or less.
5   THE COURT:  Six?
6   MR. NORRIS:  Yes.
7   THE COURT:  Mr. McDaniel?
8   MR. McDANIEL:  I do plan to call on some, Your
9  Honor.  I'm not sure how many at this point in time.
10   THE COURT:  Give me your best estimate.
11   MR. McDANIEL:  I would guess about five witnesses.
12   THE COURT:  Are any of them the same so far?
13   MR. McDANIEL:  No.
14   THE COURT:  Mr. Acree?
15   MR. ACREE:  Maybe about six or seven, Your Honor.
16   THE COURT:  Mr. Balarezo?
17   MR. BALAREZO:  Probably about the same.
18   THE COURT:  So let's say, just hypothetically
19  speaking, 20 witnesses.  Won't be that, and they're not going
20  to be all long.  That's a guess.  But I think that, anything
21  that's been played to the jury, they can have.  Then the
22  question, and that has to be all that is going to them.  I
23  don't want them hearing things for the first time in the jury
24  room.
25   MS. LIEBER:  That's what I was suggesting.  We'd

122

```
1   have to probably check transcripts, but just to be sure that
2   what they get back is one final burned disk of all the calls
3   that they listened to and the calls of the transcripts from
4   the transcript books. I know there's a call from Mr.
5   McDaniel played a call off a hard disk that we hadn't been
6   transcribed. So that one has been played through Mr.
7   McDaniel. But I just want to make sure we get the numbers
8   right. We'll get everything onto one disk so everything
9   they've heard in court --
10        THE COURT: Good job. I think that would be
11  wonderful. Then they have a copy of the disk to listen to,
12  and then the defense counsel before it travels in there.
13        MS. LIEBER: Right, of course.
14        THE COURT: When you, therefore, these transcripts,
15  you are proposing, I take it from what I gather from reading,
16  is that would you take the same transcripts and ask to put
17  them in evidence?
18        MR. GEISE: Yes, Ma'am.
19        THE COURT: Okay. Well, I think the key is the
20  Government has to first of all burn it to a manageable. They
21  have already gotten the transcripts. I have a feeling,
22  without having any objection to the transcripts et cetera, we
23  may well, unless defense counsel has response to the cases
24  they've given me, what will happen is those things that have
25  been played will go back and the transcripts may well go
```

```
1   back, too.
2        Not as evidence but they get the same old
3   instruction, but they'll have them available to them.
4   Because at the end of the day, once you have your summary
5   chart and you don't need all these hundreds of calls, it will
6   be a manageable. I think we're talking about something about
7   three inches, instead of two big binders.
8        MR. GEISE: I think that's correct, Your Honor.
9        THE COURT: I don't know how many more we have to
10  go. But if anybody reads the case law to say that's not
11  doable, let us know. But they will ultimately only be
12  sending back, as a disk, that which has already been played.
13  I don't want them having the ability to just search around.
14        MR. GEISE: As long as we fashion instruction that
15  explains what's been done so they don't think that they were
16  mislead in some way, I'm fine with that, Judge.
17        THE COURT: I don't want them to listen to anything
18  they haven't heard.
19        MR. BALAREZO: Your Honor, I haven't talked to my
20  co-counsel here, but would the Court allow me to present
21  whatever case we put on, if any, after the other defendants?
22  The reason for that is --
23        THE COURT: I think you should talk to them.
24        MR. BALAREZO: If they agree, would the Court have
25  any problem with that?
```

123

```
1         THE COURT: I think you should talk among
2   yourselves. I just don't want repetition. You're not going
3   to call the same witnesses. But if they have no objections,
4   I don't know what the Government put in so far. I think it's
5   up to them frankly.
6         All right. As soon as you have figured that out,
7   the Government has made clear what they're going to do with
8   the tapes and the transcripts. So they will have to make a
9   copy of tapes and a copy of transcripts so that all these
10  volumes that they're hanging around with, we'll just make one
11  book available to the jury.
12        We'll tell them again what they can use them for.
13  These tapes are remarkably clear. I have seen no problems as
14  we went along. They were all, as far as I could tell,
15  accurate. There were no objections on accuracy, so I'm not
16  troubled by the procedure, as long as what they get is only
17  what they heard.
18        MR. GEISE: As I understand it, Your Honor, it's
19  not immensely time consuming because it's computerized. We
20  simply have to tell it what to burn to the disk. It will
21  take a day or so I suspect.
22        THE COURT: You have a day or so. They have now
23  promised me somewhere in the neighborhood of 20 witnesses.
24  That's more than I expect, but okay. Thank you. We'll be
25  back at quarter of.
```

124

```
1         (A luncheon recess was taken.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| | | | | |
| WILLIAM KELLY | | | | |
| By Ms. Lieber | 20 | | | |
| By Mr. Balarezo | | 24 | | |
| | | | | |
| ANTHONY GIVENS | | | | |
| By Ms. Lieber | 31 | | | |
| By Mr. Balarezo | | 80 | | |

EXHIBITS

| | PAGE: |
|--|-------|
| Government: | |
| ICE 10 and 11 | 22 |
| MISC 12 | 35 |
| | |
| Defendant: | |
| Jones 33 | 94 |

### CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Lisa Walker Griffith_    11-28-06

Lisa Walker Griffith, RPR

— [60]        4/20 5/11 6/14
7/23 7/24 8/3 8/4 8/16 9/3
9/6 9/12 9/15 9/24 10/19
11/7 12/13 12/15 15/6 20/3
29/7 29/16 38/12 41/25
42/13 42/22 45/19 47/13
59/1 59/21 60/1 62/1 64/13
73/8 74/1 76/19 83/1 83/3
91/1 91/9 92/8 93/19 94/6
94/11 95/12 96/25 98/3
101/16 103/1 103/18 104/10
109/6 110/3 111/2 112/24
116/18 116/23 118/18
118/23 121/9 122/22
—————————X [2]

1/2 1/7

A

A.M [4]        1/8 1/9 7/20 17/8
ability [1]        122/13
able [2]        4/20 18/9
about [130]
about — [1]        41/25
above [2]        36/20 36/21
above-entitled [1]        126/6
absence [1]        4/16
absorbed [1]        51/9
accept [1]        101/10
accident [1]        40/12
accompanied [2]        59/25 60/4
According [1]        100/21
account [2]        106/10 106/12
accuracy [3]        6/10 118/1
123/15
accurate [7]        5/7 9/15 9/21
12/5 55/7 108/23 123/15
Achilles' [2]        82/8 82/10
acquaintance [2]        41/4 41/5
acquire [2]        67/12 67/15
acquired [1]        68/13
ACREE [2]        2/6 120/14
across [1]        10/5
actual [8]        7/19 8/1 13/9
23/25 24/6 36/6 80/16
91/12
actually [34]        4/13 6/13
8/25 10/1 22/9 29/3 29/25
33/11 34/6 34/21 35/3 36/2
46/18 46/23 48/18 54/2
54/5 54/18 55/4 58/22
59/9 59/13 59/16 60/1 64/5
70/3 72/9 75/9 79/9 80/13
90/21 94/2 107/9 112/5
actually — [1]        60/1
Adams [2]        7/20 97/15
add [5]        51/11 55/14 55/16
98/22 98/24
added [2]        13/21 13/24
additional [2]        3/20 3/20
additions [4]        13/18 13/19
13/22 13/22
address [4]        3/13 18/18
25/7 80/20
admission [3]        35/10 91/15
94/10
admit [2]        6/3 91/11
admitted [9]        22/25 35/19
77/4 91/12 91/22 92/17
92/23 94/16 94/18
admitting [3]        91/19 92/21

advised [4]        6/16 19/7
105/11 105/14
aerobics [1]        64/16
affect [1]        52/6
afield [1]        73/10
after [23]        15/23 19/19
25/16 25/19 26/9 26/15
26/18 30/4 33/16 50/4 50/4
53/2 57/11 69/22 73/14
78/2 78/5 81/20 82/13
100/4 100/5 110/23 122/21
afternoon [2]        12/9 19/15
again [13]        3/10 17/17
17/19 19/5 20/17 21/17
25/19 37/22 45/25 55/21
56/11 77/13 123/12
against [1]        102/10
agent [9]        14/25 17/25 21/5
21/7 24/23 24/24 25/16
26/11 26/18
agents [3]        18/6 25/18
26/18
ago [4]        13/20 14/8 15/20
81/16
agree [6]        4/3 12/6 112/8
112/9 112/11 122/24
agreed [12]        36/7 36/14
36/16 38/12 77/6 85/9
87/19 96/4 98/5 98/19
102/24 105/9
agreeing [1]        85/13 98/6
agreement [23]        35/4 52/18
52/20 86/17 96/6 96/17
97/18 99/20 101/22 102/7
102/15 102/19 103/11
104/23 105/2 105/8 105/11
105/16 105/18 109/17
109/18 109/19 109/21
agrees [4]        4/8 8/7 8/12
14/15
ahead [10]        21/15 27/9 35/8
40/7 68/24 75/3 87/22
109/6 110/25 113/2
air [2]        70/14 70/23
al [2]        1/5 3/3
all [89]        4/8 6/8 8/10
11/17 12/7 13/6 13/10
13/15 15/10 15/17 16/2
16/8 19/21 20/16 20/16
20/18 22/9 22/13 24/10
25/14 25/15 25/16 29/8
30/13 31/5 32/7 32/7 34/9
35/23 36/11 37/12 43/6
43/12 45/21 46/7 49/9
51/12 53/10 53/11 54/2
54/10 55/11 61/18 62/7
62/9 65/4 68/9 68/15 68/18
69/23 69/24 70/14 70/23
70/23 73/4 73/9 75/24 77/7
79/25 80/15 87/3 87/22
97/21 105/2 107/2 107/22
112/3 112/6 113/23 114/20
116/8 116/14 116/21 116/23
117/5 117/17 118/4 118/5
118/10 119/3 119/18 120/20
120/22 121/2 121/20 122/5
123/6 123/9 123/14
allocution [1]        98/5
allow [3]        13/7 47/2 122/20
allowed [1]        43/18
almost [5]        6/5 39/14 52/4

72/6 72/6
along [3]        61/1 84/25
123/14
already [14]        12/13 14/10
22/23 26/21 27/7 34/24
51/19 54/10 95/20 95/22
98/22 98/25 121/21 122/12
also [7]        3/19 26/17 40/16
63/11 88/21 95/5 108/22
although [1]        19/18
aluminum [2]        28/10 69/11
always [3]        10/23 74/17
76/13
am [5]        6/3 6/7 30/13 35/3
97/21
AMERICA [1]        1/3
among [1]        123/1
amount [3]        36/25 68/11
106/18
amounts [1]        28/14
ample [1]        13/5
analysis [1]        15/2
and — [1]        98/3
another [9]        11/18 39/11
43/11 43/18 55/5 79/5
80/13 99/12 119/8
answer [9]        40/9 86/22
92/12 107/18 109/7 112/18
112/20 113/1 116/7
answered [1]        112/2
Anthony [6]        14/19 20/10
31/7 31/12 37/13 125/8
anticipate [1]        13/13
ANTOINE [44]        1/5 3/3 8/10
41/1 41/3 41/15 41/24
42/20 42/21 43/2 43/25
44/4 44/10 44/13 44/15
44/15 44/24 46/16 47/12
48/3 49/9 56/8 56/19 57/24
58/6 58/8 58/10 59/9 63/2
67/2 67/4 71/6 71/22 71/23
72/2 72/2 79/14 100/14
100/19 101/1 101/4 101/14
101/18 115/20
any [59]        4/7 14/7 15/23
16/8 16/11 16/20 16/21
17/20 18/1 18/3 22/20 23/3
26/4 26/7 26/25 27/23
27/23 27/24 28/1 28/10
28/10 28/12 28/14 30/6
30/19 35/1 35/6 35/10 38/9
39/21 60/6 75/8 76/9 76/21
77/20 91/9 91/15 91/21
93/4 93/16 93/25 94/4
94/10 97/7 104/3 111/11
113/10 113/10 115/10
113/13 115/16 115/22 116/1
117/13 117/25 120/12
121/22 122/21 122/25
anybody [3]        94/1 116/22
122/10
anything [6]        7/15 13/10
20/11 26/13 28/18 38/11
38/12 38/17 40/18 43/10
46/25 49/12 64/12 65/1
69/19 73/5 79/22 85/4
93/21 98/22 104/13 110/12
110/14 115/14 120/20
122/17
anything I [1]        38/12
anyway [2]        66/19 118/6
apartment [3]        26/22 53/23

Case 1:07-cv-01102-JR    Document 1-5    Filed 06/29/2007    Page 38 of 58

## A

apartment... [1]         53/24
apartments [1]       15/3
apparently [2]           43/17 98/3
appeal [1]      16/20
appear [1]       23/25
APPEARANCES [2]      1/12 2/1
applicant [1]        22/1
application [4]        23/15
23/20 23/23 23/25
approach [10]          21/12 21/13
25/12 34/13 42/7 42/8
91/25 97/8 97/10 116/6
approached [1]        84/24
approximately [3]        55/5
73/10 111/18
April [7]       58/9 58/11 71/8
71/8 71/9 111/10 111/11
are [96]        3/14 5/1 5/8 5/9
5/14 5/14 6/14 7/5 7/18
7/22 7/23 8/24 9/22 10/8
10/18 10/19 10/21 11/1
11/7 12/12 13/18 13/19
13/22 15/4 16/1 16/12 18/9
18/19 20/7 21/23 21/25
22/4 22/9 22/12 22/22
22/23 23/6 24/9 25/6 26/24
31/2 31/3 31/21 31/23
31/25 36/18 36/24 37/2
37/4 37/12 38/3 38/3 39/5
42/11 42/14 42/18 42/23
43/8 45/18 46/15 63/11
70/3 73/10 77/8 80/8 85/13
89/8 91/10 91/19 92/3
92/21 92/22 95/9 97/12
97/17 97/20 98/22 99/9
102/8 103/2 104/12 105/8
106/8 106/17 114/11 115/5
117/24 118/1 118/16 118/17
118/22 119/7 119/18 120/12
121/15 123/13
are -- [1]        6/14
area [3]        32/14 62/7 62/9
argue [4]        10/23 116/17
116/24 117/3
argument [1]      7/16
argumentative [3]         87/9
116/25 117/8
around [21]        15/23 17/13
17/16 27/15 44/14 45/9
50/5 50/8 51/18 60/7 61/13
64/13 64/13 75/24 76/16
86/13 111/7 111/10 111/13
122/13 123/10
arrangement [1]       79/20
arrest [3]        71/3 78/3 78/5
arrested [34]         33/6 33/7
33/8 33/9 39/13 71/5 77/14
77/14 77/20 77/21 77/22
81/16 83/11 84/12 84/13
84/19 86/6 86/14 87/15
87/18 88/1 88/24 89/1
90/10 94/14 94/21 99/17
100/5 100/9 100/25 101/3
111/2 111/9 116/5
arrested -- [1]         111/2
arrive [1]       61/16
arrived [1]       62/19
Arthur [2]       53/22 53/23
as [84]        4/6 4/17 6/1 9/15
12/13 13/8 13/8 13/20

13/21 15/25 16/1 18/5 18/5
18/8 18/8 18/12 19/8 19/18
21/19 22/5 29/13 30/17
33/20 34/3 34/3 34/3 34/4
34/10 35/15 35/16 35/22
37/2 40/10 40/10 40/11
40/11 41/20 43/21 52/20
52/20 54/18 62/11 62/20
64/20 65/16 65/16 65/17
66/12 66/12 67/12 67/12
67/15 67/15 67/16 67/17
67/17 74/13 74/14 74/14
74/14 79/13 79/13 91/3
91/3 91/7 97/19 98/2 106/2
109/20 111/3 118/20 119/1
122/2 122/12 122/14 122/14
123/6 123/6 123/13 123/14
123/14 123/16 123/16
123/18
ask [26]         14/21 21/20 25/11
25/15 25/16 26/8 26/10
26/13 27/8 27/9 35/22
55/20 68/21 72/25 73/3
86/8 86/10 93/3 97/21 99/5
112/16 115/22 116/12
116/18 117/22 121/16
asked [25]         14/7 18/23
24/22 29/21 34/19 83/4
86/21 86/23 87/25 90/2
90/3 90/5 94/21 96/2
100/17 101/7 101/9 101/13
102/4 103/19 104/13 104/22
107/18 108/1 112/19
asking [12]         78/11 81/4
82/4 89/8 89/24 92/3
100/24 104/12 104/16 105/2
105/17 113/24
asleep [1]       17/18
aspects [2]       14/22 37/9
assist [1]       38/17
associated [1]       41/12
assume [2]       92/9 93/1
assuming [2]        4/25 7/3
assumptions [1]        7/16
attack [1]       40/18
attend [1]       10/15
attention [3]         14/4 17/21
21/9
attorney [3]         1/14 37/7
96/21
Attorney's [1]         98/13
audio [1]       91/13
authenticate [1]        20/9
authenticating [1]        15/4
authenticity [1]        118/1
available [4]        15/21 35/16
122/3 123/11
Avenue [4]         2/2 2/6 2/10
10/4 21/10 21/24 23/16
27/11 62/1 62/2 62/5 62/9
68/3 76/4
average [1]       112/4
aware [18]        16/18 18/3 25/6
36/24 39/5 91/3 95/9 96/25
97/3 102/8 103/9 105/8
106/6 106/8 106/9 106/17
115/5 115/22
away [1]        81/18

## B

back [42]        8/2 12/3 24/20
25/19 25/22 34/25 35/16

48/7 51/7 52/17 52/21
68/18 71/2 74/14 76/2
82/17 83/11 85/23 94/20
95/5 95/10 96/1 96/7 98/1
98/1 99/13 99/16 99/17
111/25 113/9 113/11 115/7
118/10 118/15 119/9 119/10
119/21 121/2 121/25 122/1
122/12 123/25
background [1]       52/8
backpacks [6]         68/8 68/8
71/15 75/17 75/19 75/22
backtrack [1]       41/19
bad [1]       49/12
bags [10]        68/6 68/7 68/8
68/9 68/9 68/10 71/14
75/16 75/19 75/20
baking [3]        51/9 51/11
51/14
balance [1]       49/13
BALAREZO [27]         1/17 3/25
4/22 7/24 9/8 9/24 10/7
10/12 15/10 16/2 16/8
16/22 17/4 17/7 17/25 18/5
24/13 34/9 34/24 80/2 98/8
98/25 99/7 119/2 120/16
125/6 125/10
Balarezo -- [1]         7/24
balloon [1]       69/12
Barrone [1]       15/5
base [5]        33/18 33/20
36/22 50/13 50/16 50/23
51/5 51/6 51/7 51/10 55/14
55/15 69/18
based [7]        4/17 51/4 57/14
112/10 113/21 113/24
115/18
basically [21]         5/6 43/3
48/5 50/24 51/6 51/14
52/23 53/10 53/17 54/6
54/20 55/15 57/21 61/21
64/15 68/10 69/21 76/19
102/15 103/4 112/4
basically -- [1]        76/19
basis [2]        40/5 63/22
basketball [1]         82/9
be [87]        5/2 5/6 5/17 6/10
6/12 6/13 6/16 7/1 9/15
9/21 9/21 10/10 10/11
10/12 10/19 12/3 12/5
13/13 13/23 14/2 14/7
14/23 14/23 15/22 15/25
16/9 16/12 16/15 16/17
16/23 19/3 19/7 19/8 23/25
24/2 25/11 27/5 28/5 29/13
29/21 30/14 30/19 38/24
39/10 39/11 42/18 42/22
42/23 45/2 49/13 49/13
51/17 52/6 60/5 61/20
69/12 73/16 74/12 78/19
82/5 89/23 91/11 91/22
91/24 92/7 92/10 92/17
93/7 100/11 107/10 107/16
107/19 108/13 111/14 118/5
118/14 118/20 118/20
119/21 120/19 120/20
120/22 121/1 121/10 122/6
122/11 123/24
Beanie [62]         41/6 41/7
41/14 41/17 41/19 41/20
41/24 42/2 42/4 42/19
42/20 42/21 43/2 43/3

Case 1:07-cv-01192-JR   Document 1-5   Filed 06/29/2007   Page 37 of 58

**B**

Beanie... [48]          43/10 43/16
43/16 43/24 44/7 44/12
47/4 48/11 48/16 48/19
48/24 52/13 52/14 53/7
53/8 53/17 53/17 54/20
55/14 55/15 57/2 59/11
59/14 59/15 59/16 59/21
59/25 60/4 60/17 61/3 61/8
61/20 62/19 63/21 64/9
64/22 66/23 66/25 67/3
71/22 75/13 75/13 76/15
76/17 79/10 114/6 114/8
116/5
Beanie's [5]          41/9 53/9
57/17 114/18 114/21
beautiful [1]          56/2
became [4]          41/13 41/18
41/22 43/16
because [60]          4/14 6/23 7/2
7/22 8/25 10/1 11/7 11/22
12/1 12/10 12/17 13/13
14/5 14/6 18/8 19/12 20/2
20/5 26/21 33/13 34/22
40/17 42/17 42/18 44/9
49/1 51/9 51/22 55/15
56/19 56/19 61/3 66/8
66/10 67/12 68/9 73/8
76/19 78/22 79/16 79/21
80/22 85/20 86/4 88/18
92/13 93/7 93/15 93/20
96/10 97/24 101/16 102/3
102/8 102/24 104/15 108/16
117/1 122/4 123/19
become [2]          14/3 41/14
becomes [2]          12/2 70/10
been [36]          13/2 13/3 13/20
13/22 15/15 15/15 18/1
21/7 24/17 25/2 27/13 33/2
58/16 65/21 67/9 67/18
75/11 77/5 81/7 96/11
97/19 102/9 103/6 106/3
106/3 106/19 116/5 117/25
118/4 118/18 120/21 121/5
121/6 121/25 122/12 122/15
before [27]          1/10 3/5 10/16
10/24 13/2 17/8 20/11 30/2
30/4 30/5 30/7 37/19 37/22
43/8 47/3 58/4 61/15 82/19
83/19 88/5 88/16 88/19
91/11 99/6 104/2 112/17
121/12
began [3]          17/8 73/21 111/3
begin [3]          3/5 20/18 111/6
beginning [6]          48/4 48/13
49/14 52/20 52/22 55/22
begins [1]          108/19
behalf [1]          39/10
behind [6]          4/15 5/16 5/17
5/17 6/11 62/14
being [16]          3/6 42/11 60/7
60/11 61/4 61/8 79/20
79/20 79/21 87/3 89/17
90/22 91/4 92/23 115/5
115/7
belabor [1]          13/12
believe [14]          17/10 17/12
19/16 28/9 37/5 38/10
44/14 55/23 68/14 71/8
73/25 77/9 77/17 94/24
bell [1]          25/4

Bench [6]          25/13 34/15 42/9
92/2 97/11 116/10
benefit [2]          38/21 98/18
benefits [4]          98/13 98/14
98/15 98/17
Bermea [1]          116/22
Besides [1]          109/15
best [5]          55/7 61/3 105/12
111/24 120/10
better [7]          10/17 50/2
60/20 64/21 66/17 75/24
118/7
between [8]          6/24 8/15
10/20 43/4 58/20 79/11
115/10 115/13
beyond [7]          25/8 32/21 40/2
43/18 93/17 93/18 98/25
BFI [2]          39/24 40/20
big [3]          55/2 117/23 122/7
bigger [1]          52/6
Bill [2]          20/8 20/21
binders [1]          122/7
birth [3]          18/17 18/24 19/1
bit [16]          5/25 14/25 32/6
32/16 62/24 62/24 71/3
71/20 76/16 78/10 100/19
black [1]          46/2
blinds [2]          28/8 28/9
block [4]          46/21 77/16
77/17 82/23
blue [2]          44/20 80/8
board [1]          86/21
book [1]          123/11
books [1]          121/4
born [1]          32/13
both [2]          55/7 96/11
bottom [1]          35/22
bought [3]          53/14 55/13
113/9
Bowie [2]          21/11 21/24
box [1]          51/13
Branch [1]          10/4
brandishing [1]          16/25
break [6]          19/13 19/15
30/11 76/22 117/15 117/18
BRIAN [1]          2/10
brief [2]          30/18 77/1
briefly [2]          23/7 76/2
bring [4]          17/21 20/7 20/13
30/24
bringing [2]          30/18 117/9
Broadnax [1]          36/12
brokering [3]          43/3 58/2
58/19
bubble [1]          69/9
build [1]          65/11
building [4]          57/7 57/8
62/14 62/15
burn [2]          121/20 123/20
burned [2]          119/19 121/2
Burroughs [1]          77/15
business [19]          22/5 22/14
22/16 57/12 57/18 64/16
64/18 64/21 64/25 65/2
65/2 65/5 65/22 66/7 66/10
66/14 66/17 111/6 113/11
But — [1]          8/3
buy [15]          44/5 44/6 44/13
47/6 47/7 48/1 52/6 55/12
57/21 60/23 65/8 68/8 68/9
74/12 76/19
buying [12]          43/5 44/9

48/15 48/18 48/23 48/24
48/25 49/16 49/21 52/25
53/1 55/9

**C**

C.C.A [9]          80/8 81/18 81/20
81/23 82/2 82/10 82/14
82/19 82/22
call [26]          4/17 5/15 6/23
6/24 7/25 8/1 8/2 8/7 8/9
8/15 9/15 9/16 10/3 10/4
19/1 20/19 25/11 25/19
61/20 74/11 111/22 120/1
120/8 121/4 121/5 123/3
call — [1]          9/15
called [3]          39/5 65/11
85/10
caller [2]          8/10 8/11
calls [26]          4/14 5/8 6/9
6/19 7/12 7/20 8/25 9/22
9/24 11/18 11/20 12/4
13/20 13/23 14/21 20/21
115/10 118/10 118/15 119/2
119/6 119/18 119/19 121/2
121/3 122/5
came [14]          41/25 42/3 42/4
42/5 42/19 43/24 44/4 47/4
47/9 53/20 56/11 62/23
87/8 114/16
can [76]          4/21 4/22 5/10
5/13 5/23 7/14 8/2 8/17
9/15 9/18 10/17 10/19
10/22 13/6 13/10 15/10
16/7 16/10 23/10 26/8
26/13 26/16 28/25 29/3
30/24 31/10 32/7 34/13
38/11 38/12 38/17 40/9
42/7 42/22 44/18 45/12
45/13 45/23 47/16 51/5
51/6 51/6 51/7 51/11 52/19
58/22 65/17 70/6 70/22
72/25 74/14 74/14 83/6
92/11 93/3 93/4 93/14 99/5
99/12 99/24 108/2 109/9
110/12 110/13 110/13
110/14 116/13 116/17
116/22 116/24 117/1 118/7
119/18 119/21 120/21
123/12
can do [1]          38/12
can't [17]          4/23 9/5 13/9
13/10 15/13 18/8 24/4
24/24 26/10 28/5 69/18
76/16 108/11 117/11 117/11
119/4 119/4
candles [3]          26/6 27/23
27/24
cannot [1]          110/3
cannot — [1]          110/3
cap [2]          98/5 98/19
capable [2]          71/25 72/3
Capers [4]          53/22 53/22
53/23 57/9
Capitol [1]          32/14
car [11]          63/2 84/19 84/22
85/23 85/24 86/12 86/13
86/23 86/25 87/4 100/25
care [2]          72/24 116/16
Careful [1]          110/4
carried [1]          96/14
carry [1]          97/6
carrying [5]          33/8 33/10

**C**

carrying... [3]            89/19
106/13 106/18
cars [2]          62/24 78/19
case [24]        1/3 3/2 3/8 10/9
12/25 13/6 15/14 16/13
16/24 17/20 18/14 18/22
19/4 19/10 34/3 34/4 37/17
85/9 90/22 97/13 117/21
119/25 122/10 122/21
cases [1]          121/23
cash [1]        68/15
CCA [1]        46/21
CDL [5]        39/24 39/25 40/2
40/19 40/20
center [2]        63/11 63/14
Central [6]        62/1 62/2 62/5
62/9 68/3 76/4
certain [11]        4/8 4/9 7/11
7/12 7/18 13/20 16/1 28/5
30/2 71/23 73/21
certainly [2]        14/22 42/22
CERTIFICATE [1]        126/3
certify [1]        126/4
cetera [2]        18/4 121/22
chair [1]        45/18
challenges [1]        10/7
change [2]        57/7 76/14
changed [1]        4/7
changes [2]        4/4 12/13
changing [1]        11/14
charged [3]        42/22 60/11
95/25
charging [1]        52/23
chart [3]        6/16 6/17 122/5
cheap [1]        56/20
cheaper [1]        50/2
check [4]        18/20 29/23
77/10 121/1
checked [1]        6/9
checks [1]        18/15
Cherokee [1]        63/10 78/21
chose [1]        101/15
chunks [1]        14/20
circle [3]        15/3 26/23
43/18
Circuit [2]        3/7 3/17
claim [2]        113/23 114/24
clarification [1]        28/21
clarify [3]        30/21 89/9
99/4
classes [1]        40/10
clean [1]        13/7
clear [14]        17/14 21/2
23/19 31/10 35/14 45/17
45/24 56/24 58/5 60/12
69/6 118/2 123/7 123/13
clearly [4]        4/16 20/5
42/14 119/15
client [2]        27/3 93/10
clients [1]        19/7
close [4]        13/8 16/16 33/13
83/13
closer [3]        9/12 45/12
46/19
club [9]        10/22 61/14 61/15
61/18 62/12 62/22 65/4
66/9 76/18
co-conspirator [6]        42/15
42/23 42/24 42/24 43/16
43/21

co-conspirators' [1]
co-counsel [1]        122/20
cocaine [110]        6/21 7/1
33/9 33/11 33/13 33/18
33/20 36/20 36/22 39/15
39/20 40/24 42/20 42/21
43/4 43/5 44/10 47/7 47/11
47/18 47/21 48/16 48/19
48/24 48/25 49/22 50/11
50/21 51/8 51/13 51/19
52/3 52/19 52/25 53/1 53/3
53/13 54/9 54/14 55/3 55/9
55/12 55/13 55/16 55/21
55/25 56/1 56/4 56/13
56/14 56/18 56/19 56/22
57/6 57/15 57/19 57/22
57/24 58/2 58/6 58/8 58/10
58/19 58/20 59/8 60/14
60/15 61/6 65/7 65/17
65/19 66/3 66/11 66/18
66/21 67/12 67/22 68/5
68/11 68/14 68/18 69/3
69/4 69/9 70/9 71/5 72/3
72/4 72/6 73/14 73/22
83/12 84/3 84/5 84/9 84/10
84/14 84/16 85/24 86/2
86/14 86/15 87/1 87/3 87/7
87/13 88/5 88/22 89/19
89/25
Code [2]        36/18 36/19
coffee [3]        70/11 70/13
70/22
collected [1]        55/8
collecting [1]        55/11 56/12
color [2]        63/10 69/17
COLUMBIA [1]        1/1
come [22]        4/21 14/5 14/6
15/4 16/16 19/19 30/20
30/22 34/16 41/11 42/25
46/11 46/14 46/18 51/12
51/15 55/8 59/16 65/18
67/21 99/13 99/16
comes [2]        10/23 43/20
113/22
comfortable [1]        101/9
coming [9]        72/22 72/24
76/7 92/6 92/15 92/19
93/15 94/2 117/24
commence [1]        24/7
commercial [2]        39/25 76/4
common [1]        73/7
company [2]        21/5 40/21
compilation [1]        5/7
complete [3]        11/10 13/14
108/23
completely [1]        98/7 98/15
complex [10]        53/23 53/24
63/15 63/20 63/24 64/6
66/3 66/6 66/16 66/21
complicating [1]        98/9
component [1]        32/4
components [1]        40/19
compound [1]        86/19
compounding [1]        43/13
compress [2]        70/13 70/14
compression [1]        70/15
computer [1]        1/25
computerized [1]        123/19
concealed [1]        75/23
conceded [1]        29/22
concern [7]        17/9 78/15
78/24 78/25 92/12 92/13

92/20
concerned [8]        7/2 17/7
17/25 76/11 76/12 79/7
79/9 93/7
concerning [1]        14/19
concerns [2]        4/25 76/9
78/8 78/22 92/8
concerns -- [1]        92/8
conduct [3]        65/6 65/7 66/3
conducted [2]        74/21 75/5
conference [6]        25/13 34/15
42/9 92/2 97/11 116/10
confessing [2]        101/11
101/12
confidence [1]        57/7
confident [1]        58/23
confused [1]        97/17
confusing [1]        97/17
Connecticut [2]        2/6 2/10
considerable [1]        20/3
considerably [1]        18/14
consideration [1]        38/2
considered [1]        80/15
considering [2]        37/21
39/11
considers [1]        19/19
consignment [1]        65/12
consistent [2]        4/9 70/17
consists [2]        119/25
conspiracy [4]        42/16 43/9
43/11 43/11
consult [1]        119/14
consuming [1]        123/19
Cont'd [1]        2/1
contact [4]        46/25 75/8
79/13 79/22
contacts [1]        47/2
contain [1]        118/15
contained [1]        6/13
contains [1]        119/19
continually [1]        26/1
continued [1]        86/22
controlled [3]        95/12 95/13
95/14
conversation [2]        44/12
66/15
conversations [1]        67/20
converted [1]        54/10
convicted [2]        37/13 96/11
conviction [8]        37/20 94/22
94/24 95/2 98/16 102/4
102/9 102/25
convictions [1]        97/16
cook [1]        54/19
cooked [1]        51/19
cooking [3]        50/14 50/16
56/22
cool [1]        57/6
cooperate [7]        34/3 34/5
39/8 99/18 100/13 105/9
107/7
cooperated [3]        82/19 99/6
106/1
cooperating [2]        38/22
97/25
cooperation [8]        38/23
39/10 97/20 98/11 99/2
108/16 108/19 108/22
cooperator [1]        20/10
coordinate [1]        7/14
copies [1]        4/6
copy [16]        3/12 3/12 5/12
14/13 23/15 23/19 34/19

**C**

copy... [9]                34/20 34/25
35/15 35/15 35/24 36/6
121/11 123/9 123/9
correct [49]              26/3 29/1
44/25 77/9 80/18 80/19
81/9 81/18 82/12 83/12
83/15 84/7 84/14 84/17
85/10 85/21 87/13 87/23
88/8 88/10 88/20 88/22
94/22 95/5 95/10 96/15
96/18 100/19 101/4 101/24
102/11 102/15 105/21
105/24 106/13 108/11
108/20 108/23 109/24
110/10 111/18 113/16
113/19 114/4 114/13 114/25
115/19 122/8 126/5
correction [1]            46/23
correctional [3]          80/11
80/14 80/17
correctly [1]             13/25
cost [1]        90/2
could [32]         5/17 8/5 10/17
11/9 15/16 18/15 19/7
25/19 25/20 38/23 38/24
50/22 52/18 56/20 64/23
70/1 71/24 73/18 74/12
75/23 77/24 91/24 102/9
103/14 103/17 103/19
105/13 107/23 111/22
112/25 115/22 123/14
couldn't [2]           34/21 74/17
counsel [17]        3/5 3/12 4/12
4/21 6/2 7/3 13/15 18/15
18/25 19/6 21/16 30/19
34/9 117/23 118/7 121/12
121/23
count [6]          71/17 72/15
72/18 96/13 97/18 101/23
counted [1]        73/3
counts [7]         19/19 95/9
95/11 95/25 96/7 96/11
98/3
couple [7]          17/3 40/10
61/15 62/11 86/11 93/3
98/24
courier [6]        89/12 89/13
89/14 89/17 89/25 90/22
course [6]       22/5 22/13 72/9
107/21 117/11 121/13
court [28]       1/1 1/21 3/13
4/6 4/7 13/21 13/23 18/13
19/14 19/22 27/11 35/9
37/14 43/22 44/16 45/15
94/15 95/2 98/10 99/2 99/8
102/4 102/25 117/16 119/22
121/9 122/20 122/24
court -- [1]          121/9
Court's [5]          4/10 23/24
71/11 74/19 75/25
courthouse [2]          1/21 110/24
courtroom [2]          26/4 45/10
covered [2]          28/3 28/4
covering [1]          28/10
coverings [1]        28/7
crack [41]          33/8 33/11
33/13 33/20 36/20 39/14
39/20 47/7 47/18 47/20
48/25 50/18 51/20 54/9
54/11 54/14 54/18 71/5

73/14 83/12 83/24 84/1
84/7 84/10 84/14 84/16
85/24 86/2 86/13 86/14
87/1 87/3 87/7 87/12 88/5
88/15 88/22 99/17 100/21
100/24 101/4
credibility [6]          37/21
93/14 97/24 98/16 117/2
117/3
criminal [6]        1/3 3/2 18/5
18/20 106/10 106/17
critical [1]          104/15
cross [4]        24/15 80/4
116/13 125/2
crosses [2]        70/1 101/4
crossing [1]        35/2
Crown [2]        62/6 79/4
CTA [2]        32/1 32/2
CTF [2]        32/1 32/2
currently [1]          31/25
customers [4]        57/25 58/21
78/25 79/8
cut [9]          56/14 79/11 81/20
95/4 95/24 97/16 97/25
98/1 98/2
cutting [1]          97/19

**D**

D.C [22]        1/7 1/15 1/18
1/22 2/3 2/7 2/11 3/7 3/17
32/3 32/4 32/12 62/3 77/15
77/18 80/13 80/15 80/16
80/25 81/3 81/7 81/9
dangerous [1]          40/12
dark [1]        69/17
dash [1]        36/16
date [11]        18/17 23/22
23/25 23/25 24/2 29/7
29/14 30/2 30/3 58/22
99/24
dates [3]        18/24 19/1 29/1
day [16]        9/24 13/14 15/21
19/20 57/3 72/17 77/21
77/21 77/22 94/8 101/3
101/3 118/6 122/4 123/21
123/22
day-to-day [1]        55/18 57/3
57/3
days [6]        12/17 15/12 15/12
81/24 88/5 88/16
dead [1]        86/24
deal [14]        47/17 47/20
72/19 81/20 95/4 95/25
97/16 97/25 98/1 98/1 98/2
99/3 111/17 114/3
dealer [2]        83/17 87/6
dealing [4]        40/23 43/17
56/5 111/3
deals [2]        92/18 97/19
dealt [11]        43/19 83/19
83/19 83/22 83/24 111/14
112/23 113/18 113/23 114/3
114/6
Dear [1]        29/8
debate [1]        11/8
December [6]        58/4 59/5
59/20 59/20 59/22 59/23
decide [2]        11/13 61/22
119/8
decided [6]        61/18 99/18
100/13 100/14 100/16
119/15

decides [1]        38/6
decision [3]        33/24 34/2
110/12
declined [1]        86/22
defendant [7]        1/17 2/2 2/6
2/10 19/24 94/17 125/19
Defendant's [1]        91/7
defendants [3]        1/6 18/23
122/21
defense [11]        13/15 18/14
18/15 18/25 19/4 19/6
30/19 117/23 119/25 121/12
121/23
definitely [5]        57/16 68/20
72/5 74/17 78/17
Delaware [1]        15/5
delay [1]        117/23
delete [1]        15/23
deletions [1]        13/19
deliberations [1]        3/7
deliver [5]        89/3 89/4 89/5
90/1 92/10
delivering [1]        90/16
Demetrius [2]        7/25 15/7
depend [1]        51/5
depends [2]        108/16 111/19
Depot [9]        62/1 62/4 62/5
62/12 68/4 76/10 76/11
76/12 76/18
describe [1]        45/24
describing [1]        18/10
description [1]        18/17
descriptive [1]        18/16
desired [1]        66/23
Detective [5]        6/2 6/4
10/11 14/19 118/21
detectives [1]        78/2
determine [9]        108/5 108/19
108/22 108/25 109/22 110/4
110/5 110/6 110/8
determined [1]        111/25
determines [1]        108/13
developed [1]        67/22
did [136]
didn't [43]        8/1 10/1 26/14
27/25 47/12 47/18 47/23
47/24 48/4 48/7 49/8 54/3
54/15 61/16 64/12 64/12
64/13 64/23 66/22 68/9
72/14 75/22 81/18 82/17
86/2 86/4 90/23 93/20
93/23 94/12 96/19 101/8
101/14 101/15 102/13
103/14 104/2 105/18 107/7
112/3 113/10 113/12 114/3
didn't -- [1]        64/13
difference [4]        10/20 25/22
25/25 91/21
different [11]        56/16 57/9
57/11 69/25 80/20 98/7
110/24 112/16 113/4 117/5
118/22
difficult [2]        18/7 18/20
difficulty [2]        45/20 45/22
digital [2]        55/1 55/2
direct [6]        20/23 21/9 31/8
68/22 79/22 125/2
directly [1]        43/5 43/17
43/19 79/23 114/4
disagree [1]        11/6
disclose [1]        17/9
disclosed [1]        18/4

# D

discussed [4]          3/7 5/8
30/20 96/21
discussing [2]         12/8 101/9
discussion [3]         5/24 35/12
42/5
disk [7]               119/19 121/2
121/5 121/8 121/11 122/12
123/20
disks [1]              118/15
dispute [1]            4/2
disputes [1]           3/22
distribute [4]         33/17 36/22
54/20 101/24
distributing [1]       36/20
distribution [6]       37/14
94/25 95/12 95/13 95/14
97/3
distributors [1]       43/20
DISTRICT [4]           1/1 1/1 1/11
1/21
divorced [1]           98/15
DMV [1]                15/4
do [121]               4/15 5/13 5/23
7/16 8/2 8/12 10/18 11/5
11/11 12/9 13/7 13/10
14/8 16/7 18/20 19/3 19/24
20/1 20/20 23/16 25/20
26/16 27/18 27/22 28/10
28/12 28/14 29/8 29/14
30/4 31/13 31/15 33/24
34/18 36/17 38/9 38/11
38/12 38/17 40/2 41/1 41/3
41/9 44/8 44/15 45/8 45/15
46/25 50/12 50/21 50/22
50/24 52/16 52/18 52/19
53/13 53/14 56/22 57/23
62/19 63/14 63/19 64/11
64/12 64/16 64/20 64/21
64/25 65/2 66/7 66/10
66/14 66/17 66/17 66/23
71/23 71/24 77/16 78/2
78/10 79/8 79/23 81/2
82/16 85/12 86/17 88/5
91/10 91/25 93/13 93/21
94/9 94/9 95/17 98/10
98/10 98/12 98/14 99/22
102/3 103/1 107/2 109/13
109/14 109/15 110/23 112/8
112/9 112/17 115/7 115/16
116/1 116/2 117/13 117/14
118/17 119/24 119/24 120/1
120/8 123/7
doable [1]             122/11
document [7]           6/4 11/22
12/2 14/18 24/9 36/4 99/21
documents [10]         15/4 20/9
21/10 21/11 21/13 21/21
21/23 22/3 22/4 24/22
does [24]              12/1 23/24 24/19
25/4 25/23 25/25 29/7 44/1
49/6 53/19 60/4 60/9 64/19
91/25 92/4 93/25 93/25
103/11 105/3 107/3 110/21
112/14 112/15 117/4
doesn't [11]           5/16 9/12
10/5 11/25 19/19 36/6
42/23 91/21 92/17 93/21
98/10
doing [21]             16/23 18/15
18/25 19/13 27/4 27/5

56/16 57/3 57/18 65/21
66/24 66/25 67/1 67/3 90/1
97/12 98/20 113/22 115/14
116/14 116/19
dollars [14]           55/25 56/25
57/1 57/1 60/10 60/19
60/20 60/21 65/8 65/13
66/11 67/5 89/19 90/10
don't [85]             3/22 3/23 4/19
5/4 5/13 6/6 7/5 8/4 11/8
12/4 12/15 15/7 15/9 15/10
15/22 15/23 16/21 25/21
25/22 30/23 35/1 36/2
38/10 40/17 42/10 43/9
43/10 45/2 45/8 45/9 47/15
49/7 49/9 70/5 72/16 72/23
72/23 72/24 73/25 74/2
75/10 83/3 83/16 89/7 91/8
92/13 92/14 93/7 93/16
93/22 94/3 95/15 102/23
103/16 103/20 104/5 104/16
108/8 109/2 109/6 109/7
109/7 109/8 114/18 115/2
115/9 115/23 116/16 116/18
116/24 117/9 117/23 118/18
119/1 119/2 119/6 119/24
120/23 122/5 122/9 122/13
122/15 122/17 123/2 123/4
don't – [1]            83/3
done [14]              7/5 13/2 13/7
20/2 20/3 25/18 65/2 83/14
90/22 103/20 103/20 114/24
119/18 122/15
double [1]             77/9
down [14]              9/8 32/7 43/9
46/11 46/14 46/19 48/12
51/1 51/3 56/14 71/2 72/9
75/21 115/25
dozen [2]              13/24 120/4
draft [3]              12/22 12/23
13/14
drafter [1]            6/3
dramatically [1]       26/25
draw [1]               116/22
drawn [1]              70/7
drive [4]              40/18 59/11
59/11 63/9
driver's [2]           39/25 40/3
driving [3]            78/19 78/20
78/20
drop [1]               96/3 96/20
dropped [5]            6/21 6/22 96/8
97/18 98/3
drove [1]              63/10
drug [16]              40/23 42/15 44/5
44/6 44/13 47/5 48/10
83/17 87/6 89/3 94/21
94/24 94/3 102/3 102/9
102/25
drug-free [1]          95/15
drugs [9]              39/17 39/19 48/1
73/12 83/19 87/25 101/13
106/12 106/18
due [2]                15/20 16/2
dumped [1]             118/5
during [3]             3/6 13/15 61/25

# E

e-mail [1]             4/12
each [5]               6/5 11/19 12/10
12/18 28/4
early [8]              12/23 12/24

18/12 19/10 19/10 23/23
61/16 119/24
earnings [1]           24/10
ease [3]               67/6 67/7 67/8
easier [3]             18/14 18/21
56/20
Eastern [1]            32/14
EDUARDO [1]            1/17
efficient [1]          18/22
eighth [10]            54/6 54/8 54/8
54/9 89/19 89/22 89/24
90/7 90/17 90/19
eighths [1]            54/18
either [10]            11/13 18/12
19/4 52/18 74/2 80/25
112/22 117/12 118/19 119/8
elementary [2]         32/17 32/18
eliminate [2]          12/14 118/25
ELLEN [2]              1/10
Elliott [2]            32/22 32/23
Elmo [1]               23/9
else [10]              20/11 23/1 28/17
28/18 40/13 59/10 79/5
90/16 95/21 116/22
employment [1]         39/21
encapsulizes [1]       8/6
encounter [1]          61/14
end [8]                12/23 12/24 13/6
16/13 19/10 94/7 118/6
122/4
ended [1]              13/21
ends [2]               15/6 108/20
engraving [1]          70/18 70/19
enhances [1]           55/17
enough [1]             19/11
enter [1]              34/6
entered [1]            104/14
entire [2]             11/22 92/17
entitled [3]           13/4 43/14
118/21
entries [3]            6/8 17/5 17/10
errors [1]             16/21
especially [1]         5/2
ESQUIRE [6]            1/13 1/17
2/2 2/6 2/10
establish [1]          27/3
estate [1]             21/5
estimate [4]           14/8 113/25
114/2 120/10
et [4]                 1/5 3/3 18/4 121/22
even [8]               5/3 19/18 25/22
61/8 66/8 69/18 82/19
102/1
events [2]             86/21 109/10
eventually [1]         13/13
ever [18]              8/25 26/8 27/13
27/24 28/1 39/21 63/17
68/11 69/2 71/17 73/3 75/8
75/11 75/13 79/11 83/14
115/10 115/13
every [17]             12/11 12/18
28/4 28/6 56/14 57/3 64/20
67/9 72/17 72/17 73/13
73/14 78/19 113/4 113/5
113/7 119/4
everybody [9]          4/5 4/12
14/14 23/10 32/7 35/24
50/5 68/24 92/11
everyone's [2]         10/8 23/12
everything [12]        9/13 15/14
16/7 49/10 51/4 51/22
72/19 101/9 104/25 108/25

**E**

everything... [2]          121/8
121/8
evidence [24]          5/25 6/18
22/9 22/11 22/12 22/25
23/7 29/4 35/19 37/19
91/11 91/12 92/5 94/18
95/20 99/22 115/18 115/23
116/7 116/12 117/4 117/5
121/17 122/2
exactly [8]          4/22 28/24
52/24 84/9 84/10 90/4
111/6 118/14
EXAMINATION [5]          20/23
24/15 28/22 31/8 80/4
example [3]          9/3 51/10
70/22
Except [1]          36/6
exchanged [1]          73/11
excuse [4]          30/14 95/13
100/4 116/8
excused [1]          30/10
executed [1]          25/6
exhibit [9]          7/11 12/2 14/2
14/4 21/20 22/24 35/18
77/2 94/17
EXHIBITS [1]          125/13
expansive [1]          16/1
expect [2]          15/7 123/24
expected [2]          50/2 50/3
Expedition [1]          78/20
experience [3]          73/7 87/6
87/12
expired [6]          84/25 85/7
85/16 85/16 85/18 85/18
explain [4]          6/19 37/9 70/6
113/2
explains [1]          122/15
explanation [1]          112/3
exploration [1]          27/7
extent [11]          6/10 6/14 9/2
9/22 10/6 13/1 13/18 17/12
108/16 109/2 118/4
extra [1]          40/2
eyes [1]          76/6

**F**

face [6]          59/2 59/3 59/4
59/4 61/11 61/11
face-to-face [1]          59/13
faced [2]          104/13 104/14
faces [1]          70/2
facility [6]          64/13 80/11
80/14 80/18 81/3 81/5
facing [7]          36/24 37/2 37/4
102/9 103/6 106/1 106/4
fact [5]          6/4 36/6 36/21
72/14 104/8
factor [1]          39/11
facts [1]          85/13
factual [3]          85/10 85/12
85/15
fair [2]          19/11 107/19
fairly [1]          119/24
fall [3]          42/14 56/4 79/23
falls [1]          17/18
familiar [4]          36/18 36/19
38/3 63/11
family [2]          80/23 81/11
far [16]          18/5 18/8 34/3
34/4 40/10 40/11 45/7

52/20 62/10 65/17 73/9
79/13 91/3 120/12 123/4
123/14
fashion [2]          28/4 122/14
fast [3]          66/12 67/17 74/14
favor [2]          98/23 119/11
fax [2]          24/2 24/5
February [2]          24/20 27/16
FedEx [6]          62/11 63/12
63/20 66/2 66/9 66/16
feeding [2]          71/25 72/2
feel [8]          13/1 49/10 49/19
72/15 75/20 81/5 101/8
110/15
feeling [1]          121/21
felony [3]          95/2 102/3
102/25
felt [27]          49/18 49/20
51/24 61/3 64/23 65/9 66/7
66/23 66/24 67/9 67/10
67/11 67/18 67/19 71/24
72/2 72/7 72/16 76/13 79/6
79/18 79/18 79/19 79/22
101/10 101/16 104/10
female [1]          25/1
few [8]          8/8 8/13 12/17
15/3 17/5 36/10 59/8 71/13
Field [5]          62/11 63/12
63/20 66/2 66/9
Fifth [1]          1/17
fifty-cents [1]          51/14
figure [2]          4/22 16/22
figured [1]          123/6
figuring [1]          11/2
file [19]          15/19 22/19 98/6
102/13 102/20 103/12
103/14 105/3 105/9 105/13
105/18 107/3 108/3 108/6
108/8 108/11 109/5 110/11
110/23
filed [10]          3/19 4/1 4/2
14/7 16/9 39/10 102/10
103/1 104/16 108/14
filed repeat [1]          103/1
files [3]          22/14 107/24
110/8
filing [1]          109/23
filled [2]          23/16 46/20
final [4]          4/6 10/11 14/24
121/2
Finally [1]          79/10
finance [3]          44/5 44/6 47/5
financing [1]          44/13
find [4]          13/9 18/9 45/23
72/15
fine [13]          9/11 10/2 11/4
12/19 15/18 16/3 30/23
35/5 70/25 71/2 82/12
119/20 122/16
finish [1]          10/24
finished [1]          6/5
finishing [2]          12/25 16/16
first [43]          7/19 9/17 9/24
11/11 12/16 13/15 17/5
17/10 24/5 25/14 29/8 33/4
35/23 36/11 37/12 44/3
44/12 45/21 47/25 50/1
54/2 54/4 55/11 56/7 59/2
59/8 61/10 61/12 61/13
62/21 63/4 64/14 68/18
69/5 73/13 74/11 74/13
83/14 94/8 94/14 114/3

fitness [2]          63/11 63/14
five [4]          15/12 30/14 74/15
120/11
Floor [1]          2/3
flushes [1]          6/13
foil [2]          28/10 69/11
folks [1]          56/12
follow [2]          14/2 86/22
Ford [1]          78/20
foregoing [1]          126/5
forfeiture [2]          19/17 19/20
form [2]          14/24 19/17
forth [1]          111/25
found [2]          82/9 114/21
foundation [1]          63/22
four [16]          57/11 57/21
73/18 100/4 111/18 112/3
112/5 112/6 112/7 112/12
112/17 112/22 113/3 113/6
113/15 113/21
fourth [1]          44/20
frankly [3]          11/7 115/23
123/5
frankly -- [1]          11/7
friend [1]          42/4
friends [4]          41/13 41/14
41/18 41/22
front [5]          60/23 70/24
71/18 104/7 104/19
fronted [2]          65/18 68/16
68/17 68/19
fronting [1]          65/11
further [2]          16/8 82/9
furtherance [2]          42/15
43/15
future [1]          37/22

**G**

G-I-V-E-N-S [1]          31/14
game [2]          7/4 16/23
gas [3]          62/6 78/23 79/4
gather [2]          74/13 121/15
gave [8]          12/22 13/14 52/16
55/14 71/14 71/17 89/2
90/4
GEISE [1]          1/13 77/2 119/14
general [3]          5/24 18/19
19/17
generally [5]          32/11 69/4
93/16 94/7 100/24
gentleman [2]          26/14 46/8
gentlemen [8]          20/15 24/14
30/13 31/5 76/22 83/7
116/9 117/17
get [66]          5/11 7/21 8/12
10/13 11/9 14/24 16/11
18/13 27/9 29/1 31/17
34/21 38/7 38/9 38/21 39/1
40/13 45/10 51/3 51/3 51/6
51/7 52/1 52/9 54/18 57/23
60/23 60/24 61/5 65/16
66/13 71/4 73/18 74/15
74/17 80/22 82/11 86/25
86/25 88/8 89/16 89/18
90/9 90/15 90/23 96/19
99/3 101/13 105/23 107/7
107/23 109/3 109/7 109/16
110/5 111/23 112/19 112/25
116/12 119/9 119/9 121/12
121/7 121/8 122/2 123/16
gets [2]          35/16 110/4

## G

getting [10]          3/22 12/21
42/20 56/3 59/8 60/5 67/21
73/9 98/12 116/21
Glkas [3]          24/23 25/16
26/18
give [25]          8/1 8/2 10/7
10/17 15/17 18/23 48/5
52/17 54/20 61/23 65/10
65/13 65/14 65/16 70/21
77/20 78/5 100/14 106/15
108/8 110/12 110/13 110/13
110/14 120/10
given [8]          12/8 17/4 17/5
17/10 18/1 34/24 106/17
121/24
Givens [27]          14/19 20/10
31/7 31/12 31/13 32/10
34/22 35/21 36/3 37/6
37/13 38/2 39/13 42/19
43/4 43/5 43/24 45/9 46/15
46/11 74/7 76/3 77/13 80/6
83/10 99/16 125/8
giving [2]          6/16 49/11
glass [1]          81/12
glasses [2]          46/20 47/2
go [47]          4/22 8/2 12/3
12/10 12/17 15/14 21/15
27/9 28/24 29/25 30/3
32/17 32/21 35/8 37/6 40/7
43/18 57/4 59/13 60/23
61/1 64/8 65/1 65/3 65/25
66/6 68/24 70/12 72/9
74/14 75/2 81/18 81/23
82/7 87/22 92/4 97/20
109/6 110/25 113/2 113/11
118/7 119/2 119/21 121/25
121/25 122/10
goal [1]          19/16
goes [8]          15/13 15/14 34/25
49/12 97/24 98/16 113/6
117/2
going [102]          5/17 5/24 6/5
6/7 6/9 6/11 6/12 8/16
9/17 10/14 10/24 10/25
12/8 12/10 12/13 12/17
14/3 14/5 14/6 14/9 14/20
14/21 15/4 15/25 16/12
16/13 16/14 16/15 16/16
16/24 17/3 18/24 18/25
19/3 19/23 21/13 21/20
23/6 30/14 32/6 34/8 34/9
34/22 34/23 35/3 35/21
36/10 40/13 40/23 42/13
42/18 43/1 49/13 49/13
50/7 57/7 60/7 60/17 64/2
66/19 68/1 76/17 79/23
86/25 88/22 89/2 89/4 89/5
89/16 89/18 89/23 89/25
90/9 90/15 91/22 91/22
92/5 92/9 92/10 93/18
97/21 98/22 102/18 102/20
103/11 105/9 105/23 108/6
108/13 110/2 112/11 116/12
118/5 118/19 118/20 119/11
119/11 119/23 120/19
120/22 123/2 123/7
going -- [1]          8/16
gold [2]          63/10 78/20
gone [5]          7/3 15/12 96/10
98/25 106/2

good [24]          9/2 19/25 20/15
20/25 21/1 24/14 31/10
50/2 50/11 50/15 51/9
51/16 52/1 66/16 75/22
77/13 79/6 80/6 80/7
113/25 114/2 117/18 117/19
121/10
gooey [2]          69/13 69/16
got [41]          3/20 14/1 15/19
17/2 17/17 17/18 19/3 46/1
47/3 50/17 50/20 53/17
55/15 58/9 60/16 61/5
62/20 62/24 62/25 63/2
63/2 63/8 68/11 69/2 69/5
69/22 80/20 81/16 88/18
88/24 90/10 91/11 93/21
93/23 94/14 96/13 96/17
98/1 98/3 101/3 111/8
gotten [6]          88/4 88/15
98/16 100/22 101/1 121/21
gOvernment [48]          1/13 8/7
12/22 14/18 16/20 20/21
20/22 22/24 27/3 27/4 27/8
31/7 34/3 34/5 35/18 38/13
38/14 38/17 38/22 81/21
82/4 82/20 91/8 91/8 93/25
95/5 96/6 96/17 97/16
98/18 99/18 100/13 101/23
102/10 102/25 105/3 107/3
107/24 108/14 110/8 110/22
115/10 115/13 117/21
121/20 123/4 123/7 125/15
Government's [7]          4/6 10/9
12/4 12/25 16/13 19/10
21/20
GPS [2]          7/12 17/6
gram [1]          55/19
grams [41]          33/8 33/13
33/17 36/20 36/22 47/7
47/18 47/20 48/25 49/18
49/19 49/25 50/1 50/4 50/4
50/17 50/20 51/10 51/11
51/12 51/15 54/14 55/4
55/6 55/6 56/14 56/15
57/20 60/13 73/14 83/12
84/13 88/24 89/12 89/17
90/10 90/16 90/18 99/17
101/24 102/1
grandmother [2]          31/18
31/19
greasy [1]          69/17
great [1]          10/21
greater [1]          18/16
greed [1]          50/3
green [3]          46/1 46/8 46/16
grew [10]          41/12 41/16
41/20 57/16 57/16 57/17
57/19 114/8 114/14 114/14
Griffith [3]          1/21 126/4
126/12
grind [3]          57/3 71/1 71/1
grinding [1]          72/17
grocery [1]          70/12
Guadalupe [1]          15/5
guarantee [1]          38/25
guess [11]          6/20 47/12
47/15 91/19 92/6 92/7
92/16 93/6 97/7 120/11
120/20
guidelines [6]          38/3 38/4
106/7 106/8 106/9 106/20
guilty [13]          34/6 36/8

36/15 85/9 95/4 95/8 96/14
97/25 98/17 101/23 104/2
104/7 104/19
guy [8]          25/19 43/15 45/1
45/1 97/15 99/1 114/6
114/8
guy's [1]          116/20
guys [1]          56/17
Gwen [1]          77/6
gym [2]          66/2 66/20

## H

had [75]          12/21 13/2 13/4
15/20 20/16 27/7 29/23
30/4 30/20 33/13 37/18
39/21 40/20 42/6 42/20
44/12 45/18 46/11 46/18
51/10 52/3 52/4 54/10 57/5
57/17 59/25 61/12 61/21
64/21 64/24 65/8 66/15
67/9 67/9 67/11 67/16
69/10 69/19 69/11 69/12
70/24 74/17 76/17 78/22
78/24 79/5 79/22 82/8
83/11 85/15 86/12 87/12
88/1 88/4 88/15 94/8 94/21
94/24 96/16 99/4 99/5
100/21 100/22 100/25 101/1
102/1 102/3 102/10 103/1
106/2 111/11 111/21 111/21
113/9 118/3
hadn't [1]          121/5
half [20]          10/24 12/14
13/24 15/21 39/14 50/20
53/2 60/6 60/9 60/10 60/11
60/12 60/12 60/22 60/22
90/18 114/15 114/17 114/20
120/4
hammer [1]          16/4
hand [3]          14/10 79/21 79/21
hand-to-hand [3]          54/2 54/3
54/16
handed [2]          14/9 117/21
handful [2]          4/18 8/24
hands [1]          59/9
hanging [2]          10/15 123/10
happen [1]          121/24
happened [4]          27/2 82/7
95/25 109/10
happens [2]          49/12 94/7
happier [1]          107/19
happy [6]          9/7 9/11 11/5
30/19 107/10 107/16
hard [12]          45/6 45/18 46/21
51/2 66/14 66/14 70/13
70/14 70/15 71/1 99/4
121/5
harder [1]          70/25
has [32]          3/19 8/7 15/15
15/15 17/5 21/16 34/24
45/23 66/11 69/24 70/1
91/9 93/13 94/11 97/15
97/25 98/12 98/25 99/2
107/4 108/8 110/22 116/5
117/21 117/25 119/21
120/22 121/6 121/20 121/23
122/12 123/7
hash [1]          10/13
have [207]
have -- [1]          116/23
haven't [4]          12/23 20/3
122/18 122/19

**H**

having [13]        7/15 22/3
40/19 43/7 43/12 45/6
46/14 46/21 56/22 77/23
119/12 121/22 122/13
he [169]
he'd [1]        65/14
he'll [2]        17/11 52/17
he's [10]        5/16 5/17 10/4
15/19 18/10 44/18 44/19
45/12 81/3 95/24
hear [3]        32/7 119/10
119/11
heard [9]        5/3 11/18 37/19
44/3 64/14 73/25 121/9
122/18 123/17
hearing [2]        77/23 120/23
heart [1]        40/18
heat [1]        50/25
heated [1]        70/10
heavy [1]        75/21
Helen [1]        77/15
help [3]        57/23 57/23 88/12
helpful [1]        39/11
Hennessy [1]        25/1
her [9]        6/7 6/12 8/8 8/13
14/22 15/13 24/24 34/21
102/5
here [35]        4/19 6/5 7/2 7/8
9/22 12/8 16/6 19/13 22/3
23/17 24/9 26/2 32/15
35/22 36/15 36/21 44/15
45/15 46/14 47/3 73/10
76/23 77/18 86/19 90/18
93/18 93/21 93/23 98/15
98/21 102/17 105/6 119/3
119/25 122/20
herein [1]        6/14
hey [2]        8/1 8/2
high [4]        32/14 32/23 32/25
52/23
highlight [1]        5/22
Hill [1]        32/14
him [91]        5/17 5/17 7/25
9/8 17/5 17/10 17/14 21/17
25/15 25/21 25/22 25/25
26/8 26/13 30/19 30/24
35/3 41/18 42/19 43/2 44/9
44/18 48/5 48/5 48/8 49/7
52/16 58/24 59/1 59/2 59/4
59/11 59/12 60/8 61/5
61/17 61/20 63/5 63/21
65/7 65/9 65/10 65/13
65/14 65/16 66/15 66/18
66/22 66/24 66/25 67/22
68/14 73/19 74/1 79/11
79/20 79/21 89/8 90/2 90/4
93/3 93/4 97/17 97/21 99/5
100/22 104/12 104/16
111/14 111/24 112/9 112/18
112/19 113/2 113/9 113/11
113/18 114/3 114/4 114/13
114/14 114/14 114/14
115/20 115/22 116/17
116/18
him -- [1]        116/18
his [27]        10/7 17/11 29/13
29/22 34/20 37/21 43/20
46/5 47/25 48/8 53/17 59/9
62/25 63/2 63/8 67/5 67/16

74/22 74/24 75/6 86/22
91/23 93/13 98/16 100/21
117/2 117/7
history [4]        18/15 18/20
106/10 106/17
hold [6]        5/25 14/23 15/13
16/10 51/17 75/23
Holland [4]        2/10 4/13 5/15
93/10
Holton [2]        3/8 3/11
Home [9]        62/1 62/4 62/5
62/12 68/4 76/10 76/11
76/12 76/18
honest [2]        52/5 92/7
honestly [1]        65/10
Honor [87]        3/4 3/6 3/14
3/18 3/24 5/5 5/15 6/1
7/17 8/5 8/21 9/7 9/14
9/20 11/6 11/10 11/16
12/17 13/25 14/17 15/25
17/2 17/23 17/24 18/11
19/5 19/14 20/8 20/12
20/20 21/12 22/8 22/21
23/12 25/10 26/5 26/20
28/19 28/21 29/3 30/17
34/8 34/13 34/18 35/13
37/24 42/7 44/14 44/21
46/3 48/20 72/21 74/4
74/23 76/20 78/9 83/5 91/1
91/6 91/17 91/19 92/1
92/24 95/23 97/9 98/4
99/10 99/12 110/7 112/20
112/25 115/25 116/2 116/7
116/11 117/1 117/6 117/14
118/9 118/19 119/17 120/2
120/9 120/15 122/8 122/19
123/18
HONORABLE [1]        1/10
hope [3]        17/1 17/4 20/16
Horne [5]        6/2 6/4 10/11
14/20 118/21
hour [1]        10/25
house [11]        8/8 8/13 26/6
26/7 26/9 28/12 28/15
28/24 28/25 30/1 30/3
how [65]        8/12 21/7 24/17
31/13 31/17 31/21 33/2
36/24 37/2 37/16 40/15
41/3 41/11 41/14 41/24
43/24 44/1 44/4 44/8 45/2
47/8 49/20 49/24 50/12
51/5 51/16 52/6 52/14
52/17 52/20 53/1 53/8 53/8
53/9 53/17 54/4 54/6 54/13
54/18 54/23 55/2 55/14
55/18 55/20 56/3 61/10
61/18 61/21 68/4 68/21
69/21 72/15 73/10 84/7
89/23 92/9 92/10 92/20
111/25 112/9 113/6 114/11
120/3 120/9 122/9
however [1]        107/14
Huggins [6]        2/6 6/22 6/23
6/25 93/9 93/22
human [1]        12/3
hundred [15]        51/11 51/15
55/6 60/7 60/16 60/19
60/19 60/20 60/21 65/8
65/13 66/10 67/5 89/19
90/9
hundreds [1]        122/5
HUVELLE [1]        1/10

hypothetically [1]        120/18

**I**

I -- [1]        101/16
I'd [1]        91/6
I'll [13]        9/18 10/7 10/25
11/13 11/15 14/22 34/18
52/17 77/9 92/8 95/19 96/2
99/10
I'm [118]        4/15 4/20 4/25
5/16 6/11 7/2 7/8 8/11
8/12 8/13 9/7 9/11 9/14
11/4 11/21 11/21 12/7 13/8
13/12 14/10 14/13 14/21
15/25 16/6 16/18 17/2
17/10 18/8 18/24 19/15
21/4 21/13 21/19 21/20
24/3 24/6 25/10 28/5 29/19
30/2 30/19 34/8 34/14
34/22 34/23 35/2 35/21
36/10 36/19 36/19 37/22
38/14 40/12 40/23 41/16
41/19 44/21 44/25 45/1
45/6 45/6 46/21 46/21
47/15 49/3 49/10 49/11
49/13 50/7 51/24 52/10
56/24 58/23 59/7 59/22
63/15 70/12 71/13 72/25
76/15 77/23 78/19 79/17
90/18 92/6 93/6 93/7 94/5
97/8 97/12 100/24 105/2
105/16 105/25 106/8 107/13
107/13 109/8 110/15 110/15
111/24 112/11 112/19
112/24 113/3 113/7 113/8
113/11 113/24 114/12
116/12 116/21 116/21 119/7
119/11 120/9 122/16 123/15
I've [11]        3/5 3/12 3/14
17/2 18/23 21/19 25/2 34/9
35/21 91/7 98/22
ICE [13]        18/2 21/13 21/14
21/20 21/20 22/10 22/24
22/24 23/12 24/7 24/9 29/4
125/16
ID [1]        77/5
idea [1]        10/17
identical [1]        34/23
identification [5]        46/4
46/6 46/12 118/11 118/13
identified [2]        45/23 46/15
identify [3]        26/14 44/18
47/25
ill [1]        6/16
illegally [1]        86/9
immediately [1]        87/19
immensely [1]        123/19
impact [1]        91/25
impeach [2]        92/15 93/4
impeaching [1]        92/19
impeachment [5]        91/20 92/4
92/17 92/21 98/25
important [2]        11/1 11/2
11/15 13/1 40/15 40/17
impression [1]        99/1
imprint [2]        69/25 70/20
imprinted [1]        70/3
in -- [1]        59/1
inaccuracies [1]        13/10
inaccurate [1]        5/15
inadequate [1]        17/11
incarcerated [5]        31/23

**I**

incarcerated... [4]        31/25
  32/11 33/2 58/17
inches [1]        122/7
include [1]        85/15
included [3]        4/11 7/19
  9/24
includes [1]        14/14
including [1]        4/5
income [1]        24/11
inconsistent [1]        93/13
inconvenience [1]        25/21
increase [1]        57/12
increased [1]        57/14
Indiana [1]        2/2
indicated [4]        3/14 26/21
  80/9 83/10
indication [2]        72/4 72/5
indicted [7]        33/14 33/16
  33/17 33/22 42/24 95/9
  96/7
indictment [2]        33/25 34/6
indulgence [4]        23/24 71/11
  74/19 75/25
inference [1]        10/21
inferences [1]        116/22
inflatable [1]        28/1
information [7]        10/8 17/6
  23/12 29/4 77/20 78/5
  100/14
injury [2]        82/8 82/12
inquiring [1]        18/9
inside [5]        27/13 27/15
  64/5 75/11 75/13
insofar [1]        98/2
inspection [3]        85/17 85/18
  86/24
instance [6]        6/24 7/19
  9/23 62/17 65/4 78/14
instead [5]        4/9 6/8 10/22
  75/19 122/7
instruct [3]        37/22 93/14
  93/16
instructed [2]        37/21 94/3
instruction [6]        19/18 92/3
  94/5 94/9 122/3 122/14
instructions [2]        19/16
  19/17
intend [2]        33/10 120/1
intended [1]        10/10
intending [1]        7/5
intent [4]        33/17 36/21
  101/24 118/9
intention [1]        118/14
interest [5]        48/7 52/23
  57/12 57/15 105/12
interested [5]        7/8 55/9
  57/18 57/24 111/22
interpretation [6]        5/10
  6/11 6/12 6/18 11/23 12/4
interpretations [3]        5/9
  6/17 7/16
interview [2]        91/4 94/20
interviewed [2]        87/15
  87/18
introduce [5]        21/2 31/11
  43/14 62/21 91/6
introduced [5]        26/2 41/24
  59/16 62/22 63/5
introducing [1]        16/11
involve [1]        47/10

involved [1]        52/9
involving [1]        115/20
irrelevant [1]        40/6
is [301]
is – [3]        42/22 118/23
  122/22
isn't [4]        13/9 80/25 83/1
  118/9
issue [9]        3/8 3/13 3/16
  9/25 13/13 16/24 18/2
  30/21 35/1
issues [1]        16/17
It [380]
It's [98]        3/6 3/8 4/16 5/1
  5/9 6/20 7/4 7/15 7/22 8/6
  9/9 10/3 11/15 12/8 12/14
  12/21 13/3 14/5 15/11
  16/22 17/11 17/18 18/7
  18/19 19/6 20/5 22/16
  23/11 32/4 34/23 35/16
  36/20 40/6 40/10 40/15
  40/19 43/20 44/25 45/1
  45/24 49/7 51/1 51/12
  53/24 57/6 57/7 57/7 62/11
  63/15 65/11 65/13 66/9
  66/14 66/14 69/17 69/25
  70/9 70/10 70/11 70/13
  70/17 70/17 70/20 71/1
  72/18 74/15 74/2 80/15
  80/16 80/20 80/25 81/2
  81/5 91/7 91/11 91/14
  91/22 91/23 94/2 94/13
  95/20 98/2 99/3 102/17
  102/19 105/6 105/18 107/25
  109/14 110/1 110/1 110/11
  110/11 110/14 110/23 123/4
  123/18 123/19
items [2]        6/5 22/4
its [3]        35/10 70/9 94/10
itself [5]        36/11 69/22
  70/3 70/4 81/7
Iverson [1]        96/22

**J**

JACK [1]        1/13
jacket [1]        46/2
Jackson [2]        2/2 93/10
jail [14]        32/3 32/4 80/13
  80/13 80/15 80/16 80/25
  81/3 81/7 81/9 81/25 82/8
  82/17 102/5
January [10]        21/11 24/1
  24/4 24/5 24/6 24/7 29/17
  29/17 29/19 68/13
jeep [10]        4/8 14/15 74/22
  75/1 75/2 75/6 75/8 75/9
  75/11 75/14
Jesus [2]        70/2 70/6
job [3]        18/21 110/11
  121/10
Joe [1]        25/1
John [3]        7/20 18/20 97/15
Johnson [2]        7/25 15/7
JON [1]        2/2
JONES [105]        1/5 1/17 3/3
  3/19 4/9 6/24 7/20 8/10
  41/1 41/3 41/11 41/24
  42/20 42/21 43/2 43/4 43/6
  43/17 43/19 43/25 44/4
  44/15 44/24 45/10 45/15
  46/4 46/6 46/9 46/16 48/3
  48/11 50/21 52/3 52/7 55/9

55/12 55/21 56/3 56/5
57/24 58/6 58/8 58/21
58/23 59/9 59/14 59/17
60/1 61/11 61/24 62/13
63/9 63/17 63/20 64/8 65/5
65/18 65/23 65/25 66/4
66/20 66/21 67/23 68/5
68/5 68/12 68/16 68/18
69/4 71/14 71/17 72/10
73/3 73/12 73/22 74/22
74/22 75/6 75/9 76/3 76/6
78/7 78/14 78/16 79/12
91/7 94/17 95/19 100/14
100/19 101/1 101/4 101/14
101/18 111/3 111/12 112/23
113/23 114/24 115/11
115/14 115/16 115/20
116/14 125/20
Jones's [1]        115/7
Jr [2]        32/23
judge [29]        1/11 19/25 38/8
  39/12 77/10 104/2 104/7
  104/13 104/17 104/19
  104/22 107/4 107/24 108/2
  108/3 108/8 108/11 110/1
  110/2 110/3 110/4 110/6
  110/7 110/11 110/17 110/23
  110/24 110/24 122/16
jump [1]        76/2
June [1]        29/16
jury [56]        1/11 5/3 12/2
  13/16 14/1 19/15 19/17
  19/19 20/7 20/13 20/14
  21/3 30/16 31/4 31/11 33/6
  37/18 39/7 39/23 43/24
  44/3 45/21 46/18 49/24
  50/9 50/17 56/11 57/14
  60/3 61/10 61/23 70/21
  71/20 74/7 76/9 76/24
  77/11 78/18 79/3 88/18
  88/21 101/1 110/1 111/17
  116/17 116/24 117/3 117/20
  118/6 118/15 118/18 119/5
  119/21 120/21 120/23
  123/11
jury – [1]        118/18
jury's [1]        20/5
just [98]        3/5 5/13 6/15
  7/1 8/5 8/17 8/22 9/1 9/15
  11/4 11/9 12/5 12/9 13/12
  14/9 15/6 16/1 16/2 16/4
  16/10 17/3 17/3 17/12
  17/13 20/12 23/11 23/12
  23/19 24/22 25/10 26/7
  28/21 30/17 32/16 34/13
  34/23 34/23 35/1 35/15
  35/23 36/10 37/18 37/19
  44/23 45/4 45/4 45/17
  46/15 48/4 50/16 52/9
  52/10 52/14 52/22 56/21
  56/24 57/6 58/4 58/5 60/12
  61/19 64/15 65/14 71/13
  75/21 75/22 77/5 79/6 79/6
  82/7 87/7 89/5 91/12 92/8
  92/14 92/21 93/18 93/20
  94/6 94/12 100/6 100/24
  102/24 103/17 107/13
  107/18 112/19 113/1 116/12
  117/24 119/12 119/19
  120/18 121/1 121/7 122/13
  123/2 123/10

## K

keep [6]           13/8 22/4 22/16
22/18 76/14 76/15
keeps [1]         98/12
Kelly [14]        20/8 20/21
20/22 21/4 21/9 21/19 22/3
23/3 23/17 24/17 28/24
29/7 29/8 125/4
kept [2]          22/13 27/23
Kevin [1]         4/13
key [3]           7/8 40/19 121/19
kl' [1]           72/6
killed [1]        40/14
kilo [9]          53/2 55/25 56/13
56/14 57/19 57/21 72/9
90/7 90/18
kilogram [11]     39/14 50/20
54/4 54/8 54/9 55/21 56/4
58/3 58/20 69/3 70/24
kilograms [5]     53/14 57/11
57/23 68/15 69/2
kilos [10]        53/3 53/9 55/3
55/13 66/11 67/14 68/14
69/8 69/9 69/10
kind [16]         8/6 18/7 18/10
25/1 26/6 28/8 48/23 48/23
54/25 63/8 63/9 64/22
64/24 68/7 80/23 99/2
kinds [4]         22/17 39/19
63/19 117/5
knew [3]          51/23 56/17 57/5
know [102]        4/19 5/4 6/6
7/5 9/3 10/22 11/22 12/9
12/20 14/7 15/15 17/11
18/5 18/16 19/6 19/25 23/7
25/22 26/7 26/13 26/15
26/17 27/18 27/22 30/4
30/23 36/17 40/15 41/1
41/3 41/9 42/10 43/9 43/10
44/8 45/2 45/5 49/7 49/8
49/9 49/10 50/12 51/24
52/19 57/6 57/8 58/20 61/2
61/5 63/14 70/12 70/16
70/21 71/24 72/19 72/23
79/2 80/22 81/2 81/9
81/11 82/16 84/1 84/3 84/9
84/9 85/7 85/12 91/3 91/10
92/13 92/14 93/20 93/23
93/24 94/12 96/13 97/17
102/3 103/1 103/16 103/20
104/5 104/16 107/2 107/4
107/22 109/9 110/21 111/24
114/18 115/2 115/7 115/9
117/4 118/7 119/6 119/24
121/4 122/9 122/11 123/4
know – [1]        9/3
knowing [3]       105/13 119/11
119/13
knowledge [1]     116/5
known [2]         33/20 114/13
knows [5]         19/14 27/2 35/24
82/16 98/8

## L

labeled [1]       21/13
ladies [8]        20/15 24/14
30/13 31/5 76/22 83/7
116/8 117/17
landlord [2]      29/22 29/23
language [1]      4/17
large [1]         28/14

larger [2]        49/21 49/25
last [11]         4/1 4/10 6/2
19/5 45/1 45/1 58/7 58/9
74/16 83/6 111/15
late [6]          5/2 7/4 12/21
16/22 61/16 62/18
later [3]         91/24 93/16
100/11
latest [1]        17/22
law [3]           16/24 17/21 122/10
Lawrence [4]      22/2 23/16
27/21 27/22
lawyer [4]        36/13 103/25
105/11 105/15
lawyers [1]       69/23
lay [1]           43/9
layers [4]        69/12 69/13
69/13 69/24
leading [1]       74/23
learning [1]      40/11
lease [9]         21/10 21/23 22/1
24/1 24/7 24/7 29/13 29/16
29/21
leasing [1]       21/5
least [5]         5/10 22/19 23/7
55/4 107/5
leaves [1]        7/24
leeway [3]        65/16 67/19
116/13
left [12]         4/13 4/17 4/19
6/23 6/25 7/1 9/19 11/13
62/25 63/1 63/3 99/1
legal [1]         16/17
legitimate [1]    39/21
length [1]        58/5
lenses [1]        46/25
less [6]          30/7 55/6 55/6
107/23 108/2 120/4
let [28]          3/24 5/11 6/1
6/15 17/11 18/16 25/15
25/18 25/25 26/10 26/18
26/19 27/7 29/22 37/18
50/9 55/20 57/6 62/19
70/16 70/16 72/8 89/9
93/20 98/24 113/2 118/7
122/11
let's [12]        8/22 23/9 25/12
27/9 35/14 41/19 42/8
44/11 94/1 94/10 97/10
120/18
letter [15]       29/9 34/20
35/25 36/5 36/7 36/11
36/11 36/14 37/7 37/10
38/6 98/6 107/3 107/24
109/3
letters [1]       70/2
letting [1]       50/5 50/8
level [1]         67/11
Levels [2]        10/22 10/23
license [2]       39/25 40/3
LIEBER [22]       1/13 3/21 5/9
9/18 10/21 11/12 15/21
20/18 23/4 24/22 27/6
68/21 68/25 94/21 99/20
102/4 106/6 107/3 112/2
119/17 125/5 125/9
life [10]         37/5 38/25 83/15
105/20 105/21 105/23
107/14 110/13 114/13
114/20
lifting [1]       64/5
like [93]         4/14 4/15 5/11

9/16 18/18 18/21 25/1
40/16 40/18 46/25 48/7
49/10 49/18 49/19 50/14
52/16 52/16 55/13 55/16
55/18 55/23 57/6 57/19
57/21 60/7 60/22 61/3
61/14 62/13 62/18 62/20
62/21 63/16 64/22 64/22
64/23 65/1 65/9 65/11
65/13 66/7 66/8 66/23
66/24 67/8 67/9 67/10
67/11 67/18 67/19 68/4
69/4 69/18 69/22 70/1 70/9
70/11 70/13 70/17 70/20
70/25 71/24 71/24 72/3
72/5 72/7 72/16 72/20 73/5
74/15 74/17 74/18 75/20
76/13 76/15 76/15 78/21
79/6 79/18 79/18 79/19
79/22 81/5 86/10 90/4 91/1
91/6 101/16 106/21 110/15
111/21 113/4 113/4
like – [1]        5/11
liked [1]         67/17
likely [2]        40/13 69/24
limbo [1]         49/13
limited [1]       117/7
line [6]          7/3 7/3 24/5
48/12 99/6 99/13
lines [1]         85/1
lips [1]          101/4
liquid [1]        70/10
Lisa [3]          1/21 126/4 126/12
listen [8]        9/5 80/16
102/19 104/11 119/3 119/6
121/11 122/17
listened [1]      121/3
lit [1]           5/25
little [19]       5/2 10/12 11/2
14/25 15/6 18/7 58/23
61/12 62/24 62/24 65/17
71/3 71/20 76/16 77/23
77/24 78/10 80/22 100/19
live [1]          32/11
lives [1]         18/14
living [1]        27/18
loan [5]          48/5 52/9 52/11
52/12 60/11
loaning [1]       52/14
location [7]      4/9 4/9 17/9
27/15 76/14 76/14 76/16
locations [2]     59/12 61/13
locked [2]        33/4 58/14
Lockhart [1]      77/3
long [11]         12/1 12/22 13/3
21/7 24/17 30/14 33/2
68/21 120/20 122/14 123/16
longer [1]        15/13
look [18]         3/21 4/2 5/19
8/17 8/22 9/3 13/5 14/5
17/5 21/21 35/23 36/2 36/3
45/9 69/4 69/2 75/22
110/2
looked [6]        64/13 64/20
65/15 75/20 75/22 86/13
looking [6]       47/8 64/15
68/9 104/8 105/20 106/19
looks [1]         25/1
lose [1]          49/10
lost [2]          97/8 106/2
lot [18]          5/1 5/8 9/1 10/18
11/23 15/13 26/1 40/19

## L

lot... [10]  61/12 62/14
62/19 64/14 65/9 72/16
76/11 79/10 104/22 118/17
lots [1]  93/17
louder [1]  77/24
love [2]  50/6 51/24
lower [1]  54/21
lunch [1]  117/18 117/19
luncheon [1]  124/1

## M

ma'am [9]  22/15 31/20 32/5
32/20 32/24 33/1 40/1 63/6
121/18
machine [1]  29/5
made [10]  4/3 12/3 13/4 14/14
39/3 52/15 52/22 82/19
100/18 113/5 123/7
maintenance [1]  15/2
majority [1]  11/17
make [34]  10/10 15/21
16/21 18/14 18/21 18/22
19/16 25/23 25/25 33/24
35/14 46/12 51/16 56/21
61/1 61/4 66/12 71/5 72/18
72/19 87/19 87/22 91/21
92/8 92/11 94/6 101/15
101/15 108/11 113/6 119/10
121/7 123/8 123/10
makes [3]  4/7 70/14 119/17
man [4]  8/1 8/2 15/3 46/16
manageable [2]  121/20
122/6
manager [2]  21/4 22/5
mandatory [15]  36/25 37/2
38/19 102/5 102/11 102/21
103/6 104/8 104/13 104/14
105/12 105/14 106/22 107/5
107/17
many [11]  27/14 45/2 67/15
73/10 112/9 117/24 117/24
120/3 120/4 120/9 122/9
map [1]  10/4
March [2]  29/15 29/19
marijuana [4]  39/20 83/20
95/15 96/3
mark [2]  34/10 95/19
marked [5]  21/19 34/9
35/21 91/7 118/10
Maryland [9]  21/6 21/11
21/24 61/13 61/23 62/2
62/4 62/4 63/10
math [1]  113/22
matter [6]  9/10 12/1 12/1
34/14 93/11 126/6
matters [1]  26/21
mattresses [1]  28/1
maximum [2]  37/4 105/20
may [37]  3/13 5/3 8/23
9/17 10/11 14/18 15/2
19/20 20/12 21/12 23/4
24/2 29/3 30/17 33/5 37/20
39/13 46/3 58/14 58/15
58/16 68/21 71/4 74/16
77/14 83/11 84/13 94/20
99/17 100/9 100/18 101/3
109/3 116/6 119/14 121/23
121/25
maybe [11]  7/4 9/2 9/9
18/12 30/7 44/25 44/25

45/1 68/23 115/25 120/15
Maynard [7]  22/2 23/16
23/20 24/10 27/21 27/22
27/23
McDANIEL [7]  2/10 20/13
30/20 30/22 120/7 121/5
121/7
McKinley [2]  32/22 32/25
me [97]  3/24 4/15 4/20
4/25 5/11 6/1 6/15 8/1 8/2
9/8 10/7 10/17 11/11 16/24
19/20 20/3 28/25 29/12
30/20 30/20 34/24 37/18
41/18 41/25 41/25 42/4
42/5 45/24 47/2 47/3 47/11
48/4 48/5 48/5 48/6 48/8
50/3 53/7 54/1 55/20 56/20
57/16 59/11 60/24 64/16
66/19 71/23 72/8 75/22
76/15 76/17 79/6 79/20
79/23 82/10 85/19 86/8
86/8 86/8 86/11 86/21
86/22 86/23 89/9 89/24
90/2 90/3 90/5 93/20 95/13
96/2 98/24 100/4 100/17
101/7 101/10 101/11 102/18
102/19 102/24 103/19
105/12 105/15 110/12
110/13 110/13 110/14
111/22 113/6 117/21 118/3
118/22 119/18 120/10
121/24 122/20 123/23
mean [22]  5/11 5/16 5/23
7/25 10/18 10/20 15/18
24/19 38/13 38/14 41/15
44/1 49/6 50/23 53/19 60/4
60/9 64/19 66/9 70/6 88/10
117/25
meaning [1]  70/7
means [5]  6/12 17/15 30/23
70/5 104/5
meant [2]  14/1 14/2
mechanical [1]  1/24
medical [1]  40/17
meet [4]  4/8 8/8 8/12
14/15 41/11 59/11 59/12
60/1 61/13 61/18 61/19
61/22 62/13 62/17 63/17
76/10 113/5
meeting [10]  4/16 59/13
61/7 76/7 76/10 76/12
76/14 76/15 78/21 116/14
meetings [3]  4/8 61/12
65/15
meets [5]  4/13 4/13 4/17
9/25 14/15
melts [1]  51/1
mention [2]  93/9 93/10
mentioned [2]  75/2 100/19
merely [2]  89/2 89/11
message [2]  7/24 7/25
met [30]  58/22 58/24 59/1
59/20 59/23 61/10 61/15
61/15 61/22 61/24 62/1
62/1 62/5 62/6 62/6 62/7
62/10 62/11 62/12 63/19
65/4 66/20 68/3 76/3 76/13
76/18 78/7 78/14 79/4
113/6
middle [2]  79/19 79/20
might [10]  6/10 13/13
13/23 18/1 24/9 69/13

74/12 74/15 79/8 79/9
mile [1]  5/17
mind [1]  27/6
minds [1]  18/8
mine [2]  41/4 53/10
mini [1]  28/9
minimum [6]  30/23 36/25
37/2 103/7 106/3 106/22
minor [2]  3/4 17/3
minutes [9]  8/8 8/13 30/14
36/10 68/23 76/23 76/25
92/25 93/1
MISC [1]  125/17
Miscellaneous [8]  34/10
34/11 35/11 35/18 35/22
77/3 77/8 99/21
mislead [1]  122/16
misstating [1]  26/24
mistake [1]  84/16
misunderstanding [1]  95/24
misunderstood [1]  41/19
mixing [1]  50/13
modus [1]  116/15
moisturize [1]  50/24
Monday [2]  1/7 113/5
money [68]  28/14 47/8
47/12 47/18 47/23 47/24
48/6 48/6 49/7 49/11 49/12
51/6 51/7 51/16 52/9 52/10
52/12 52/14 52/15 52/19
52/21 52/22 53/17 55/8
55/11 55/15 55/17 55/18
55/19 56/12 56/21 57/5
57/16 57/16 57/17 60/5
60/6 60/18 60/21 60/24
61/1 61/2 61/5 61/21 65/9
66/11 67/17 68/4 71/13
71/14 71/18 72/14 72/15
72/17 72/18 73/4 73/11
73/19 74/14 75/21 75/24
79/13 80/22 89/4 111/21
113/8 113/9 113/10
month [17]  30/7 73/16
73/17 73/18 73/18 73/22
74/13 74/18 88/19 111/18
112/3 112/17 113/4 113/12
113/12 113/15 113/22
months [10]  12/18 33/3
59/8 81/16 100/4 100/11
111/14 112/6 112/22 113/19
Moore [1]  17/6
more [51]  12/9 13/4 15/1
18/22 19/21 33/18 36/22
51/5 51/6 51/7 51/7 51/9
55/5 55/6 55/17 55/17
57/17 60/5 60/6 60/7 60/25
64/16 65/7 65/10 65/16
65/17 65/17 66/17 66/18
67/13 67/18 67/19 67/21
71/13 71/24 71/25 72/3
73/22 75/23 75/23 75/23
93/2 98/25 101/24 106/22
110/14 114/15 114/17
114/20 122/9 123/24
morning [21]  3/25 4/1 4/1
7/6 11/21 14/19 15/17
16/10 17/13 17/19 20/15
20/25 21/1 22/4 24/14
31/10 34/21 77/13 80/6
80/7 90/1
most [9]  3/15 3/17 40/13
62/19 68/11 69/2 69/24

**M**

most... [2]       70/16 114/13
motion [7]       39/5 39/7 39/8
39/9 39/9 105/9 109/23
mouth [1]       74/24
move [7]       20/9 22/10 45/12
46/19 74/3 76/16 99/12
moving [5]       17/17 17/18
17/19 67/17 99/9
Mr [68]       3/25 4/21 5/15
6/24 7/24 9/8 9/23 10/6
10/12 15/10 16/2 16/8
16/14 16/22 17/4 17/7
17/20 17/25 18/5 20/13
21/14 24/13 28/24 30/20
30/22 32/10 34/9 34/22
34/24 35/21 36/3 37/6 38/2
39/13 43/4 43/5 43/24 45/8
45/15 46/6 46/11 68/16
74/7 76/2 77/2 77/13 80/2
80/6 83/10 93/9 93/10
93/10 93/22 98/7 98/24
99/6 99/16 116/22 119/2
119/14 120/1 120/7 120/14
120/16 121/4 121/6 125/6
125/10
Mr. [81]       3/19 6/24 7/20
21/9 22/3 23/3 23/17 23/20
24/10 24/17 27/23 29/7
29/8 41/11 43/4 43/6 45/10
45/15 46/4 46/9 48/11
50/21 52/3 52/7 55/9 55/12
55/21 56/3 56/5 58/21
58/23 59/14 59/17 60/1
61/11 61/24 62/13 63/9
63/17 63/20 64/8 65/5
65/18 65/23 65/25 66/4
66/20 66/21 67/23 68/5
68/5 68/12 68/18 69/4
71/14 71/17 72/10 73/3
73/12 73/22 74/22 74/22
75/6 75/9 76/3 76/6 78/7
78/14 78/16 79/12 96/22
111/3 111/12 112/23 113/23
114/24 115/7 115/11 115/14
115/16 116/14
Mr. [1]       55/9
Mr. Iverson [1]       96/22
Mr. Jones [68]       3/19 6/24
7/20 41/11 43/4 43/6 45/10
45/15 46/4 46/9 48/11
50/21 52/3 52/7 55/12
55/21 56/3 56/5 58/21
58/23 59/14 59/17 60/1
61/11 61/24 62/13 63/9
63/17 63/20 64/8 65/5
65/18 65/23 65/25 66/4
66/20 66/21 67/23 68/5
68/5 68/12 68/18 69/4
71/14 71/17 72/10 73/3
73/12 73/22 74/22 74/22
75/6 75/9 76/3 76/6 78/7
78/14 78/16 79/12 111/3
111/12 112/23 113/23
114/24 115/11 115/14
115/16 116/14
Mr. Jones's [1]       115/7
Mr. Kelly [7]       21/9 22/3
23/3 23/17 24/17 29/7 29/8
Mr. Maynard [3]       23/20
24/10 27/23

Mrs. [2]       6/22 6/23
Mrs. Huggins [2]       6/22 6/23
Ms [19]       3/21 5/9 9/18
10/21 11/12 15/21 20/18
24/22 27/6 68/21 68/24
94/21 99/20 102/4 107/3
112/2 119/17 125/5 125/9
Ms. [2]       23/4 106/6
Ms. Lieber [2]       23/4 106/6
much [24]       18/21 18/22
36/24 37/2 48/4 48/8 51/5
53/1 53/8 53/9 54/13 55/20
56/3 56/23 61/21 67/12
67/15 72/3 74/12 74/13
89/23 92/9 92/10 111/25
my [66]       5/5 5/12 11/9
15/17 17/21 19/16 21/4
25/24 27/3 31/6 31/18
34/4 34/19 36/5 36/13
38/19 38/23 39/8 39/10
39/10 39/12 42/4 48/6 49/7
49/11 49/12 50/3 52/9 54/6
57/2 59/7 61/6 61/13 62/21
64/14 64/24 65/2 66/13
67/15 77/8 79/23 80/16
82/8 82/10 92/8 92/8 92/11
92/12 92/16 92/20 93/6
93/10 101/10 101/11 102/7
104/11 105/11 105/12
105/15 107/18 108/4 109/18
109/19 109/21 118/9 122/19
Myrtle [5]       21/10 21/23
23/16 25/7 27/13
myself [2]       15/21 57/6

**N**

N.W [5]       1/14 1/17 2/2 2/6
2/10
name [13]       21/4 24/23 24/24
26/14 31/12 41/5 41/9 44/3
47/25 48/8 63/14 114/18
114/21
named [1]       41/1
names [4]       18/17 18/19 19/2
43/8
Nannie [1]       77/15
narcotics [1]       28/12
nature [1]       12/3
near [1]       63/11
nearby [6]       10/1 10/1 10/2
10/6 11/24 11/25
Nearly [1]       83/13
necessarily [3]       5/16 92/22
93/22
need [16]       5/23 6/6 10/12
11/1 11/3 14/5 15/22 15/23
27/3 30/18 55/3 55/4 55/5
72/17 76/21 122/5
needed [4]       56/19 79/16
79/18 79/18
needs [1]       34/16
negative [1]       18/7
negotiated [3]       47/13 47/17
47/19
neighborhood [15]       41/12
41/20 53/16 53/18 53/20
53/21 54/5 54/7 54/21 57/2
57/18 57/20 85/21 114/9
123/23
neighborhoods [4]       56/16
57/4 57/9 57/12
never [14]       27/6 66/15

71/19 73/3 73/6 79/22
90/15 90/25 94/2 96/21
100/19 101/4 114/20 118/18
new [3]       58/4 68/13 98/22
next [14]       12/18 18/12 19/4
20/10 20/19 25/24 53/13
59/7 67/10 72/22 72/24
72/25 74/18 80/14
nice [3]       20/16 21/2 31/10
nickname [2]       31/15 31/17
night [1]       4/1
no [98]       1/3 7/7 7/7 7/7
13/19 14/12 18/6 18/9
22/21 27/25 28/11 28/13
28/16 28/19 28/20 29/7
35/7 35/12 35/18 36/19
38/19 38/25 39/2 48/14
54/3 61/9 64/10 65/24 66/1
66/5 66/22 69/18 75/1
75/12 77/22 77/22 77/25
78/12 79/14 79/22 81/19
81/22 82/6 82/8 82/13
82/18 84/16 84/21 85/5
86/1 86/3 86/8 86/16 86/18
86/19 86/20 88/17 89/15
90/17 90/20 90/24 91/17
93/9 93/10 94/9 94/17 95/6
95/7 100/24 101/17 101/20
102/14 102/16 102/19
102/19 103/11 104/12
104/15 105/2 105/11 105/18
109/18 110/2 114/5 114/19
114/22 115/6 115/9 115/12
115/15 115/17 116/16
117/25 118/3 120/13 123/3
123/13 123/15
nobody [1]       26/3
None [1]       39/4
NORRIS [4]       2/2 16/14 17/20
120/1
Northeast [3]       32/12 32/15
77/15
Nos [1]       22/24
not [130]
not as [1]       12/13
note [1]       71/21
noted [1]       13/20
nothing [9]       11/11 23/1
26/2 28/17 74/16 94/11
98/14 99/7 116/20
notice [5]       27/24 28/1 28/3
73/21 86/2
noticed [3]       74/7 84/25
85/24
noticing [1]       67/13
November [3]       1/7 59/25
60/3
now [56]       4/5 7/4 11/24
12/20 12/21 14/8 16/18
17/2 18/5 25/20 32/10 33/3
36/17 39/13 39/21 40/23
45/18 46/14 47/1 47/4 55/8
56/11 63/11 67/11 69/2
71/3 72/8 76/22 82/12
82/22 82/22 83/10 84/19
88/7 88/18 93/14 93/18
93/24 95/17 97/17 98/1
98/5 99/1 99/10 99/16
100/18 101/22 105/20 107/7
110/17 111/2 112/14 112/15
117/15 117/24 123/22
number [7]       3/2 12/12 19/2

**N**

number... [4]         45/16 46/1
91/11 95/19
numbers [2]          70/2 121/7

**O**

O'Brien [1]          14/25
oath [4]          92/4 93/15 94/9
104/20
object [3]          26/4 66/18
72/21
objecting [2]          5/2 8/14
objection [42]          7/23 9/5
9/23 11/14 11/15 22/20
25/8 35/10 40/4 42/1 42/6
44/22 47/14 48/20 63/22
73/25 74/23 76/20 78/9
81/1 81/13 82/15 82/24
85/2 87/9 91/9 91/15 92/23
93/23 93/25 94/10 96/23
97/5 104/4 109/4 109/6
110/18 112/15 115/1 115/21
116/6 121/22
objections [13]          3/20 3/20
12/12 14/7 15/17 15/19
15/22 16/9 16/11 16/19
118/3 123/3 123/15
observe [1]          76/6
observed [1]          75/13
obtain [1]          40/2
obtained [2]          69/3 91/8
obvious [1]          10/3
obviously [6]          9/20 13/3
16/14 16/20 119/22
occasion [2]          46/8 47/25
occasions [1]          44/9
October [9]          13/17 17/6
44/14 47/4 58/7 59/25 60/3
111/7 111/8
odds [1]          15/6
odor [3]          69/18 69/18 69/20
of -- [2]          4/20 93/19
off [12]          6/21 6/22 14/23
16/10 43/18 56/21 62/5
62/9 69/22 69/24 113/13
121/5
offender [1]          103/4
offense [4]          16/15 33/14
33/16 33/22
offer [1]          16/24
offered [1]          42/11
offering [1]          6/18
offhand [1]          41/10
office [4]          1/14 25/18
26/20 98/13
officer [2]          85/24 89/18
101/9
officers [1]          5/11
oil [5]          50/15 51/1 51/3
51/9 51/16
okay [45]          5/21 10/2 14/13
19/9 19/25 20/11 21/15
21/22 22/3 23/9 24/13 25/3
29/16 32/8 32/17 35/8
36/10 37/23 40/25 45/3
45/8 45/21 49/10 49/24
52/12 53/23 54/10 58/16
61/7 62/9 63/14 64/18
65/21 68/24 75/11 78/18
91/15 91/18 94/14 99/14
110/25 114/23 116/1 121/19

123/24
old [4]          31/21 114/11
114/12 122/2
once [6]          25/19 51/2 51/23
51/23 51/23 122/4
one [53]          3/4 4/3 8/4 8/6
8/17 8/19 8/22 9/3 9/4
10/16 12/11 12/18 13/2
14/11 14/14 16/14 16/15
16/18 17/3 19/13 19/24
20/3 23/4 25/14 28/6 30/18
34/14 35/6 35/6 45/4 45/16
46/1 53/16 55/4 55/5 55/14
68/12 68/14 69/9 76/2
79/21 96/8 96/20 97/18
98/19 101/23 116/3 118/23
119/15 121/2 121/6 121/8
123/10
one -- [1]          20/3
One's [1]          84/5
ones [5]          11/1 16/1 108/5
109/22 110/22
only [28]          4/18 5/23 7/17
10/7 12/16 13/19 13/22
14/3 16/18 20/1 47/2 71/25
72/2 88/10 92/6 92/12
92/18 92/20 104/15 107/22
108/1 109/9 110/22 114/25
115/18 118/12 122/11
123/16
open [7]          27/11 35/9 43/22
76/18 94/15 99/8 117/16
operandi [1]          116/15
operate [1]          40/15
operation [1]          82/11
opinion [2]          64/24 72/23
opportunities [2]          66/16
66/17
opportunity [9]          11/12 13/5
37/6 64/20 64/20 65/16
66/7 66/10 67/11
orange [1]          81/9
order [2]          107/7 109/15
orders [1]          80/22
ordinary [3]          22/5 22/13
22/16
other [50]          7/23 15/3 15/23
16/18 17/24 18/3 18/6 18/9
18/11 19/19 35/6 36/17
48/8 50/5 50/8 50/9 55/9
55/12 56/12 56/13 57/4
57/4 57/8 57/24 58/21
60/22 62/1 61/2 69/18 75/8
76/2 78/8 78/15 78/25 79/7
79/8 79/21 96/8 96/20 97/7
99/2 111/21 115/23 116/1
116/7 116/11 116/14 116/20
117/4 122/21
others [1]          22/23
otherwise [5]          4/24 18/3
20/2 96/10 118/25
ought [1]          19/1
our [15]          17/9 18/14 18/21
21/3 31/11 35/12 53/16
53/20 55/15 55/18 55/19
57/16 57/16 67/16 118/14
ours [1]          60/22
out [68]          4/22 6/13 6/21
6/25 10/6 10/8 10/13 10/24
11/2 13/14 15/15 16/5
16/22 18/13 23/16 29/22
30/16 34/17 34/21 43/8

43/12 45/10 45/23 48/25
49/1 51/15 52/18 52/20
53/8 54/19 55/23 56/16
57/4 57/5 62/20 62/23
62/24 63/2 63/21 64/2 64/3
64/8 64/11 64/12 64/17
64/24 64/25 64/25 65/5
65/7 65/17 65/25 67/14
69/10 70/14 70/23 76/10
76/24 79/11 82/9 88/8
88/13 99/2 113/22 114/21
117/5 117/20 123/6
outside [2]          8/11 8/12
over [13]          14/7 15/20 27/9
32/16 37/6 72/9 82/5 87/7
96/14 98/10 99/6 100/4
112/22
overrule [1]          11/15
overruled [6]          40/7 43/20
48/21 74/25 75/2 81/14
overwhelming [1]          11/17
owe [1]          65/14
own [5]          48/11 53/16 53/18
76/6 105/15
owned [1]          67/8

**P**

P-A-Y-N-E [1]          32/19
P-I-G [1]          31/16
page [2]          7/19 125/14
pages [2]          3/14 12/14
paid [5]          72/8 89/17 89/18
89/23 92/10
papers [13]          102/10 102/10
102/13 102/20 103/1 103/1
103/12 103/14 104/16 105/3
105/10 105/13 105/19
Paragraph [1]          36/15
parcel [2]          43/6 43/19
parking [2]          62/14 62/19
part [12]          43/6 43/8 43/10
43/19 81/2 90/13 102/15
105/8 105/11 105/16 105/18
118/20
particular [5]          8/6 90/1
92/15 92/18 101/7
past [2]          39/17 39/19
pattern [6]          27/4 67/13
73/21 74/8 74/10 74/11
Pauline [3]          8/8 8/12 8/20
pause [3]          31/1 99/11
119/16
pay [6]          48/6 52/8 52/21
53/11 68/15 68/18
paying [5]          14/4 55/20
55/23 56/4 72/5
Payne [2]          32/18 32/19
PCP [8]          37/14 39/20 83/22
94/25 95/14 96/3 96/13
97/4
peek [2]          25/17 26/19
peel [1]          69/24
Pelos [1]          15/6
penalties [1]          96/22
penalty [3]          96/14 97/3
97/7
penny [1]          72/17
people [23]          43/18 50/5
50/8 50/10 51/19 51/23
51/23 54/21 55/9 55/12
55/17 57/8 57/17 57/21
60/2 64/15 78/8 78/15

**P**

people... [5]          78/22 78/23
99/3 111/21 116/14
people's [3]          18/8 61/1
61/2
per [5]          19/24 52/19 72/9
73/16 73/17
percentage [1]          48/6
percentages [1]          52/16
perfect [1]          57/7
perhaps [4]          3/21 12/1 27/5
107/16
period [3]          45/20 61/25
113/21
permission [1]          34/24
person [10]          42/3 44/23
45/19 46/15 59/17 61/3
61/10 72/16 79/7 79/10
personally [1]          50/22
pertaining [2]          21/10 21/23
perusing [1]          119/12
petty [2]          10/18 11/7
phone [1]          66/15
phones [2]          15/1 115/5
115/7
physical [1]          18/17
physically [1]          75/9
pick [1]          61/19
picking [1]          119/5
pickings [1]          74/15
picture [2]          70/6 70/7
pictures [1]          115/16
piece [1]          10/11
Pig [1]          31/16
place [4]          37/17 78/21 92/6
116/15
placed [1]          82/5
places [4]          61/24 68/3 76/4
78/7
plain [3]          86/14 87/3 87/7
plan [2]          57/2 120/8
planned [1]          90/1
planning [1]          117/22
plastic [2]          69/6 71/14
plate [1]          81/12
play [7]          9/16 14/20 91/11
94/10 99/10 115/10 119/3
played [12]          13/23 93/7
117/23 118/5 118/18 118/20
119/19 120/21 121/5 121/6
121/25 122/12
playing [5]          6/8 13/21 82/9
92/21 119/18
plea [22]          34/6 34/20 35/4
35/24 36/5 36/7 36/11
36/14 37/7 37/9 38/6 38/11
38/19 86/17 96/6 97/18
99/3 99/20 101/22 102/7
104/14 104/22
plead [5]          36/14 36/16 96/2
96/8 104/19
pleading [1]          104/15
Pleasant [1]          36/12
please [7]          21/2 23/23
25/12 31/11 42/12 99/9
99/24
pled [13]          36/8 38/20 85/9
95/4 95/8 96/14 96/20
97/18 97/25 98/17 101/23
104/2 104/7
pocket [1]          67/5

point [22]          3/13 4/20 8/5
11/18 15/11 16/15 18/11
19/7 20/6 26/14 48/10 92/8
92/15 93/5 93/6 94/3 99/19
101/16 113/5 118/24 119/17
120/9
pointed [1]          99/2
points [2]          18/13 92/11
police [14]          84/24 85/3
85/16 87/8 87/16 87/18
88/7 89/1 89/8 89/11 89/16
89/18 89/21 91/4
portion [1]          92/18
portrait [1]          10/15
position [1]          92/16
possession [11]          33/17
36/21 39/14 61/6 67/16
67/16 83/11 101/10 101/11
101/12 101/23
possibility [2]          10/17
107/25
possible [5]          13/8 16/1
66/12 67/12 96/18
possibly [4]          78/25 96/11
106/19 107/23
posted [1]          86/10
poster [1]          86/21
posters [5]          85/21 86/4
86/9 86/9 86/11
pounds [1]          40/12
powder [25]          50/17 50/19
50/20 51/1 51/8 51/20 56/1
56/18 56/18 60/14 60/15
69/22 70/3 70/4 70/7 70/8
70/10 70/15 70/25 71/2
71/4 71/7 84/5 84/9 84/17
powdery [1]          51/2
powerful [1]          69/20
prescription [1]          46/20
present [6]          20/14 31/4
58/16 73/11 77/11 122/20
presented [1]          13/3
presently [1]          31/23
press [1]          70/20
presumably [1]          8/10
pretty [4]          74/12 105/23
105/25 118/2
prevented [1]          116/19
previous [2]          8/15 87/12
price [3]          51/13 56/2 72/8
prices [1]          90/4
pricing [1]          72/4
principal [1]          6/3
printed [1]          69/25
prior [14]          32/10 37/20
56/5 76/6 91/23 93/12
94/21 97/16 98/16 101/8
102/3 102/8 102/24 106/10
prison [1]          105/24
probably [4]          4/24 11/17
19/17 58/9 68/23 74/18
92/4 92/24 93/3 94/8
120/17 121/1
probation [5]          95/8 98/3
107/16 107/19 107/23
probative [1]          99/7
problem [8]          9/4 43/7 43/11
43/13 93/16 94/4 118/25
122/25
problems [2]          35/6 123/13
procedure [1]          123/16
proceed [3]          20/11 31/2

31/6
proceedings [5]          1/24 31/1
99/11 119/16 126/6
process [7]          6/4 47/10
50/25 51/20 51/22 51/23
70/9
produced [1]          1/25
product [1]          70/17
proffer [3]          85/10 85/12
85/15
promise [1]          30/15
promised [2]          39/1 123/23
promises [1]          39/3
proof [1]          24/11
property [1]          25/18
proposing [1]          121/15
prosecuting [1]          27/3
prosecutor [1]          109/23
provide [2]          24/23 24/24
provided [1]          47/3
public [1]          40/16
pull [1]          34/19
pump [3]          79/4 79/5 79/5
purchase [3]          47/11 50/1
71/7
purchased [2]          53/3 58/8
purchasing [1]          57/5
purpose [4]          11/18 26/9
91/23 91/23
purposes [7]          14/21 15/19
16/19 17/11 65/22 92/16
109/23
put [29]          4/8 6/6 6/7 7/5
8/1 11/20 22/9 23/6 23/9
25/11 29/4 29/4 35/15 50/3
50/22 51/5 51/6 51/8 51/11
51/14 53/16 53/18 60/23
70/15 79/5 82/7 121/16
122/21 123/4
putting [6]          5/25 50/13
50/16 67/5 74/24 85/21

**Q**

quality [5]          50/11 51/4
51/4 72/3 72/7
quantities [14]          48/15
48/19 48/23 48/24 49/17
49/21 49/25 52/7 53/25
54/5 58/3 58/20 59/5 69/3
quantity [1]          53/13
quarter [5]          10/16 56/15
57/11 117/18 123/25
quarters [2]          56/16 56/18
question [26]          3/6 19/6
25/19 25/24 60/2 73/1
80/16 83/4 83/6 83/16
86/19 89/7 92/12 92/19
101/7 104/3 104/8 104/11
107/19 112/2 112/16 113/1
115/3 115/24 117/25 120/22
questioning [1]          99/6
questions [18]          23/3 27/8
27/9 28/19 28/20 59/7
71/13 86/11 86/21 86/22
90/3 93/4 97/7 104/22
116/1 116/25 117/13 118/23
quite [3]          11/7 18/19 36/19
quote [2]          6/10 7/21
quotes [6]          5/1 5/14 7/19
7/22 7/22 8/2

**R**

raised [1]          32/13
ran [1]          29/16
range [1]          106/15
rates [1]          52/23
RE-DIRECT [1]          28/22
reactivated [1]          17/12
reactivation [1]          17/15
read [6]          12/3 18/8 87/21
103/21 103/22 105/4
reading [2]          11/22 121/15
reads [1]          122/10
ready [6]          20/7 20/16 20/18
31/2 31/6 65/3
real [4]          21/5 41/9 49/18
69/17
realize [1]          13/2
realized [1]          56/20
really [20]          12/15 15/6
16/22 49/1 49/14 50/1
50/11 50/15 52/8 56/22
64/12 66/22 70/14 70/15
72/16 76/11 111/25 114/25
115/18 118/17
really -- [1]          15/6
reason [10]          26/12 26/20
60/25 76/18 85/19 85/20
88/7 88/10 106/1 122/22
recall [4]          17/7 17/18
24/24 28/2
receive [2]          59/9 59/10
received [1]          95/8
receiving [1]          46/22
recent [2]          3/15 3/17
recently [1]          14/3
recess [3]          76/21 77/1
124/1
recognize [1]          36/4
recollection [1]          77/5
record [13]          11/9 13/14
15/19 17/4 17/13 35/5
40/17 45/24 46/3 46/5 46/7
77/8 126/5
recorded [1]          1/24
records [3]          15/5 22/17
22/19
recovered [1]          15/1
RECROSS [1]          125/2
redirect [2]          99/5 125/2
redone [1]          5/20
references [1]          6/21
reflect [2]          46/3 46/8
reflected [1]          118/16
reflects [1]          46/5
refresh [1]          77/5
regard [1]          93/22
regarding [3]          37/19 114/23
115/23
registration [1]          86/23
relationship [9]          48/10
58/6 64/23 65/22 67/10
67/22 67/25 72/10 79/11
relationships [1]          57/8
relevant [2]          3/14 19/18
97/23 98/20
religious-type [1]          27/23
remain [1]          87/21
remained [1]          82/19
remarkably [1]          123/13
Remax [5]          20/9 21/5 21/7
22/5 24/17

remember [11]          13/25 28/10
28/12 28/14 77/16 78/2
88/5 95/15 95/17 95/18
99/22
remind [2]          28/25 37/18
removal [2]          39/24 40/21
rental [7]          21/4 22/5 23/15
23/19 23/22 25/18 26/20
repeat [13]          102/10 102/13
102/20 103/1 103/1 103/4
103/12 103/14 104/16 105/3
105/10 105/13 105/19
repetition [1]          123/2
report [1]          77/3
Reporter [2]          1/21 126/3
representation [3]          5/7
9/21 94/11
request [1]          29/22
requesting [1]          94/5
requests [1]          119/10
reregister [1]          86/25
resolve [2]          11/1 77/2
resolved [2]          10/19 16/11
respect [2]          16/2 34/19
responded [1]          4/24
response [3]          52/1 52/4
121/23
responsible [1]          61/2
rest [2]          65/15 77/7
result [1]          82/4
resume [2]          76/25 117/18
reviewed [1]          22/3
rid [2]          3/22 7/21
ride [1]          60/25
ridiculous [1]          11/22
right [131]
rights [2]          87/21
ring [1]          25/4
rock [1]          84/7
rolling [1]          19/3
room [3]          1/22 110/17
120/24
roughly [2]          90/2 90/2
RPR [2]          1/21 126/12
RUDOLPH [1]          2/6
rule [9]          3/22 9/5 9/11
9/19 11/3 15/22 15/24
118/3 118/8
ruled [1]          98/23
ruling [1]          4/23
rulings [3]          4/7 5/23
117/25
run [2]          12/1 67/14
running [1]          10/8 111/25
ruptured [1]          82/10

**S**

safer [2]          79/19 79/19
safety [1]          40/11
said [43]          6/22 6/23 39/13
40/20 47/4 47/17 47/19
50/7 51/18 55/13 55/16
62/1 61/17 61/23 62/18
69/2 71/14 73/3 73/21
75/16 76/3 77/13 81/16
83/19 84/12 86/9 87/3
87/22 89/20 90/9 96/19
97/6 103/17 103/17 104/25
108/1 111/21 112/2 112/5
112/12 112/13 112/17 114/6
said you [1]          59/21
Sam's [11]          61/14 61/15

61/18 62/10 62/12 62/13
62/17 62/18 62/22 65/4
66/9
same [24]          37/13 41/20 62/7
62/9 68/9 70/17 76/13
76/14 76/16 78/19 78/21
78/22 81/5 97/14 98/13
110/2 116/15 116/15 116/15
120/12 120/17 121/16 122/2
123/3
sampling [1]          9/1
Saran [1]          69/11
sat [1]          7/3
satisfied [1]          67/25
satisfy [5]          109/2 109/7
109/9 109/15 109/18
satisfying [1]          109/4
save [1]          25/11
saved [1]          20/3
saw [8]          3/24 26/13 26/15
51/23 59/2 59/4 85/16
86/13
say [83]          3/10 3/24 4/14
5/1 6/1 6/15 6/20 7/18
8/24 9/7 9/9 9/23 10/1
10/5 10/8 11/16 13/6 13/11
15/10 15/11 16/14 17/3
18/24 33/10 34/5 35/3 38/9
39/25 41/20 42/10 44/15
44/24 50/9 50/16 50/22
52/17 53/18 54/8 54/13
54/15 54/23 56/24 58/4
58/6 59/4 60/3 60/9 60/16
60/22 61/14 62/12 63/8
64/18 66/7 66/8 66/25
69/11 72/5 74/1 78/14
78/14 79/8 85/4 89/8 93/20
96/19 103/11 105/3 106/2
107/20 111/3 111/22 113/5
113/6 113/7 113/8 113/12
113/25 116/13 117/11
117/12 120/18 122/10
say -- [1]          74/1
saying [20]          8/11 9/14
11/21 12/7 12/20 15/8 35/2
39/19 49/10 51/24 70/12
86/18 89/5 92/20 93/6
102/23 109/20 111/24
112/24 113/3
says [7]          5/16 7/21 8/11
10/22 11/25 12/5 43/2
scale [5]          54/24 54/25 55/1
55/2 55/7
scales [1]          55/3
schedule [1]          18/13
school [5]          32/14 32/17
32/21 32/23 32/25
scope [1]          25/8
screen [1]          23/6
se [1]          52/19
search [9]          17/8 18/2 25/6
25/16 26/4 26/18 26/22
27/1 122/13
searches [4]          18/1 18/3
18/6 18/9
seat [3]          44/20 45/16 46/1
seated [4]          44/18 45/17
45/18 45/25
seats [1]          45/2
second [4]          8/4 8/22 23/5
74/14
secretary [2]          34/19 35/16

143

**S**

security [1]    19/2
see [33]    4/6 4/15 8/4 9/18
11/12 12/14 12/15 15/22
23/10 23/16 26/7 29/8
29/14 36/4 44/15 45/6
45/10 45/10 45/15 50/5
50/8 50/10 64/1 64/5 70/13
73/19 76/7 81/12 85/18
94/1 99/24 100/18 112/9
seeing [8]    28/12 28/14
45/7 45/19 45/20 45/22
78/15 79/1
seeing the [1]    45/19
seemed [1]    50/5
seems [1]    118/21
seen [7]    12/23 21/16 87/1
92/7 93/8 93/17 123/13
SEGAL [1]    1/10
seized [2]    17/15 26/2
selection [2]    13/16 14/1
self [1]    15/4
sell [10]    33/11 51/13 53/1
53/25 54/2 54/3 54/15
56/20 84/7 88/22
selling [1]    87/12
semantics [1]    9/10
send [2]    118/9 118/15
sending [1]    122/12
sense [6]    30/6 51/3 61/24
64/22 70/21 97/25
sensitive [1]    19/6
sent [3]    82/10 119/9 119/9
sentence [12]    38/7 38/9
39/1 96/18 102/18 102/21
103/7 104/8 106/19 107/4
107/17 108/2
sentenced [1]    38/24
sentencing [10]    37/12
37/16 38/3 38/4 38/18
39/12 106/7 106/8 106/9
106/15
separate [4]    19/20 48/11
81/3 83/4
September [6]    7/20 7/24
8/7 9/25 100/2 100/11
sequence [1]    86/20
series [2]    14/20 59/7
SESSION [1]    1/9
seven [1]    120/15
several [4]    5/14 17/10
44/9 66/11
shades [1]    28/8
shake [1]    53/8
she [11]    6/9 9/12 15/2
25/17 26/14 26/21 26/21
26/25 27/2 34/20 78/11
she's [4]    4/24 5/19 6/9
12/13
sheet [1]    19/21
sheets [1]    19/23
shirt [3]    46/1 46/9 46/16
shopping [4]    68/8 75/16
75/19 75/20
short [3]    14/18 30/11
76/21
shortly [1]    78/2
should [13]    6/20 9/9 9/15
19/21 30/11 66/23 67/10
76/13 77/4 92/13 115/25
122/23 123/1

shouldn't [1]    27/5
show [9]    4/21 17/8 21/16
34/9 35/21 51/19 51/20
93/12 115/13
showed [2]    51/22 99/20
showing [3]    15/5 21/19
51/18
shows [1]    77/8
shy [1]    100/6
sights [1]    64/15
signature [1]    36/7
signed [8]    34/19 34/20
34/23 34/25 35/2 35/15
99/20 101/22
silent [1]    87/21
Silver [1]    21/5
simple [3]    10/23 113/22
116/7
simply [2]    105/2 123/20
since [2]    5/3 23/11
sir [16]    20/25 21/7 23/1
23/15 24/9 31/10 31/15
32/7 77/24 79/25 86/17
108/1 110/3 110/10 110/17
113/15
sit [5]    9/5 9/8 9/18
115/25 119/3
sitting [6]    11/19 11/21
46/14 61/17 62/18 87/17
situation [5]    49/2 49/6
49/11 50/3 61/4
six [7]    111/14 112/6 112/7
112/22 113/18 120/5 120/15
six-month [2]    61/25 113/21
size [1]    40/13
skeptical [5]    49/1 49/3
49/5 49/5 49/14
siender [1]    25/1
slim [1]    74/15
slowly [2]    50/25 51/1
small [2]    49/18 49/19
smaller [1]    49/16
smiling [1]    71/20
Smith [1]    18/20
sneak [1]    25/17 26/19
snitch [1]    82/23
so [171]
so -- [2]    9/6 12/15
social [2]    14/20 65/22
soda [3]    51/10 51/12 51/14
sold [11]    39/17 39/19
53/20 53/25 54/10 54/18
56/17 56/18 56/19 57/11
57/20
solicit [2]    57/4 60/24
solid [1]    67/9
some [39]    3/13 4/2 4/20
4/23 5/4 6/8 11/6 11/18
12/13 13/13 14/22 15/1
16/17 16/24 18/11 18/16
18/19 19/7 20/9 21/10 22/8
28/4 51/22 61/24 65/10
68/16 68/17 69/12 73/8
78/5 99/1 99/19 111/3
111/13 117/24 118/4 119/7
120/8 122/16
some -- [1]    73/8
somebody [10]    6/18 8/11
11/25 26/19 40/13 48/16
59/10 79/5 85/21 90/16
somebody's [1]    70/7
someone [1]    41/1

something [25]    6/22 7/1
10/18 11/13 16/14 17/17
17/18 18/18 18/21 34/16
39/5 44/18 49/11 49/12
63/15 84/25 93/13 95/21
103/19 106/21 109/12
109/14 111/23 113/10 122/6
sometimes [3]    70/1 75/16
75/17
somewhere [3]    5/18 111/10
123/23
soon [2]    35/15 123/6
sooner [1]    65/2
sorry [22]    13/12 14/10
14/13 24/6 29/19 34/14
38/14 41/16 41/19 44/21
45/1 47/15 49/3 52/10
56/24 59/7 59/22 71/13
72/25 76/2 79/17 97/12
sort [9]    4/6 5/24 10/10
10/13 32/4 70/18 70/22
78/24 93/19
source [4]    42/20 43/2 48/1
48/16
Southeast [3]    32/16 80/17
80/18
speak [5]    14/18 23/4 27/1
32/6 77/24
speaker [1]    10/22
speaking [2]    120/19
Special [2]    14/25 17/25
specific [4]    5/22 14/21
94/11 118/3
specific -- [1]    94/11
specifically [11]    21/9
28/11 40/24 47/5 50/9
62/13 94/3 101/13 117/7
118/8 119/8
spell [1]    31/13
Spence [3]    8/8 8/13 8/20
spend [5]    10/25 11/2 26/1
36/10 119/5
spending [2]    32/10 65/9
spoon [2]    71/25 72/2
sports [8]    63/15 63/20
63/23 64/6 66/2 66/3 66/6
66/20
spot [1]    76/13
spots [2]    61/19 61/23
Spring [1]    21/6
squeeze [1]    70/23
stack [1]    69/6
stamp [1]    70/16
stand [6]    14/8 19/8 45/9
46/11 46/15 119/1
standing [1]    26/4
start [12]    6/16 18/25
44/11 48/10 48/15 48/18
49/21 55/11 58/2 61/7
67/21 113/12
started [26]    11/19 14/4
43/5 48/18 48/25 49/1
49/16 50/4 50/7 51/18
52/25 55/23 56/12 56/15
57/5 58/7 60/5 60/5 60/6
60/7 60/16 60/25 67/13
75/20 75/21 76/10
state [1]    18/7
statement [10]    3/15 42/25
43/21 87/19 87/23 89/2
91/23 93/13 101/15 101/16
statements [5]    24/10 42/15

**S**

statements... [3]                42/18
42/23 43/15
STATES [6]           1/1 1/3 1/11
3/3 3/8 3/11
station [2]                62/6 79/4
stations [1]                78/23
status [1]                103/4
stay [1]                9/12
stayed [1]                81/24
stenography [1]                1/24
steps [1]                40/2
sticker [3]           85/17 85/19
86/24
sticky [1]                69/17
still [9]           19/15 38/24 56/2
82/14 110/11 110/12 110/12
110/13 110/13
stipulation [1]                34/12
stood [2]           44/23 45/4
stop [5]           10/14 10/16 50/7
72/8 86/4
stopped [5]                85/19 85/20
86/6 86/8 86/8
store [1]                70/12
stores [1]                65/1
straight [3]                56/21 72/19
73/4
street [10]           1/14 1/17 10/5
17/6 25/7 33/20 80/17
80/18 81/24 82/17
stretch [1]                65/17
stretches [1]                55/16
Stricken [1]                74/5
strike [4]           60/2 74/3 83/6
111/2
struck [1]                10/1
stuff [2]           10/13 118/5
sturdy [1]                75/23
subject [2]           4/7 35/12
subjected [1]                102/21
submitted [1]                24/10
substance [7]                51/1 51/2
69/13 69/16 95/12 95/13
95/14
substance -- [1]                95/12
substitute [4]                14/9 34/24
34/25 35/5
such [1]                119/24
sufficient [1]                15/11
sugar [1]                70/25
suggest [1]                119/23
suggesting [1]                120/25
suggestions [1]                4/10
Suite [3]           1/18 2/7 2/11
summarize [1]                9/13
summary [14]           5/6 5/8 6/15
6/17 6/17 7/11 13/4 117/25
118/20 118/25 119/1 119/1
119/5 122/4
Summit [2]           15/3 26/22
Superior [5]           37/14 95/2
98/10 102/4 102/25
supplied [3]           3/5 3/12
17/14
supplies [1]                76/19
supposed [5]                22/18 43/9
46/20 46/23 61/5
supposition [2]           7/1 11/23
suppositions [1]                7/9
suppress [1]                70/11

sure [24]           4/20 17/10 18/8
23/8 24/3 28/5 30/25 36/20
37/22 46/15 61/1 61/4
63/15 72/18 72/19 94/6
94/12 99/10 105/23 105/25
118/6 120/9 121/1 121/17
surgery [1]                82/18
surprise [2]           116/13 116/17
surprised [1]                117/10
surveillance [1]                4/16
suspect [2]           19/9 123/21
sustain [1]                116/3
sustained [10]           82/25 83/2
83/2 87/10 96/24 97/1 97/1
110/19 112/16 115/3
sustaining [1]                11/14
sweater [2]           44/20 45/2
SWORN [2]           20/22 31/7

**T**

tacky [1]                75/20
tags [8]           63/10 84/25 85/4
85/7 85/16 85/18 86/25
87/1
take [29]           5/19 12/9 16/13
19/13 19/20 21/21 30/11
35/23 36/2 36/3 37/17
38/23 40/2 40/10 45/9
50/24 60/24 67/10 70/11
70/14 76/21 105/14 106/9
106/12 107/14 117/15
121/15 121/16 123/21
taken [2]           77/1 124/1
takes [1]                12/2
taking [4]           16/17 19/8 50/4
50/8
talk [16]           6/7 8/16 14/25
40/23 42/14 42/19 43/25
66/14 66/21 66/22 70/21
71/22 84/24 88/7 122/23
123/1
talked [11]           17/25 18/6
44/9 66/2 71/3 77/6 79/10
87/25 91/24 107/3 122/19
talking [10]           10/4 36/10
42/2 58/19 62/20 62/23
65/21 73/10 78/2 90/7
90/18 94/13 97/19 107/13
107/13 116/21 122/6
tall [1]                25/1
tan [1]                45/1
tape [11]           9/6 92/17 92/18
99/9 99/13 100/18 100/23
101/5 101/6 101/8 101/10
tapes [7]           117/24 118/1
118/4 119/9 123/8 123/9
123/13
tapped [2]           115/5 115/7
Tech [1]                32/25
tell [56]           4/23 4/25 5/10
9/8 16/22 24/4 33/6 39/7
39/23 43/24 44/3 45/21
45/25 46/18 47/6 47/8 47/9
47/16 48/3 48/4 48/7 49/24
50/8 50/17 50/22 51/2
56/11 57/14 60/3 61/10
61/20 63/23 66/22 71/20
71/23 74/7 76/9 78/18 79/3
79/9 85/3 88/12 89/1 89/11
89/16 90/21 100/16 101/14
101/18 109/9 109/16 109/20
109/21 123/12 123/14

123/20
telling [13]           11/14 41/16
41/25 47/11 48/5 76/17
88/18 107/11 109/8 109/12
109/22 110/15 110/16
tells [1]                85/12
ten [25]           21/8 24/18 37/3
38/19 38/24 68/13 68/15
68/23 69/2 76/22 76/25
102/5 102/7 103/7 105/14
106/23 107/2 107/5 107/7
107/10 107/15 107/23 108/2
108/8 110/13
ten-year [3]           104/14 105/12
106/2
tenant [2]           27/21 29/2
tendon [2]           82/8 82/10
termination [1]                29/13
terms [7]           3/21 4/19 14/17
37/12 38/6 58/5 117/24
terrible [1]                60/1
testified [5]           25/17 25/17
26/18 111/17 113/18
testify [2]           6/9 39/9
testifying [2]           93/2 110/21
testimony [8]           6/13 26/5
75/1 112/10 113/15 113/24
115/19 116/21
Texas [1]                15/5
texture [1]                50/14
than [18]           12/9 13/4 16/18
18/16 48/8 50/2 50/2 79/20
93/2 98/25 106/22 107/23
108/2 110/15 114/15 114/17
114/20 123/24
thank [15]           20/20 23/1 23/2
23/11 24/12 30/8 30/9
35/17 37/24 38/15 76/23
79/25 80/3 99/7 123/24
Thanksgiving [1]                20/16
that [571]
that -- [4]           83/1 103/18
104/10 112/24
that's [6]           5/23 6/11
7/15 7/16 8/13 10/16 10/23
11/4 12/7 12/13 12/18
13/10 14/4 14/13 14/14
14/14 15/6 15/18 16/3 16/6
19/11 19/25 20/1 25/24
26/9 29/4 29/21 30/23
32/16 36/13 38/20 38/20
38/24 43/11 48/8 49/20
51/15 52/17 53/17 54/9
55/14 55/18 55/18 60/1
60/10 65/15 66/18 67/19
69/21 70/10 73/9 73/24
74/5 77/9 77/18 79/25
80/13 80/13 80/14 81/3
84/7 86/6 86/6 86/8 86/13
86/20 88/10 88/20 89/19
93/5 95/2 96/4 97/18 97/21
104/15 105/11 105/16
105/16 107/18 108/1 109/16
109/18 109/18 109/21 112/7
112/7 112/9 112/22 113/5
113/7 113/11 113/23 113/25
114/2 116/21 117/6 120/20
120/21 120/25 122/8 122/10
123/24
the -- [2]           8/4 96/25
their [10]           13/6 18/16
18/17 18/22 19/7 60/24

their... [4]              72/18 98/5
110/11 119/5
them [67]              4/3 4/3 7/14
8/16 11/14 13/7 13/8 16/22
18/23 22/9 23/6 23/9 23/10
43/18 46/22 49/11 51/19
51/21 51/22 55/7 56/16
56/17 57/6 57/23 64/2 64/5
67/19 78/5 81/12 87/25
88/4 88/12 88/15 89/25
90/15 90/21 90/25 93/14
100/14 100/16 101/8 101/14
101/18 108/11 109/2 109/4
109/7 109/9 109/15 109/18
110/5 118/4 119/3 119/3
119/12 120/12 120/22
120/23 121/17 122/3 122/3
122/13 122/17 122/23 123/5
123/12 123/12
themselves [3]          4/14 13/23
57/22
then [42]          4/20 4/21 5/22
6/20 10/25 11/13 11/15
14/21 16/10 20/9 22/22
24/19 25/10 25/11 30/22
32/22 43/5 56/15 57/4
58/14 60/16 61/7 62/10
65/14 66/6 67/14 74/12
82/2 87/1 88/15 92/11
94/10 95/5 95/10 98/1
103/19 111/23 113/9 119/2
120/21 121/11 121/12
there [112]          3/7 4/11 4/12
4/18 5/11 5/14 6/10 6/14
7/18 7/22 7/23 8/15 8/24
9/22 9/23 9/25 10/15 11/11
11/20 11/21 11/23 13/9
13/18 13/18 13/22 13/23
15/15 16/1 16/12 16/15
18/1 18/6 18/9 19/13 23/24
24/2 24/20 25/6 25/14 26/2
26/5 26/15 26/25 27/4
27/15 27/18 29/7 30/20
31/1 38/3 38/11 38/12
38/17 38/25 50/7 51/11
51/15 55/8 56/11 59/16
61/8 61/16 61/16 62/6
62/11 62/23 63/17 63/23
64/14 64/24 64/25 65/1
65/1 65/5 65/7 65/18 66/4
67/21 69/14 70/6 70/24
72/8 73/4 73/15 74/21 75/5
81/11 82/5 82/7 85/24
86/17 86/18 87/7 90/12
92/12 93/9 93/10 93/17
96/14 99/11 104/15 111/13
113/9 116/11 117/4 117/5
117/25 118/17 118/22
119/16 121/12 123/15
there's [8]          5/15 5/24 6/12
11/24 62/5 75/1 84/16
121/4
thereabouts [1]          84/13
therefore [2]          86/24 121/14
therein [1]          6/8
these [41]          3/21 5/1 5/4
6/5 6/8 9/20 10/18 11/7
11/17 12/11 16/19 21/11
21/16 22/13 22/17 22/18
24/9 26/2 42/14 42/23

43/12 43/20 57/9 57/24
65/15 65/21 66/16 68/3
70/3 79/7 114/23 115/23
116/14 116/25 118/1 118/4
119/1 121/14 122/5 123/9
123/13
they [111]          4/14 8/16 10/19
10/19 15/20 16/20 18/24
19/1 21/25 26/19 27/5 28/9
38/23 40/17 47/2 51/24
51/24 52/1 52/20 57/21
62/22 62/23 63/21 64/2
64/11 70/11 70/11 70/13
70/15 70/16 70/20 70/22
72/17 72/18 79/9 81/9 82/7
82/9 82/10 84/7 84/24 85/3
85/18 85/20 86/12 86/12
86/13 87/21 87/25 89/24
96/2 96/3 96/7 96/19 96/19
96/20 98/3 98/5 98/10
100/16 101/7 101/13 102/13
102/18 102/20 103/14
103/14 103/17 103/19
103/20 105/13 105/18
106/15 108/2 108/8 108/19
108/22 108/25 109/5 109/12
110/15 111/22 111/22
116/20 116/23 116/24
118/22 119/6 119/7 119/9
119/9 119/10 119/10 120/21
121/2 121/3 121/11 121/20
122/2 122/11 122/15 122/15
122/18 122/24 123/3 123/8
123/12 123/14 123/16
123/17 123/22
they'll [1]          122/3
they're [22]          5/11 7/22 9/1
13/4 16/2 16/9 30/17 43/8
43/12 43/14 98/5 98/15
99/1 105/9 108/5 108/6
118/19 118/21 119/10
120/19 123/7 123/10
they've [4]          7/4 13/3 121/9
121/24
thing [23]          3/4 5/23 7/18
10/7 14/1 17/24 18/11 19/5
26/6 28/8 57/3 64/21 67/15
70/13 76/2 76/11 79/6
80/23 92/22 97/15 98/4
116/15 119/24
things [32]          4/14 4/15 4/23
5/11 5/22 10/18 11/7 16/12
17/3 26/2 27/5 40/16 43/12
48/7 50/14 62/21 63/19
64/22 65/21 70/17 71/23
71/23 72/20 78/23 86/10
87/22 90/4 98/24 115/18
119/12 120/23 121/24
think [55]          5/13 6/2 7/25
9/15 10/3 11/1 11/4 12/7
12/8 12/10 15/11 16/2
18/12 18/22 20/1 22/13
25/9 27/8 28/5 38/19 38/19
38/24 44/20 49/12 50/3
53/2 58/9 59/20 63/15 67/3
68/13 68/13 72/21 73/17
74/2 75/22 81/3 81/24 91/8
94/11 95/24 97/15 100/6
107/14 110/14 119/15
120/20 121/10 121/19 122/6
122/8 122/15 122/23 123/1
123/4

thinks [3]          9/9 72/24
110/15
third [2]          46/5 90/21
Thirty-four [2]          31/22
95/23
thirty-some [1]          90/9
Thirty-three [1]          94/16
this [133]
this – [1]          29/7
those [24]          4/3 4/18 7/21
13/21 13/22 13/24 16/4
21/21 21/23 22/3 22/4 22/9
24/23 27/23 27/24 57/11
68/15 81/12 84/25 87/22
114/25 115/18 119/5 121/24
though [5]          24/3 25/22 29/8
64/23 102/1
thought [6]          26/12 79/24
85/20 92/14 92/18 118/24
thousand [5]          55/25 56/6
56/14 56/25 57/1 57/1
60/10 60/19 60/20 60/21
65/8 65/13 65/14 66/10
67/5
three [7]          15/12 22/19
74/16 88/5 88/16 98/19
122/7
three-year [1]          96/18
through [35]          4/22 6/5 6/7
10/25 11/19 12/3 12/10
12/16 12/17 15/12 15/14
21/14 21/20 22/10 22/22
41/4 41/14 43/16 48/16
48/19 48/24 50/13 50/13
50/14 50/15 50/25 53/17
64/22 68/6 81/12 103/25
114/6 119/2 119/12 121/6
throwing [2]          43/8 43/12
tickets [1]          7/21
time [78]          4/1 10/12 10/13
10/23 11/2 12/22 13/3
15/11 19/12 20/4 22/8
22/10 25/11 26/1 27/15
27/18 32/10 34/8 36/24
36/25 37/2 42/11 43/5 44/3
45/7 45/18 46/21 53/1 55/8
56/2 56/7 56/11 58/7 58/9
58/17 59/2 59/16 61/17
62/21 63/4 64/14 65/18
67/8 67/21 68/10 68/12
68/14 69/3 69/25 70/1
70/16 73/13 73/14 78/19
78/22 85/7 85/23 88/1 88/4
90/22 94/3 94/8 95/4 96/21
101/19 102/5 104/14 111/4
111/8 111/11 112/7 114/3
114/20 117/18 119/5 120/9
120/23 123/19
timeframe [3]          29/25 30/6
44/11
timeline [11]          3/21 4/4
10/10 11/19 13/15 13/19
14/22 15/13 15/15 16/19
16/21
timelines [1]          9/21
timely [1]          16/9
times [30]          4/11 4/12 7/18
7/23 27/14 61/15 62/11
73/10 73/18 73/22 74/21
75/5 111/18 112/3 112/5
112/6 112/6 112/7 112/7
112/9 112/12 112/17 112/22

## T

times... [7]       112/23 113/3
113/7 113/15 113/22 113/23
114/1
timing [2]       10/3 14/17
to -- [2]       29/16 91/1
today [5]       12/23 14/23
44/16 88/18 88/21
together [3]       22/10 51/12
70/20
told [20]       6/2 6/2 18/5
25/2 47/16 60/11 88/4
88/15 88/21 89/18 89/21
89/25 90/2 90/15 90/25
100/25 101/8 102/5 106/6
119/22
tomorrow [9]       10/14 12/9
12/24 14/24 15/16 16/10
17/1 17/21 19/16
too [6]       12/21 29/1 34/18
48/8 56/22 122/1
took [7]       4/2 6/21 6/25
10/6 53/16 56/16 69/10
top [3]       24/2 24/6 56/21
total [2]       58/5 118/10
totally [1]       98/9
touch [1]       111/24
transaction [5]       47/5 62/23
66/12 83/14 83/16
transactions [12]       43/4
58/2 58/19 58/20 66/3
74/21 75/5 111/11 114/23
114/24 115/19 117/7
transcribed [2]       8/25 121/6
transcript [8]       1/10 1/24
5/2 5/4 9/12 26/25 121/4
126/5
transcript -- [1]       9/12
transcripts [15]       3/6 5/1
9/2 117/22 118/16 119/9
121/1 121/3 121/14 121/16
121/21 121/22 121/25 123/8
123/9
transferred [2]       68/4 68/5
trash [2]       39/24 40/21
travels [1]       121/12
treatment [3]       80/11 80/14
80/17
trees [1]       86/10
trial [5]       1/10 10/13 96/10
106/2 110/25
tried [1]       86/24
trouble [2]       77/23 88/8
troubled [2]       119/7 123/16
truck [5]       40/12 62/25 63/3
63/8 63/8
trucks [1]       40/11
true [2]       74/5 87/16
trust [2]       65/10 66/18
trusted [1]       67/18
truth [16]       39/9 42/11
43/13 88/12 88/16 93/15
94/2 100/16 109/8 109/12
109/16 109/20 109/21
109/22 110/15 110/16
truthful [1]       108/22
try [9]       10/17 48/10 65/16
66/17 67/12 67/15 74/13
107/18 111/23
trying [9]       25/10 45/6 88/8
93/12 112/19 113/6 113/7

113/8 113/11
Twelve [2]       60/10 114/1
Twenty-six [2]       56/6 57/1
Twenty-three [2]       55/24
55/25
twice [1]       73/18
two [38]       4/3 8/16 8/19
8/20 12/14 12/18 13/20
53/3 53/9 53/14 55/3 55/13
57/20 69/6 69/6 69/8 69/9
69/10 74/16 78/19 92/24
93/1 95/8 95/9 95/11 95/25
96/7 112/5 112/6 112/7
112/12 112/17 112/22 113/3
113/15 113/21 118/22 122/7
two-minute [1]       91/9
two-minute -- [1]       91/9
type [4]       61/3 61/4 65/5
69/12
typical [1]       40/3
typically [1]       56/4

## U

U.S [5]       1/14 1/21 36/18
36/19 98/13
Uh-huh [2]       99/23 100/3
ultimately [8]       33/24 38/6
48/15 49/21 52/25 61/7
93/14 122/11
unbelievable [1]       52/4
uncommon [2]       73/7 73/8
under [8]       38/11 92/4 93/15
94/9 102/7 104/20 106/20
109/5
understand [13]       70/5 75/10
78/10 83/16 89/7 97/14
102/23 103/23 103/24 109/6
115/2 115/23 123/18
understanding [7]       5/5
37/16 38/2 38/21 39/7 39/8
108/4
understands [1]       16/20
understood [2]       7/15 104/25
Unfortunately [1]       11/20
unheard [1]       72/7
uniform [1]       80/8
unindicted [1]       42/22
unit [2]       82/22 83/1
UNITED [6]       1/1 1/3 1/11
3/3 3/8 3/11
universe [1]       118/10
unlawful [3]       95/12 95/13
95/14
unless [3]       9/5 109/5
121/23
unrelated [1]       97/13
unsigned [4]       35/4 35/15
35/24 99/21
until [13]       3/25 11/12 14/3
15/16 16/11 18/5 19/10
19/19 71/1 74/18 93/21
93/23 111/8
unwrapped [1]       70/23
up [45]       4/21 5/25 13/8
13/21 14/9 15/13 16/13
16/17 23/17 28/4 28/4 32/6
33/4 41/12 41/16 41/20
44/4 44/23 45/4 45/9 51/19
54/19 54/19 54/20 58/14
59/5 60/16 60/23 67/8
73/18 74/13 78/21 79/5
85/21 86/17 93/21 93/23

96/14 102/2 104/8 114/4
114/14 114/16 117/9 123/5
urging [1]       13/8
us [24]       14/2 17/11 18/16
41/16 45/25 47/16 57/18
62/21 63/23 65/8 65/10
65/10 65/14 65/16 66/17
66/18 66/19 67/18 71/25
72/2 107/11 116/8 119/12
122/11
USC [2]       36/16 36/17
use [9]       5/3 10/11 13/4
34/22 37/20 75/19 91/22
116/25 123/12
used [1]       3/6 51/21 71/4
71/22 75/16 75/17 95/22
usual [1]       99/3

## V

vacated [5]       26/9 26/16
29/1 29/2 30/4
vague [1]       78/9
varied [2]       112/13 113/12
varies [2]       69/25 70/2
various [12]       6/19 14/20
16/12 37/9 54/22 59/12
61/13 61/23 69/10 76/3
78/7 90/3
vary [1]       73/17 112/14
112/15
vehicle [3]       40/11 40/16
63/9
verbatim [2]       5/6 9/13
verdict [2]       19/21 19/23
verify [1]       118/22
version [8]       4/7 35/4
versus [8]       3/3 3/8 3/11
9/9 14/15 105/14 107/12
107/14
very [16]       6/16 7/4 14/3
14/18 14/21 16/16 18/19
40/12 48/13 71/1 71/2 73/8
83/8 99/3 118/25 119/7
video [3]       91/12 91/14
99/16
videotaped [1]       91/4
videotapes [1]       115/13
view [4]       20/6 86/14 87/3
87/7
visional [1]       46/23
visits [1]       81/11
voice [3]       21/2 31/10 64/24
VOLUME [2]       1/9 8/20
volumes [1]       123/10

## W

wait [5]       6/15 19/9 74/17
104/12 118/24
waiting [1]       61/17
walked [1]       64/13
Walker [3]       1/21 126/4
126/12
walking [2]       84/22 85/23
Walton [10]       104/2 104/7
104/13 104/17 104/19
107/24 110/6 110/7 110/17
110/24
Walton's [1]       110/12
want [45]       3/13 4/23 5/19
9/20 9/21 11/16 12/4 12/5
16/21 17/21 20/19 21/9
25/15 25/16 25/21 26/7

want... [29]          26/15 26/17
35/1 35/22 40/17 45/5
47/15 68/9 74/15 87/22
91/25 93/7 94/1 94/9
109/12 109/14 109/15
112/18 117/9 118/7 118/18
118/22 119/1 119/6 120/23
121/7 122/13 122/17 123/2
wanted [29]          22/9 26/12
30/21 42/19 44/5 44/6 47/5
47/6 47/7 47/9 47/11 48/1
48/5 54/21 57/21 61/21
62/20 65/7 65/8 65/10
65/11 65/15 66/11 66/12
86/10 88/7 88/12 94/6
111/23
wants [3]          10/7 30/19
110/14
warrant [4]          18/2 25/6
25/16 26/19
warrantless [2]          26/22 27/1
warrants [1]          18/4
was [232]
was − [3]          9/24 42/13 94/6
wash [1]          10/24
Washington [11]          1/7 1/15
1/18 1/22 2/3 2/7 2/11
32/12 32/15 77/15 77/18
wasn't [21]          12/17 14/1
26/25 60/6 61/3 64/25
64/25 67/17 73/13 79/6
79/23 82/4 83/14 84/16
85/19 88/16 90/10 94/9
113/4 113/4 118/6
watched [1]          64/15
water [1]          50/25
way [18]          12/14 15/23 20/1
32/7 45/11 66/13 66/15
67/25 76/21 93/4 93/17
107/22 108/1 110/2 111/24
119/4 119/7 122/16
ways [1]          54/22
we [173]
we'd [3]          65/13 78/19
120/25
we'll [17]          12/24 16/4 35/5
35/15 65/14 76/22 76/25
99/16 100/18 117/15 117/18
119/3 119/3 121/8 123/10
123/12 123/24
we're [30]          10/14 12/8
12/10 16/12 16/16 18/13
19/3 19/12 20/18 22/18
23/19 31/5 42/2 42/13 43/7
43/9 43/12 45/17 56/24
58/5 58/19 60/12 66/9 73/9
90/7 91/22 92/20 92/20
103/11 122/6
we've [5]          7/18 17/4 17/10
37/18 118/10
wear [1]          81/9
wearing [2]          44/19 80/8
Wednesday [5]          14/24 15/22
18/24 19/3 19/22
week [16]          4/10 6/2 12/25
13/15 13/16 13/20 14/7
15/20 16/16 18/12 18/12
19/4 19/13 74/13 74/15
113/7
weeks [1]          74/16

weigh [3]          54/19 54/23
75/21
weighed [1]          54/23
weighs [2]          55/4 55/5
weight [3]          55/17 55/17
106/12
weights [1]          64/5
welcome [1]          80/1
well [45]          5/5 9/4 10/19
12/12 12/20 13/21 14/6
15/12 15/18 18/13 19/8
19/18 22/12 28/7 37/12
46/7 50/1 50/11 55/13
57/16 60/5 61/12 62/11
71/22 81/7 83/8 86/4 86/17
92/6 95/9 95/19 100/9
102/8 102/17 103/17 106/1
109/5 112/6 112/12 116/3
118/17 118/19 121/19
121/23 121/25
Wendy's [6]          9/25 10/5
11/24 62/7 78/14 78/23
went [27]          11/19 12/16 26/7
26/8 32/18 32/22 32/22
49/24 53/2 54/4 54/6 57/19
59/5 61/4 61/14 62/22
62/22 72/5 81/20 82/2 93/1
103/25 111/8 112/9 113/9
118/12 123/14
were [129]
weren't [2]          8/25 56/3
what [210]
what's [14]          4/19 11/2 11/2
11/12 23/7 37/4 40/5 41/5
50/23 85/9 93/18 102/4
119/11 122/15
whatever [12]          9/19 15/12
15/19 16/21 19/12 54/21
74/12 91/22 92/12 100/16
109/2 122/21
when [125]          7/22 10/23 14/1
14/4 16/16 17/12 17/18
18/22 28/24 28/25 29/1
29/25 30/6 33/4 33/6 33/8
33/10 34/5 34/25 35/2
35/16 36/8 39/25 40/20
44/11 44/12 44/15 47/4
48/18 50/9 50/16 50/17
50/20 50/22 51/12 51/18
52/25 53/18 53/25 54/8
54/10 54/13 54/23 55/3
55/11 56/11 56/24 58/2
58/7 58/22 58/24 59/2 59/5
59/19 59/21 61/14 61/21
62/12 62/19 63/19 64/11
64/18 65/4 66/8 66/8 66/8
66/9 66/20 66/25 67/13
67/14 68/3 69/3 69/5 69/10
69/24 70/10 70/10 70/20
70/23 71/7 71/17 71/22
73/11 74/11 75/6 75/8
77/20 78/7 79/5 81/11
81/23 83/10 84/12 84/19
85/9 86/12 86/13 87/8
87/15 87/18 87/25 88/21
89/1 94/8 94/13 94/20 99/2
99/16 100/13 100/18 103/25
104/2 104/7 104/19 108/19
108/19 111/2 111/6 112/2
113/8 114/13 114/14 119/18
121/14
whenever [3]          13/16 14/24

73/18
where [32]          5/15 8/7 8/16
14/8 31/25 32/11 32/13
32/17 32/21 42/11 43/1
44/18 45/17 45/17 45/25
53/20 61/5 61/22 62/2
62/13 62/13 62/17 71/4
76/7 77/14 81/25 97/20
101/13 103/11 105/2 111/13
118/7
whereas [1]          64/23
whether [25]          4/23 11/13
11/24 11/25 17/8 18/1 18/2
19/7 26/10 26/13 26/17
27/4 27/22 28/3 43/10 81/2
92/13 108/5 108/13 110/8
116/16 117/9 119/8 119/9
119/10
which [21]          4/22 10/15 17/4
34/20 47/2 51/10 51/14
56/2 56/15 62/7 62/10
65/11 72/6 82/9 82/22
86/24 92/9 99/21 106/22
119/4 122/12
whichever [1]          19/2
while [5]          6/3 6/6 20/13
42/21 74/22
white [1]          78/20
who [28]          7/20 22/1 27/18
27/20 36/12 38/6 42/2
42/21 43/19 44/6 45/23
45/24 48/1 49/3 49/8 52/12
53/6 59/13 60/23 63/1 72/1
72/16 72/17 83/16 108/13
109/22 111/22 114/8
who's [2]          14/20 42/3
whole [6]          49/1 49/6 58/17
92/22 98/4 118/24
wholesale [3]          48/15 48/19
48/20
whom [1]          67/1
whomever [1]          8/11
Whose [1]          60/21
why [30]          16/6 33/6 36/2
45/8 45/9 46/18 47/9 47/9
48/23 49/5 49/16 51/7
60/25 66/6 71/20 71/20
75/19 76/12 76/15 76/16
79/15 82/14 82/16 85/19
86/6 86/6 86/8 97/23
105/13 117/6
wife [2]          6/24 6/25
will [33]          3/21 6/3 8/24
9/7 9/23 12/23 13/7 14/23
15/17 15/21 16/7 18/13
19/7 19/16 21/2 21/16
26/22 27/7 30/22 37/22
45/2 45/10 46/7 105/3
109/9 110/6 111/12 121/24
121/25 122/5 122/11 123/8
123/20
WILLIAM [3]          20/22 21/4
125/4
willing [2]          10/21 52/8
willingness [1]          52/6
window [2]          28/4 28/7
windows [4]          28/3 28/7
28/10 81/12
wire [1]          118/11
wise [1]          79/13
within [3]          29/25 30/6
90/12

## W

without [7]          10/19 18/2
56/22 56/22 61/7 119/12
121/22
witness [17]          6/6 14/19
20/19 20/22 21/13 30/10
30/18 30/21 31/7 37/20
45/18 46/11 46/14 113/1
114/25 116/25 125/2
witnesses [8]          18/16 19/1
116/20 120/1 120/11 120/19
123/3 123/23
won't [5]          30/14 47/2 51/17
51/17 120/19
wonderful [2]          52/4 121/11
word [5]          10/6 11/25 20/12
30/18 67/9
words [5]          9/22 10/20 13/9
36/18 74/24
work [10]          20/16 39/24
52/20 63/21 64/3 64/8
64/12 64/25 78/23 78/23
worked [2]          40/20 52/18
working [7]          3/25 17/2
19/15 24/19 64/2 64/11
64/17
worthy [1]          11/13
would [91]          5/6 6/16 7/1
7/4 7/18 10/12 12/3 17/8
18/14 18/21 20/2 22/10
26/4 29/13 36/3 37/16
39/10 39/11 45/25 48/6
51/24 52/16 52/21 54/19
54/20 57/4 58/4 59/4 59/11
59/11 59/13 60/22 60/23
61/12 61/19 61/19 61/20
61/20 61/20 61/22 61/22
61/22 62/17 63/21 66/22
67/13 67/14 67/17 67/18
68/8 69/12 71/22 71/23
73/16 73/17 73/19 73/22
74/11 75/19 76/10 76/19
90/2 91/1 96/3 96/10 96/19
96/20 97/6 100/11 102/21
103/6 103/20 106/3 106/3
106/18 107/14 107/19
111/14 111/17 111/23 113/5
113/25 116/13 116/16
118/14 119/23 120/11
121/10 121/16 122/20
122/24
wouldn't [3]          14/23 105/13
115/2
wrap [6]          54/19 54/19 69/7
69/10 69/11 69/12
wrapped [2]          69/12 69/21
wrappings [2]          69/11 70/24
written [2]          102/17 102/19
wrong [3]          11/3 16/2 49/12

## Y

Yanta [1]          17/25
yeah [7]          4/15 26/24 70/20
79/13 89/4 99/19 109/25
year [9]          29/21 58/4 58/11
68/13 100/4 100/6 102/11
105/14 106/19
years [20]          21/8 22/19
24/18 37/3 38/19 38/24
95/8 102/5 102/7 102/18
106/23 107/2 107/5 107/7

107/10 107/23 108/2 108/9
110/13 114/12
yes [195]
yesterday [1]          4/12
yet [2]          5/13 20/3
you [786]
you – [1]          109/6
you'd [2]          107/10 107/16
you'll [3]          19/9 19/12 39/1
you're [40]          4/20 5/24 6/18
9/17 12/20 15/8 16/24
18/25 19/23 32/6 32/10
36/4 46/23 52/14 66/8
71/20 80/1 82/14 82/22
82/22 83/17 85/13 86/18
87/6 88/18 102/23 104/16
105/20 105/23 105/23 106/1
106/9 107/10 109/22 110/21
113/6 114/25 117/22 119/23
123/2
you've [24]          12/21 13/4
14/9 15/12 19/2 20/3 37/19
65/21 81/7 83/10 83/14
83/19 83/19 83/22 83/24
84/12 87/12 90/22 93/17
94/21 97/19 98/15 112/23
114/13
young [1]          114/14
your [180]
yours [2]          8/17 53/9
yourself [8]          21/3 31/11
48/16 48/19 53/1 64/8
75/11 88/12
yourselves [1]          123/2

## Z

zone [1]          95/15

## U

U.S [2]    1/14 1/21
UI [1]    79/25
ultimately [1]    81/9
um [1]    34/3
under [4]    11/18 77/18 84/4
85/2
understand [5]    30/4 56/8
56/11 56/12 75/1
understanding [4]    39/11
45/5 58/14 73/20
unintelligible [3]    79/25
80/2 80/2
UNITED [4]    1/1 1/3 1/11
3/3
units [1]    66/19
unless [1]    51/22
until [1]    9/22
unusual [1]    80/13
up [30]    4/18 5/13 6/20 8/8
8/9 10/18 12/1 15/25 16/20
16/22 22/12 24/4 25/19
25/21 34/19 35/2 35/6 41/6
46/20 52/2 52/12 54/4
55/12 55/15 55/16 71/5
71/7 75/19 75/20 76/12
upon [1]    62/16
upper [1]    25/18
upset [1]    44/13
us [18]    3/9 10/14 10/18
26/13 41/6 45/7 45/10
47/12 47/24 48/6 49/1
57/25 63/15 63/17 64/5
64/8 65/2 74/3
use [9]    56/17 61/1 62/15
62/21 64/4 79/16 80/6
80/13 87/10
used [6]    27/4 56/17 56/21
61/1 68/22 71/15
useful [1]    10/7
using [2]    63/17 74/24

## V

vague [1]    62/5
various [1]    51/10 66/9
vast [1]    14/1
Vegas [1]    68/22
vehicle [1]    70/6
verdict [1]    9/19
versus [2]    3/3 87/14
very [8]    14/22 29/8 29/25
47/13 47/14 51/2 53/7
59/22
view [1]    75/11
violated [1]    87/7
visitors [1]    11/15
voice [4]    44/13 60/25 61/2
61/3
volume [17]    1/9 12/5 12/6
15/6 19/8 19/10 19/18 20/3
20/11 20/25 20/25 22/24
27/20 27/21 53/16 75/25
77/17

## W

wait [4]    11/8 88/1 88/1
88/1
Walker [3]    1/21 91/3 91/11
want [17]    3/8 3/10 9/9
10/25 16/8 17/1 17/19 18/9
63/24 64/4 71/9 74/16

74/19 77/12 84/20 85/1
86/5
wanted [7]    32/11 51/13
51/14 51/15 51/15 53/4
86/3
warrant [4]    52/4 52/18
52/19 68/9
was [224]
was -- [1]    41/25
wash [2]    25/2 87/19
Washington [7]    1/7 1/15
1/18 1/22 2/3 2/7 2/11
wasn't [3]    36/15 68/5
68/16
watch [1]    11/16
way [9]    16/19 16/19 18/9
23/9 34/3 71/25 74/25 75/3
75/12
ways [1]    74/21
we [85]    3/5 3/21 3/22 4/14
4/14 5/3 5/23 6/1 6/1 6/9
6/21 7/2 7/12 7/14 7/14
7/15 7/19 7/20 8/2 9/2 9/9
10/10 11/7 11/16 11/16
11/25 11/25 12/10 12/14
12/16 12/23 13/3 13/5
14/14 16/2 16/15 16/22
16/23 16/25 17/1 17/4
17/10 18/10 18/11 18/13
22/1 22/5 22/14 25/1 25/9
26/6 29/2 29/16 34/8 35/8
35/12 35/12 35/21 39/21
46/1 48/14 50/11 50/23
52/23 53/19 54/6 57/2
58/20 59/7 59/7 60/16
61/16 62/9 70/11 70/18
71/21 74/6 75/3 81/14
81/24 82/8 84/1 85/2 88/3
88/12
we'll [14]    10/15 11/3
11/10 19/6 19/7 22/22 23/9
35/22 50/14 52/24 84/18
87/4 88/2 88/12
we're [24]    4/23 4/24 5/11
7/6 11/5 13/2 16/12 16/24
17/11 26/1 35/15 51/1 53/8
59/7 66/19 72/4 74/8 75/3
75/11 82/24 84/19 85/3
85/5 87/18
we've [17]    7/25 15/16 16/25
18/10 22/8 36/12 56/14
Webster [1]    56/18
Wed [1]    1/7
week [12]    5/4 5/5 7/12
7/25 27/3 27/8 27/11 27/13
27/14 31/15 73/17 85/18
week's [1]    74/15
welcome [2]    11/16 11/17
well [36]    17/7 35/12 36/6
9/7 12/19 21/13 27/3 28/12
31/25 36/18 36/22 38/17
38/20 40/17 44/12 45/5
45/7 45/9 45/15 45/23
46/18 48/12 52/2 54/25
55/12 55/22 56/17 57/22
64/15 64/21 65/25 67/22
75/13 80/17 80/22 80/25
went [9]    17/7 35/12 36/6
37/24 44/2 54/1 56/2 77/20
84/1
were [77]    5/3 6/7 6/20
10/22 10/22 11/2 12/11

12/19 12/21 12/25 13/8
13/9 13/10 14/11 14/20
14/21 15/1 21/5 26/8 27/6
27/17 27/25 29/5 31/10
31/11 31/11 31/14 31/18
31/21 32/7 32/16 32/18
37/8 37/18 37/22 37/25
38/9 38/18 39/7 39/20
39/21 40/22 43/10 43/15
43/24 45/6 45/6 45/14
45/20 47/5 48/7 48/16
49/11 51/14 51/17 53/12
55/22 56/17 59/19 59/19
64/21 66/13 72/17 72/18
72/19 73/7 73/25 76/8
76/10 76/17 76/19 76/21
78/16 81/7 81/14 83/8 86/5
were -- [1]    14/11
weren't [2]    37/19 37/23
what [122]
what -- [1]    41/5
what's [11]    9/3 11/3 15/25
33/8 44/10 65/5 69/19 79/4
81/1 81/5 81/6
whatever [3]    59/19 83/22
86/14
when [57]    3/9 3/11 6/7
7/17 11/25 12/20 14/4
15/22 16/1 27/24 32/12
33/7 37/13 37/16 37/19
37/23 38/14 40/18 43/18
44/14 44/24 48/9 49/25
51/17 55/22 56/10 56/21
57/22 58/15 60/7 60/21
62/3 62/8 62/17 62/19
64/11 66/3 68/5 69/14
69/21 70/2 70/3 72/16
80/25 81/1 81/5 81/9 81/12
82/12 82/17 83/4 83/4 83/8
87/4 87/12 87/15 88/6
where [46]    8/6 23/6 23/16
25/1 25/4 25/17 27/13
27/24 34/1 34/2 34/6 34/10
34/24 34/25 35/3 35/7 35/8
35/10 35/14 36/23 38/11
39/8 41/20 41/23 42/4 42/5
42/13 51/19 52/3 55/2 55/9
55/12 58/2 61/11 61/21
62/1 62/13 65/2 67/16
68/22 68/25 69/2 72/11
79/21 79/22 79/24
where -- [1]    41/23
Where's [1]    34/3
whether [13]    7/3 7/24
37/16 56/16 59/23 71/13
71/14 71/14 74/3 74/4
78/21 78/22 87/18
which [27]    12/6 14/7 19/9
20/19 21/10 21/15 22/23
29/24 31/24 32/18 38/23
38/23 39/12 40/13 41/23
46/24 47/19 47/24 48/8
53/17 53/18 57/1 60/1
60/14 73/25 77/16 80/23
while [2]    16/7 57/2
who [24]    4/8 4/14 5/23 6/9
15/1 15/18 18/10 24/19
42/6 43/25 44/7 46/17 57/5
58/25 58/25 61/15 62/10
62/11 71/12 71/17 80/8
81/24 85/17 85/19
whoever [1]    70/3

# W

whole [7]          25/1 34/19 37/19
37/23 56/16 86/6 87/10
Wholesale [1]              66/21
whom [1]    53/3
whose [1]          34/14
why [18]          14/10 16/10 16/18
18/1 18/22 22/3 45/5 45/6
45/10 45/13 45/16 64/21
74/11 76/10 76/19 86/14
87/13 87/16
wife [3]        21/17 42/7 76/14
wife's [1]          22/16
will [20]          3/6 4/16 4/18
4/21 5/15 5/19 6/19 7/1
7/9 7/10 7/13 9/7 10/12
11/4 11/9 11/11 51/24
75/13 75/16 87/22
will -- [1]          75/13
wire [9]          12/20 13/8 13/18
14/1 36/3 38/4 41/10 73/12
83/4
wire -- [1]          83/4
wires [1]          63/11
wiretap [8]        6/21 36/16
37/1 37/6 41/13 41/13
63/19 83/4
within [2]          19/23 56/5
without [9]          15/12 21/5
23/4 23/15 59/22 62/10
75/8 75/9 85/4
witness [9]          3/25 11/18
11/20 17/1 75/8 84/25 85/9
87/11 89/2
witnesses [8]          3/19 5/2 5/9
5/18 8/7 8/15 63/4 63/5
won [2]        70/17 70/20
won't [5]          16/9 21/9 21/15
26/7 86/16
Woods [1]        25/10
word [7]        25/10 33/8 33/19
61/1 71/7 71/8 85/5
words [8]        33/18 37/24
56/17 56/17 56/20 62/8
71/13 73/22
work [3]        11/9 17/17 72/12
worked [1]        11/7
working [3]        7/20 18/5 72/3
Worley [1]        6/12
worried [2]        6/18 7/6
worse [1]        75/16
worth [1]        74/15
would [54]        3/13 5/6 5/25
7/17 7/22 8/3 9/10 9/17
10/11 16/23 17/25 23/5
24/8 25/4 25/19 25/24 28/5
28/12 28/15 28/21 28/24
29/9 32/3 33/15 33/16 34/7
36/19 37/11 39/10 41/24
41/24 42/10 44/7 48/12
49/1 49/21 52/1 52/7 60/25
61/4 62/25 65/4 67/13
67/13 68/9 75/24 76/7 76/9
76/15 77/6 78/25 82/4
85/21 88/7
wouldn't [2]          47/10 82/4
writing [1]        3/9
wrong [4]        17/16 17/18
80/23 83/22

# Y

Yanta [2]        5/11 64/7
yeah [3]        43/17 44/23 57/20
years [2]        63/3 63/9
yes [115]
yesterday [27]            4/3 4/3
10/21 11/25 12/10 12/24
13/5 15/18 27/2 27/4 27/17
27/24 28/4 28/9 28/11
28/19 29/6 29/15 29/25
32/19 51/6 51/9 52/13
53/11 53/22 75/18 76/3
yet [4]        11/7 13/3 53/6
86/16
you [425]
you -- [3]          25/7 64/3 69/23
You'd [1]          35/1
You'll [1]          87/8
you're [25]          7/23 8/17 9/6
9/10 10/6 16/18 16/19
26/17 42/1 42/13 42/17
43/6 46/19 48/3 56/9 56/10
65/7 65/11 65/21 79/3
80/23 83/1 84/7 85/25
86/12
you've [11]          9/23 13/18
37/6 45/14 52/11 59/13
61/1 66/8 72/7 72/8 75/2
your [123]

# Z

zodiac [2]          83/20 83/22